
# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

---

**DALE W. EATON**,

Petitioner,

vs.

**EDDIE WILSON, Warden, Wyoming Department of Corrections State Penitentiary**,

Respondent.

Case No. 09-CV-261-J

---

## ORDER GRANTING CONDITIONAL WRIT OF HABEAS CORPUS

---

   Dale W. Eaton, Petitioner, is an inmate incarcerated at the Wyoming Department of Corrections State Penitentiary. He has filed, through counsel, a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. 64].

   The Court, having carefully reviewed and considered each pleading, the exhibits, the evidentiary presentation, arguments, and written briefs of counsel for Petitioner and Respondent, having thoroughly reviewed the file herein, and being otherwise fully advised, finds and concludes the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 should be conditionally granted.

# TABLE OF CONTENTS

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    State Court Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    State Court Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    State Court Post-Conviction Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Federal Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    28 U.S.C. § 2254.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    American Bar Association Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        Guideline 1.1 Objective and Scope of Guidelines . . . . . . . . . . . . . . . . . 37

        Guideline 4.1 The Defense Team and Supporting Services . . . . . . . . . . . 40

        Guideline 5.1 Qualifications of Defense Counsel. . . . . . . . . . . . . . . . . . 45

        Guideline 8.1 Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        Guideline 10.4 The Defense Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        Guideline 10.5 Relationship with the Client. . . . . . . . . . . . . . . . . . . . . 48

Guideline 10.7 Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Guideline 10.11 The Defense Case Concerning Penalty . . . . . . . . . . . . . 55


DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CLAIM ONE       Lead trial counsel Wyatt Skaggs' failure to recognize and respond appropriately to [Petitioner's] cognitive and emotional impairment generated mutual distrust, animosity and disloyalty toward his client, and a corresponding failure to communicate with [Petitioner], which precluded the development of a workable attorney-client relationship and resulted in an irreparable conflict of interest, in violation of [Petitioner's] Sixth and Fourteenth Amendment right to the effective assistance of counsel.


CLAIM TWO

Trial counsel failed to conduct a reasonable investigation into [Petitioner's] background, character and mental health.. . . . . . . . . . . . . . 60

DEFICIENT PERFORMANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ABA Guideline 4.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Two Qualified Attorneys. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Wyatt Skaggs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Vaughn Neubauer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Investigator/Mitigation Specialist. . . . . . . . . . . . . . . . . . . . 70

Mental or psychological disorders. . . . . . . . . . . . . . . . . . . 75

ABA Guideline 10.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

ABA Guideline 10.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

ABA Guideline 10.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Meeker, Colorado. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Marion Eaton Hospital Files. . . . . . . . . . . . . . . . . . . . . . . . 146

Alan Eaton. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Family History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Sweetwater County. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Sandy and Jim Hoopes. . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Operating Engineers Local 800. . . . . . . . . . . . . . . . . . . . . . 175

Doris Buchta's Journal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Riverton Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

ABA Guideline 10.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Incorrect and Deficient Chronology. . . . . . . . . . . . . . . . . . 196

Failure to Provide Dr. Ash With an Adequate and Reliable
History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Evidence of Petitioner's Remorse. . . . . . . . . . . . . . . . . . . 214

Deficient Performance - Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . 215

PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

Abuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Mental impairment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Family History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

Petitioner's Life History. . . . . . . . . . . . . . . . . . . . . . . . . . 268

Documentation and Instructions Provided. . . . . . . . . . . . 270

Observations and Interactions . . . . . . . . . . . . . . . . . . . . . 272

Developmental, Psychiatric, and Life History. . . . . . . . . . 274

Early childhood development. . . . . . . . . . . . . . . . . . . . . . 275

Meeker, Colorado. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277

Greeley, Colorado. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

Young Adulthood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Adulthood/Symptomology. . . . . . . . . . . . . . . . . . . . . . . . 291

Remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Likeability - Humanizing Qualities. . . . . . . . . . . . . . . . . . . . . . 318

Prejudice - Conclusion................................................ 339

CLAIM FOUR.......................................................... 345

Claim Four - Conclusion.............................................. 370

CONCLUSION........................................................... 371

ORDER................................................................ 374

## BACKGROUND

<u>Factual Background</u>

Lisa Marie Kimmell left Denver, Colorado, on March 25, 1988, intending to drive to Billings, Montana, with a stop in Cody, Wyoming. [Doc. 83-5, p. 20]. Ms. Kimmell did not arrive in Cody as planned, and a search for her began on March 26, 1988. [Doc. 83-5, p. 27]. Her body was found by a fisherman on April 2, 1988, in the North Platte River southwest of Casper, Wyoming, near what is called Government Bridge. [Doc. 83-6, p. 53]. An autopsy revealed she died from multiple stab wounds to her chest, inflicted after a severe blow to the head. [Doc. 83-12, p. 47]. The examination also revealed semen in her vagina. Samples of the semen were taken and preserved. *Eaton v. State*, 192 P.3d 36, 51 (Wyo. 2008). [Doc. 83-10, pp. 62, 63, 64]. DNA from the semen samples was matched, in 2001, to Petitioner, who

had formerly resided in Moneta, Wyoming. *Eaton v. State*, 192 P.3d at 51. Law enforcement agents obtained a search warrant for Petitioner's property in Moneta, where they found Ms. Kimmell's buried car. [Doc. 84-9, p. 3; Doc. 84-10, pp. 11-20].

State Court Trial

The Natrona County District Attorney charged Petitioner with first-degree premeditated murder, first-degree felony murder, kidnaping, first-degree sexual assault, and aggravated robbery. *Eaton v. State*, 192 P.3d at 49, fn 1. A jury trial was conducted before the Honorable David Park of the Seventh Judicial District at the Natrona County Courthouse in Casper, Wyoming. Petitioner was represented by Wyatt Skaggs and Vaughn Neubauer from the Trial Division, Wyoming Public Defender Office. [Doc. 81-3, pp. 2, 3, 4]. The trial commenced in February, 2004, and continued for two weeks. The jury, at the close of the guilt/innocence stage of the proceedings, returned guilty verdicts on all counts. *Eaton v. State*, 192 P.3d at 49, fn 1. [Doc. 85-6, pp. 6, 7, 8, 9].

The State of Wyoming, during the penalty phase of the trial, called three witnesses. Shannon Breeden testified she was traveling in 1997 on Interstate 80 outside of Rock Springs, Sweetwater County, Wyoming, when Petitioner threatened her with a rifle. [Doc. 85-7, pp. 55, 56]. Sweetwater County Sheriff Deputy Rich Haskell testified he investigated the aggravated assault on Ms. Breeden. [Doc. 85-7, pp. 57, 58, 59]. Sweetwater County

Prosecuting Attorney Tony Howard testified Petitioner was convicted of aggravated assault. [Doc. 85-8, pp. 1-5].

Petitioner's trial team, during the penalty phase, presented two expert witnesses, Dr. Kenneth Ash, a psychiatrist, and Dr. Lisa Gummow, a neuropsychologist. Dr. Ash testified he met with Petitioner on four separate occasions for a total of approximately twelve and one-half hours, during which time he observed Petitioner and discussed his life history and present circumstances. [Doc. 85-8, pp. 19, 20, 21]. Dr. Ash also examined Petitioner's available medical records, including those from the Colorado Psychiatric Hospital (University of Colorado Medical Center) where Petitioner was a patient at age sixteen, and from the Torrington Hospital from 1986. [Doc. 85-8, p. 22]. Dr. Ash, from those hospital records, noted a consistent finding of depression. He also determined Petitioner had a global assessment of functioning (GAF) of 31, which indicated a major impairment. [Doc. 85-8, pp. 34, 35]. Dr. Ash expressed his professional opinion Petitioner committed the Kimmell homicide while under the influence of extreme emotional disturbance and extreme distress. [Doc. 85-8, p. 51].

Dr. Gummow testified she spent two days with Petitioner. Test administration accounted for seventy-five percent (75%) of the two days, with interviews accounting for the remaining twenty-five percent (25%). [Doc. 85-11, p. 11]. Dr. Gummow also indicated she reviewed relevant life documents such as medical, educational, psychiatric, and police

records, including statements from Petitioner's sisters and father, and developed a chronology of Petitioner's life which she presented to the jury. Dr. Gummow stated in her professional opinion Petitioner suffered from a depressive disorder NOS, which was present in a severe phase in 1988. His depression was probably genetic, and his major depressive disorder was considered a brain disease. She further indicated Petitioner had significant brain damage along with a long-standing learning disorder. His IQ ranged between 76 (borderline) to high 80s to 90s. [Doc. 85-11, pp. 6-60; Doc. 85-12, pp. 1-16].

Four family members also testified on behalf of Petitioner. Loren Ferrins[1], his uncle, testified Petitioner's father, Merle, picked on Petitioner. [Doc. 85-9, pp. 37-50]. Betty Ferrins, Petitioner's aunt, testified she did not want Petitioner to die, and stated "I don't think he was in his right mind when he did this." [Doc. 85-9, pp. 55, 56]. Marilu O'Malley, Petitioner's maternal aunt, testified Merle abused his children, and Petitioner got the brunt of the abuse. [Doc. 85-9, pp. 58, 59]. Natrona County Deputy Sheriff Lynn Cohee presented testimony from her interview with Sharon Slagowski, Petitioner's sister. Deputy Cohee stated Ms. Slagowski recalled physical and emotional abuse by her father. Merle hit Petitioner with a belt, his fists, and hit him over the head with a beer bottle. [Doc. 85-12, pp. 52-56].

---

[1] Petitioner's pleadings have spelled this name "Farrens." The apparent correct spelling, based upon the trial transcript and Petitioner's exhibits, is "Ferrins." Any reference in the transcript of the evidentiary hearing before this Court to "Farrens" should be considered "Ferrins."

Petitioner's counsel also presented testimony from four friends. Shirley and Floyd Widmer testified they had always "gotten along real good" with Petitioner, and he had never exhibited a bad temper around them. Virginia Schifferns testified Petitioner had previously stayed with them, and she could not believe he would do anything violent. Lodine Schifferns testified he liked Petitioner, and he couldn't believe this could happen. [Doc. 85-10, pp. 8-27].

The jury returned a unanimous penalty verdict fixing Petitioner's sentence at death. The jury found beyond a reasonable doubt the existence of three statutory aggravating circumstances. Petitioner was previously convicted of a felony involving the use or threat of violence to the person. The murder of Ms. Kimmell was especially atrocious or cruel, being unnecessarily torturous to the victim. Petitioner had killed another human being purposely and with premeditated malice while engaged in robbery, sexual assault and kidnaping. No mitigating factors were found to exist. [Doc. 85-14, pp. 18, 19, 20].

State Court Appeal

Petitioner, represented by Donna Domonkos, Ryan Roden, Diane Lozano, Marion Yoder, and Tina Kerin Olson from the Appellate Division, Wyoming Public Defender Office, appealed his convictions and sentence to the Wyoming Supreme Court. *Eaton v. State*, 192 P.3d at 36. Appellate counsel, on January 10, 2005, filed a motion to withdraw from representation of Petitioner asserting a conflict of interest based on the fact both the trial

team and appellate counsel were supervised by the same individual, Kenneth Koski, the Wyoming Public Defender.[2] [Doc. 67-5, Exhibit 26, Exhibit 56, Exhibit 59]. An additional basis for the request to withdraw was the fact Andy Fraser, the investigator assigned to Petitioner's appeal, had withdrawn from participation asserting he "heard that Mr. Skaggs [was] not happy with the fact that [he was] working on the Eaton appeal." [Doc. 70-10, pp. 3,4]. The motion to withdraw by Petitioner's appellate counsel was denied by the Wyoming Supreme Court on January 19, 2005. [Exhibit 28, Exhibit 60].

Petitioner raised the following claims on appeal:

I. The trial court committed reversible error and violated the *Ex Post Facto* Clause by applying post–1989 amendments to Wyo. Stat. Ann. § 6–2–102 (1982) to Eaton's case.

II. Eaton received ineffective assistance of counsel.

A. Eaton's counsel were ineffective for stipulating to the use of the entire 2001 amended version of Wyo. Stat. Ann. § 6–2–102 (1982), excluding "future dangerousness." Amended portions were more disadvantageous to Eaton and violated the *Ex Post Facto* Clause of the United States and Wyoming constitutions.

B. Defense counsel were ineffective by failing to comply in substantive ways with the ABA Guidelines which establish specific standards for both experience and performance in trying death penalty cases.

---

[2] Mr. Koski died on September 6, 2006, while backpacking in the Wyoming Wind River Mountains.

C. Failure to know the law.

D. Concession of Eaton's guilt without valid consent from him.

E. Eaton was unable to assist in his defense and thus not competent to be tried. Counsel's failure to address this fundamental problem and election to allow the case to proceed under these circumstances rendered trial patently unfair.

F. Trial counsel were ineffective for waiving objection to venue.

G. The oversights, errors and decisions to forego (i.e., the sorts of things set out above) amounted to an abandonment of Eaton's defense by his own counsel.

H. Defense counsel were ineffective in failing to adequately investigate potential mitigation evidence, failing to offer appropriate mitigation evidence, and failing to provide necessary information to mitigation experts.

I. Counsel's failure to object to the given instructions which were substantively different than those proposed by the defense constituted substandard performance and substantially prejudiced Eaton.

J. Counsel did not assure that Eaton's jury was given a constitutionally adequate sentencing form.


III. The jury was not properly instructed on the law as intended by Wyoming's death penalty statute.


IV. An unconstitutional and fatally defective voir dire deprived Eaton of a fair and impartial jury to determine his guilt or innocence and to decide on life or death.


V. The trial court was biased at trial and in limiting the remand, showing such hostility to his claims that Eaton was deprived of due process and prejudiced as a result.

VI. Prosecutorial misconduct occurred, violating Eaton's due process rights and warranting reversal.

VII. Eaton was unable to assist in his own defense and thus was not competent to be tried.

VIII. The trial court erred in denying defense counsel's motion for mistrial, where a juror conducted his own investigation and discussed his investigation during deliberations.

IX. The trial court erred in the admission and presentation of evidence.

X. The trial court erred in permitting the testimony of Dr. Ash without Eaton's express waiver of privilege, and without insuring the protection of Eaton's Fifth Amendment right against self-incrimination.

XI. Is the record below reversibly incomplete?

XII. Cumulative error occurred, warranting reversal of Eaton's convictions and death sentence.

*Eaton v. State*, 192 P.3d at 49-51.

The Wyoming Supreme Court granted a remand pursuant to *Calene v. State*, 846 P.2d 679 (Wyo. 1993), for the limited purpose of conducting an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel. The Supreme Court ordered the trial court rule on those claims within ninety days. [Doc. 272, Exhibit 350], *Eaton v. State*, 192 P.3d at 61. Petitioner objected to the "speedy schedule," and moved for a continuance in

order to investigate his claims for relief. [Doc. 272, Exhibit 351]. The trial court, and the Wyoming Supreme Court, denied the motions to continue the *Calene* hearing, which was then held by the trial court on June 6-10, 2005. [Doc. 272, Exhibit 352; Doc. 272, Exhibit 353], *Eaton v. State*, 192 P.3d at 61. Trial counsel for Petitioner, Wyatt Skaggs and Vaughn Neubauer, testified at the hearing. [Doc. 86-3, pp 18-44; Doc. 86-4, pp. 1-44; Doc. 86-5, pp. 1-44; Doc. 86-6, pp. 1-44; Doc. 86-7, pp. 1-44; Doc. 86-8, pp. 1-44; Doc. 86-9, pp. 1-4; Doc. 86-10, pp. 6-55; Doc. 86-11, pp. 1-55; Doc. 86-12, pp. 1-40; Doc. 87-8, pp. 11-48; Doc. 87-9, pp. 1-48; Doc. 87-10, pp. 1-24]. The deposition of defense mitigation expert, Priscilla Moree, was presented. [Doc. 86-5, p.145; Doc. 144-1].

Judge Park issued a decision letter on July 1, 2005, finding trial counsel were not ineffective. [Doc. 272, Exhibit 354]. He found the "additional mitigation evidence [did] not present new mitigating factors, it only reinforce[d] evidence of a known mitigator (i.e., that Eaton had a terrible childhood)." [Doc. 272, Exhibit 354, p. 30]. Judge Park, after weighing the aggravating and mitigating factors, determined Petitioner was not prejudiced by any failure to investigate or present mitigating evidence. [Doc. 272, Exhibit 354, p. 30].

A hearing was conducted on July 13, 2006, to address Petitioner's motion for new trial based on competence issues. Counsel also attempted to introduce new mitigation-based evidence, including an affidavit from Brian Conrado, Petitioner's childhood friend, and school records not previously presented. The motion was denied. [Doc. 145-4].

The Wyoming Supreme Court, on August 18, 2008, in a lengthy decision, unanimously affirmed Petitioner's convictions and sentence. *Eaton v. State*, 192 P.3d at 49, 124.

State Court Post-Conviction Relief

Petitioner, represented by Michael Reese, filed a petition for post-conviction relief with the trial court on June 3, 2009. The petition raised six issues:

1. The Eighth Amendment, at a minimum, bans the death penalty for individuals who are so mentally ill that *Panetti v. Quarterman* mandates a vacation of the death penalty.

2. Petitioner was deprived of meaningful appellate review.

3. Defense counsel stipulated to use of a hybrid statute (that is, a statute that contained elements of both the law in effect at the time of the crime and the law in effect at the time of the trial) and by so doing, violated the ex post facto clause.

4. The death penalty, at least as presently administered in Wyoming, is cruel and unusual punishment under the Eighth and Fourteenth Amendments.

5. W.S. § 6-2-102 is further unconstitutional pursuant to the holding in *Panetti* and *Atkins.*

6. Wyoming's law on post-conviction relief in [sic] unconstitutional and should be overturned.

[Doc. 272, Exhibit 355].

The State moved for dismissal on the basis none of Petitioner's claims were cognizable in post-conviction relief proceedings. [Doc. 272, Exhibit 356]. It specifically argued Wyo. Stat. Ann. § 7-14-101 limits postconviction relief to constitutional violations which occurred in the proceedings resulting in conviction. Alleged constitutional violations related to the sentencing phase are not cognizable on postconviction review. [Doc. 272, Exhibit 356]. The trial court, following a hearing on the State's motion, issued an Order Granting Respondent's Motion to Dismiss Petition for Post-Conviction Relief on November 4, 2009. [Doc. 272, Exhibit 357]. Petitioner sought a writ of review [Doc. 272, Exhibit 358] from the Wyoming Supreme Court, which was denied. [Doc. 272, Exhibit 359].

Federal Habeas Corpus

Petitioner filed his Petition for Writ of Habeas Corpus herein on August 13, 2010. [Doc. 64]. He raised eleven claims for relief.

> 1. Lead trial counsel Wyatt Skaggs' failure to recognize and respond appropriately to Mr. Eaton's cognitive and emotional impairment generated mutual distrust, animosity and disloyalty toward his client, and a corresponding failure to communicate with Mr. Eaton, which precluded the development of a workable attorney-client relationship and resulted in an irreparable conflict of interest, in violation of Mr. Eaton's Sixth and Fourteenth Amendment right to the effective assistance of counsel.

2. Trial counsel failed to conduct a reasonable investigation into Mr. Eaton's background, character and mental health.

3. Trial counsel Wyatt Skaggs was ineffective for failing to investigate and assert the issue of Mr. Eaton's lack of mental competence to proceed. As a result, there is a reasonable probability that Mr. Eaton was brought to trial while mentally incompetent.

4. Mr. Eaton's appellate counsel were burdened by a conflict of interest because of their professional affiliation with trial counsel Wyatt Skaggs and State Public Defender Ken Koski, whose personal and professional interests were adverse to Mr. Eaton's interests, and who actively undermined appellate counsel's ability to investigate and pursue legitimate claims of ineffective assistance of trial counsel against Mr. Skaggs.

5. Mr. Eaton's right to due process of law was violated when the prosecution failed to disclose the full extent of its relationship with, and consideration extended to, key prosecution witnesses, including Joe Dax, thus misleading the court, the jury and the defense about witness Dax's incentive to perjure himself.

6. Trial counsel was ineffective for withdrawing Mr. Eaton's motion to change venue and for failing otherwise to assert his client's rights to protect him from devastating effects of highly inflammatory and prejudicial pretrial publicity.

7. Trial counsel was ineffective for failing to question the jury panel effectively regarding the issues of predisposition to impose the death penalty and pretrial publicity, and failed to challenge jurors who admitted bias,

resulting in a violation of Mr. Eaton's Sixth and Fourteenth Amendment rights to a fair and impartial jury and to due process of law.

8. Mr. Eaton's trial was tainted by juror misconduct which included an unauthorized, unsupervised trip to the crime scene by one juror who reported his findings to the rest of the jurors, following which several opinions were expressed concerning the crime scene evidence as to tire tracks such that it was the subject of substantial discussion during deliberations, thereby depriving Mr. Eaton of his right to a fair and impartial jury, his Due Process right to a verdict based solely on the evidence and testimony adduced at trial, given under oath, subjected to cross-examination by counsel, and with the opportunity to rebut, under the Sixth and Fourteenth Amendments to the United States Constitution.

9. The application to Mr. Eaton of disadvantageous changes in Wyoming capital sentencing law that occurred after the commission of the offense violated the Ex Post Facto clause of the United States Constitution.

10. The failure to properly instruct Mr. Eaton's jury as to mitigating circumstances left the jury with a fatally flawed formula to weigh aggravating circumstances against mitigating circumstances prior to reaching a verdict, and precluded the jury from considering mitigating evidence and circumstances, violating Mr. Eaton's rights under the Due Process Clause of the 14th Amendment and the Cruel and Unusual Punishment clause of the 8th Amendment.

11. Trial Counsel was ineffective for failing to know the law and assert Mr. Eaton's rights, including, but not limited to:

(a)     Trial counsel failed to insist that the jury be properly instructed on its duty to weigh aggravating and mitigating circumstances prior to deciding punishment and trial counsel failed to challenge jury instructions and prosecutorial argument telling the jury that it could not consider or find mitigating factors not causally connected to the crime;

(b)     Trial counsel failed to assert the Ex Post Facto Clause violation that occurred when the trial court instructed the jury that the defense had the burden of establishing mitigating factors by a preponderance of the evidence;

(c)     Trial counsel's choice of "defense" reflected a flawed understanding of Wyoming's felony murder rule, as interpreted in *Bouwkamp v. State*; and

(d)     Trial and appellate counsel failed to assert the Sixth Amendment/*Bruton v. United States* violation that occurred when Detective Tholson informed the jury that Mr. Eaton confessed his guilt to federal inmate Bret Hudson.

[Doc. 64, pp. 36, 56, 126, 140, 158, 186, 201, 219, 238, 257, 281].

Respondent moved for summary judgment on all claims, asserting Petitioner had failed to meet his burden of proof under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). [Doc. 132, Doc. 150]. Petitioner opposed the motion, and requested an evidentiary hearing on all claims. [Doc. 144, Doc. 155, Doc. 157]. A hearing on

Respondent's Motion for Summary Judgment was held December 19 and December 20, 2011. [Doc. 147, Doc. 148, Doc. 153, Doc. 154]. An Order was entered May 3, 2012, granting Respondent's motion for summary judgment on Petitioner's Claims 3, 5, 6, 7, 8, 9, and 11(d). [Doc. 158, p. 91]. The Court, however, agreed with the assertion by Petitioner "Wyoming courts have no jurisdiction to entertain claims of ineffective assistance of appellate counsel for failing to present a claim of ineffective assistance of trial counsel where the underlying claim involves punishment rather than guilt/innocence," thus there is no available state court remedy, and Claim 4 was technically exhausted. [Doc. 158, p. 19]. The Court further agreed because the state courts did not have jurisdiction, the claim was not procedurally defaulted, and could be review by the Court *de novo*. [Doc. 158, p. 19] The Court further concluded a return to state court would be futile, *Williams v. Taylor*, 529 U.S. 420, 444 (2000), and presentation of new evidence in the federal court proceeding was appropriate. [Doc. 158, pp. 22, 23]. Respondent's motion for summary judgment on Claim 4 was denied.

The Court also denied Respondent's motion for summary judgment on Claim 1 and Claim 2, which are unquestionably linked. [Doc. 158, p. 33]. The Court concluded Petitioner had overcome the deferential standard of § 2254, and had thus shown the state courts' decisions with regard to Claim 1 and Claim 2 were based on an unreasonable determination of the facts in light of the evidence presented to those courts. [Doc. 158, pp. 32, 35, 36].

Petitioner's Claim 10 and Claims 11(a-c) were denied as moot. His request for an

evidentiary hearing on Claims 1, 2, and 4 was granted, [Doc. 158, pp. 90, 91]. An evidentiary

hearing was held July 30, 2103, July 31, 2013, August 1, 2013, August 2, 2013, August 5,

2013, August 6, 2013, August 7, 2013, August 8, 2013, August 9, 2013, and August 10,

2013. [Doc. 242; Doc. 245; Doc. 246; Doc. 248; Doc. 251; Doc. 253; Doc. 254; Doc. 255;

Doc. 257; Doc. 258; and Docs. 261-271].

## APPLICABLE LEGAL PRINCIPLES

### 28 U.S.C. § 2254

The petition at issue is subject to review pursuant to the AEDPA which became

effective on April 24, 1996. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Relitigation of any

claim adjudicated on the merits in state court is barred by the AEDPA unless a petitioner can

show the state court adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 783-784 (2011).

The Court has previously concluded Petitioner has overcome the deferential standard set forth in 28 U.S.C. §2254 as applicable to Claim One and Claim Two, and Claim Four is technically exhausted. [Doc. 158, pp. 19, 32, 35, 36]. A *de novo* review of Petitioner's claims is, therefore, appropriate to determine whether Petitioner is in custody in violation of the Constitution or law or treaties of the United States. The Court, in making such a determination, may not grant habeas relief if Respondent can show the constitutional error was harmless, *i.e.*, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrehamson*, 507 U.S. 619, 637 (1993). A habeas petition governed by AEDPA which alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), is considered in light of the *Strickland* prejudice standard. A separate analysis applying the *Brecht* standard is not required. *Byrd v. Workman*, 645 F.3d 1159, 1167 fn.9 (10th Cir. 2011).

Ineffective assistance of counsel

A petitioner, in order to establish an ineffective assistance of counsel claim, "must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 1419 (2009).

"To establish a claim for ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was constitutionally deficient, and (2) counsel's deficient performance was prejudicial." *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995)

(citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 787-792. Counsel's performance is deficient if the representation "falls below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 690. Prejudice entails "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. *See also*, *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009)(quoting *Strickland v. Washington*, 466 U.S. at 688, 694). A petitioner, to prove his counsel's performance was deficient, must show the attorney's performance was not within the wide range of competence demanded of attorneys in criminal cases. *Laycock v. State of New Mexico*, 880 F.2d 1184 (10th Cir. 1989).

The United States Supreme Court, in 2011, in *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770 (2011), reiterated its philosophy on deficient performance and prejudice first set out in *Strickland v. Washington*. The Supreme Court, with regard to deficient performance, stated:

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.*, at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment." *Id.,* at 687, 104 S.Ct. 2052.

.     .     .

The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

.     .     .

*Strickland,* however, permits counsel to "make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. 2052.

.     .     .

Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. See *Knowles, supra,* at 787 – 788, 129 S.Ct. at 1421–22; *Rompilla v. Beard,* 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith,* 539 U.S. 510, 525, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Strickland,* 466 U.S., at 699, 104 S.Ct. 2052.

.     .     .

*Strickland,* however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

.     .     .

Representation is constitutionally ineffective only if it "so undermined the proper functioning of the adversarial process" that the defendant was denied a fair trial. *Strickland, supra,* at 686, 104 S.Ct. 2052.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. at 787, 788, 789, 790, 791. *See also, United States v. Rushin*, 642 F.3d 1299, 1306, 1307, 1308 (10th Cir. 2011).

The United States Supreme Court in *Harrington v. Richter*, as concerns prejudice, also stated:

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.,* at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.,* at 687, 104 S.Ct. 2052.
>
> .          .          .
>
> In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes,* 558 U.S. ——, ——, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009) *(per curiam)* (slip op., at 13); *Strickland,* 466 U.S., at 693, 104 S.Ct. 2052. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.,* at 696, 104 S.Ct. 2052. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.,* at 693, 697, 104 S.Ct. 2052. The likelihood of a different result must be substantial, not just conceivable. *Id.,* at 693, 104 S.Ct. 2052.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. at 787-788, 791-792. *See also, United States v. Rushin*, 642 F.3d at 1309-1310.

The United States Supreme Court has also offered this explanation of the "deficient performance" and "prejudice" standard, and its relationship to the AEDPA:

" 'Surmounting *Strickland* 's high bar is never an easy task.' *Padilla v. Kentucky,* 559 U.S. ——, —— [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S., at 689–690 [104 S.Ct. 2052]. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' *Id.,* at 689 [104 S.Ct. 2052]; see also *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id.,* at 689 [104 S.Ct. 2052]; *Lindh*

*v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles,* 556 U.S., at ——, 129 S.Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —— [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard."

*Premo v. Moore*, 562 U.S. 115, 131 S.Ct 733, 739-740 (2011)(quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 788).

Logic would seem to dictate a defendant must show deficient performance before showing how such performance prejudiced him. A reviewing court, however, may consider the two inquiries, performance and prejudice, in any order, and there is no reason "to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which [the Supreme Court] expect[s] will often be so, that course should be followed." *Strickland v. Washington*, 466 U.S. at 697.

The proper standard for measuring attorney performance is not one of perfection. *United States v. Haddock*, 12 F.3d 950, 955, 956 (10th Cir. 1993). It is rather one of reasonably effective assistance. *Gillette v. Tansy*, 17 F.3d 308, 310, 311 (10th Cir. 1994).

A petitioner, to establish prejudice, has a difficult burden. More than a theoretical effect must be shown on the outcome of petitioner's case as a result of attorney errors. A petitioner must show that, but for those errors, there is a reasonable probability the results would have been different, *i.e.*, petitioner would have been acquitted, or would not have pleaded guilty, or would have received a more favorable sentence. *Strickland v. Washington,* 466 U.S. at 694. *See also, Hill v. Lockhart*, 474 U.S. 52, 59 (1985), and *Lasiter v. Thomas*, 89 F.3d 699, 703 (10th Cir. 1996).

> "In analyzing whether counsel's alleged errors prejudiced petitioner, [the Court] must keep in mind the standard to be applied in assessing whether petitioner is entitled to an evidentiary hearing in federal court on his ineffectiveness claim. First, the petitioner bears the burden of alleging facts which, if proved, would entitle him to relief. Moreover, his allegations must be specific and particularized; conclusory allegations will not suffice to warrant a hearing."

*Hatch v. State of Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995) (overruled on other grounds by *Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001)) (citations and quotations omitted). If a petitioner is unable to meet this burden with regard to either prong of the test, his motion must be denied. *Hatch v. State of Oklahoma*, 58 F.3d at1457.

A court's review, in measuring an attorney's performance, must be highly deferential:

It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular

act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case.

*Strickland v. Washington*, 466 U.S. at 689 (citations and quotation omitted). *See also*, *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. at 689).

The parameters for consideration of a claim of deficient performance are thus, in summary:

1.    Measuring standard is reasonably effective assistance, not perfection.

2.    Performance is deficient if it falls below an objective standard of reasonableness.

3.    Strong presumption performance falls within wide range of reasonable assistance.

4.    Standard is prevailing professional norms, not best practices or common custom.

5.　　Decision not to pursue a particular investigation may be a reasonable decision.

6.　　Reasonable strategy to balance limited resources with effective trial tactics and strategies.

The parameters for consideration of a claim of prejudice can be summarized as:

1.　　Prejudice must be more than theoretical.

2.　　"But for" deficient performance reasonable probability results would have been different, *i.e.* more favorable sentence.

3.　　The fact the errors [deficient performance] had some conceivable effect on outcome is not sufficient.

4.　　Likelihood of a different result must be substantial, not just conceivable.

The Tenth Circuit in *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012), addressed, in some depth, deficient performance and prejudice with regard to mitigation in a capital case.

### b. Counsel's failures

Mr. Evans's mitigation case failed to meet the standards we have set out for counsel in capital-sentencing proceedings. Indeed, the presentation was sub-par in almost every relevant respect. Evidence of family and social history was sorely lacking; the mental-health evidence presented was inadequate and quite unsympathetic; and Mr. Evans not only failed to rebut the prosecution's case in aggravation but actually bolstered it by his own statements.

***Family and social history.*** The testimony by Mr. Hooks's family members was perfunctory, to put it mildly. Mr. Evans made no attempt to

educate the jury, through the testimony of Clara and Vargus Hooks, on Mr. Hooks's life circumstances and his tragic, chaotic upbringing. Even the most minimal investigation would have uncovered a life story worth telling: a premature birth, an openly abusive father, frequent moves, educational handicaps, and personal family tragedies. We have previously recognized that "this type of evidence 'is exactly the sort of evidence that garners the most sympathy from jurors.'     .     .     . The information was readily available from Clara and Vargus, but Mr. Evans neglected even to ask.

*Mental-health evidence.* While Dr. Murphy's testimony may have helped the jury see that Mr. Hooks suffered from mental problems, it was troubling in a number of respects. First, throughout the testimony, Mr. Evans made little effort to connect Dr. Murphy's diagnosis to the circumstances of the crime. The importance of counsel's role in this regard cannot be overstated, as we have repeatedly recognized. Counsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question.     .     .     . Here, in listening to Dr. Murphy, the jury was left with almost no explanation of how Mr. Hooks's mental problems played into the murder of Ms. Blaine (both the fatal beating he administered, and his apparent remorse and attempt to secure help immediately thereafter).

Absent this explanation, Dr. Murphy's testimony at several points actually worked in the State's favor.     .     . He repeatedly referred to Mr. Hooks as "violent,"          .          . even once as "very, very violent," and "crazy,"     .     . True, Dr. Murphy did opine at one point that Mr. Hooks could not have committed "cold-blooded, premeditated" murder. ... But that aspect of his testimony was significantly undermined when the jury learned, on cross-examination, that Dr. Murphy knew almost nothing about Mr. Hooks's case—that he had not read the police reports, had not listened to

Mr. Hooks's confession, and had not seen the photographs.    .    .. Mr. Evans totally failed to prepare his witness, thus strongly diminishing the potential mitigating impact of the testimony.

Further investigation into readily available evidence also would have revealed that the mental-health problems were enduring. Since childhood, Mr. Hooks had struggled in school, was frequently evaluated for mental retardation, and was placed in special-education classes.    .    . While he may not meet the legal definition of mentally retarded under Oklahoma law, no one disputes that by the time of trial he had been clinically diagnosed with mild or borderline mental retardation.    .    .    . Evidence of Mr. Hooks's educational handicaps was surely relevant to the jury's appraisal. It was readily available and should have been part of Mr. Evans's mitigation case. *See Anderson,* 476 F.3d at 1143.

Even more importantly, Mr. Hooks's premature birth, the head injury he suffered in an eighteen-wheeler accident, and the problems he experienced thereafter were clear markers for organic brain damage.    .    . Five years after conviction and sentencing, Dr. Gelbort diagnosed Mr. Hooks with diffuse organic brain damage and testified at the 1997 federal evidentiary hearing that Mr. Hooks has damage to his frontal lobes, the "gas pedal and the brake pedal of behavior."    .    .    . Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect.    .    .    . And for good reason—the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action. .    .    . Neither Mr. Evans nor Dr. Murphy looked into the possibility of organic brain damage. Had they done so, as Dr. Gelbort did, Mr. Evans could have sketched a more sympathetic figure of Mr. Hooks, one less deserving of death.

*Hooks v. Workman*, 689 F.3d at 1203, 1204 (internal citations and footnotes omitted, emphasis in original).

<u>American Bar Association Guidelines</u>

The United States Supreme Court has concluded, when considering deficient performance in death penalty cases, the American Bar Association guidelines in effect at the time of the representation may well indicate the appropriate "prevailing norms" which reasonably diligent attorneys would follow.

> Under *Strickland,* we first determine whether counsel's representation "fell below an objective standard of reasonableness." 466 U.S., at 688, 104 S.Ct. 2052. Then we ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694, 104 S.Ct. 2052. The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.,* at 688, 104 S.Ct. 2052. We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ... ." *Ibid.; Bobby v. Van Hook,* 558 U.S. 4, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) *(per curiam)*; *Florida v. Nixon,* 543 U.S. 175, 191, and n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Although they are "only guides," *Strickland,* 466 U.S., at 688, 104 S.Ct. 2052, and not "inexorable commands," *Bobby,* 558 U.S., at ——, 130

S.Ct., at 17, these standards may be valuable measures of the prevailing professional norms of effective representation[.]

*Padilla v. Kentucky*, 559 U.S. 356, 366, 367 (2010). *See also*, *Anthony v. Alabama*, \_\_\_\_\_ U. S. \_\_\_\_\_, \_\_\_\_, 134 S.Ct. 1081, 1088 (2014)(quoting *Padilla v. Kentucky*, 559 U.S. at 366); *Heard v. Addison*, 728 F.3d 1170, 1180 (10th Cir. 2013).

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).

*Wiggins v. Smith*, 539 U.S. 510, 524 (2003). *See also*, *Young v. Sirmons*, 551 F.3d 942, 957 (10th Cir. 2008)(quoting *Wiggins v. Smith*, 539 U.S. at 524).

> Counsel must perform in accordance with "prevailing professional norms." *Young v. Sirmons (Julius Young),* 551 F.3d 942, 956–57 (10th Cir.2008) (quoting *Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527). In capital cases, we refer to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") in assessing those "professional norms." *Id.* at 957. Generally, "[a]mong the topics defense counsel should investigate and consider presenting include *medical history,*

educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences." *Id.* (emphasis added).

Counsel must conduct a "thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial." *Wilson,* 536 F.3d at 1083. "We recently had occasion to expound on this principle, drawing on a trilogy of Supreme Court cases— *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)—involving ineffective assistance at capital-sentencing proceedings." *Victor Hooks,* 689 F.3d at 1201 (referring to the discussion in *Wilson,* 536 F.3d at 1084–85). We set forth "three important principles" that are derived from these cases:

> First, the question is not whether counsel did *something;* counsel must conduct a full investigation and pursue reasonable leads when they become evident. Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. Finally, because of the crucial mitigating role that evidence of a poor upbringing or *mental health problems* can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence.

*Wilson*, 536 F.3d at 1084–85 (emphasis added) (internal quotation marks omitted) (citations omitted); *see id.* at 1085 (noting that "[o]ur own Circuit has emphasized this [due-diligence] guiding principle").

*Littlejohn v. Trammell*, 704 F.3d 817, 859, 860 (10th Cir. 2013).

> Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Bobby v. Van Hook*, 558 U.S. 4, 6, (2009)(citing *Strickland v. Washington*, 466 U.S. at 688). *See also, Welch v. Workman*, 639 F.3d 980, 1015 (10th Cir. 2011); *Detrich v. Ryan*, 677 F.3d 958, 973-974 (9th Cir. 2012).

Petitioner's state court trial resulted in a sentence of death imposed on June 3, 2004. *Eaton v. State*, 192 P.3d at 49. The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February, 2003, thus represent the "guides to determining what is reasonable" in considering the deficient performance aspect of the ineffective assistance of counsel allegations. *Bobby v. Van Hook*, 558 U.S. at 6.

There are a number of American Bar Association Guidelines possibly relevant to the assertions by Petitioner. [3]

---

[3] The ABA Guidelines are available online at http://www.americanbar.org/content/dam/aba/migrated/legalservices/downloads/sclaid/deathpenaltyguidelines2003.authcheckdam.pdf.

Guideline 1.1 Objective and Scope of Guidelines

A.      The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.

B.      These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings, and any connected litigation.

*Definitional Notes*

Throughout these Guidelines:

1.      As in the first edition, "should" is used as a mandatory term.

.           .           .

5.      The term "post-conviction" is a general one, including (a) all stages of direct appeal within the jurisdiction and certiorari (b) all stages of state collateral review proceedings (however denominated under state law) and certiorari, (c) all stages of federal collateral review proceedings, however denominated (ordinarily petitions for writs of habeas corpus or motions pursuant to 28 U.S.C. § 2255, but including all applications of similar purport, e.g., for writ of error coram nobis), and including all applications for action by the Courts of Appeals or the United States Supreme Court (commonly certiorari, but also, e.g., applications for original writs of habeas corpus, applications for certificates of probable

cause), all applications for interlocutory relief (e.g., stay of execution, appointment of counsel) in connection with any of the foregoing.

.              .              .

*Commentary*

.              .              .

<u>Representation at Trial</u>

An attorney representing the accused in a death penalty case must fully investigate the relevant facts. Because counsel faces what are effectively two different trials – one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death – providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation. Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty. Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case. Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence, to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty. At the same time, counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress.

.               .               .

Along with preparing to counter the prosecution's case for the death penalty, defense counsel must develop an affirmative case for sparing the defendant's life. A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death. [*Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982)] This Eighth Amendment right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'" Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) links the client's behavior to the evidence offered in mitigation.

.               .               .

Post-conviction Review

Ensuring high quality legal representation in capital trials, however, does not diminish the need for equally effective representation on appeal, in state and federal post-conviction proceedings, and in applications for executive clemency.

.               .               .

A.      Representation on Direct Appeal

The Constitution guarantees effective assistance of counsel on an appeal as of right. [*Evitts v. Lucy*, 469 U.S. 387, 395-396 (1985)].

.            .            .

Conclusion

Unless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." [*Lockett v. Ohio*, 438 U.S. 586, 605 (1978)]. Accordingly, any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February 2003, [ABA Guidelines] pp. 1, 5, 6, 7, 8, 10, 11, 12, 13, 14, 17(footnotes omitted, selected case citations from footnotes included in text).

Guideline 4.1 The Defense Team and Supporting Services

.            .            .

A.1. The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.

A. 2. The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

.            .            .

*Commentary*

Introduction

In a capital case reaffirming that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. [*Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)].

It is critically important, therefore, that each jurisdiction authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal, post-conviction and clemency, and to procure and effectively present the necessary expert witnesses and documentary evidence.

The Team Approach to Capital Defense

National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate supporting services, including, "expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencing, and trained investigators to interview witnesses and to assemble demonstrative evidence."

This need is particularly acute in death penalty cases.

.            .            .

In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process.

.            .            .

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A (2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or

defects and recommend such further investigation of the subject as may seem appropriate.

.        .        .

## The Core Defense Team

In addition to employing the particular nonlegal resources that high quality legal representation requires in each individual case, the standard of practice demands that counsel have certain specific forms of assistance in every case. This Guideline accordingly requires that those resources be provided.

A.      **The Investigator**

The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings.

.        .        .

B.      **The Mitigation Specialist**

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and

to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."

[ABA Guidelines, pp. 28, 29, 30, 31, 32, 33, (footnotes omitted, selected case citations from footnotes included in text)].

Guideline 5.1 Qualifications of Defense Counsel

.          .          .

B.1.    That every attorney representing a capital defendant has:

.          .          .

c.      satisfied the training requirements set forth in Guideline 8.1.


B.2. [T]he pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

a. substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

b. skill in the management and conduct of complex negotiations and litigation;

c. skill in legal research, analysis, and the drafting of litigation documents;

d. skill in oral advocacy;

e. skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

f. skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

g. skill in the investigation, preparation, and presentation of mitigating evidence; and

h. skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

[ABA Guidelines, p. 35].

Guideline 8.1 Training

.          .          .

B.      Attorneys seeking to qualify to receive appointments should be required to satisfactorily complete a comprehensive training program, approved by the Responsible Agency, in the defense of capital cases. Such a program should include, but not be limited to, presentations and training in the following areas:

1.      relevant state, federal, and international law;
2.      pleading and motion practice;
3.      pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty;
4.      jury selection;
5.      trial preparation and presentation, including the use of experts;
6.      ethical considerations particular to capital defense representation;
7.      preservation of the record and of issues for post-conviction review;
8.      counsel's relationship with the client and his family;
9.      post-conviction litigation in state and federal courts;
10.     the presentation and rebuttal of scientific evidence, and developments in mental health fields and other relevant areas of forensic and biological science;
11.     the unique issues relating to the defense of those charged with committing capital offenses when under the age of 18.

.            .            .

*Commentary*

As indicated in the Commentary to Guideline 1.1, providing high quality legal representation in capital cases requires unique skills. Accordingly, the standard of practice requires that counsel have received comprehensive specialized training before being considered qualified to undertake representation in a death penalty case. Such training must not be confined to

instruction in the substantive law and procedure applicable to legal representation of capital defendants, but must extend to related substantive areas of mitigation and forensic science. In addition, comprehensive training programs must include practical instruction in advocacy skills, as well as presentations by experienced practitioners.

[ABA Guidelines, pp. 46, 48, (footnotes omitted)].

Guideline 10.4 The Defense Team

.        .        .

B. Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards.

.        .        .

C. As soon as possible after designation, lead counsel should assemble a defense team by:

.        .        .

2. . . . selecting and making any appropriate contractual agreements with non-attorney team members in such a way that the team includes:

    a.    at least one mitigation specialist and one fact investigator;

    b.    at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments; and

    c.    any other members needed to provide high quality legal representation.

D. Counsel should demand on behalf of the client all resources necessary to provide high quality legal representation. If such resources are denied, counsel should make an adequate record to preserve the issue for post-conviction review.

*Commentary*

As reflected in Guideline 4.1 and the accompanying Commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines.

.            .            .

The defense team should include at least two attorneys, a fact investigator, and a mitigation specialist. .   .   . In addition, as also described in the Commentary to Guideline 4.1, the team must have a member (who may be one of the foregoing or an additional person) with the necessary qualifications to screen individuals (the client in the first instance, but possibly family members as the mitigation investigation progresses) for mental or psychological disorders or defects and to recommend such further investigation of the subject as may seem appropriate.

The team described in the foregoing paragraph is the minimum.

Lead counsel is responsible, in the exercise of sound professional judgment, for determining what resources are needed and for demanding that the jurisdiction provide them.

.            .            .            .

If such requests are denied, counsel should make an adequate record to preserve the issue for post-conviction review.

[ABA Guidelines, pp. 63, 65, 66 (footnotes omitted)].

Guideline 10.5 Relationship with the Client

A.    Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

.          .          .

C.    Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1.    the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

2.    current or potential legal issues;

3.    the development of a defense theory;

4.    presentation of the defense case;

5.    potential agreed-upon dispositions of the case;

6.    litigation deadlines and the projected schedule of case-related events; and

7.    relevant aspects of the client's relationship with correctional, parole, or other governmental agents (e.g., prison medical providers or state psychiatrists).

.          .          .

*Commentary*

<u>Counsel's Duty</u>

Although ongoing communication by non-attorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement; others,

which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, as discussed in the text accompanying notes 101-04 supra, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. Client contact must be ongoing. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Similarly, a client will not – with good reason – trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. . . . .

Often, so-called "difficult" clients are the consequence of bad lawyering – either in the past or present. Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation.

Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information, the lawyer must understand the client and his life history. To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.

.          .          .

[ABA Guidelines, pp. 68, 70, 71, 72 (footnotes omitted)].

Guideline 10.7 Investigation

A.    Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

.            .            .

2.    The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

B.    1.    Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

.            .            .

*Commentary*

Penalty

Counsel's duty to investigate and present mitigating evidence is now well established. [*Williams v. Taylor*, 529 U.S. 362, 365-396 (2000); *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002) *cert. denied*, 122 S. Ct. 2645 (2002); *Coleman v. Mitchell*, 268 F.3d 417, 449-451 (6th Cir. 2001) *cert. denied*, 122 S. Ct. 1639 (2002); *Jermyn v. Horn*, 266 F.3d 257, 307-308 (3d Cir. 2001)]. The duty to investigate exists regardless of the expressed desires of a client. [*Blanco v. Singletary*, 943 F.2d 1477, 1501-1503 (11th Cir. 1991) *cert. denied*, 525 U.S. 837 (1989)]. Nor may counsel "sit idly by, thinking that investigation would be futile." [*Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D.

Miss. 1980); *accord* Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) *cert. denied*, 523 U.S. 1079 (1998)].

.               .               .

Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," [*Brown v. State*, 526 So.2d 903, 908 (Fla. 1988)(citing *Hitchcock v. Dugger*, 481 U.S. 393 (1987)], "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1)     Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2)     Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3)    Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4)    Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5)    Employment and training history (including skills and performance, and barriers to employability);

(6)    Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

.          .          .

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer. As noted supra in the text accompanying note 101, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually

everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, [*Williams v. Taylor*, 529 U.S. 362, 395 (2000)] and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources – a time- consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:

a.    school records
b.    social service and welfare records
c.    juvenile dependency or family court records
d.    medical records
e.    military records
f.    employment records
g.    criminal and correctional records
h.    family birth, marriage, and death records

i.    alcohol and drug abuse assessment or treatment records

j.    INS records

If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct. The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness or disability to determine whether the client's problems were ever accurately identified or properly addressed.

[ABA Guidelines, pp. 76, 80, 81, 82, 83, 84, (footnotes omitted, selected case citations from footnotes included in text)].

Guideline 10.11 The Defense Case Concerning Penalty

A.    As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.

B.    Trial counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between the strategy for the sentencing phase and for the guilt/innocence phase.

C.    Prior to the sentencing phase, trial counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing.

D.     Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body or individual, means by which the mitigation presentation might be strengthened, and the strategy for meeting the prosecution's case in aggravation.

E.     Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing or reviewing body or individual.

F.     In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:

  1.     Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;

  2.     Expert and lay witnesses along with supporting documentation (e.g. school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than

death; and/or to rebut or explain evidence presented by the prosecutor;

3.       Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

4.       Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones;

.        .        .

*Commentary*

<u>The Defense Presentation at the Penalty Phase</u>

[A]reas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death. [*Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989)]. In particular, a mitigation presentation may be offered not to justify or excuse the crime "but to help explain it." If counsel cannot establish a direct cause and effect relationship between any one mitigating factor and the commission of a capital offense, counsel should endeavor to show the combination of factors that led the client to commit the crime. In any event, it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors.

Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the

client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations.

.        .        .

Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants.

.        .        .

In addition to humanizing the client, counsel should endeavor to show that the alternatives to the death penalty would be adequate punishment. Studies show that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials," whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.

.        .        .

Counsel should emphasize through evidence, argument, and/or instruction that the client will either never be eligible for parole, will be required to serve a lengthy minimum mandatory sentence before being considered for parole, or will be serving so many lengthy, consecutive sentences that he has no realistic hope of release. [*Kelly v. South Carolina*, 534 U.S. 246 (2002)].

[ABA Guidelines, pp. 104, 107, 108, 109, (footnotes omitted, selected case citations from footnotes included in text)].

There are no American Bar Association Guidelines for determining whether a deficient performance by either trial counsel or appellate counsel resulted in actual prejudice, without which there is a substantial likelihood a different result would have occurred, *i.e.*, as regards Petitioner, a sentence of life imprisonment. The United States Supreme Court has,

however, outlined the proper prejudice inquiry for evaluating a claim of ineffective assistance of counsel in the context of a penalty phase mitigation investigation.

We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below. [footnote omitted] In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U.S., at 397–398, 120 S.Ct. 1495. And, in *Porter,* we recently explained:

"To assess [the] probability [of a different outcome under *Strickland* ], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig [h] it against the evidence in aggravation." 558 U.S., at ——[, 130 S.Ct., at 453–54] (internal quotation marks omitted; third alteration in original).

That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase.

*Sears v. Upton*, 561 U.S. 945, 130 S.Ct. 3259, 3266-3267 (2010). *See also*, *Littlejohn v. Trammell*, 704 F.3d at 864 (quoting *Sears v. Upton*, 561 U.S. 945, 130 S.Ct. at 3266).

## DISCUSSION

CLAIM ONE

Lead trial counsel Wyatt Skaggs' failure to recognize and respond appropriately to [Petitioner's] cognitive and emotional impairment generated mutual distrust, animosity and disloyalty toward his client, and a corresponding failure to communicate with [Petitioner], which precluded the development of a workable attorney-client relationship and resulted in an irreparable conflict of interest, in violation of [Petitioner's] Sixth and Fourteenth Amendment right to the effective assistance of counsel.

CLAIM TWO

Trial counsel failed to conduct a reasonable investigation into [Petitioner's] background, character and mental health.

These two claims as presented by Petitioner through his § 2254 petition are unquestionably linked as each asserts ineffective assistance of trial counsel. Petitioner alleges lead trial counsel failed to recognize and respond appropriately to his, Petitioner's, cognitive and emotional impairment. He asserts this failure created an atmosphere of mutual distrust and animosity between Petitioner and his counsel, with a resulting lack of communication which precluded a workable attorney-client relationship. The consequence of this communication breakdown was an irreparable conflict of interest, in violation of Petitioner's Sixth and Fourteenth Amendment right to the effective assistance of counsel.

Petitioner further alleges his trial counsel was ineffective for failing to perform an appropriate investigation into his life history, character, and mental health for presentation during the penalty phase of Petitioner's trial.

Petitioner, in order to establish an ineffective assistance claim, must show both deficient performance as well as prejudice resulting from such performance. *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 1419 (2009); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 787-792. *See also, United States v. Rushin*, 642 F.3d 1299, 1306, 1307, 1308 (10th Cir. 2011). Performance is measured against an objective reasonableness standard, while prejudice requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. *See also*, *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. at 787-788, 791-792, and *United States v. Rushin*, 642 F.3d at 1309-1310. A reviewing court may consider the two inquiries, performance and prejudice, in any order, and there is no reason "to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697. And a court's review of a counsel's performance must be highly deferential. *Strickland v. Washington*, 466 U.S. at 689; *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. at 689). *See also*, *Premo v. Moore*, 562 U.S. 115, 131 S.Ct 733, 739-740 (2011)(quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 788).

**DEFICIENT PERFORMANCE**

The United States Supreme Court has concluded, when considering deficient performance in death penalty cases, the ABA Guidelines in effect at the time of the representation may well indicate the appropriate "prevailing norms" which reasonably diligent attorneys would follow. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). *See also*, *Young v. Sirmons*, 551 F.3d 942, 957 (10th Cir. 2008)(quoting *Wiggins v. Smith*, 539 U.S. at 524); *Bobby v. Van Hook*, 558 U.S. 4, 6, (2009)(citing *Strickland v. Washington*, 466 U.S. at 688); *Welch v. Workman*, 639 F.3d 980, 1015 (10th Cir. 2011); and *Detrich v. Ryan*, 677 F.3d 958, 973-974 (9th Cir. 2012).

> Counsel must perform in accordance with "prevailing professional norms." *Young v. Sirmons (Julius Young),* 551 F.3d 942, 956–57 (10th Cir.2008) (quoting *Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527). In capital cases, we refer to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") in assessing those "professional norms." *Id.* at 957.

*Littlejohn v. Trammell*, 704 F.3d at 817.

There are a number of ABA Guidelines relevant to the performance of trial counsel. Wyatt Skaggs, as Petitioner's lead trial counsel, acknowledged he had read the ABA Guidelines, and agreed the objective of the Guidelines was "to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing possible imposition or execution of a death sentence by any

jurisdiction." [Doc. 261, p. 24; ABA Guidelines, p. 1]. He further agreed with the Guidelines Commentary "[u]nless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" [Doc. 261, p. 24; ABA Guidelines, p. 17]. Mr. Skaggs did caveat his acknowledgment and agreement with the ABA Guidelines with the assertion "there were several times" during his representation of Petitioner compliance was not "practical." [Doc. 261, p. 46].

*ABA Guideline 4.1*

The ABA Guidelines mandate [4] a team approach in the defense of capital cases. The defense team, at a minimum, should consist of two qualified attorneys, an investigator, and a mitigation specialist, the need for which Mr. Skaggs as lead trial counsel specifically agreed [Doc. 261, pp. 69, 91], and at least one member should be qualified to detect the presence of mental or psychological disorders. [ABA Guideline 4.1, p. 28]. The Guideline Commentary notes while defense counsel's own observations of a defendant are necessary, such observations can not be expected to detect the vast array of possible conditions, e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning,

---

[4] "Throughout these Guidelines:

1. As in the first edition, 'should' is used as a mandatory term." ABA Guideline 1.1, p. 1.

schizophrenia, mental retardation, which could be critical in preparation of the defense case, thus the need for a person qualified to screen for mental and psychological disorders. [ABA Guideline 4.1, pp. 31]. The Commentary also notes a trained investigator to discover and develop facts is necessary as "the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation." [ABA Guideline 4.1, p. 32]. The mitigation specialist should possess "clinical and information-gathering skills and training" which most lawyers lack, and is a critical part of the defense team to insure the penalty phase of the defense presentation is integrated into the entire defense case. The task of mitigation specialist includes development of a "comprehensive and well-documented psycho-social history" based on in-depth investigation as well as development of mitigation themes, locating and coordinating appropriate experts, and development of a cohesive case in mitigation. [ABA Guideline 4.1, p. 33].

Two Qualified Attorneys

The capital defense team, at a minimum, should consist of two qualified attorneys. [ABA Guideline 4.1, p. 28]. Those qualifications include a substantial knowledge of the relevant law governing capital cases, as well as demonstrated skill in complex litigation; in legal research and analysis; in oral advocacy; in the use of expert witnesses and familiarity with common areas of forensic investigation; in the investigation, preparation and presentation of mental status; in the investigation, preparation and presentation of mitigation

evidence; along with skill in all elements of trial advocacy. [ABA Guidelines 5.1.B.2, p. 35].

The ABA Guidelines also require an attorney defending a capital case to have completed a

training course which includes many of the areas enumerated in ABA 5.1.B.2 as well as

ethical considerations unique to capital defense, and defense counsel's relationship with the

defendant and his or her family. [ABA Guideline 8.1, p.46].

*Wyatt Skaggs*

Mr. Skaggs, during his representation of Petitioner both before and during his state

court trial, was chief trial counsel, and chief capital trial counsel, for the Wyoming Public

Defender Office. He was, as he agreed, essentially the "capital unit" of the Public Defender

Office. [Doc. 261, pp. 19, 21; Doc. 262, p. 146]. He was, at least in the capital unit, and in

the cases to which he was assigned, responsible for implementing standards of performance.

[Doc. 261, p. 23].

Mr. Skaggs, as the chief trial counsel for the capital unit of the Public Defender

Office, appears, based upon his own testimony, to have had limited capital training and

experience. The only formal training he identified as having attended, prior to representing

Petitioner, was four "Life in the Balance" seminars sponsored by the National Legal Aid and

Defender Association. [Doc. 261, pp. 28, 35].

Mr. Skaggs capital defense experience prior to representing Petitioner was limited as

well. His first significant experience occurred as "second chair" during the retrial of the

penalty phase of the trial of Mark Hopkinson[5] [Doc. 261, p. 46], who was ultimately executed in 1992.[6] [Doc. 261, p. 47]. Mr. Skaggs admitted he had received no formal capital defense training prior to representing Mr. Hopkinson. [Doc. 261, p. 47].

Mr. Skaggs next capital defense experience came as lead counsel for Roy Engberg, at which time he still lacked any formal capital defense training. [Doc. 261, p. 48]. Mr. Engberg's death sentence was ultimately overturned, and he was resentenced to life in prison.[7]

Mr. Skaggs third capital defense experience came as lead counsel for Marty Olsen. Mr. Skaggs, prior to representing Mr. Olsen, had attended one Life in the Balance seminar

---

[5] *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922 (1982) [*Hopkinson I* ]; *Hopkinson v. State,* 664 P.2d 43 (Wyo. 1983) cert. denied 464 U.S. 908 (1983) [*Hopkinson II*]; *Hopkinson v. State,* Wyo., 679 P.2d 1008 (Wyo. 1984) cert. denied 469 U.S. 873 (1984) [*Hopkinson III*]; and *State ex rel. Hopkinson v. District Court, Teton County,* 696 P.2d 54 (Wyo. 1985) cert denied. 474 U.S. 865 (1985)[*Hopkinson IV*]; and *Hopkinson v. State,* Wyo., 704 P.2d 1323 (1985) cert denied. 474 U.S. 1026 (1985) [*Hopkinson V*].

[6] "Wyoming Conducts State's First Execution in 26 Years", Boston Globe, January 23, 1992, 1992WLNR 1893963.

[7] *Engberg v. Meyer*, 820 P. 2d 70 (Wyo. 1991); *Engberg v. State*, 874 P.2d 890 (Wyo. 1994).

in 1996. [Doc. 261, pp. 49, 50]. Mr. Olsen's death penalty was later overturned on appeal.[8]

[Doc. 261, p. 49].

Mr. Skaggs fourth capital trial was his defense of Petitioner. He testified after the *Olsen* case, and prior to his representation of Petitioner, he "got a lot of training" which, based on his prior testimony, would have consisted of attendance at three Life in the Balance seminars. [Doc. 261, pp. 28, 35]. The extent of Mr. Skaggs training and experience, prior to his defense of Petitioner, thus consisted of four Life in the Balance seminars, one penalty phase trial as second chair, and defense of two capital cases as lead counsel. It is also relevant to note Mr. Skaggs did not review and analyze the adverse results in *Engberg* and *Olsen* to possibly determine what he might have done differently to get a better result for his clients.

> Q. All right. When you try a capital case and your client is
> sentenced to death, do you have any meetings with your team to
> sit down and ask what might we have done differently to get a
> better outcome for our client?
> A. After the case?
> Q. After the case.
> A. No.
> Q. Do you use your losses as a learning experience in that
> way?
> A. No.

---

[8] *Olsen v. State*, 67 P.3d 536 (Wyo. 2003).

[Doc. 261, p. 50, lines 21-25, p. 51, lines 1-5].

*Vaughn Neubauer*

Mr. Neubauer, while there is no question of his sincerity and diligence in his representation of Petitioner, clearly did not meet the ABA Guideline standards for a capital defense counsel. He was, in fact, as an appointed public defender, not required to meet any particular standards to function as a capital defense counsel since the Wyoming Public Defender Office, prior to Petitioner's trial, had no such standards. [Doc. 261, p. 30]. Mr. Skaggs also stated his opinion the "second attorney qualified in accordance with" the ABA Guidelines did not have to have "capital experience." [Doc. 261, p. 53, lines 19-22].

Mr. Neubauer, prior to his entry of appearance as counsel for Petitioner on September 12, 2003, had graduated from law school only three years earlier, and had been practicing law for only two and one-half years. He had no previous experience representing a capital defendant, and his only "formal" capital trial training consisted of one lecture by a Wyoming attorney on the "Wymore" method of jury selection. [Doc. 261, pp. 25, 96; Doc. 262, pp. 145, 146, 147]. He thus clearly lacked substantial knowledge of the law governing capital cases, and his limited experience, even if gleaned from "very serious felony cases," as alleged by Mr. Skaggs [Doc. 261, p. 25], was not sufficient to demonstrate the required skills necessary in complex litigation, *et al.* outlined by ABA Guideline 5.1.B.2. He obviously as well had no training in those areas, nor with regard to the ethical considerations unique to capital cases

and the relationship between counsel and a capital defendant, and his or her family. [ABA Guideline 8.1]. Mr. Neubauer, in fact, affirmatively stated he had, prior to being appointed counsel for Petitioner, no specific training as to the relationship of trial counsel with a capital defendant or his family. [Doc. 262, p. 167].

The ABA Guidelines quite clearly require two qualified attorneys who possess defined skills and knowledge with regard to the defense of capital defendants. [ABA Guideline 4.1, p. 28; 5.1.B.2, p. 35; 8.1, p. 46]. Mr. Neubauer, without question, did not meet the ABA Guidelines for a qualified capital defense attorney. The answer to the question of whether Mr. Skaggs was "qualified" as defined by the ABA Guidelines is somewhat less distinct, however, based on his very limited formal training and obviously limited capital defense experience, as he himself described, he was, at best, marginally qualified, and clearly not so over qualified as to overcome the lack of qualification by Mr. Neubauer.

The combination of Mr. Skaggs and Mr. Neubauer as counsel for Petitioner did not achieve the level of two qualified attorneys mandated by the ABA Guidelines. While this failure alone may not be sufficient, in and of itself, to render their representation of Petitioner deficient under *Strickland v. Washington*, it is a factor relevant to a deficient performance inquiry.

Investigator/Mitigation Specialist

The ABA Guidelines mandate, as part of the team approach to the defense of capital cases, the "team" should include both an investigator, as well as a mitigation specialist. [ABA Guideline 4.1, p. 28]. A qualified investigator and a qualified mitigation specialist each have unique skills which allow them, as opposed to trial counsel, to address the challenges which arise in developing facts, and presenting a strong mitigation case, on behalf of a defendant. [ABA Guideline 4.1, pp. 32, 33].

Mr Skaggs, as lead trial counsel responsible for the selection and performance of the capital defense team [ABA Guideline 10.4; Doc. 261, pp. 52, 64, 70; Doc. 262, p. 150], made the conscious decision to combine and delegate the responsibilities of both investigation and mitigation to a single person. He made this decision notwithstanding the fact the ABA Guidelines, which he acknowledged having read [Doc. 261, p. 24], mandate a capital defense team have at least two qualified attorneys, an investigator, **and** a mitigation specialist.

Guideline 4.1 The Defense Team and Supporting Services

.               .               .

A.1. The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.

[ABA Guidelines, p. 28].

As soon as possible after designation, lead counsel should assemble a defense team by:

. . . .

> 2. . . . selecting and making any appropriate contractual agreements with non-attorney team members in such a way that the team includes:
>
> > a. at least one mitigation specialist and one fact investigator;

[ABA Guidelines, p. 63].

It was Mr. Skaggs position the ABA requirement for an investigator and a mitigation specialist did not require two separate individuals. One person might be sufficient.

> A. Okay. Now, if you -- it doesn't say it's got to be separate, investigator and mitigation specialist. It says you have to have both.
>
> Q. An investigator and a mitigation specialist.
>
> A. You're saying two different individuals. I'm saying one different individual is sufficient.
>
> Q. All right. So a grammatical reading of this would be 1plus 1 plus 1 equals 4, but you -- now, let me ask you this question. If you had asked Mr. Koski for an investigator and a mitigation specialist, he would have said yes, wouldn't he?
>
> A. I think so.
>
> Q. You did not ask him --
>
> A. Did not --
>
> Q. -- for a four-member team?
>
> A. -- no.
>
> Q. All right. Because you interpreted this "and" to mean two people?
>
> A. Could be two. Could be one; could be two

[Doc. 261, p. 54, lines 2-19].

The single person Mr. Skaggs chose to fulfill the responsibilities of both investigator **and** mitigation specialist was Ms. Priscilla Moree. [Doc. 261, pp. 26, 61, 100; Doc. 262, pp. 168, 213, 219]. She was, as a result, expected to perform the functions of both an investigator, for which she had considerable experience, and a mitigation specialist, for which she little experience.[Doc. 262, pp. 223, 224].

Ms. Moree, to fulfill her responsibilities as an investigator, possessed experience and skills gleaned from performing investigative work for plaintiff attorneys in both Wyoming and Colorado, including two significant and large contamination cases, as well as medical malpractice and product liability cases. [Doc. 262, pp. 214, 215]. She, prior to being hired in Petitioner's case for the dual role of investigator and mitigation specialist, had also functioned as a mitigation specialists in one other capital murder trial, [Doc. 262, p. 222], and provided some limited assistance to the designated mitigation specialist in an earlier capital case. [Doc. 262, p. 215].

Ms. Moree, prior to taking on the responsibility of mitigation specialist for Petitioner, had no formal training or education in the fields of mental health, social work, or education, [Doc. 262, p. 216], although she had attended "several death penalty workshops." ]Doc. 262, p. 218]. And Mr. Skaggs, while he agreed a mitigation specialist should be capable by training and experience to prepare a psycho social history [Doc. 261, p. 83]; should possess

clinical and information-gathering skills [Doc. 261, p. 90]; and have the "ability to elicit sensitive, embarrassing and often humiliating evidence, such as family sexual abuse," [Doc. 261, p. 91], he did not actually inquire of Ms. Moree as to whether she possessed any of those skills. He did not, in fact, even interview her or inquire as to her qualifications to be a mitigation specialist. He failed to do what would normally be considered a job interview, rather, he simply had a discussion with Ms. Moree on the telephone and had a copy of her resume. [Doc. 261, p. 82; Doc. 262, pp. 214, 216, 217]. Mr. Skaggs, even after hiring Ms. Moree to fulfill the responsibilities of a mitigation specialist, provided no guidance to her with regard to his thoughts or concepts on the mitigation process other than "let's just do it."[Doc. 262, p. 224]. The idea of "mitigation" was simply not clearly defined. [Doc. 262, p. 224].

There is, in addition, a question as concerns the actual amount of time Ms. Moree was able to devote to the mitigation responsibilities in her dual role as investigator and mitigation specialist. While she was delegated the mitigation responsibilities by Mr. Skaggs [Doc. 261, pp. 62, 100], it appears other tasks he delegated to her actually consumed the vast majority of her time working on Petitioner's case. Those tasks included researching and reporting to Mr. Skaggs on media coverage [Doc. 261, p. 62]; reviewing jury questionnaires [Doc. 261, p. 62]; traveling to Wisconsin with Mr. Neubauer to interview a prosecution witness, Joe Dax; as well as discovery review, travel, and time in court. The time records Ms. Moree

utilized in submitting her billings to Mr. Skaggs indicate, of the 544.6 total hours itemized, she spent only 107.4 hours in actual mitigation work. [Doc. 212-1, 2, 4,7, 8, 11, 12,15,17, 18, 22, 25; Doc. 328, pp. 2, 3]. Mr. Russell Stetler, the national mitigation coordinator for the Federal Death Penalty Projects [Doc. 264, p. 7], stated, in his expert opinion, based on his review of Ms. Moree's billings, she spent very little time in what he would characterize as the mitigation function, in fact, a fraction of the hours necessary to perform a typical mitigation investigation. [Doc. 264, pp. 7, 25, 67, 69, 70, 71; Doc. 328, pp. 2, 3].

Ms. Moree, while arguably a skilled investigator based on her background and experience, obviously did not have the training or the experience, nor was she allowed to devote the time necessary, to be an effective mitigation specialist. The ABA Guidelines mandate two separate qualified persons as part of capital defense team, one to act as an investigator, and one to fulfill the responsibilities of a mitigation specialist. [ABA Guidelines, p. 63]. Ms. Moree was likely qualified to act as an investigator, and did fulfill said function as part of Petitioner's trial team. She was not, however, qualified by either training or experience, as well as being restrained by time, to act as a mitigation specialist.[9]

---

[9] Mr. Neubauer also readily agreed he did not, during preparation for Petitioner's trial, have "the qualifications, training, and experience that you would want to have in a mitigation specialist on a death penalty team." [Doc. 262, p. 153, lines 14-17].

<u>Mental or psychological disorders</u>

Adherence to the ABA Guidelines requires at least one member of a capital defense team be qualified to screen for the presence of mental or psychological disorders. [ABA Guideline 4.1, p. 28]. The observations of defense counsel, while necessary and important, can not reasonably be expected to detect some or all of the vast array of possible conditions which may well be critical in defending a capital case, e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, and mental retardation, thus the need for a person qualified to screen for those disorders. [ABA Guideline 4.1, p. 31]. The Guideline appears to embrace a conclusion expressed in 1992, by Dr. Deana Logan, a psychologist and capital defense attorney. She suggested, in light of the fact only the capital defense team members have access to their client over a period of time, it is their duty to "act as the observational caretakers for the mental status symptoms of the client." 19 Cal. Attys For Crim. Just. F. 40, 40 (1992). A capital defense team member (or members) must therefore be trained to "perceive data from multiple sources," including "history, ...nonverbal cues, [and] listening at multiple levels." 19 Cal. Attys For Crim. Just. F. at 40. Such training and skills are an integral part of any capital defense team since the information which can therefore be gathered, "if properly noted by the legal team and passed on to the mental health expert, ....will help guide the expert to make a more accurate evaluation." 19 Cal. Attys For Crim. Just. F. at 40.

Mr. Skaggs, while acknowledging the value of a member of the defense team having the clinical skills and ability to recognize mental or psychological disorders and impairments as required by the ABA Guidelines, nevertheless then contradicts the Guideline suggestion a defense counsel alone is not qualified to fulfill said function. [Doc. 261, p. 70]. He believes, through his lifetime experience, he, in fact, had the ability to perform such function with regard to Petitioner.

> Q. (BY MR. O'BRIEN) ABA Guideline 4.1.2, "The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments."
>
> .    .    .
>
> Q. And this gives us some qualifications that would be necessary to a capital defense team. Do you disagree that those are necessary qualifications?
>
> A. I think they should be able to recognize if an individual has a mental or psychological disorder or impairment.
>
> Q. Right. We're not talking about diagnosing but just simply recognizing; right?
>
> A. Recognizing.
>
> Q. And so you're not a psychologist; right?
>
> A. No.
>
> Q. I'm not a psychologist.
>
> A. No.
>
> Q. So you are not the person described in Guideline 4.1.2, are you?
>
> A. Well, I think I can do pretty much that when it comes to

screening individuals at least for the presence of mental or
psychological disorders or impairments.

Q. You can.

A. I think that lifetime experience gives me that ability.

[Doc. 261, p. 70, lines 4-7; p. 71, lines 1-16].

Mr. Skaggs believes he was qualified by training and experience, during his representation of Petitioner, to screen individuals for the presence of psychological disorders or impairments even though he is not, and was not, familiar with many of the subtle signs of mental illness apparent in an individual's speech.

Q. Do you -- you agree that speech is one of the most sensitive ways in which mental health experts can identify mental illness?

A. I don't know.

Q. You don't know that?

A. I don't know.

Q. So you've not been trained to look for subtle signs of mental illness in an individual's speech?

A. In what way? In what way are you talking about? Which -- speech impairment? A lot of individuals are very qualified even though they have speech impairments.

Q. That's true. Well, let me ask you some specific questions. For example, would you be able to identify a client whose speech includes neologisms?

A. Speech -- I didn't hear you. You dropped off right at the end.

Q. Neologism.

A. I again didn't hear you.

Q. N-e-o-l-i-g-i-s-m [sic], neologism.

A. I don't know what that is.

Q. You don't know what that is.

A. No.

Q. Let's try paraphasia.

A. I don't know what that is either.

Q. Let's try dysarthria.

A. I don't know what that is.

Q. Let's try aprosody.

A. Aprosody?

Q. A-p-r-o-s-o-d-y.

A. I don't know what that is.

Q. Tangentiality?

MR. DELICATH: Your Honor, I'll object. The witness
has already testified that he is not a mental health
professional.

MR. O'BRIEN: Maybe I could clear that up with one
more question, Your Honor.

THE COURT: You may.

Q. (BY MR. O'BRIEN) So you would admit you are not qualified
by training and experience to screen individuals for the
presence of psychological disorders or impairments, are you?

A. I think I am.

Q. Let's continue. What is tangentiality?

A. Pardon me?

Q. What is tangentiality?

A. Similar to, same plane, uh.

Q. Let me try another one. What is circumstantiality?

A. Circumstantiality?

Q. Yes, as a sign of mental impairment.

A. Oh, I don't know.

Q. What is blocking as a sign of mental impairment?

A. Walking?

Q. Blocking, b-l-o-c-k-i-n-g.

A. I don't know.

Q. Okay. Are you ready to admit that you are not the person qualified by training and experience to screen for the presence of mental disorders or impairments?

A. No, I'm not.

[Doc. 261, p. 72, lines 16-25; p. 73, lines 1-25; p. 74, lines 1-22]. [10] Mr. Skaggs, in fact, further believed Ms. Moree had the same ability, maybe even better than his, to screen for mental health issues, even though she had no formal training in the mental health field, and her exposure to the screening concept was the result of attendance at only three death penalty seminars. [Doc. 261, p. 75; Doc. 262, pp. 216, 218]. Ms. Moree, however, definitively stated

---

[10] Neologisms are basically gibberish, but may sound like sentences. "Pressure of speech" is also described as "rapid speech," in which the client "[t]alks rapidly and is hard to interrupt," his "[s]entences [are] left unfinished because of eagerness to move on," he "[c]ontinues talking even when interrupted;" the client "[o]ften speaks loudly and emphatically," and "[t]alks too much and interrupts others." "Circumstantial" describes "[s]peech pattern [that] is circuitous, indirect, or delayed in reaching its goal;" it "[i]ncludes many tedious details, seems 'long-winded,'" and "[r]equires that you interrupt in order to finish business." Speech is "tangential" when the subject "[a]nswers questions in an oblique or irrelevant way." Blocking occurs when the client "[s]tops in the middle of a thought and after some silence [c]annot remember what he was talking about;" he "says his 'mind went blank.'" 19 Cal. Attys For Crim. Just. F. at 40, 43, 44 "Paraphasia" is a form of aphasia in which a person has lost the ability to speak correctly, substituting one word for another and jumbling words and sentences unintelligibly. "Dysarthria" is a disturbance of speech due to emotional stress, to brain injury, or to paralysis, incoordination, or spasticity of the muscle used for speaking. "Aprosody" is the absence, in speech, of the normal pitch, rhythm, and variations in stress. *Steadmans Medical Dictionary* (27th ed. 2000).

she was not responsible for the screening function as a member of Petitioner's trial team. [Doc. 262, p. 218]. [11]

Petitioner's trial team did employ Linda J. Gummow, Ph.D., a neuropsychologist, who Mr. Skaggs believe was qualified to screen for mental or psychological impairments. [Doc. 262, p. 66]. It appears from the record before the Court, however, Dr. Gummow was not a member of the defense team in the sense contemplated by the ABA Guidelines, and thus did not have the opportunity to observe Petitioner over an extended period of time as the trial counsel did . She was primarily an expert witness who evaluated Petitioner and testified at trial. [Exhibits 169-64, 171-15, 216-16, and 220-30].

Adherence to the team approach to capital defense outlined by ABA Guideline 4.1 basically requires the team leader to take four affirmative steps. First, select two **qualified** attorneys. Second, select an investigator. Third, select a mitigation specialist. And fourth, ensure one of the team members is qualified to detect by observation and interaction with the defendant the presence of any mental or psychological disorders. [ABA Guideline 4.1, p. 28]. Petitioner's trial team failed to fulfill at least three of these requirements.

---

[11] Mr. Neubauer testified before this Court although he felt, at the time of Petitioner's trial, he had the ability to screen for mental health issues based on his "on-the-job experience" and discussions with "a lot of psychologists," in retrospect he concluded he did not. [Doc. 262, p. 396].

Mr. Neubauer, as one of Petitioner's trial team, was clearly not a qualified capital defense attorney pursuant to the ABA Guidelines. And while Mr. Skaggs may arguably have fulfilled the required qualifications, his abilities were not such as to overcome the fact Mr. Neubauer was not qualified. Petitioner's trial team thus did not fulfill the "two qualified attorneys" element.

Ms. Moree was hired by Mr. Skaggs to fulfill both the investigator and mitigation specialist element set out by the Guidelines. She apparently had the background and experience to fulfill, and did fulfill, the responsibilities of the team investigator. She was not, however, qualified by either experience or training to fulfill the responsibilities of a mitigation specialist. She had, prior to Petitioner's trial, functioned as a mitigation specialist in only one other capital case, and had attended, at most, three death penalty seminars. Petitioner's trial team thus lacked a qualified mitigation specialist.

Finally, Petitioner's trial team clearly lacked a member with the ability to screen for mental or psychological disorders. Ms. Moree affirmatively indicate she had not been asked to fulfill such responsibility, and Mr. Neubauer recognized, albeit after Petitioner's trial, he was not qualified to fulfill the screening function. The third team member, and leader of Petitioner's trial team, Mr. Skaggs, while firmly convinced of his own ability to fulfill the screening responsibilities, was not qualified to do so. The basis for his perceived ability was his "lifetime experience," yet he was not familiar any of the subtle signs of mental illness

which might be manifested by an individual's speech. Petitioner's trial team thus lacked anyone with the skills necessary "to screen individuals for the presence of mental or psychological disorders or impairments." [ABA Guideline 4.1.2.A, p. 28].

Petitioner's trial team failed, at the time of his trial, to adhere to the prevailing standards for the defense of capital cases set out by ABA Guideline 4.1.

*ABA Guideline 10.4*

The responsibility for assembling and supervising the capital defense team falls squarely on the shoulders of lead counsel. He or she is responsible for selecting the investigator and mitigation specialist, as well as co-counsel, and allocating, directing and supervising the work of the entire team in accord with the ABA Guidelines and professional standards. [ABA Guideline, 10.4, p. 63]. Mr. Skaggs, as lead trial counsel for Petitioner, did not, as previously discussed, fulfill this mandate. He not only failed to select qualified co-counsel, he as well failed to hire a qualified mitigation specialist, and enlist the assistance of a person qualified by training and experience to screen for mental and psychological disorders.

Mr. Skaggs, as lead trial counsel, was also charged with the responsibility of demanding and acquiring "on behalf of the client all resources necessary to provide high quality legal representation," and make an adequate record for post-conviction review if such resources are not provided. [ABA Guideline, 10.4, p. 63]. It appears, based on the testimony

and record evidence before the Court, this mandate as well was not rigorously fulfilled, arguably to the detriment of Petitioner.

Mr. Skaggs, in testimony during the evidentiary hearing before this Court, professed to be a "frugal person" when "it comes to public money," even if it meant economizing on an indigent defense. [Doc. 261, pp. 64, 65]. He felt keeping costs down is always a consideration, [Doc. 261, p. 80], and economizing is important. [Doc. 261, p. 81]. There was even some evidence presented, which Mr. Skaggs did not directly dispute, indicating he had expressed the opinion the more funds expended on outside experts and travel in defense of a case, the less funds available in the public defender budget for personnel salaries and raises. [Doc. 261, p. 80].

> Q. Did he discuss with you anything with respect to public funds, anything along those lines?
> A. Yes. During the conversation he indicated that it was very important to preserve the funds of the public defender system so that the employees of the public defender system could continue to receive raises.
> Q. Now, did Mr. Skaggs mention anything else besides the need for raises with regard to the public funding that he was worried about?
> A. No, just that he was, he was very concerned that we conserve money, uh, so that the public defender system could, you know, reward its people for their hard work.

[Doc. 267, p. 30 lines 17-22].

Mr. Skaggs expressed his fiscal philosophy with specific reference to the defense of Petitioner in a letter to State Public Defender Ken Koski justifying a request for trial expenditures for a Dr. Spitz.

> Q. (BY MR. O'BRIEN) You're talking about expenditures
> generally. "I think the expenditures in this case are quite
> low when compared to other notable trials such as Harlow,
> McKinney, Dowdell and Collins. Check them; the costs to trial
> in those cases were very high. We have spent just over
> $10,000 on a mitigator which includes both investigation and
> helping Garri mitigate. That $10,000 figure contains the
> $5,000 which is up for approval at this time. These costs are
> very low and helped by the fact that Garri is shouldering some
> of the load."

[Doc. 261, p. 86 lines 7-16; Doc. 65-2, p. 2].

> Q. All right. And so -- but as compared to those other
> cases, you were spending far, far less on the mitigation
> function, weren't you?
> A. I thought I was, and that should allow me to get a little
> bit more money than might be ordinarily given.

[Doc. 261, p. 87 lines 9-13].

> Q. (BY MR. O'BRIEN) -- now it's the middle paragraph, or you
> told Mr. Koski that, "The expenses up to now are a drop in the
> bucket compared to trial expenses. We have no choice, but I'm
> proud of the fact that my expenses are running considerably
> less than we have paid out in other cases and the expenses may

still come in under the expenses that we spent in Marty

Olsen's case." Isn't that true? That's what you told --

A. In justification for the Spitz expense I said that, yes.

Q. Yeah. In fact, you advise Mr. Koski that this case --

"This is a bargain Ken and it will continue to be so."

Correct?

A. I did.

[Doc. 261, p. 89 lines 11-22; Doc. 65-2, p. 2].

Frugality, in and of itself, may well be a philosophy appropriate when expending public funds. Such philosophy, however, as manifested in certain decisions by Mr. Skaggs as lead counsel, clearly adversely impacted not only the composition of the trial team, but the ability of those team members as well to perform their duties to the prevailing professional standards.

Mr. Skaggs chose to hire one person rather than separate individuals to handle the mitigation and investigation responsibilities of the team as mandated by the ABA Guidelines. [ABA Guideline 4.1(A)(1); 10.4(C)(2)(a)]. His stated philosophy was "why hire four when you can get by with three." [Doc. 261 pp. 54, 55]. He made this decision notwithstanding the fact he believed Kenneth Koski, the Wyoming Public Defender, would have granted his request to hire both an investigator and a mitigation specialist, [Doc. 261 pp. 54], as had occurred in prior death penalty cases defended by the Wyoming Public Defender Office. [Doc. 261, pp. 78, 88; Doc. 262, pp. 215, 223, 232]. Ms. Moree seems to have the same

impression. The concern she felt with regard to funding came from Mr. Skaggs. [Doc. 263, pp. 97, 98].

The team member perhaps most adversely impacted by Mr. Skaggs' frugality was Ms. Moree, who had the combined responsibilities of investigator and mitigation specialist. [Doc. 262, p. 213]. It was apparent to Ms. Moree from her initial conversation with Mr. Skaggs cost containment was a priority with him.

> Q. Did you talk about fees at all?
> A. We discussed it, as I recall, and, uh, I, I believe I quoted that I would do the case for 40 an hour.
> Q. All right. And at that time were you aware or were you made aware of Mr. Skaggs' concerns about funding?
>
> .          .          .
>
> A. Well, it's been nine years ago, so I'm trying to recall as best I can, but that was -- that's the impression that Mr. Skaggs gives during an interview.
> Q. All right. And the impression -- what impression?
> A. That we keep costs down.
> Q. All right. And so is the impression that he gave you during that interview about the need to keep costs down reflected in your engagement letter of May 4th, 2003?
> A. Yes, it is.

[Doc. 262, p. 220 lines 13-17; p. 221 lines 1-9].

Ms. Moree, as a result of Mr. Skaggs' cost concerns, agreed to an hourly rate of $40 rather than the $65 per hour previously paid by the Wyoming Public Defender Office for

someone acting solely as a mitigation specialist. [Doc. 262, pp. 218, 219]. She also acknowledged her understanding of the funding concerns in her engagement letter to Mr. Skaggs.

> Q. Okay. On the screen in front of you, Ms. Moree, is
> Exhibit 4, which is your engagement letter of May 4th, 2003.
> And I'd like you to look at the second paragraph up from the
> bottom and the last sentence. "I understand the need to keep
> costs to a minimum" --
> A. Yes, uh-huh.
> Q. Yes. "I understand the need to keep costs to a minimum in
> a capital case, and you can be assured I will do my part to
> that end."
> A. Yes.
> Q. Is that line in your letter a product of your discussion
> with Mr. Skaggs about his concern about funding?
> A. Yes, it is.
> Q. All right. Did that seem pretty important to Mr. Skaggs?
> A. Yes.

[Doc. 262, p. 221 lines 16-24; Doc. 65-4].

Ms. Moree also felt her work was constrained by the funds allotted to her for both investigation and mitigation.

> Q. Explain how your work on the Eaton case compares to that.
> A. Well, I was, I was constrained by not only the, my hours,
> money spent, uh, and just the time. We had, we had a trial
> date set, and that was the way it was going to be, and, uh, so

you're working against the calendar, and you -- I felt like I
was working against, uh, my expenses.

Q. Stop right there for a minute and explain to me what you
mean by working against your expenses.

A. Well, in Mr. Eaton's case I was allotted X number of
dollars, uh, by what Mr. Skaggs would request from the Public
Defender's Office. And during Eaton I know -- I believe I
only turned in one voucher for a motel room. I stayed with a
friend in Casper. So that I did ask for a few meals, and I
did ask for some mileage between Laramie and Casper, but as
far as staying in a motel or anything like that, uh, I, I
don't believe I did.

Q. Okay. And I want to make sure that I'm interpreting what
you just said correctly. So, for example, if you were
allocated $10,000 for your work, and if you spent mileage on
travel or you bought a plane ticket or you stayed in a hotel
room and purchased meals, that came out of that $10,000?

A. Yes.

.          .          .

Q. All right. And so if you spent a thousand dollars of that
10,000 dollars on, on travel expenses, out-of-pocket expenses,
then you're just left with $9,000 worth of time that you could
devote to the case; is that correct?

A. Yes.

[Doc. 262, p. 233 lines 19-25; p. 234 lines 1-13, 19-23].

Mr. Skaggs' frugality, and desire to economize on an indigent defense, also manifested itself in his approach to contacting and interviewing potential mitigation witnesses. He had a strong preference for telephone rather than in-person interviews.

Q. All right. And if it's possible for you to economize in indigent defense, you will do that, won't you?

A. I will do that. Yes, I will.

Q. And the phone call issue is an example of that, isn't it?

A. That is an example, yes.

Q. All right. And so you would ask Priscilla to call a witness such as Richard Eaton, Dale's brother, on the telephone – --

A. Or Kerry Rose.

Q. -- or Kerry Rose, that's another example, and say find out on the telephone if they'll be good candidates perhaps for being a mitigation witness in the case?

A. Well, find out on the telephone where they are, where they stand with respect to the case. Particularly family members were in a different standing at that time than were other people because family members sometimes weren't cooperating. So we used telephone calls to determine where they stood. Followed up by a visit in person if practical, but sometimes we used telephone calls for that, too, for in-depth interviews, and then followed up by interviews by myself.

Q. Okay. Follow up by interviews in person if practical. Is that what I heard you say?

A. If practical.

Q. What do you mean by if practical?

A. Okay. There are a number of things that go into
interviews in person. Number one, how important the witness
is. .....

[Doc. 261, p. 65 lines 12-25; p. 66 lines 1-12; Doc. 262, pp. 240, 241]. He, in fact, basically
required Ms. Moree, his mitigation specialist, to have telephone contact with a potential
witness before granting her permission to travel to conduct an in-person interview.

Q. There was some -- we've had some discussion in the case
about telephone versus in-person interviews. Mr. Skaggs had a
strong preference that you do your work by telephone, didn't
he?
A. Yes.
Q. What is the reason for that?
A. I suppose cost containment.
Q. In fact, in order to get permission to go see a witness in
person, did you have to tell Mr. Skaggs that you had contacted
that person by phone and that they were going to be home and
you had an appointment and they had agreed to visit with you?
A. Yes, I had to get permission for the travel.
Q. And if you had not had that prior telephone contact, you
wouldn't get permission until you had --
A. Correct.

[Doc. 261, p. 469 lines 20-25; p. 470 lines 1-9].

Mr. Skaggs' preference for telephone screening and telephone interviews rather than
in person interviews of potential mitigation witnesses was, as discussed *infra*, in conflict with

the prevailing standards of performance for mitigation investigation during his representation of Petitioner.

Mr. Skaggs' frugality and desire to economize also affected who would be called as a witness at trial. One particular example was Kerry Rose, a potential mitigation witness whom Ms. Moree, based upon a couple of telephone conversations, concluded would have been a "very good witness" for Petitioner. [Doc. 263, p. 56]. Mr. Skaggs declined to call her at trial as a mitigation witness based, in part, on the fact she did not live in Wyoming. The other reasons he expressed for not calling her were apparently not significant as he would have "rethought" his decision if she had lived in Wyoming.

> Q. And, in fact, you said had she lived in Wyoming you might
> have made a different decision; isn't that true?
> A. I probably said that, and I would agree with you, I
> certainly would have rethought that decision had she lived in
> Wyoming. But the funding was certainly a problem ...

[Doc. 261, p. 197 lines 9-15]. [12]

The apparently successful effort by Mr. Skaggs to "economize" on the expense in defense of Petitioner is troubling. The ABA Guidelines mandate lead counsel "demand on behalf of the client **all** resources necessary to provide high quality representation." [ABA

---

[12] Mr. Skaggs' preference in defense of Petitioner for telephone interviews and only in-state personal interviews was not unique. He had a similar philosophy when working with Mary Goody on the defense of Marty Olsen. [Doc. 261, p. 79].

Guideline 10.49(D), p. 63 (emphasis added)]. Mr. Richard Burr, as an attorney, has spent

almost all of his legal career defending death penalty cases. [Doc. 265, p. 106]. The Court

allowed him to testify as an expert on the performance of capital defense teams. [Doc. 265,

p. 122]. He offered these thoughts with regard to counsel who self-censor and self-constrain

when it comes to acquiring adequate defense funding.

> Q. Is there anything about this case that would justify
> deviating from the well-established norm?
> A. Not -- I mean, the only justification for it that I saw
> Mr. Wyatt put forth was cost, and, and that can't be a
> reason -- I mean, it may be a constraint. I'm not saying that
> everybody gets all the money they need. We don't. I've never
> gotten all the money I needed in any of my cases, but I've
> gotten a lot more than -- I haven't self-constrained, and
> self-constraint, even if you're, you know, if you're working
> as a state employee -- and, you know, we all -- all of us are
> appointed in these cases, and, you know, we, we serve because
> of the grace of the government that pays us, and we can't
> abuse that. So we do have some trust relationship with the
> government that pays us, but the government pays us to do our
> work, and **if we self-censor and self-constrain and don't argue**
> **for the funds that we need to do the work well and**
> **effectively, then we're doing a disservice to our clients.**

[Doc. 265, p. 159 lines 9-25 (emphasis added)].

The failure by Mr. Skaggs to seek from Kenneth Koski, the State Public Defender, adequate funding, which he apparently knew would be approved, for Petitioner's defense clearly adversely impacted the trial defense, particularly, as discussed *infra*, the mitigation phase.

Petitioner's trial team clearly failed to meet the mandates of ABA Guideline 10.4.

*ABA Guideline 10.5*

The ABA Guidelines also mandate defense counsel "make every appropriate effort to establish a relationship of trust" with a defendant, including "a continuing interactive dialogue" concerning all materials which might well impact the defendant's case. [ABA Guideline 10.5, p. 68]. The Commentary suggests while communication with the defendant by non-attorney members of the defense team is important, such communication "does not discharge the obligation of counsel" to keep the defendant apprised of case development and progress. The establishment of a trust relation with the defendant is essential, thus contact must be ongoing. So-called "difficult" defendants may well be the consequence of bad lawyering, either current or previous, and establishing communication and rapport with the defendant is "critical to effective representation." [ABA Guideline, 10.5, pp. 70, 71].

Mr. Skaggs failed to establish even a minimally effective trust relationship with Petitioner, primarily because he completely failed to engage in a "continuing interactive dialogue" with him which was essential to establishing the communication and rapport

"critical to effective representation." He apparently basically concluded because Petitioner was competent to stand trial, his inability, or failure, to provide, when requested, a life history, a work history, in fact, any information which might assist in his defense, or in the mitigation of a death penalty, was willful and intentional.

> A. But he seemed to be relatively competent. In other words, he could understand what I was asking, he could understand the reasons why I was asking, and he seemed to me to be relatively competent, and –

[Doc. 261, p. 104 lines 15-18].

> Q. I thought you said you had reached that conclusion after Priscilla Moree's June 10th, 2003 visit with Mr. Eaton.
> A. Uh, you know, I reached that conclusion in talking to the expert, so --
> Q. You told us --
> A. -- and he was competent.

[Doc. 261, p. 123 lines 24-25; p. 124 lines 1-4].

> Q. And one of the questions is whether or not in making this conclusion, now, you're drawing the conclusion that, you know, he's competent and therefore his refusal to cooperate is willful -- is that what I hear you saying?
> A. Yes.

Q. You don't see an intermediary position at all on that
spectrum?
A. With that particular defendant, no.

[Doc. 261, p. 142 lines 1-8].

Q. All right. But you would say that Mr. Eaton was unable to
relate to you, wouldn't you?
A. Again, it's a matter of degree.
Q. Or is it a matter --
A. I wouldn't say that he was unable to. I would say that he
did not want to.

[Doc. 261, p. 143 lines 4-9].

Mr. Skaggs reaffirmed a number of times in his testimony before this Court his

"position" with regard to Petitioner's failure to provide requested information.

Q. And you understand that one of the issues in this case is
the difference between couldn't give information and wouldn't
give information; correct?
A. That may be one of your issues. I don't know that it's
one of mine.
Q. All right. Because you were solidly ensconced in the camp
that he would not give you information; correct?
A. I am in the camp that he didn't want to give information.

[Doc. 261, p. 112 lines 12-19].

Q. All right. Well, let me back up a minute and ask. There are other factors that might frustrate a client who is asked to give an institutional history, such as a school history, might there be, in a case like Mr. Eaton's?

A. I don't know of any factors that would have frustrated Mr. Eaton in doing that other than the fact he didn't want to talk about it.


[Doc. 261, p. 115 lines 12-18].

Q. -- there was -- he moved a lot from job to job because these jobs are temporary jobs; right?

A. By nature.

Q. Quite often. And so over the course of his work history do you have any idea how many jobs he had worked?

A. Priscilla can talk to you about that, but I think that we probably identified six or eight.

Q. There were a lot of –

A. And then he was an independent contractor, too, you know, so I don't know how you lump those into jobs. I don't know how many jobs he had as an independent contractor.

Q. All right. And so a question to Mr. Eaton about how many jobs have you had could be data that he might have a little bit of frustration and difficulty coming up with, mightn't it?

A. Not necessarily.

Q. But you acknowledge that that's possible?

A. In some clients, yes. In Mr. Eaton's situation, I don't think so.

[Doc. 261, p. 119 lines 8-25].

     Q. -- beforehand. And so wouldn't you agree that a doctor
saying that your client is depressed, it affects the brain,
and he has significant problems with concentration, with
thinking, might very well cause him to be unable to give you a
history of the schools that he attended?

     A. I would disagree with that.

     Q. You disagree.

     A. My, my interactions with him indicated that he simply did
not want to present that information for whatever reason he
had. He just didn't like talking about it.

     Q. He didn't like talking about his background?

     A. No.

[Doc. 261, p. 149 line 25; p. 150 lines 1-11].

     Q. All right. A malfunctioning brain could cause the
problems that you saw with Mr. Eaton, couldn't it?

     A. In this particular case, I don't believe so.

     Q. All right. And that's your opinion.

     A. That's my opinion.

     Q. You are not a psychologist?

     A. Not a psychologist.

[Doc. 261, p. 151 lines 5-11].

     Q. Yeah. And so on page 293 you indicated that you tried to
explain to Mr. Eaton about the importance of family

mitigation, but you said he really didn't understand the importance of family history in terms of mitigation, didn't understand it, didn't want to know that part of the case at all. Is that correct?

A. Didn't want to talk about it.

Q. Yeah, he just didn't understand it.

A. Well, that's what I said.

Q. All right.

A. Didn't want to understand it.

Q. But, on the other hand, if he suffered from a mental disorder that would impair his ability to communicate with you, that would raise different issues, wouldn't it?

A. If he did, but again --

Q. If he did --

A. -- that's why I have him checked out.

Q. That wasn't my question. If he did, that would impair his ability to communicate with you?

A. Might. Might. It depends --

Q. Yes.

A. -- on degree. It depends on a lot of different things. But in this particular case I felt that he did not want to answer the question, not that he didn't have the ability to, he didn't want to cooperate.

[Doc. 261, p. 121 lines 22-25; p. 122 lines 1-21].

Q. Did you review with her particular techniques and instructions in the field of mental health that are used to establish a rapport with, say, troubled mental patients, for

example?

A. No, because it was my belief he wasn't troubled mentally.

Q. And this -- it was your belief at the time of that first visit he was not troubled mentally?

A. I had not seen any indication of that.

Q. And you hadn't seen any neologisms on his part?

A. I had not seen any indication that he was troubled mentally.

Q. All right.

A. I had seen plenty of indication of obstructionism or stubbornness, but I hadn't seen any indication that he was troubled mentally.

[Doc. 261, p. 103 lines 11-25].

Mr. Skaggs maintained this position even though he eventually acknowledged Petitioner "had mental illnesses," [Doc. 261, p. 142 line 18], and had, as well, major mental impairments.

Q. You think it's good judgment to refuse to cooperate with your capital defense team?

A. Can't think of any situation in which it would be good judgment, but I can envision circumstances in which they don't knowingly and voluntarily, and I found one.

Q. Mm-hmm. And yet your expert is telling you he has major impairments in relationships, judgment, thinking and mood; isn't that true?

A. I don't dispute that. In fact, I saw major impairment in

relationships, judgment, that sort of thing, and I could have
developed that.

Q. Yeah. And certainly the difficulties you experienced with
Mr. Eaton were consistent with a major impairment in judgment,
thinking, and mood, weren't they?

A. He had, he had problems in judgment.

Q. Yeah.

A. There's no question about that.

[Doc. 261, p. 152 lines 20-25; p. 153 lines 1-11].

Mr. Skaggs, however, did not discuss, at least with Ms. Moree who he had hired as

the mitigation specialist, conditions or symptoms of possible disorders which might cause

Petitioner to act against his best interest. Mr. Skaggs left the impression with Ms. Moree he

did not put "much stock" in mental health issues.

Q. You would agree that a capital defendant's refusal to
cooperate with counsel would be contrary to his best
interests, wouldn't it?

A. Yes.

Q. Did Mr. Skaggs ever discuss with you conditions or
symptoms of possible disorders or other explanations that
might prompt Mr. Eaton to act against his best interests?

A. No, that wouldn't fit Mr. Skaggs' approach to this, I
don't believe.

Q. What do you mean by that?

A. I believe that -- I'm not sure how much stock he put into,
uh, mental health issues.

Q. He just doesn't believe in mental health issues, does he?

A. I could -- that's the inference that I got.

Q. And, in fact, Dr. Ash found that Mr. Eaton suffered from major depression; right?

A. Yes.

Q. And Dr. Gummow found that Mr. Eaton suffered from significant brain damage; correct?

A. Yes.

Q. Did Mr. Skaggs ever discuss with anyone, with you or anyone in your presence, whether these conditions could explain what you were seeing in Mr. Eaton?

A. No.

[Doc. 263, p. 73 lines 23-25; p. 74 lines 1-21].

Mr. Skaggs relationship with Petitioner was also characterized by a philosophy he, Mr. Skaggs, was the one making decisions concerning Petitioner's defense, and if those decisions did not "meet with Mr. Eaton's approval, it's tough."

Q. So I think this is the first time you mentioned that you had a directive from Dale about not wanting Kerry Rose involved in the trial. You had other disagreements with Mr. Eaton, didn't you, about who should be called and who shouldn't be called, didn't you?

A. I don't call that a disagreement, but I went on ahead and called the witnesses I thought needed to be called, were necessary to be called in his defense, and if he didn't like it, tough, tough.

. . .

Q. In fact, that language that you just used is kind of
reminiscent of a discussion that you had with the trial court
about his disagreement with your trial strategy. Do you
recall that discussion with Judge Park in front of Dale during
a recess in the trial when Dale was grumbling about how you
were handling his case?

A. I recall taking him in front of the judge in an ex parte
hearing, yeah.

Q. Right. You said: I control the cross-examination in this
case. I have told that to Mr. Eaton, and I'm gonna tell him
one more time for the record. I'm going to make a decision on
which questions I want to ask, how I want to ask them, and how
I'm going to approach the witness, and if some of those things
don't meet with Mr. Eaton's approval, it's tough.

Right?

A. Very well could have said that. If that's on the
transcript, I did.

[Doc. 261, p.197 lines 19-25, p. 198 lines 1-23].

Mr. Skaggs relationship with Petitioner deteriorated to the point Petitioner indicated

a number of times he would like to have a different lawyer, [Doc. 262, p. 24 lines 8-12], and

Mr. Skaggs, in fact, considered withdrawing as counsel. He ultimately did not withdraw, in

part because who would he "dump this on."

Q. And, in fact, you considered withdrawing from this case,
didn't you?

A. Yeah, I did. Yes, I did.

Q. And that had to do with your relationship with Mr. Eaton, didn't it?

A. Not entirely, no.

Q. But do you -- you explained your thought process to the Calene court about why you chose not to move to withdraw. Do you remember what you said?

A. Not exactly, no.

Q. Do you remember why you chose not to withdraw?

A. Remembering now, and again I haven't reviewed my Calene, Calene testimony at all, but remembering now it would have been a very difficult proposition to get new lawyers for him, to say the least, very difficult.

Q. Do you remember the language you used to express that to the Calene court?

A. No, but my language is quite plain and quite simple.

Q. And you said, "Who am I gonna dump this on?" Is that right?

A. Well, I could have said that, yeah.

[Doc. 262, p. 28 lines 6-25; p. 29 line 1].

Q. Now, as lead counsel, did you ever consider, when he refused to talk to you on those occasions, just withdrawing from the case and getting some other counsel in there?

A. Oh, that was always a consideration far back in the list of considerations in this case. But I had considered it. My thought was who else

who am I going to dump this on? Who is qualified to
do it?

[Doc. 86-7, p. 4 lines18-25; p. 5 line 1].

Mr. Skaggs' apparent solution to his failure to establish a continuing dialogue and a

trust relationship with Petitioner was to have Ms. Moree and Mr. Neubauer attempt to fulfill

such responsibility.

Ms. Moree, according to Mr. Skaggs, put in "considerable effort" in her attempt  to

establish a dialogue and rapport with Petitioner, and thus have him share information helpful

to his defense, and, in particular, mitigation of any death penalty. [Doc. 261, p. 124 lines 13-

17].

> Q. Here's what I'm asking. What else did you do to help
> Ms. Moree establish -- you're talking about considerable
> effort, and I'm giving you every opportunity to describe that
> considerable effort.
> A. Well, she put considerable effort in to getting him to
> talk. She tried, as she told me anyway, several different
> methods to get him to talk . . . .
>
> .      .      .
>
> Q. Well, you're the one that represented she put considerable
> effort into this; right?
> A. I believe she did, yes.

[Doc. 261, p. 104 lines 21-25, p. 105 line 1; p. 105 lines 14-16].

Ms. Moree's "considerable effort" involved only two visits with Petitioner in the

Natrona County Jail, which lasted a total of 50 minutes. Mr. Skaggs believes such an effort

was "considerable."

> Q. Well, you're the one that represented she put considerable
> effort into this; right?
> A. I believe she did, yes.
> Q. Okay, and I'm asking you to describe it. So how many
> visits?
> A. Pardon?
> Q. How many visits did she make with Mr. Eaton?
> A. As I told you, I know of two definitely.
> Q. So two visits, in your view, is considerable effort?
> A. Yes.

[Doc. 261, p. 105 lines 14-23].

> Q. And then Ms. Moree shows up the first time on the 6th --
> A. I see that.
> Q. -- is that correct?
> A. Yes.
> Q. And so this is the, this is her first making of a
> considerable effort to establish that rapport?
> A. I would assume so. I would assume that's her first visit
> overall.
> Q. Yeah.
> I don't know where my underline went. There we go.
> And that visit began at 10:00 a.m. and ended at

10:35 a.m.; correct?

A. Yes, it did.

Q. 35 minutes total --

A. Right.

Q. -- correct? And I see you left about six minutes prior to that, it appears. Is that correct?

A. Yes.

Q. And then let's continue going down, looking for her next visit. Oh, here's her name again on June the 10th, 2003?

A. Yes.

Q. And she checked in at 13:27 hours and checked out at 13:43 hours; correct?

A. Yeah, she was with me.

Q. And that was a 15-minute-long visit; correct?

A. That's correct.

**Q. And so just so we're clear, in your view her considerable effort took place within a total span of 50 minutes on two visits?**

**A. I think that was a considerable effort, yes, under the circumstances –**

**Q. By your standards --**

**A. -- under the circumstances, yes.**

**Q. -- that's a considerable effort?**

**A. Yes.**


[Doc. 261, p. 107 lines 24-25; p. 108 lines 1-25; p. 109 lines 1-8(emphasis added)].

Ms. Moree did not agree with the characterization by Mr. Skaggs of her efforts to establish a dialogue with Petitioner as "considerable," and, in fact, did not recall any request by Mr. Skaggs she make such effort.

Q. I want to go back to your first efforts with Dale. Did you and Mr. Skaggs discuss, after your visit with Dale when he kind of shut down on you, did you talk about what happened and why it might have happened?

A. Yes.

Q. Did he give you directions to go back and make a considerable effort to establish a working rapport with Mr. Eaton?

A. No.

Q. Exhibit 175 is already in evidence. It's a visitation log. It does show one additional visit more than two months later on June the 10th of 2003, you and Mr. Skaggs, and it reflects that you entered the prison -- entered the jail at 13:27 hours and left at 13:43 hours, so that would be a 15-minute visit. Would you consider your visit with Mr. Eaton on that occasion a considerable effort to establish a working rapport with him?

A. No.

Q. In fact, did Mr. Skaggs ever direct you to make a considerable effort to do that?

A. No.

Q. Was there any attempt on your part to make a considerable effort to do that?

A. Uh, no.

Q. And after June 10th of 2003 there were no further visits
of Mr. Eaton by you; correct?
A. Correct.

[Doc. 263, p. 71 lines 23-25; p. 72 lines 1-24]. [13]

The visits by Ms. Moree with Petitioner were obviously not sufficient to establish

either a "continuing interactive dialogue" nor a trust relationship with him. And even if Ms.

Moree had been able to establish a productive dialogue and trust relationship with Petitioner,

her success as a non-attorney member of the defense team "does not discharge the obligation

of counsel" to keep the defendant apprised of the case development and progress as

mandated by the ABA Guidelines.

Mr. Skaggs felt Mr. Neubauer had better rapport with Petitioner then he did. [Doc.

262, p. 72 lines 2-7]. He thus apparently assigned Mr. Neubauer the responsibility of

communicating with Petitioner concerning the progress of his defense, including "signing

off" on the way the defense would proceed. [Doc. 262, p. 72 lines 11-14]. Mr. Neubauer

testified, however, Petitioner would not "talk to me about the case." [Doc. 262, p. 163 line

13]. Petitioner would discuss with him such things as the "oil field," as well as hunting

antelope and fishing, and seemed comfortable doing so. [Doc. 262, p. 162 lines 10-25]. Mr.

---

[13] Mr. Neubauer was unaware until the day before he testified during the
evidentiary hearing before this Court Ms. Moree had visited Petitioner only twice before
trial in the Natrona County Jail. [Doc. 262, pp. 198, 199].

Neubauer agreed there may well have been reasons other than simply being stubborn or recalcitrant, such as malfunctioning brain and mental illness, which would explain Petitioner's failure or inability to provide information his defense team was requesting.

> Q. Okay. Would you agree there are a lot of explanations for the behavior that you observed in Dale besides Dale simply being recalcitrant?
> A. Absolutely.
> Q. A mentally ill person might be distrustful?
> A. I agree.
> Q. A person with severe mood disorder might be unable to comply with your requests for information?
> A. Possibly, yes.
> Q. Even though those requests to you seemed quite simple?
> A. Yes.

[Doc. 262, p. 189 lines 4-14].

> Q. Would you agree, having heard those experts testify and then what you've experienced with Dale Eaton, that a malfunctioning brain could have caused the problems that you or Wyatt Skaggs had been observing in Mr. Eaton?
> A. Hmm, I, I suppose it's possible, yes.
> Q. Your experts didn't rule that out, did they?
> A. No.
> Q. In fact, they said a malfunctioning brain is part of his condition.
> A. I seem to recall that, yes.
> Q. Would you agree that problems with concentration and

thinking could cause the problems that you had been observing
in Dale Eaton?

A. Yes.

Q. And your experts didn't rule that out either, did they?

A. No.

Q. Would you agree that Dale Eaton's response to your
attempts to help him as you were trying to talk to him about
the things you wanted to discuss with him as his attorney,
could have been due to his hopelessness or suicidal thinking?

A. It's possible, yes.

Q. And the experts that were brought on board didn't rule
that out either, did they?

A. No.

[Doc. 262, p. 195 lines 9-25; p. 196 lines 1-4].

Q. And certainly the difficulties that either you, Wyatt, or
Priscilla Moree may have been experiencing with Dale Eaton are
consistent with a major impairment in judgment, major
impairment in thinking, or a major impairment in mood. Is
that fair to say?

A. Yes.

[Doc. 262, p. 196 lines 19-24].

Mr. Skaggs' theory the inability or failure of Petitioner to provide needed information

for his defense and mitigation of a death penalty was "willful and intentional" is significantly

undercut by the fact other counsel representing Petitioner, both before and after Mr. Skaggs

and his trial team, had the ability to work with Petitioner despite his mental illnesses and impairments, and thus acquire his cooperation in their representation of him.

Ms. Tina Olson [14] was lead counsel on the Wyoming Public Defender Office appellate team which represented Petitioner in the appeal of his conviction and sentence docketed in the Wyoming Supreme Court on August 27, 2004, [Doc. 263, pp. 145-150], as well as the *Calene* hearing in June, 2005. [Doc. 86-2, p. 2].

Ms. Olson's first attempt to meet with Petitioner at the Wyoming State Penitentiary was not successful as Petitioner "would not come out and talk to us." His case manager explained "we had come too late in the day. We had come in the afternoon after lunchtime." [Doc. 263, p. 185 lines 5-16; Exhibit 219-3]. She was eventually able to meet with Petitioner in April, 2005, after at least two prior attempts to meet with him failed because of road closures. [Doc. 263, p. 226 lines 10-22; Doc. 264, p. 175 line 10; Exhibit 249-5]. Petitioner explained at this first meeting with his appellate counsel why he had not met with her on October 7th.

> Q. In your meetings with Dale Eaton did he ever explain to
> you why he did not meet with the team October 7th, 2004?
> A. Yes.
> Q. What did he tell you?
> A. He actually told me that in that first meeting. He said

---

[14] Doc. 66-7 is a Declaration of Tina Kerin executed by Ms. Olson in August, 2010, prior to her marriage. [Doc. 263, p. 145 lines 22-24].

that he had not been showered that day, taken to the shower
that day, that he felt that he was dirty, um, and he was
ashamed of that, and, uh, so he didn't want to try to meet
with us that day.

[Doc. 264, p. 178 lines 4-12].

Petitioner also during his first meeting with Ms. Olson was very suspicious of her,

expressing his belief she would be "just like that other one, just like that other one," referring

to Mr. Skaggs. [Doc. 264, p. 175 lines 20-25; p. 176 lines 1-3]. Petitioner also at various

times expressed to Ms. Olson his frustration with Mr. Skaggs.

Q. You talked about this briefly, but did there ever come a
time during your meetings with Dale Eaton where he again would
discuss Wyatt Skaggs and how he felt about Wyatt Skaggs?
A. Yes.
Q. What would Dale tell you?
A. Um, that, that Wyatt, uh, did not listen to him. Uh, that
Wyatt, uh, disregarded -- that's my word, not his -- things
that Dale did say to him. That he had tried to do what
Priscilla had asked him to do, because she had apparently
asked him to make lists and so forth, um, but that Wyatt was
frustrated with him, uh, well, I believe his word was mad at
him for not being able to, uh, produce like a list of, a
linear list of schools, a linear list of employers. Again,
"linear" is my word. Um, that, um --
Q. And apologize for interrupting. When you say linear,
like –

A. Chronology.

Q. -- a proper chronology?

A. A proper chronology.

Basically it was just an expression over and over of

kind of an anger and frustration that he hadn't been listened

to and hadn't, um -- there was not a relationship there. I

discerned no relationship there

[Doc. 264, p. 178 lines 13-25; p. 179 lines1-10].

Ms. Olson, in her meetings with Petitioner, noticed signs of the same types of impairments which were also apparent to his trial team, but which were not recognized as a possible cause for his inability or failure to comply with their information requests. Ms. Olson indicted his speech was pressured and he has difficulty expressing himself. [Doc. 264, p. 176 lines 18-23]. He did not "stay on topic," and was prone to go off on a tangent. You had to be very gentle in keeping him on topic or it would be frustrating to him. [Doc. 264, p. 176 lines 23-25; p. 177 lines 1-17]. Ms. Olson stated Petitioner showed signs of mental impairments, including, in particular, intellectual disabilities. She questioned, based on her visits with him, whether Petitioner had any kind of organic brain damage. [Doc. 264, p. 179 lines 11-25; p. 180 lines 1-4].

Ms. Olson and her appellate team, notwithstanding Petitioner's apparent impairments, were able to meet with Petitioner and have him participate in attorney-client meetings.

Q. We'll talk a little bit about what you did in response to that here in a little bit, but I want to stick with your visits.

Despite Dale's apparent impairments, when you or the team would meet with Dale, would he participate in the attorney-client meetings?

A. Yes.

Q. Other than that first time where he wouldn't come out.

A. Yeah.

Q. When asked, would Dale discuss life history topics with you, such as his employment or work history?

A. Yes.

Q. Schools?

A. Yes.

Q. Where he lived at various times in his life?

A. Yes.

Q. Friends?

A. Yes.

Q. People --

A. Well --

Q. -- he worked with?

A. Yes.

Q. You kind of hesitated with respect to friends. Tell us what's on your mind there.

A. Oh, he, he just, you know, he was, um -- he had a lot of interpersonal relationship difficulties, um, but you could tell he had a number of people that he was obviously very fond of. I don't know if they were really his friends or not, but certainly people he had known that he was very fond of that he

had those types of feelings towards.

[Doc. 264, p. 180 lines 5-25; p. 181 lines 1-9].

> Q. "During divorce, trying to make things better."
> Do these notes reflect whether Dale seemed to be
> discussing with you his life history?
> A. Yes, he was very open with us about his life history.
> MR. HARRIS: Your Honor, I --
> A. Not in a straight line, but very open.

[Doc. 264, p. 186 lines 3-8].

Ms. Olson and her team were, over time, able to gain Petitioner's trust, and she

offered the reasons why.

> Q. (BY MR. HARRIS) Over time did it seem you and your team
> were able to gain Dale's trust?
> A. Yes.
> Q. Did it take time?
> A. Yes.
> Q. And how did you do that?
> A. We went to see him. We did what we said we would do. We,
> uh, tried to address some of the issues he was having at the
> prison. We did the things that you're supposed to do.

[Doc. 264, p. 186 lines 13-21].

Robert Pepin is an Assistant Federal Public Defender for the District of Colorado

working in Denver. He has significant state and federal court criminal experience including

death penalty cases. [Doc. 263, pp. 101-104]. He met Petitioner in 2002 when he was assigned to represent him on a charge of manslaughter arising out of the death of an inmate in the federal prison in Florence, Colorado. [Doc. 263, p. 105]. Petitioner was acquitted of all charges after a jury trial. [Doc. 263, p. 126; Exhibit 303-48].

Mr. Pepin, in his representation of Petitioner, found him to be a warm but challenging client. He found him to have significant limitations with his ability and comfort level in communicating. He would get easily frustrated and had limited basic communication skills. His thinking, his thought processes, were not at all organized. [Doc. 263, pp. 107, 108, 110]. These limitations clearly affected Petitioner's ability to assist his attorney. Mr. Pepin was, however, able to obtain Petitioner's assistance basically through patience.

Q. In spite of Dale's limitations, were you able to obtain
his assistance?
A. I was.
Q. And how did you do that?
A. Well, with patience and with, uh -- I mean, by the time I
represented Dale Eaton, I had been a lawyer for maybe 20
years. I had worked on death penalty cases. I'd worked with
a variety of different kinds of people, people who
had -- clients who had mental health issues sometimes who were
suffering from extraordinary pressures from all different
kinds of sources, whether it's family or the jail or wherever,
and I had a pretty good idea that you just can't go in
bullying someone like Dale Eaton. It was very, very obvious
very early on that my approach was gonna have to be I sit, I

try and get to know him, I try and listen to what he had to

say, uh, tried to understand what was going on with him at a

given moment, what he might be afraid of or frustrated with.

We did a fair amount of work just trying to understand what he

had gone through and what people thought of him and saw of him

in the prison. We went back and talked to -- my investigator,

I should say, went back and talked to people he had been there

with, try to get perspectives on him, and then just tried to

show the patience to hear what he -- what was going on with

him and respond accordingly.

[Doc. 263, pp. 109 lines 7-25; p. 110 lines 1-5].

Mr. Pepin was able to establish a rapport with Petitioner who was eventually able to help with defense of the charges against him, in part by providing the names of persons Mr. Pepin could contact and talk with. [Doc. 263, p. 118]. Mr. Pepin ultimately felt he had a good relationship with Petitioner. [Doc. 263, p. 114]. He also offered his philosophy he would never tell any client, including a difficult client, that he was the "decider" and if the client disagrees with a decision "that's tough." [Doc. 263, p. 112].

Mr. Pepin, during his representation of Petitioner, became aware his possible connection to the death of Miss Kimmell. [Doc. 263, p. 130]. After Petitioner was acquitted of the charges against him, Mr. Pepin attempted to contact whomever might be representing Petitioner on the charges in the death of Miss Kimmell in Wyoming. He eventually was

contacted by Ms. Moree who indicated they were having problems communicating with Petitioner. Mr. Pepin offered to help. [Doc. 263, p. 135].

> I offered -- I learned that the trial wasn't that far away. I had been trying to find out why no one was contacting me about the fact that I had represented this man and had made offers of assistance. I felt I had information that would be important or could well be important to them. When she called, I made some inquiries concerning that generally, just that I hadn't heard from you and I was glad to hear from you. I told her about the fact that we had collected -- and I don't know if it was this date. I only recall one conversation with her. There may have been more, but I don't know if it was on this date -- that I had records that we had collected and a stack of them. I guess, from looking at a deposition of hers, there may have been about 10 inches of stuff that we sent her, and I know that we sent her a bunch of stuff. I kept my file out so that I could send it to this defense team, and it sat there forever, and finally I had someone to send it to. I told her about my relationship with Dale. I understood from talking with her that they were having problems communicating with him. I offered to help them communicate with him because I had a good relationship with him or I had had a year and a half or whatever it was before. I told them that we had done investigation that involved talking to people in the prisons in the background, I know something about building a life history and the detail you go into, and we had information that could contribute to that and that we could offer them to help them.

[Doc. 263, p. 134 lines 3-25; p. 135 lines 1-3].

Mr. Pepin never spoke to Mr. Skaggs, [Doc. 263, p. 132], and was more than a little

surprised no one from Petitioner's capital defense team, other than Ms. Moree, had contacted

him as an attorney who had successfully represented Petitioner.

> Q. Did it surprise you, regardless of your efforts to reach out to Dale's team,
> that you were never contacted as a previous attorney?
> A. Other than the contact by -- is it Ms. Moree?
> Q. Ms. Moree, yeah.
> A. Astounded.
> Q. Can you expand? Why were you astounded?
> A. These kinds of cases invariably involve emotional issues. I mean, you have
> whole communities who refuse to be involved, sometimes families, to be
> involved. It is not always easy to find people who have a little bit of a window
> into one of our clients in these circumstances, into them and into their capacity
> for sadness or remorse or compassion who are willing to work with them. I
> mean, it isn't that often. It's a struggle. And to have something sitting there in
> front of you, somebody saying I'll be happy to help, I mean, I don't want to
> take over your case, I'm happy to help, and to not even be contacted? It's
> astounding.

[Doc. 263, p. 135 lines 21-25; p. 136 lines 1-13].

Mr. Skaggs, as the acknowledged leader of Petitioner's trial team, quite clearly failed

to develop, and arguably never attempted to develop, [15] the continuing dialogue and trust

---

[15] The visitation records of the Natrona County Sheriff's Office for Petitioner
indicate Mr. Skaggs visited Petitioner eleven times before trial while he was incarcerated
in Natrona County. The first visit occurred on April 21, 2003, and last on January 12,

relationship with Petitioner which was a key part of providing him a competent defense. This failure is compounded by the fact he failed to take advantage of the offer of assistance by Mr. Pepin, an experienced criminal defense attorney, including death penalty cases, who had developed a good working relationship with Petitioner, and had successfully defended him on manslaughter charges. The mandates of ABA Guideline 10.5, as applicable to the trial defense of Petitioner, were clearly not fulfilled.

*ABA Guideline 10.7*

The ABA Guidelines, in effect during Petitioner's trial, further mandate defense counsel conduct a thorough and independent investigation with particular emphasis on the penalty issues. The investigation should be undertaken notwithstanding the fact a defendant may not want evidence bearing on the penalty phase to be collected or presented. [ABA Guideline, 10.7, p. 76]. The Commentary points out the duty to investigate regardless of the desires of the defendant is well established by case law, citing *Williams v. Taylor*, 529 U.S. 362, 365-396 (2000); *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002) *cert. denied*, 122 S. Ct. 2645 (2002); *Coleman v. Mitchell*, 268 F.3d 417, 449-451 (6th Cir. 2001) *cert. denied*, 122 S. Ct. 1639 (2002); *Jermyn v. Horn*, 266 F.3d 257, 307-308 (3d Cir. 2001);

---

2004. The shortest visit was one minute. The longest was 3 hours and 14 minutes. The total time for all eleven visits over the nine month period was 7.89 hours. [Exhibit 175, pp. 17-20].

*Blanco v. Singletary*, 943 F.2d 1477, 1501-1503 (11th Cir. 1991) *cert. denied*, 525 U.S. 837 (1989); and *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss. 1980); *accord* Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) *cert. denied*, 523 U.S. 1079 (1998). [ABA Guideline, 10.7, p. 80].

Preparation for the penalty phase of a death case requires "extensive and generally unparalleled investigation into personal and family history," including medical records, family and social history, educational history, military service, employment and training history, as well as prior juvenile and adult correctional experiences. [ABA Guideline, 10.7, p. 80, 81, 82]. This preparation and investigation should include interviews with family members, as well as anyone who might know or have known the defendant or his family such as neighbors, teachers, clergy, case workers, doctors, correctional, probation and parole officers. It should also include a review of the records for the defendant and his or her siblings, parents, and other family members from schools, social service agencies, juvenile courts, along with medical, military, criminal and correctional, birth, marriage, and death and alcohol and drug abuse treatment records. [ABA Guideline, 10.7, p. 84].

Mr. Skaggs "totally" agreed with these mandates of the ABA Guidelines, and acknowledged the United States Supreme Court had stated the Guidelines were a "well-defined norm."

Q. Well, look at this language from *Wiggins versus Smith*.

"The ABA Guidelines provide that investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."

Is that correct?

A. I agree with that totally.

Q. Do you agree with that standard?

A. Yes, I do.

Q. All right. And, in fact, the U.S. Supreme Court referred to this very standard as a well-defined norm. Would you agree?

A. Well, if the U.S. Supreme Court said it, it's hard to disagree, but I, I think that, uh, it's well written.


[Doc. 261, p. 34 lines 17-25; p. 35 lines 1-6

Q. (BY MR. O'BRIEN) Taking you to American Bar Association Guideline 10.7:A on investigation, and I think we've talked about this language, the counsel at every stage have an obligation to conduct thorough and independent investigations relating to issues of both guilt and penalty. We're in agreement that that's an appropriate standard, aren't we?

A. That is.

Q. And we've talked earlier about *Wiggins versus Smith* which says that investigation into mitigation evidence should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravation -- any aggravating evidence that may be introduced

by the prosecutor; right?

A. That's correct.

[Doc. 261, p. 163 lines 6-19].

The preparation for the penalty phase of Petitioner's trial by his trial team, notwithstanding this clear acknowledgment by Mr. Skaggs of the appropriate standards, was significantly inadequate, and as a result completely failed to fulfill the mandates of ABA Guideline 10.7.

The foundations for the modern standards of death penalty defense are be found in *Furman v. Georgia,* 408 U.S. 238 (1972), which struck down all death penalty statutes in the United States in light of the risk of arbitrary and capricious infliction of such penalty. Justice Stewart put it most succinctly: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and un-usual."*Furman v. Georgia,* 408 U.S. at 309 (Stewart, J., concurring). Each of the nine Supreme Court justices filed separate opinions, however, the common thread running through the five justices in the majority indicated the Eighth Amendment's Cruel and Unusual Punishment Clause is violated by a system of capital punishment in which a capital sentencer has unbridled discretion in choosing whether to impose the death penalty.

The Supreme Court in *Gregg v. Georgia,* 428 U.S. 153 (1976), authorized the resumption of capital punishment, however, the personal value and dignity of the common

man and the scientific advancement in the understanding of human behavior concepts identified by Justice Brennan in *Furman v. Georgia,* 408 U.S. at 296 are now two pillars of capital defense representation. The humanity of the accused, in the wake of *Furman v. Georgia*, is now a focal point of capital litigation. The United States Supreme Court has concluded, because "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases," a capital sentencer must be allowed to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978). Chief Justice Berger, writing for the full Court, concluded "that an individualized decision is essential in capital cases." *Lockett v. Ohio*, 438 U.S. at 605.

The Supreme Court has spoken "in the most expansive terms" when defining the scope of mitigating evidence necessary to individualized sentencing. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990)). The Court has emphasized the concept of mitigation extends far beyond factors related to a defendant's culpability in the underlying offense, striking down any requirement to establish a causal nexus between a mitigating factor and the crime. *Tennard v. Dretke*, 542 U.S. at 284. A casual nexus requirement "will screen out any positive aspect of a defendant's character, because good character traits are neither 'handicap[s]' nor typically traits to which criminal

activity is 'attributable.'" *Tennard v. Dretke*, 542 U.S. at 285. The Supreme Court further noted "that impaired intellectual functioning is inherently mitigating," *Tennard v. Dretke*, 542 U.S. at 287, regardless of whether it contributed to the commission of the crime. The Supreme Court deems the unrestricted scope of mitigating evidence necessary to "be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 305 (1976)) (alteration in original).

The referenced principles are important when analyzing the performance of Petitioner's trial counsel in light of the Eighth Amendment constitutional right to offer mitigating evidence.

> Consider, for example, the bedrock Eighth Amendment rule that a sentencer must be free to consider all mitigating evidence that the defendant proffers as a basis for imposing a sentence less than death, a rule designed at least in part to minimize the arbitrariness that comes when a sentencer treats cases that are fundamentally different as the same. Although it makes no express demands on counsel, the rule does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those "compassionate or mitigating factors stemming from the diverse frailties of humankind."

Louis D. Bilionis & Richard A. Rosen, *Lawyers, Arbitrariness and the Eighth Amendment*, 75 TEX L. REV. 1301, 1316-1317 (1997)(footnotes omitted), and *Woodson v. North Carolina*,

428 U.S. at 304. The Supreme Court, after observing "[t]he lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing," has concluded "[i]nvestigation is essential to fulfillment of these functions." *Wiggins v. Smith*, 539 U.S. at 524-525, *citing* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982).

Consideration of the fact Petitioner was facing the death penalty is thus essential to proper application of the familiar *Strickland v. Washington* ineffective assistance of counsel standard to the conduct of Petitioner's trial counsel. "First, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. at 687. In assessing counsel's performance, "prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable."*Wiggins v. Smith*, 539 U.S. at 522, citing *Strickland v. Washington,* 466 U.S. at 688-89.

The Supreme Court in *Wiggins v. Smith* recognized counsel's duty in a death penalty case to conduct a thorough investigation of the client's background.

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). . . . Cf. *id*., 11.8.6, p. 133 (. . . among the topics counsel should consider presenting

are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences).

*Wiggins v. Smith*, 539 U.S. at 524-525 (emphasis in original). Courts reviewing capital cases must therefore determine whether trial counsel satisfied his "duty to conduct the 'requisite, diligent' investigation into his client's background." *Wiggins v. Smith*, 539 U.S. at 523 citing *Williams v. Taylor*, 529 U.S. 362 (2000). This assessment "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. at 522, quoting *Strickland v. Washington,* 466 U.S. at 689. The Supreme Court explained:

> In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

*Wiggins v. Smith*, 539 U.S. at 527. Where an attorney is alleged to have failed to present substantial mitigation evidence, "we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. at 523. Where facts known to counsel suggest

further investigation would be fruitful, the failure to investigate results from "inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. at 526.

The Tenth Circuit Court of Appeals also recognizes the constitutional design of the adversarial process in criminal cases depends on a thorough, independent investigation by defense counsel.

> In order to make the adversarial process meaningful, counsel has a duty to investigate all reasonable lines of defense. *Nyugen v. Reynolds*, 131 F.3d 1340, 1345 (10th Cir. 1997); see also *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). This duty is "strictly observed in capital cases." *Nguyen*, 131 F.3d at 1347.

*Fisher v. Gibson,* 282 F.3d 1283, 1291 (10th Cir. 2002). In other words, as Mr. Stetler, the national mitigation coordinator for the Federal Death Penalty Projects, testified, the investigation comes *before* the strategic judgment, not the other way around, "so that you can make fully informed decisions about what you are going to present."[Doc. 264, p. 101 lines 7,8].

The duty to investigate in a specific case may well include consideration of the aggravating factors on which the prosecution may rely.

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving

> Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. App. 665-666. There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans. *Ibid*. It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.

*Rompilla v. Beard*, 545 U.S. 374, 383-384 (2005). The prosecution, prior to Petitioner's trial, gave notice, as discussed *infra,* it would use his Sweetwater County kidnaping and assault convictions in aggravation and gave the trial team the entire court file of the case, which clearly included mitigation, mental health and investigative leads. There would appear to be no reasonable strategic reason for failing to investigate a file which includes information the prosecution has indicated it will present at trial. As the United States Supreme Court has observed, "looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." *Rompilla v. Beard,* 545 U.S. at 389. The notice and disclosure by the prosecution prior to Petitioner's trial concerning his Sweetwater County convictions resulted in an unconditional duty on the part of his trial team to investigate the information they knew the jury was going

to hear. Such an investigation arguably would have resulted in possible mitigating evidence as well as investigative leads which could result in further research.

> But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.

*Rompilla v. Beard,* 545 U.S. at 391 n. 8.

Mr. Burr, an attorney who has spent almost all of his legal career defending death penalty cases, and was permitted to testify as an expert on the performance of capital defense teams, in discussing the clear line of decisions beginning with *Williams v. Taylor* and including *Wiggins v. Smith*, *Rompilla v. Beard*, *Sears v. Upton*, and *Porter v. McCollum*, 558 U.S. 30 (2009), offered these observations.

> [I]n all of these cases, starting with *Wiggins*, the centerpiece was the failure to investigate. The court has, has, to my knowledge, . . . never decided somebody was ineffective for failing to present a certain kind of mitigation. The premise starting with *Strickland* is if you have conducted a reasonable, reasonably effective investigation, then your strategy decision about what to present and what not to is almost untouchable. It's rare that the court would second-guess that. The whole question is what you investigate, because if you have -- again, the premise is if you have not investigated, you can't make a decision that's informed by the facts. And all of these cases dealt with failures to investigate. There was investigation done to a certain extent in all of them, to varying extents, and there were experts retained and some mitigation witnesses put on

and experts put on in all of those cases, but the quantity and quality of mitigating evidence that was uninvestigated was so important that the court found ineffective assistance in all those cases.

[Doc. 265, p. 128 lines 19-25; p. 129 lines 1-12].

The concept of mitigation, as applicable within the confines of the Eighth Amendment Cruel and Unusual Punishment Clause, is quite broad, and there is, as noted by Mr. Burr, a direct relationship between a thorough psychosocial history and reliable psychiatric findings.

The mental health experts can only do effective insightful work if they have good information to work with. And so the key to working with a mental health expert is having a kind of life history of the sort I've been describing that, that goes as far through the layers of this person's life as you can get with the time and the resources that you've got, and provides that information to experts who then sift through and make sense of it . . . with their expertise. And without that body of information, they're left with much smaller databases, as it were, or sets of facts to work with, and what they have to say often doesn't seem to fit the life of this person or just doesn't have much meaning. It sounds sort of contrived.

[Doc. 265, p. 136 lines 11-22].

A complete psychosocial history is important. "[T]he less complete your history is going in, the less accurate, reliable, and persuasive and meaningful the opinion is coming out. It's very, a very direct relationship." [Doc. 265, p. 139 lines 18-21]. The capital defense

lawyer bears the responsibility for an accurate and complete psychosocial history. Ineffective

assistance of expert is not a recognized legal concept.

> The investigation that goes into it and the working with experts is a lawyer's task. And there's not ineffective assistance of expert. There's ineffective assistance and a guarantee of effective assistance in the Constitution by counsel. And so it's the lawyer's duty to assure that, you know, an adequate mental health history is presented to the mental health expert.

[Doc. 265, p. 139 lines 8-14].

The results in *Rompilla v. Beard* are an example of the consequences of an incomplete

psychosocial history. Three experts, without the benefit of a good life history for Mr.

Rompilla, found him to be antisocial, yet after a thorough life history investigation, there was

little doubt he suffered from fetal alcohol syndrome, borderline mental retardation, brain

damage, and a serious mental illness, complicated by a extreme abuse and neglect in

childhood. *Rompilla v. Beard*, 545 U.S. at 391-393. Such issues are at the core of capital

mitigation work, and Mr. Skaggs agreed a psychosocial report, generally prepared by a

qualified mitigation specialist, is an important tool in the defense of a capital case. "It's part

and parcel of the mitigation, sure." [Doc. 261, p. 83 line 2]. Mr. Skaggs acknowledged the

commentary to ABA *Guideline* 4.1 states the mitigation specialist should compile a

comprehensive and well documented psychosocial history, based upon an exhaustive

investigation which pursues investigative leads to mitigation evidence. [Doc. 261, p. 95 lines

20-22]. He stated, "I sure would like to have one," [Doc. 261, p. 94 line 11], and "Generally it's something I would aspire to, yes." [Doc. 261, p. 95 line 19]. [16] The trial lawyers in *Wiggins v. Smith*, *Rompilla v. Beard*, *Sears v. Upton*, and *Porter v. McCollum* all consulted mental health experts, however, they neglected to give those experts important background information about the client.[Doc. 265, p. 129 lines 6-20].

Mr. Skaggs conceded other "very helpful" tools in the investigation, organization and presentation of mitigating evidence and themes are the genogram of the client's family, and a detailed chronology of the client's life. [Doc. 261, pp. 84-85; Doc. 262, pp. 44, 45]. These tools can provide a useful template for guiding a life history investigation and identifying mitigating themes. [Doc. 264, pp. 96, 97, 98 (psychosocial histories); pp. 102-105 (chronologies); pp. 105-109 (genograms)]. Neither Mr. Skaggs nor anyone on the trial team used these tools in Petitioner's case. [Doc. 264, pp. 98, 105, 109].

Mr. Skaggs also acknowledged the purpose of gathering documents was to develop leads for further investigation. He stated "[d]ocuments are very valuable" in a capital case investigation. They not only describe conditions and events, but also name people who might

---

[16] Mr. Skaggs also stated there are circumstances when an exhaustive investigation is excused, as was the case, in his opinion, with Petitioner, when he refused to cooperate, and his family members as well were not a resource. [Doc. 261, p. 94 lines 17-25; p. 95 lines 1-13].

have relevant information was well. [Doc. 261, p. 200]. Ms. Moree used the term "dot-to-dot" to describe a similar investigative approach.

> Q. And explain what you mean by dot-to-dot.
> A. I mean it as I look at one document, it's going to give me
> a lead perhaps on the same direction or a different direction,
> and that's the path that I choose to take. When I, when I do
> that and I find something else, then I would, I would meet
> with Wyatt and, and show him what I found and, uh, and proceed
> from that point.

[Doc. 262, p. 227 lines 10-16]. Mr. Stetler testified the standard for capital defense calls for a cyclical approach to investigation, in which documents are gathered, leads are followed, and more documents are gathered and more witness interviews or re-interviews are conducted based on what is learned. [Doc. 264, pp. 115, 116].

Mr. Skaggs acknowledged the value of each of the referenced tools and approaches to the defense of a capital case, yet none of them were used in preparing Petitioner's trial defense. The trial team's files apparently contained numerous investigative leads in documents obtained from several sources. A more thorough investigation based on these leads would very well have provided, as discussed *infra*, significant mitigation evidence which the trial team did not discover, and thus could not present to the jury. Many of these documents, similar to what occurred in *Rompilla v. Beard,* were provided by the prosecution, with notice of their intent to use Petitioner's criminal history against him. "But looking at a

file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." *Rompilla v. Beard*, 545 U.S. at 389. Other documents, such as an incomplete copy of Mr. Eaton's middle school file from Meeker, Colorado, and Marian Eaton's admission and discharge summary at the Colorado State Hospital, were obtained by Ms. Moree. Most, if not all, of the mitigation evidence presented by Petitioner to this Court, and all of the witnesses who testified at the hearing before this Court, or whose testimony was filed by declaration, can be traced back to a lead which was contained in the trial team's files. A few examples of significant leads which were not pursued merit discussion.

### *Meeker, Colorado*

Petitioner's trial team was "on notice" from multiple sources there were valuable mitigation witnesses to be found in the Meeker, Colorado area, including John, Syble, and Lyn Barney, Phyllis Barney Lake, and Brian Conrado. The trial team had a report by Dr. Donald Langsley to Weld County Judge Donald Carpenter regarding a psychiatric assessment of Petitioner. [Exhibit 223-14]. Mr. Skaggs conceded life history documents such as the report by Dr. Donald Langsley should be reviewed for leads to potential mitigation witnesses. [Doc. 261, p. 216 lines 11-24]. Dr. Langsley, in his report, advised Judge Carpenter Petitioner "…states that the only time in his life that he has ever been happy has been in working on the ranch of a Mr. and Mrs. Barney of Meeker, Colorado, over this past summer

and after school during last spring." [Doc. 261, p. 220 lines 7-14; Exhibit 223-14, p. 2 ¶ 1].

Mr. Skaggs agreed the information related by Dr. Langsley "sure would" indicate Petitioner

had a positive relationship with the Barneys. He conceded a thorough investigation would

include going to Meeker to interview them, and if they had mitigating evidence, it would be

reasonably discoverable. [Doc. 261, p. 220 lines 15-24]. Mr. Skaggs, however, had no idea

what Mr. and Mrs. Barney could have added to the mitigation case. [Doc. 261, p. 220 line

25; p. 221 lines 1-2]. This report would, however, suggest to a qualified mitigation specialist

Mr. and Mrs. Barney could well be potential mitigation witnesses, as well as provide insight

into Petitioner's life history. As National Mitigation Coordinator Russell Stetler explained,

he would want to interview them

> …because of the content of this report. If this is the only time he's been happy,
> these people are going to have some insight into who he was at that time,
> maybe something about the dynamics in his own family that were different
> from his treatment when he was staying with them.
> Q. All right. Does it indicate that this is potentially a fruitful endeavor if you
> go to Meeker, Colorado?
> A. Yes, absolutely.
> Q. All right.
> A. I mean, the other thing you may be looking for here is, you know, the limits
> on their contact. You know, if only they had been able to keep him in their
> living environment for a longer period of time, maybe things would have
> turned out a little differently for him. So they're potentially a wealth of
> information.

[Doc. 264, p. 123 lines 25-25; p. 124 lines 1-13]. Richard Burr relates the same thought, testifying competent capital counsel would have pursued contacting the Barneys.

> Oh, yes, a statement like this where a child of * * * 16 says the only time he's ever been happy in his life has been working with these people, it says you've got to know what was going on to make his life so unhappy at that point and find out what was so good about that and what those people learned about him in his life, because they themselves could be rich historians about -- you know, he may have talked with them about how he saw his life at that point."

[Doc. 266, p. 45 lines 20-25; p. 46 lines 1-5].

Independent of Dr. Langsley's report, the mental health experts utilized by the trial team also uncovered information suggesting the Barney ranch as a possible source of mitigation evidence. Dr. Ash wrote to Mr. Skaggs on May 17, 2003.

> As far as depression, the first time that Mr. Eaton felt suicidal, was when he was 13 and working at a ranch nearby. It was getting close to the end of time that he would be working at the ranch and he would have to go home and be around his father. He snuck the .22 pistol from the fellow he was with and went out behind the building to put the gun to his head. The lady saw him and took the gun away.

[Doc. 261, p. 221 lines 12-19; Exhibit 16, p. 1 ¶ 5]. In light of Petitioner's age and circumstances, "the lady" was unquestionably Mrs. Barney. The episode was, in fact, verified by Mrs. Barney's daughter, Phyllis Lake, who testified, "Dale had taken a gun and had put

it up to his head, and my mother saw him and made him stop. But he was tired of the torment that he had." [Doc. 268, p. 25 lines 5-7].

Dr. Gummow, in rather cryptic notes of her interviews with Petitioner, also refers to this or a similar incident, and mentions Petitioner had a history of suicide attempts. Though "never able to follow through," he had put a "gun to head multiple times." [Exhibit 169-64, p. 1863]. This incident was grouped with other attempts which included tying a rope around his neck and kicking a horse out from under him, and attempting to overdose on pills in Evanston. [Exhibit 169-64, p. 1863]. Dr. Gummow, in her notes, drew a line connecting "suicide" group of notes to the phrase, "Mrs. Barney, Meeker, caught him and fired him from ranch job." [Exhibit 169-64, p. 1863].

Another indication the Barney ranch in Meeker, Colorado, was a possible source of mitigation evidence was supplied through information from the trial prosecutor. Natrona County Deputy Lynn Cohee tape-recorded a telephone interview with Petitioner's sister, Sharon Slagowski, which was transcribed and provided to Petitioner's trial team in discovery. Deputy Cohee asked Ms. Slagowsky, "Do you know if [Dale] had any childhood friends?" Petitioner's sister replied, "Oh boy. I know in Meeker, the only ones that I can think of, is their names was Barney's, but that's…" [Exhibit H, p. 11]

There were thus four distinct leads, three by mental health experts and the fourth by Petitioner's sister, which suggested to the trial team the Barney ranch in Meeker, Colorado,

was a potential source of mitigation evidence. John and Phyllis Barney, though living and able to testify at the time of Petitioner's trial, have, unfortunately, since died. Their son, Lyn Barney, died in a car accident after Petitioner's trial. Phyllis Barney Lake was, however, available to testify at the hearing before this Court to some of what her parents and brother could have said about Petitioner. [Doc. 268, pp. 6-32]. An experienced mitigation specialist would also realize a visit to the Meeker area, and conversations with the Barney family prior to Petitioner's trial, would likely have lead to other possible mitigation witnesses, a possibility recognized by Ms. Moree even though she was not asked by Mr. Skaggs to travel to the Meeker area. [Doc. 263, p. 43 lines 1-17]. Mr. Burr also recognized the same possibility.

> I know Ms. Moree last week talked about connecting the dots. That's another way to think of it, but very person you talk to and every record you talk to will lead you to somebody else or to some other records. And I mean, it's – on occasion you'll find somebody who doesn't have somebody else you can talk to, but almost never because they know somebody who knew your client, and they know somebody who knew your client. And it's the collection of all of those experiences with your client, observations of your client, and stories about your client that -- I mean, there are literally hundreds of them, thousands of them. It's those stories that . . . give us the ability to capture our clients' lives. And . . . it's capturing our clients' lives in the fullest and deepest way possible that give our clients the best chance of getting a life sentence.

[Doc 265, p. 133 lines 4-18].

Mr. Burr agreed the Declaration by Phyllis Lake provided compelling mitigation information with respect to Petitioner. He also noted, as stated in her Declaration, Mrs. Lake's parents, Mr. and Mrs. Barney, "were available and, both mentally and physically, back at the time of" Petitioner's trial, and they along with Phyllis' brother Lyn "would have been an important person for the team to talk to as well because he was more of a peer age person for Dale Eaton, and they had lots of interaction, and you would have wanted to talk with him." [Doc. 266, p. 46, 47, 48; Exhibit 33].

A reasonable investigation in the Meeker, Colorado area, based on the information regarding Petitioner's time living in the area, of which the trial team had actual notice, would have very likely produced additional mitigating witnesses, including Brian Conrado, a friend of Mrs. Lake. [Doc. 268, pp. 50, 54].

Mr. Conrado, when he testified at Petitioner's evidentiary hearing before this Court, was 66 years old and had lived in Meeker, Colorado for 61 years. [Doc. 268, p. 33 lines 13, 14]. He was 12 years old and in the sixth grade when he first met Petitioner. [Doc. 268, p. 40]. He offered the following observations of Petitioner during the time he was living in Meeker, observations which would have been appropriate mitigation evidence if Mr. Conrado had testified at Petitioner's trial.

Q. Tell us about the Dale Eaton that you knew back when the two of you were kids in Meeker, Colorado.
A. Dale, uh, Dale that I knew, uh, was a terrifically

hardworking kid. He, uh, he was the brunt of all kinds of
harassment and belittling. He was different. His parents
didn't have money. In my view, he was a good kid.

[Doc. 268, p. 40 lines 16-21].

Q. Did Dale do anything outside of school as far as
extracurricular-type activities?
A. The only thing that I know that I can remember that Dale
did, and it wasn't a school sanctioned, was a 4H electric
program . . .
Q. And tell us what you remember about that 4H electric club.
Was that something Dale did for that one year?
A. Actually, he did it for several years. And, um, I think
that was probably the only organization or extracurricular
anything that Dale ever did.

.          .          .

We would have the meetings and always
had refreshments, and then we would go outside and wait for
our parents to show up or whoever to take us back to town.
And Dale in that time would, while we were waiting,
would usually end up being harassed and belittled, unbeknownst
to the leader. And -- the two leaders, I should say. And on
one occasion I can remember that we depantsed him and ran
Canadian thistles over his genitals.

[Doc. 268, p. 41 lines 15-19, 24,25; p. 42 lines 1-3, 9-16].

Q. How did Dale fit in with you and the other kids his age?

A. He didn't.

Q. Was he treated well, just -- or at least just, as just another kid?

A. No.

Q. How was he treated?

A. He was belittled.

[Doc. 268, p. 43 lines 2-8].

Q. Did you and Dale have anything in common?

A. I liked Dale, and down deep I felt sorry for Dale, but you got this peer pressure. And we both mowed lawns in the summer.

.           .           .

Q. Okay. Tell us about Dale's lawnmower.

A. Well, um, Dale I'm sure didn't -- his parents didn't buy him that lawnmower. There was a competing hardware store other than my father's, and the guy that owned it gave Dale a break. It was a red Toro. And he trusted Dale. He financed Dale on that lawnmower so that he could start his little business.

Q. Did Dale pay for that lawnmower?

A. Yes, I'm sure he did.

Q. He believed in Dale and gave him a chance?

A. He did.

[Doc. 268, p. 43 lines 16-19; p. 44 lines 9-19].

Q. You talked about the Canadian thistles incident. Were you

ever involved personally in any other sort of harassment or bullying of Dale?

A. I was with groups of people that were older than me. I had a neighbor that was three years older than me, and he had friends that were even older than that who had their licenses. Dale, when he mowed lawns, wow, he -- you know, you could see him, it might be 6:00, 7 o'clock at night when he was pushing his mower down the street heading home. And I can remember -- I wasn't involved 'cause, I mean, I was just -- I wasn't as big as these guys by any means, and -- but I was in the car when it happened several times. And they'd pull over, and they would, pardon my language, threaten to beat the shit out of Dale if he didn't give them his money or his candy bars.

Q. Did you stand up for Dale on those occasions?

A. I didn't.

Q. Did Dale ever fight back to keep the money he had earned?

A. No, because he was, he was outnumbered. These guys were, were high school kids.

[Doc. 268, p. 45 lines 19-25; p. 46 lines 1-13].

Q. How did Dale react to the constant bullying?

A. He withdrew. He, he, he didn't socialize. He didn't -- I, you know, I can only imagine what went through his mind, but he, uh, he didn't retaliate. And I think about what could he do?

Q. Would anyone stand up for Dale when he was bullied?

A. No. No, um, I don't even think -- I don't even think
there was an adult that, um, that did in the school system
or -- I -- no.

[Doc. 268, p. 46 lines 20-25; p. 47 lines 1-3].

Q. Do you remember whether Dale had a younger brother who was
handicapped?
A. I do.
Q. Tell us about that.
A. Well, I would see, uh, Dale would pull him around in a
wagon. And he was, he was also in a wheelchair. I wasn't
really, um, you know, I wasn't concerned what was wrong with
him. Back then the polio thing was, was a big thing, and so I
assumed he had polio, but I really didn't know what it was.
And, you know, I feel bad, but I really didn't care.
Q. Where would you see Dale pulling his younger brother?
A. He'd be pulling him towards school.

[Doc. 268, p. 47 lines 13-24].

Mr. Skaggs stated, apparently in reference to Brian Conrado: "I would have used that

witness that, that called me from Meeker, Colorado. Had I known about him, had he been

reasonably available, I would have used him." [Doc. 262, p. 142 lines 1-13]. Mr. Skaggs and

Petitioner's trial team would likely have found Mr. Conrado had they simply pursued the

leads with regard to potential mitigation witnesses contained in their files.

The report by Dr. Donald Langsley to Weld County Judge Donald Carpenter regarding a psychiatric assessment of Petitioner, Exhibit 223-14, contains an additional reference to records which were not researched by the Petitioner's trial team. The very first sentence indicates "Dale Eaton was hospitalized at the Colorado Psychopathic Hospital from October 16, 1961, through October 26, 1961, for psychiatric examination and diagnosis." [Exhibit 223-14, p. 1; Doc. 261, p. 217 lines 9-14]. When asked if the referenced sentence suggested the possible existence of hospital records, Mr. Skaggs replied, "No, it doesn't tell me that at all. It tells me there probably was a record at one time." He then stated, after agreeing if the records existed in 2013, he could have obtained them in 2003, "[t]his particular situation I didn't want to develop." [Doc. 261, p. 217 lines 15-25; p. 218 lines 1-2]. He made his decision without even knowing what the records might reveal.

The records of Petitioner's ten-day evaluation at the Colorado Psychopathic Hospital (now the University of Colorado State Hospital, Exhibit 169, pp. 498, 504) do indeed exist, were obtained using a HIPAA-compliant release, and are in evidence as Exhibit 169-4 and 169-59. Exhibit 169-4 contains additional information with regard to Mr. and Mrs. Barney. The contents of those records are discussed *infra*.

### Marion Eaton Hospital Files

Mr. Skaggs, being aware family mental health history was important, directed Ms. Moree to obtain the records concerning the involuntary commitment to the Colorado State

Hospital of Petitioner's mother, Marian Eaton. Ms. Moree, as a result, received Exhibit L, a letter advising her Mrs. Eaton's records had been destroyed. The letter enclosed an admission/discharge summary of Mrs. Eaton's intermittent psychiatric hospitalization between March, 1962, and 1965, which indicated a diagnosis of chronic undifferentiated schizophrenia. [Doc. 261, pp. 200-202; Exhibit L, p. 1]. Mr. Skaggs, when asked if this document reflected significant family history, stated, "Well, it could have been a lot better . . . Schizophrenic reaction doesn't say very much." [Doc. 261, p. 202 lines 2-9]. "In fact, my belief was it wasn't particularly greatly significant without a whole lot of other records to back it up." [Doc. 261, p. 202 lines 16-18]. He made it clear, "…we wanted all those records." [Doc. 261, p. 203 lines 4-8]. The fact is the trial team could have obtained them.

Mr. Skaggs, through his investigator, Ms. Moree, was aware Mrs. Eaton had been involuntarily committed, and the summary Ms. Moree received in fact so indicates. [Exhibit L, p. 6 "Admission Type: RE-Commitment (412)"; p. 10 "Type of Admission - Commitment"]. Mr. Skaggs acknowledged a judicial process would necessarily have preceded Mrs. Eaton's involuntary commitment, and the notation "Weld D.C. 84M" was a court file, however, he did not ask Ms. Moree to attempt to obtain that file. [Doc. 261, p. 203 lines 22-24; p. 204 lines 1-25; p. 206 lines 1-9]. He stated, "We stopped with that that piece of paper you got right there." [Doc. 261, p. 206 lines 11, 12]. He was thus unaware of what the file might contain, although he did agree the file could have referred to a physician and

a local hospital from which records might be recovered. [Doc. 261, p. 205 lines 1-25]. He also admitted, however, a reasonable, thorough investigation would have included researching the district court file, and any hospitalization records from 1965 (which he opined "are not ordinarily available") discovered by such an investigation would be helpful. [Doc. 261, p. 206 lines 13-25; p. 207 lines 1-18]. Petitioner's habeas counsel pursued this investigative lead, and obtained contains 214 pages of Mrs. Eaton's psychiatric hospitalization records. [Exhibit 176].

The letter advising Ms. Moree the records of Mrs. Eaton's involuntary hospitalization had been destroyed, Exhibit L, also identifies Mrs. Claude Thomison, complete with contact information in Greeley, Colorado, as a sister of Mrs. Eaton. [Exhibit L, p. 8]. Mr. Skaggs, when asked if the listing of Mrs. Thomison on a hospital record might suggest she had a close relationship with Mrs. Eaton, replied, "I'm not aware. We didn't pursue that lead." [Doc. 261, p. 207 lines 19-25; p. 208 lines 1-2]. Mr. Skaggs did not know Mrs. Thomison was Mrs. Eaton's sister, notwithstanding the fact she is listed as such on the hospital records. [Exhibit L, p. 8; Doc. 261, p. 208 lines 3-6]. Neither Mr. Skaggs nor anyone else on the trial team ever attempted to speak with Mrs. Thomison, and thus had no idea what she might have said on behalf of Petitioner. [Doc. 261, p. 208 lines 7-17].

*Alan Eaton*

Alan Eaton, the younger brother of Petitioner, was born with cerebral palsy. [Doc. 263, p. 47 lines 13-25]. Ms. Moree did not interview him. She was advised by their sister, Judy Mason, Alan never got along with Petitioner, and Mr. Skaggs thus never directed her to interview Alan. [Doc. 263, p. 39 lines 2-21; Exhibit 220-94].

> Q. All right. And this is the 10-day hospitalization that we
> were discussing as a result of Dr. Langsley's report. And
> Judy Mason had told you that Alan and Dale had never gotten
> along; correct?
> A. That's what she said.
> Q. And you passed that information along to Mr. Skaggs;
> correct?
> A. Yes.
> Q. And so without any further investigation of that issue, no
> effort was made subsequently to interview Alan Eaton; correct?
> A. Right.

[Doc. 263, p. 46 lines 22-25; p. 47 lines 1-7].

A reasonably thorough mitigation investigation would have established Alan was a potentially significant mitigation witness. The trial team, if it had obtained the records of Petitioner's ten-day hospitalization at University of Colorado State Hospital, Exhibit 169-59, would have learned Dr. R. T. Dean, reviewing Petitioner's siblings in order of birth, wrote in his report, "Next is a nine-year-old boy, in the fourth grade, who was born after a six

months' pregnancy and has suffered from cerebral palsy since birth. . . . This child was born during Dale's first year in school. Dale reports that he has always tried to help and take care of this brother. The parents confirm this." [Doc. 263, p. Hrg. Tr. Vol. 3, p. 524, *quoting* Exhibit 169-4, p. 516]. [17] Ms. Moree, when asked if this was sufficient reason to go talk to Mr. Eaton's brother, answered in the affirmative.

> Q. And so is that a reason to go interview Alan Eaton?
> A. Oh, yes.
> Q. Even assuming being a sibling wasn't reason enough --
> A. Yes.
> Q. -- this gives you additional reason. Does this give you reason to disbelieve or discount the information you were given by Judy Mason?
> A. Yes.
> Q. And so had you obtained the records, this would advise you that here's some information that would be helpful; correct?
> A. Oh, I wish I'd had this.
> Q. And, in fact, this is the kind of evidence that would be positive mitigation evidence to present --
> A. Absolutely.
> Q. -- on behalf of your client.
> And so you have no idea as you sit here today what

---

[17] The University of Colorado State Hospital records also state: "One of the patient's (Petitioner's) younger siblings is a nine year old boy, who suffers from cerebral palsy which dates to birth after a six month gestation. The patient has always felt rather close to this sibling, and has tried to help and take care of him." [Exhibit 169-4, p. 504].

Alan Eaton would have provided in the way of information or
mitigation about his brother Dale, do you?

A. No, I, I was relying on, uh, false information.

Q. Is this the only example of misinformation you obtained
from Judy Mason?

A. No.

[Doc. 263, p. 48 lines 2-23].

The trial team, in addition, if they had thoroughly researched the possibility of
mitigation evidence in the Meeker, Colorado area, would have interviewed Brian Conrado
and Margie Jackson, both of whom stated Petitioner pulled Alan to school and around town
in a wagon. [Doc. 268, p. 47 lines 13-24; Exhibit 35, p. 2; Exhibit 195].

Mr. Burr recalls Mr. Skaggs' proffered reason for not interviewing Alan Eaton was
"one of Mr. Eaton's other siblings, a sister, Judy I think, told the defense team that Alan and
Dale didn't get along with each other." [Doc. 266, p. 48 lines 19-21]. He points out, however,
competent capital counsel does not rely on a sister's assertion to forgo any sort of
investigation. "Not at all. You take that information for -- at face value, and, you know, you
-- when you're making contact with Alan, you know, you may exercise some caution or
particular care in approaching him if that happens to be true. If it is true, you want to know
why they're estranged from each other. If it's not true, then obviously you're going to talk

with Alan about everything he can tell you about his brother." [Doc. 266, p. 48 line 25; p. 49 lines 1-6].

The trial team had a clear responsibility to interview Alan Eaton. He was a sibling of Petitioner, and information from at least two sources indicated interviewing Alan could produce helpful mitigating evidence.[18]

*Family History*

Mr. Skaggs, even though he did not know how many generations back a competent psychosocial history should cover, acknowledged family history is important because it "can bear upon how he was raised, how an individual is raised as a child. It can bear upon how they react as an adult. It can also furnish mitigation because it sometimes furnishes a reason for them acting out in the way that they did. So family history is critical. And I can't under -- I can't underemphasize how critical that is." [Doc. 261, p. 121 lines 4-9, 10-15]. He was also aware the mental health history of other members of the family is relevant to his client's predisposition to inherit a mental disease.[Doc. 261, p. 121 lines 14-21]. Mr. Skaggs and trial team, nevertheless, did very little to unearth the extensive history of mental disease in Petitioner's family, apparently because, according to Mr. Skaggs, Petitioner didn't

---

[18] Alan Eaton was alive at the time of Petitioner's trial, however, he died in November, 2008. [Exhibit 292, Death Certificate of Alan Lee Eaton].

understand the importance of family history, or "didn't want to understand it." [Doc. 261, p. 121 lines 22-25; p. 122 lines 1-21].

Petitioner's reluctance to discuss his family history is not unusual. As Russell Stetler testified, family mental health history is often a closely guarded family secret. [Doc. 264, p. 116 lines 8-19]. "Sometimes the family members that one member will tell you not to talk to are going to be the ones who are ultimately most informative or most willing to reveal the family secrets." [Doc. 264, p. 127 lines 2-5]. Some family secrets are, in fact, so successfully kept the client or his siblings may not even be aware of significant information, just as Richard Eaton "had never heard anything about" the involuntary hospitalization of his Aunt, Zelma Eaton Smith. [Doc. 266, p. 225 lines 14-19].

It is fairly clear the trial team failed to use some of the most basic tools for uncovering mitigation evidence. *i.e.* a thorough psychosocial history, a chronology, and a genogram. Each of these tools has multiple uses, and one important purpose is to guide the life history/mental health investigation. Mr. Skaggs agreed all capital defense trainings have a heavy focus on the psychosocial history, [Doc. 261, p. 36 lines 9-23], and the mitigation specialist should be providing mental health experts with such a history of the client. [Doc. 261, p. 78 lines 19-23]. No such report, however, was prepared or attempted on behalf of Petitioner. [Doc. 261, p. 84 lines 16-23; p. 85 lines 1-3].

Mr. Skaggs likewise acknowledged a genogram to be an important, "very helpful" tool in preparing the defense of a capital case, yet again no such tool was brought to bear on behalf of Petitioner. [Doc. 261, p. 84 lines 3-25; p. 85 lines 1-3]. These two tools used together provide a template which guides the family history investigation by indicating relatives who are easily identified and located. A reasonable psychosocial history investigation, with or without specific notice of family members, will identify, locate and interview aunts, uncles, parents, cousins and living grandparents, as well as spouses and offspring of each generation. Mr. Stetler explained the genogram is a standard capital defense tool.

> Well, a genogram is just, you know, what we called in school the family tree, who are the parents, who are the children, who are the grandparents, the cousins. And you want to, in the context of a capital case, you want to map out all of those family members, and it's for a couple of reasons. It's a working document just to keep track of everybody in the family as your investigation proceeds, but then ultimately it may be an important piece of demonstrative evidence that you'll present if you want to show that something is running in the family.

[Doc. 264, p. 106 lines 1-10].

Petitioner's family members advised the trial team there were hereditary issues contributing to Petitioner's impairments. Loren Ferrins told Ms. Moree "Merle's father had at one time hit the gas man on his head, knocking him out, and Loren said, 'it was just

handed down in the family.'" [Exhibit171-25]. The trial team was on notice there could be mental health issues on the Ferrins' side of the family as well. Marilu O'Malley, the sister of Petitioner's mother, advised Ms. Moree she and Marian (Petitioner's mother) had grown up on a homestead "about seven miles southeast of Moneta, and 'our house was dysfunctional.'" Exhibit 171-28. Equally significant was the suicide of Petitioner's brother, Daryl, on October 10, 1988, of which trial team was directly on notice since their mental health experts testified to it's importance. [Doc. 262, p. 48 lines 17-25; p. 49 lines 1-22].

There was, however, no attempt to follow up on any of this information, apparently and primarily based on the fact Petitioner's trial team lacked a full-time mitigation specialist with the skills, acquired through training and experience, as outlined by Mr. Stetler and Mr. Burr, necessary to obtain an accurate and complete psychosocial history. A capital defense team must include someone, as explained by Mr. Stetler, who

> is experienced at gathering and analyzing life history records, multigenerationally, for all the family members, who is just going to do that automatically, and is going to have the skills to extract from records significant themes to formulate hypotheses about what may be going on based on what we see in the records, and also scrutinize records for what else to follow up, what other records does this particular document allude to, who are the people that I should interview based on finding their names in these records.

[Doc. 265, p. 62 lines 4-14].

Mr. Burr offered his thoughts as well.

Q. So what efforts does competent capital counsel make to obtain an accurate and complete psychosocial history, um, in a case?

A. We need to have at least a full-time mitigation specialist working with us who is trained and experienced. The work of the mitigation specialist is expert work. Most lawyers are not capable of doing that kind of investigation because it requires the ability to -- much of the information we seek or look for is information that people don't easily disclose because it's about hard things. It's about, it's about abuse and malevolence and dysfunction. And, you know, all of us like to be perceived as competent and fully functioning, and the evidence that we suspect is there and almost always is there is the opposite, and people don't willingly talk about that. So it requires some real skill at getting to that information with people. * * * Most laypeople will -- I mean, they'll know if a relative has a mental health problem or has been sent to a doctor or has been hospitalized involuntarily, and they can describe their behavior, but if you simply go in and say, um, do any of your relatives have schizophrenia, they'll say no, and yet there are. And so you have to learn how to ask these questions in a way that will help people connect to the information they know and have and are willing to talk about. So part of it is overcoming a reluctance to disclose information. Part of it is helping people understand what kind of information you're looking for if it's there. And that requires some real skill. It is not something -- it's very different from so-called fact investigation, which is looking more at, you know, what happened and who did it, um, and that kind of evidence. This is a very different form of investigation. It requires patience and, uh, gaining the trust of people that you are talking with.

[Doc. 265, p. 139 lines 22-25; p. 140 lines 1-25; p. 141 lines 1-7]. The trial team did not include such a person, and even though Mr. Skaggs was actually aware of potential multi-generational mental impairments, no attempt was made to investigate them.

The trial team, with respect to pursuit of relevant family history evidence, even though Petitioner lived a good portion of his early years and young adulthood in Riverton, chose not to interview Petitioner's cousins who lived on nearby farms. "I just don't know if it would be helpful to talk to cousins." [Doc. 261, p. 213 lines 7-8]. Mr. Skaggs deliberately narrow scope of investigation thus automatically excluded three of Petitioner's cousins, Darlene Pursel, the daughter of Merle Eaton's sister Zelma, [Doc. 261, p. 215 lines 3-8], as well as Sandra Andrae and Lorena Altman, the twin daughters of Loren Ferrins. [Doc. 261, p. 213 lines 17-25].

Mr. Burr explained how mitigation investigation is much like "a series of concentric circles," beginning with the nuclear family but by no means ending there.

> I think of it as a series of concentric circles. You start working with the nuclear family, whoever's around. You know, and then you work out to, to paternal and maternal aunts and uncles and their children. And then you work out -- then at some place in these probably first two concentric circles are the grandparents on either side and the siblings of the parents, you know, your aunts and uncles.
>
> And in the course of that you're always looking for generational problems. So we've learned that you can't just look at your client's generation of, you know, himself or herself and the siblings, but the parental generation

and their siblings and their parents, so it's the grandparents and their siblings, and try to understand mental health problems at all those generational levels and how they have seemed to sort of track through family lines, straight or, you know, not straight, but there often is some tracking. And we know, you know -- we've known for a long time, but now we know more and more that there is a genetic handing down at least of vulnerabilities to various kinds of mental illness through the genes that people inherit and even trauma. Trauma in previous generations can change the genetic pool enough that it gets passed down even though I, as a child, don't experience the primary trauma. You know, if I were a Native American, my parents might have traveled the Trail of Tears, but I didn't, but the trauma they experienced and the changes in their lives that the Trail of Tears brought could be passed down to me. And so it's very important to understand even the trauma that previous generations have been exposed to . . . .

[Doc. 261, p. 141 lines 10-25; p. 142 lines 1-13].

Mr. Burr also pointed out the decision by Mr. Skaggs not to locate and interview the three cousins of Petitioner, Darlene Pursel, Sandra Andrae, Lorena Altman, and his proffered excuse therefore he "just didn't know if it would be helpful to talk to cousins," is ***not*** a characteristic of reasonably competent capital counsel performance.

No. You can't make that judgment without investigating, because you don't know whether a cousin . . . may be the client's best playmate. The cousin may be a frequent visitor at the client's home. The cousin may have the client over at his house where the client says to his parents, could I stay with you, I feel so bad when I'm at home. The cousins are people uniquely situated as age peers and as already having a relationship by virtue of blood and who often

have the opportunity to have genuine insight and perspective and know about things that have gone on.

[Doc. 265, p. 204 lines 11-20]. Those same cousins might well have also witnessed severe abuse by a parent. [Doc. 265, p. 204 lines 21-23].

Mr. Skaggs and the trial team also ignored the possible relevance of the suicide of Daryl Eaton to a reliable assessment of Petitioner's mental condition. They did nothing to investigate Daryl's background or the circumstances leading up to and surrounding his death. They thus overlooked the opportunity to shed light on Petitioner's mental condition by investigating the suicide of his brother. No one from the trial team spoke to Daryl's ex-wife, Elizabeth Pryor, nor did they attempt to interview Daryl's widow, Terry Lerseth. [Doc. 263, p. 70 lines 15-25; p. 71 lines 1-19].

The trial team was also on notice, based on a phone call by Ms. Moree with Petitioner's son, Ed Eaton, in June, 2003, that he, Ed, had been a patient at the Wyoming State Hospital and had been diagnosed with Post Traumatic Stress Disorder and bipolar disorder. [Exhibit 169-103, pp. 1, 2; Exhibit 237, p. 4]. Ed indicated while he was a patient at the Wyoming State Hospital, he "was given Mellaril, Thioridazine, Desipramine and a host of others " he could not remember. [Exhibit 237, p. 2]. Dr. Ash testified Mellaril is "used as a mood stabilizer often in the manic state of bipolar disorder," and Desipramine "is a tricyclic antidepressant." [Doc. 267, p. 85 lines 16-22]. Both medications are consistent with a

diagnosis of bipolar disorder. [Doc. 267, p. 85 lines 23-25; p. 86 lines 1-3]. Dr. Ash testified if this information regarding to bipolar disorder in Petitioner's relatives had been available to him prior to trial, it would have altered his view of Petitioner's vulnerability to such disorder.

> Q. How would this information about Ed Eaton help your assessment of his father, Dale?
> A. Again, profound. A first-degree relative diagnosed with bipolar disorder in a man who shows symptoms of bipolar disorder.
> Q. So at this point we've identified two first-degree relatives –
> A. That's correct.
> Q. -- diagnosed with or who have bipolar disorder, one diagnosed, one not --
> A. In my opinion.
> Q. Yes. And the aunt diagnosed with bipolar disorder.
> A. Yes.
> Q. Does that alter the view of Mr. Eaton's genetic vulnerability to bipolar disorder that you had at the time of trial?
> A. Tremendously so, of course.

[Doc. 267, p. 86 lines 2-20].

*Sweetwater County*

The trial team had in their possession the Sweetwater County case file, including a presentence report, from Petitioner's conviction arising from his 1997 encounter with Scott and Shannon Breeden. This document as well offered mitigation investigative leads. [Doc. 262, p. 12 lines 16-25; p. 13 lines 1-12]. The report quoted Petitioner:

> He stated, "I can't remember a lot and don't really know when I worked or where. I do know the best job I had was with West Hills and Mark was my boss and he was just too nice. You need to remember I'd go through these spells and take off and not know what I was doing."

[Doc. 262, p. 13 lines 13-24, *quoting* Exhibit 171-7, p. 5]. Mr. Burr testified the trial team should have made an attempt to find "Mark with West Hills," "[a]nd to see if there are any employment records associated with it." [Doc. 265, p. 197 lines 19-25; p. 198 lines 1-16]. Mr. Skaggs agreed there are sufficient investigative leads in the paragraph from the Sweetwater County Presentence Report to find and interview Mark Dotson, an employer who was "just too nice" to his client. Those leads, however, were not followed, and no attempt was made to contact Mark Dotson. [Doc. 262, p. 13 lines 10-25; p. 14 lines 1-23].

Mr. Burr cited another opportunity for possible mitigation evidence in the quoted statement from the Sweetwater County presentence report, Exhibit 171-7, one which suggests

a mental impairment which competent capital defense attorney would need to investigate further.

> That, that is yet another symptom that hasn't been recounted in the materials we've talked about, that it's -- when people sort of lose periods of their life in the sense that they recount it this way, "I'd go through spells and take off and not know what I was doing," this, you know -- something is happening. As far as we know, he's not an alcoholic, he doesn't go through blackout periods, but he is going through some sort of what mental health experts call a dissociative state which is you were unconnected from your experience, your realizing what you are doing, your laying down memories about what you are doing, your ability to recall later what you did. That in general is thought of as a dissociative experience, and that is . . . to me, it's a red flag to look into that as well.

[Doc. 265, p. 197 lines 24-25; p. 198 lines 1-12].

The Sweetwater County Presentence Report contained other possible mitigation evidence leads, for example, Kerry Rose.

> In 1993, the Defendant began dating Kerry Rose who was 45 years old. She had a six month old child at the time this relationship began and the Defendant reported that he loved the child as his own. Presently, the Defendant has no idea if he and Kerry still have a relationship. Kerry Rose presently resides in Kaliante [*sic*], Nevada (702) 726-3289.

[Exhibit 171-7, p. 5].

Ms. Moree did in fact talk to Ms. Rose by telephone, and after a brief conversation came away with the impression "Kerry sounds like a very nice person and she is willing to help Dale in any way she can." [Exhibit 171-36]. Ms. Moree wanted Mr. Skaggs to bring Ms. Rose to trial because "she would be very, a very good witness for Dale Wayne." [Doc. 263, p. 56 lines 2-13]. Even Ms. Rose parents, Ron and Sally Rose, approved of her relationship with Petitioner, and would have provided positive information about him at his trial.

I met Dale in Milford because he was working for Mark Dotson and also seeing Kerry Lynn. Kerry Lynn and her young daughter, Angela, were living with my wife and me at the time. Dale was a likeable guy. He never gaves us any reason to think different. He was polite and good to Kerry Lynn.

. . .

We had Dale over for dinner several times while he and Kerry Lynn were seeing each other. He was always polite and a good guy to talk to. It was clear he thought a lot of Kerry Lynn and Angela. I know Dale helped Kerry Lynn out with money from time to time even after they stopped seeing each other.

[Exhibit 200 - Declaration of Ron Rose].

Ron and I met Dale when he was working for Mark Dotson in Milford, Utah. Kerry Lynn and Angela were living with us at the time, but Dale and Kerry Lynn met prior to that in Elko, Nevada. I don't remember why Kerry Lynn and Angela were staying with us.

I liked Dale and he was good to my daughter. Dale thought a lot of Kerry Lynn and Angela, you could tell by the way he treated them. He was always kind and polite. He often had surprises for Angela, such as candy, toys

and games. Dale helped out Kerry Lynn with money sometimes. Kerry Lynn told me Dale was always sending her money.

We had Dale over to our home often while he worked for Mark Dotson. He came for dinner or to visit with us. He was polite and kind. He noticed our walk needed repair so he fixed it himself and also built us a new driveway. It was so good of him to do that for us, he didn't have to do such a thing. He did the work in his extra time and he worked hard to get it right. It was generous of Dale and we appreciated it. We liked Dale.

[Exhibit 201, p. 1 - Declaration of Sally Rose].

Kerry Rose was also an important direct lead to mitigation witness Mark Dotson. Ron Rose "met Dale in Milford because he was working for Mark Dotson and also seeing Kerry Lynn." [Exhibit 200]. Ron recalled Petitioner lived in his camper on Mark Dotson's property, and got pretty upset with co-workers who were stealing from Mark. [Exhibit 200]. The trial team thus had a second lead to Mark Dotson and the mitigation evidence he might be able to provide, yet he was not contacted. [Doc. 262, p. 13 lines 10-25; p. 14 lines 1-23].

Mr. Stetler stated, in addition to the above-referenced leads for Mr. Dotson, he would also show up on the Social Security Administration retained earnings report, which is one of the documents a life history investigator will go after "on Day One." [Doc. 264, p. 151 lines 8-19]. He further stated if the trial team, as reasonably competent counsel, had used the standard mitigation tool of creating an adequate life history chronology, Mark Dotson, through Kerry Rose, would "absolutely" have shown up on the chronology as well, so there

were at least three different reasonable paths of investigation which led to Mark Dotson. [Doc. 264, p. 151 lines 19-24; p. 152 lines 1-8].

Mr. Stetler also noted Mr. Skaggs, in the *Calene* remand hearing, asserted he did not want to investigate Petitioner's work history because "[h]e seemed to think that he - -that Mr. Eaton lost all of this jobs because of assaultive behavior," a conclusion Mr. Stetler indicated, based upon his review of the material gathered for the Petition to this Court, was not correct. [Doc. 264, p. 152 lines 9-23]. The failure of the trial team to interview any of Petitioner's employers was neither reasonable or appropriate nor was it an informed conclusion in light of the fact there was no investigation at all of Petitioner's work history. A reasonable capital defense team would investigate before reaching such conclusions, and, in this matter, a reasonable investigation, before reaching any conclusions concerning Petitioner's work history, would have interviewed former employers and co-employees Jim Hoopes, Sandy Hoopes, Steve DuBry, Mark Dotson, and Daniel Dotson. Those interviews would have revealed the conclusion Petitioner had lost each of his jobs as the result of assaultive behavior was simply invalid speculation. [Doc. 264, p. 152 lines 21-25; p. 153 lines 1-25; p. 154 line 1]. Mr. Burr stated:

> a part of mitigation investigation is always reinvestigating prior offenses, either adjudicated or unadjudicated offenses, because you're always going to face negative stuff in your client's life. I mean, we all – every human being has done negative things. Our clients are the same way. They've done one, at least

one horrendously negative thing which is what they're on trial for their life for, but they've also done a lot of really bad things generally. And you have to understand that because if you can't come to understand that and help the jury understand that, chances are your client is going to get sentenced to death. If you do understand it and help the jury understand it as fully as it can be understood, chances are your client will not get death. That's just -- we've learned that over the years.

[Doc. 265, p. 131 lines 21-25; p. 132 lines 1-10]. The trial team did not know what evidence they were sacrificing by failing to do a search for Mark Dotson, nor did they even know what evidence might result from an interview with him. The decision to not attempt to contact Mark Dotson can not be considered a strategic one as "[i]t was not informed." [Doc. 264, p. 153 lines 2-4].

Another valuable mitigation evidence lead apparent in the Sweetwater County Presentence Report, Exhibit 171-7, is Probation & Parole Officer Kimberly Bramwell's interview of Petitioner's brother, Richard Eaton, in which he displayed remarkable insight into his brother's life history and impaired mental condition.

We don't want mom to be told about this because of her health. My dad was really abusive to Dale when he was a child. Dale is 10 years older than me so all I hear I hear from my sisters. I still notice my dad doesn't care for him still. Dale is doing better now that he is on this medicine. My other brother died because of suicide and Dale blames himself because my brother had asked him for some money and he did not get it to him before he killed himself. He is a kindhearted guy but he has a temper but the medicine has helped. He lived

like a hermit after his divorce and then when my brother killed himself he just went on and on til he popped. He had said he had plans to go to the woods and take his life and when he saw this family he wanted them to kill him so they could have his van. He has always been there for me all my life so I try to be there for him. I was so young when he was growing up so I don't know much about him. I have got a pretty good relationship with him. My son was shot and killed here in Green River and Dale has a hard time with it. I don't think prison would be an answer for him. He is staying busy now with his job and when he's busy he's happy and when he couldn't find a job he got down and another problem he has is that he doesn't talk, 'he holds everything in. He needs to work and go to some counseling. When I heard about this I was totally amazed. He has taken off before so when I didn't see him for a while I didn't think nothing of it. I can never remember him consuming large amounts of alcohol he just has some depression problems.

[Exhibit 171-7, p. 4].

Mr. Stetler testified Richard should definitely have been interviewed in person."Q. The trial team dropped their pursuit of him as a witness because of one negative phone call. First of all, would you have started your investigation with a telephone call? A. No, I would have gone to see him." [Doc. 264, p. 155 lines 5-8]. "He's a full sibling, has a lot of information." [Doc. 264, p. 150 lines 15-20]. Richard Eaton described in a declaration the first contact he had with the trial team.

Dale's crime and his prosecution have been very difficult for my family. We all have our issues about it. The high publicity and the facts surrounding the crime added to the trauma. Judy and Sharon are hurt by what Dale did because

*their* images were tarnished. I was hurt by his crime because it is my image of Dale that is tarnished. I really looked up to Dale and respected him. It was in the middle of all that when I got a telephone call from Priscilla Moree, the investigator who worked for Wyatt Skaggs, asking me some very personal questions. I had never met this woman, and her approach really turned me off. On top of that, I then got a nasty letter from Wyatt Skaggs telling me that my brother's death would be on my head, and that really made me mad. No one ever came to talk to me in a way that reflected some understanding of what we were going through as a family. No one explained the legal process to us, no one ever talked to us about the evidence in the case, and no one attempted to explain to us what happened or why it might have happened. They started right in talking about personal, embarrassing things and I had no idea why that was necessary. It turned me off. If Mr. Skaggs had approached us with some sensitivity to what we were going through, things might have been different.

[Exhibit 40, p. 1].

Mr. Stetler described this investigative technique as "a textbook for how not to do it."

Q. (BY MR. O'BRIEN) And here's the declaration of Richard Eaton that we have talked about in which Richard expresses his experience with the trial team, the phone call followed by a nasty letter from Mr. Skaggs, and really no communication with him. Is this a formula for failure of a capital trial team?
A. Yes. This is, this is a textbook for how not to do it.

[Doc. 264, p. 156 lines 12-17].

The Sweetwater County Presentence Report contains a further mitigation evidence lead, as discussed *infra*, when it references Petitioner's decades of employment through the Operating Engineers Union.

> The Defendant has been a member of the Operating Engineers Union, Local 326 since 1972. In 1980 the union split and regathered [*sic*] as operating Engineers Union, Local 800 in Casper, Wyoming.

[Exhibit 171-7, p. 5].

### *Sandy and Jim Hoopes*

Investigative leads for mitigation witnesses were also contained in the investigative reports of the Natrona County Sheriff's Office. One example is the interviews of Jim and Sandy Hoopes conducted in October, 2002, by Natrona County Deputies Lynn Cohee and Dan Tholson.

Ms. Moree, in a memo to Mr. Skaggs, related the fact Mrs. Hoopes told the deputies on October 10, 2002, she had known Petitioner for about 27 years, and her husband had known him even longer. Petitioner did welding work for them and had lived on their property. [Exhibit 220-97, p. 1]. Mrs. Hoopes had positive things to say about Petitioner, and perhaps had some mental health perspective as well. She described Petitioner as "'highly intelligent with his hands and with welding…I don't think he was coordinated to think a lot of things through…if he was working with something, he'd work with it until he got it done.'

[She] … 'thought Dale was a little slow' in his thinking." "Dale never lost his temper when he was around Sandy, and she says Dale was always nice and polite around her. Dale stayed with them for 3 or 4 months, but he wouldn't eat with them 'because he didn't want to put us out.'"[Exhibit 220-97, p. 1]. The statements by Mrs. Hoopes were clearly sufficient to put Mr. Skaggs on notice she was potentially a valuable mitigation witness who should be interviewed.

Ms. Moree also wrote a memo to Mr. Skaggs addressing the interview by Deputies Cohee and Tholson of James Hoopes on October 10, 2002, which also identified him as a possible valuable mitigation witness. Mr. Hoopes had worked with Petitioner for many years, and had positive things to say about him. [Exhibit 220-98, p. 1]. "Hell, he seemed real good to us…it was always the same old Dale around me all the time." [Exhibit 220-98, p. 2]. Mr. Hoopes also made several comments about Petitioner's hygiene, a possible characteristic of his mental impairments. "[O]nly thing I see was he didn't bathe often enough . . . a lot of times when he'd ride with me, you'd have to have the window down."[Exhibit 220-98, p. 2]. Mr. and Mrs. Hoopes lived in Lyman, Wyoming. [Exhibit 220-97, p. 1].

Mr. Hoopes was not interviewed by trial team. Mr. Skaggs, in fact, did not "know who Jim Hoopes is," did not know he had been friends with Petitioner for 30 years, and apparently did not know Mr. Hoopes had been interviewed by the Natrona County Sheriff's Department.

Mr. Skaggs, even when made aware of this information, still did not think it would be productive to interview him because he "didn't know what the door would open."

Q. Well, the police already knew about Jimmy Hoopes; correct?

A. Pardon me?

Q. The police already knew about Jim Hoopes; correct?

.            .            .

A. I don't know who Jim Hoopes is.

Q. All right. So you don't know --

A. I don't know.

Q. -- that he is a good friend of Mr. Eaton who Mr. Eaton knew for 30 years? You don't know that?

A. Don't know that.

Q. All right. Although you did have an interview with Mr. Hoopes by Detective Tholson in which Mr. Hoopes told him that very thing, didn't you?

A. I have no doubt that there's probably an interview of that, like that in there, and there's probably other witnesses who would probably say the same thing, sir.

Q. And having an interview by the police of a person who says I've known Dale Eaton for 30 years would indicate that he has some relevant information about Mr. Eaton, wouldn't it?

A. Well, I thought we were talking about his work history.

Q. We're talking about witnesses. We're talking about people who knew Mr. Eaton who could come to court and testify and provide mitigating evidence on his behalf. Correct?

A. Okay. The mere fact that he knew him for 30 years, no, that's not helpful.

Q. And so you would want to put more with that, wouldn't you?

A. I'd want to know more.

Q. All right. And you didn't bother to learn more, did you?

A. With respect to him?

Q. With respect to Jim Hoopes.

A. With respect to who?

Q. Jim Hoopes.

A. No.

Q. All right. So you don't know what he says, what he would add to the mitigation case.

A. No.

Q. All right.

A. I didn't know what the door would open.

[Doc. 261, p. 225 lines 20-25; p. 226 lines 1-25; p. 227 lines 1-12].

Mr. Burr pointed out for Mr. Skaggs to have sealed himself off from the information Jim Hoopes could have provided, and to make judgments with regard thereto without having done an investigation, is the very kind of mistake the United States Supreme Court said in *Strickland v. Washington* doesn't get deference. [Doc. 265, p. 203 lines 6-10]. Mr. Burr explained:

Q. Would the same apply to Mr. Skaggs' statement that he didn't want to interview Jim Hoopes because opening the door to evidence that he got fired for assaultive behavior, that's something he wanted to stay away from?

A. No, again --

Q. Is that reasonably competent performance –

A.  - - it's the same thing I've talked about with, with – and anybody, truly, anybody who knows Mr.Eaton at all for any period of time or in any, you know, strong relationship is going to have mixed information. And, you know, that's, that's true about most of our clients. It's true about all of our clients. It's true about all of us. I mean, none of us has lived pristine lives of virtue. And to want to stay away from those parts of the life that are not virtuous means that you don't understand that you have to understand that to understand that person.

[Doc. 265, p. 203 lines 11-25; p. 204 line 1]. Mr. Burr even described the reasons proffered by Mr. Skaggs for not having located and interviewed Jim Hoopes as nonsensical. "That makes no sense to me. Somebody who's known somebody 30 years who might be a parental-like figure who loved the person is one of the first people I'd want to go see or have my mitigation specialist go see." [Doc. 265, p. 205 lines 18-21].

Mr. Burr stated his opinion the decision by Mr. Skaggs to *not* investigate Petitioner's work history was neither based upon a reasonable investigation, nor consistent with a reasonable performance of capital counsel.

Q. So did that decision Mr. Skaggs made not to investigate appear to have been based upon a reasonable investigation having been done?
A. No.
Q. And does it appear to have consisted of reasonable performance of capital counsel?

A. No. You cannot avoid the bad things in your client's history and purport to understand your client and, therefore, get others to understand him.

[Doc. 265, p. 201 lines 12-20].

Mr. Burr pointed out:

[T]he court has been very clear that . . . counsel can make strategic decisions about the presentation of evidence . . . that . . . if they are reasonable, will be deferred to, but that counsel cannot refrain to investigate evidence simply because there may be a double-edged quality to it or . . . may appear to be only aggravating. The court has said you just can't make judgments about that effectively unless you know what the facts are, unless you've investigated. . . . You . . . can't know what's out there until you go look for it. * * * [T] the rule of thumb, I think, drawn from these cases [*Williams*, *Wiggins*, *Rompilla*, *Upton*, *Porter*, and *Sears*], and just as the standard of practice has evolved through, you know -- from really the late '80s and through the '90s and since, is that you've got to conduct the most thorough investigation possible of anything that might be mitigating. Your client's life is the primary subject.

[Doc. 265, p. 129 lines 23-25; p. 130 lines 1-16, 25; p. 131 lines 1-5].

Mr. Burr suggested, with regard to the testimony by Mr. Skaggs he felt it would be too hard to find some of Petitioner's former co-employees and employers, "sounds like a lame excuse."

Q. Do you recall Mr. Skaggs also testifying here that he thought it would be too hard to find them, some of those co employees, some of those employers?

A. I do remember that.

Q. What's your perspective on that? Is that reasonable performance?

A. It sounds like a lame excuse to me. It's easy to find people. It was as easy then as it is today with all the computer databases that exist. And it sounds like he didn't want to find people because he didn't, he didn't want to learn what they had to say.

[Doc. 265, p. 201 lines 21-25; p. 202 lines 1-6].

The concern by Mr. Skaggs about "opening the door" to employment history, if it had any validity at all, would not preclude interviewing Sandy Hoopes, who did not know Petitioner in an employment context. The decision by Mr. Skaggs to not investigate or interview investigate Jim and Sandy Hoopes was not an informed decision.

*Operating Engineers Local 800*

A number of documents which could have been useful to reconstruct Petitioner's life history were provided to the trial team by the Natrona County Sheriff's Department. [Doc. 262, p. 15 lines 8-22]. The documents included a letter from the business manager of the Operating Engineers Union Local 800 Chapter, Steve DuBry. [Doc. 262, p. 16 lines 2-24; Exhibit 318, p. 55.[19] Ms. Moree also had developed an investigative lead for "Steve DuBay," whom she could not locate, but who was described as a friend and fellow worker of

_____

[19] The reference to Petitioner's numerous years of work through the Operating Engineer's Union also appears in the Sweetwater County Presentence Report. [Exhibit 171-7, p. 5].

Petitioner. [Doc. 262, p. 17 lines 3-25; p. 18 lines 1-4; Exhibit 220-49, p. 1]. Mr. Skaggs

noted DuBay and DuBry were located in Mills, Wyoming, "so it might be the same." [Doc.

262, p. 18 lines 6, 7]. Steve DuBry was thus apparently identified twice as a good friend of

Petitioner having very possibly valuable mitigation evidence and was easily located through

the address and phone number on the Operating Engineers Union letterhead. [Exhibit 318,

p. 55]. No one from the trial team ever interviewed Mr. DuBry, thus the team had no idea

what he could add to Petitioner's mitigation case. [Doc. 262, p. 18 lines 8-19].

Mr. Burr again points out, with reference to Mr. Skaggs' proffered concerns about

"opening the door" to employment history, a reasonably competent investigation "absolutely"

would include attempts to locate and interview employers, particularly since Petitioner, in

fact, had such a history.

> Q. Would reasonably competent investigation attempt to locate
> and interview employers?
> A. Absolutely.
> Q. Would reasonable –
> A. You know, many of our clients don't have employers because
> they're young and they haven't had work, or they've just been
> on the margins of society for however long they've lived and,
> you know, they don't have Social Security records and they
> don't have employment records. This guy had some employment
> records, and he had a, not a conventional employment history
> but a real employment history. He had worked at a lot of
> things. And so there was, there was a body of information to

tap into there.

[Doc. 265, p. 205 lines 22-25; p. 206 lines 1-9].

The Operating Engineers Union, Jim Hoopes, and Steve DuBry were resources for identifying other possible witnesses such as Johnny Miller [Exhibit 45], who knew Petitioner through his employment which was an important part of his life, yet no effort was made by the trial team to develop those resources. [Doc. 262, pp. 21, 22].

### *Doris Buchta's Journal*

Doris Buchta was acquainted with Petitioner when they were neighbors in Moneta, Wyoming. She kept a rather detailed journal containing numerous entries regarding the interaction between herself and her husband, and Petitioner. [Doc. 266, p. 33 lines 19-17; Exhibit 233]. She was listed by Ms. Moree as a potential mitigation witness based on her journal entries. [Doc. 220-91, p. 1]. Mr. Skaggs acknowledged Mrs. Buchta's journal contained entries regarding Petitioner helping her husband fix the brakes on his truck, and also install a new starter which Petitioner supplied. [Doc. 261, p. 186 lines 21-25; p. 187 lines 1-15; Exhibit 233, p. 2 - April 22; p. 3 - July 29]. Petitioner, on many occasions, also brought Mrs. Buchta gifts, including boxes of her favorite candy, jellybeans, ice cream, baskets of fruits and vegetables, as well as fish he caught. [Exhibit 235, p. 1 - May 14th, May 23rd, June 9th; p. 2 - April 20th and April 23rd; p. 3 - July 4th and December 25th]. It also

appears he ate meals with them on a number of occasions, and simply "visited" on others [Exhibit 233, 1989 - September 24th, October 7th, December 15th; 1988- March 8th, 16th, 22nd, April 1st, 25th, May 14th, 23rd, June 23rd, August 16th, September 17th, 16th, October 3rd, 21st, 31st, November 15th, 29th, December 2; 1989 - April 20th, 21st, 22nd, 25th, May 9th, 11th, 17th, 18th, 20th, June 13th, July 19th, August 5th, and December 8th].

The prosecution took Doris Buchta's deposition to preserve her testimony against Petitioner at trial. She was, however, never interviewed as a mitigation witness, thus no attempt whatsoever was made to learn and develop what helpful mitigation testimony she might have been able to provide even though the trial team knew she was in very poor health. [Doc. 263, p. 53 lines 3-20].

_Riverton Witnesses_

Petitioner spent a significant portion of his life in the Riverton area, both as a young child and young adult. He and his wife, Melody, moved in with his family after their marriage. [Doc. 266, p. 112 lines 11-23]. Ms. Moree interviewed Marilu O'Malley, and Loren and Betty Ferrins, at their homes in Riverton. There were other potential mitigation witnesses in the Riverton area, including "Keith and Irba (Jeannie) Lange," identified as "friends of Dale's." [Exhibit 220-91]. The Langes, who Ms. Moree interviewed by telephone, had a positive impression of Petitioner. [Exhibit 253-48]. They stated Petitioner was always helpful and polite, and one time stopped to help them round up livestock (hogs) after they got

loose. [Exhibit 253-48, p. 1; Doc. 261, p. 184 lines 14-20; p. 185 lines 11-17]. Mr. Skaggs discounted them as potential mitigation witnesses based on the fact "they wouldn't talk about Merle," Petitioner's father. [Doc. 261, p. 184 lines 13-17]. Keith Lange, however, did state "if they went over to Merle's house while he and Marion and the kids were having dinner, that Merle would make Dale get up from the table and stand eating in the corner so whoever was visiting could have Dale's chair at the table, and 'that didn't sit well with me.'" [Exhibit 253-48, p. 1; Doc. 261, p. 184 lines 23-25; p. 185 lines 1-3]. Mr. Skaggs admitted the statements by the Langes were not hurtful, yet then gratuitously added, "but I can imagine the cross." [Doc. 261, p. 188 lines 5- 13]. He also admitted he could think of nothing which would render the Langes a bad avenue of investigation. [Doc. 261, p. 188 lines 5- 13]. Mr. Skaggs further acknowledged "it's reasonable to ask a witness who knows your client if he or she knows other witnesses who might also know your client.: .... "Sure…just an investigation technique." [Doc. 261, p. 187 lines 16-23]. He, nevertheless, did not utilize this "investigation technique." He did not ask Ms. Moree to conduct an in-person interview with the Langes. [Doc. 261, p. 188 lines 14-19].

Mr. Skaggs also suggested they, the Langes, "don't know him (Petitioner) well enough, for number one, and number two, they simply don't know him." [Doc. 261, p. 186 lines 1-3]. Mr. Burr expressed his opinion such a suggestion was not a reasonable conclusion.

No[this was not a reasonable conclusion]. You know, a life lived as long as Mr. Eaton's has thousands of grains of sand in it, and each grain has the potential of helping somebody have some understanding about a person. And if you've got a report of just a generous incident like that, it does -- you know, however – whatever their relationship was, it's worth that grain of sand being known about and put into the jar. And, you know, you may not decide to call that fellow, but it may be something that a mental health expert learns about and the mental health expert can recount as part of the social history, because mental health experts can rely on hearsay because that's a part of what their profession allows them to do. So there are many ways in which information can come in short -- you may want to call that witness because if you went and talked to him you may have decided they're good people to call. But to seal yourself off from information and make judgments about it without knowing enough about it, without having investigated it, is the very kind of mistake that the Supreme Court said in *Strickland* doesn't get deference.

[Doc. 265, p. 202 lines 17-25; p. 203 lines 1-10].

Mr. Skaggs believed the lead to Keith and Irva Lange probably came from "Farrens, but that's just a guess." [Doc. 261, p. 188 lines 14-25]. Information leading to neighbors and friends of Petitioner in the Riverton area would not, however, have been hard to develop through Petitioner himself, Keith and Irva Lange, Marilu O'Malley, and Loren and Betty Ferrins, all of whom lived in Riverton at the time. A reasonable investigation would have identified Irva Lange, who lived more than 90 years on the farm next to the Eaton family farm; Terry and Donna Schmuck, who still work a farm nearby; and other good friends such

as Tanis Manning and David Brewbaker. None of these witnesses were ever interviewed by Ms. Moree or anyone else on the trial team. [Doc. 261, p. 189 lines 23-25; p. 190 lines 1-25; p. 191 lines 1-21. S*ee also* Exhibits 37, 192, 197, 203, 239].

Jim and Sandy Hoopes, Steve DuBry, Tanis Manning, David Brewbaker, and possibly many others would have been interviewed by competent capital defense counsel.

> Q. Does that universe of people to be interviewed include coworkers, employers?
> A. Oh, yeah, once you get past relatives then you look for peer-aged friends, you look for teachers, you know, during, during preschool and school years, healthcare providers, pastors if people went to churches, social service agencies if they were helping the family in any fashion at all and, if your client's old enough to have worked, work situations or failures of work, military service. You -- those circles keep expanding outward to -- you're looking for people who have, either by relation and proximity, familiarity, friendship, professional relationships or work relationships, have had some unique opportunity to learn something real about this person, you know, not just ephemeral, not just an impression, but have had some real experience with this person. It doesn't have to be over years. It might be, but it could be over a significant period of time where something significant happened.

[Doc. 265, p. 142 lines 16-25; p. 143 lines 1-8].

The mitigation evidence investigation by Mr. Skaggs and the trial team lacks both scope and depth. The witnesses and evidence previously discussed, with the possible exception of Richard Eaton, involve evidence which trial team did not even attempt to

pursue. The trial team performance shares similarities with the mitigation investigation found

to be ineffective in *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), although the lawyers who

defended Mr. Ferrell interviewed 40-45 witnesses, *Ferrell v. Hall*, 640 F.3d at 1229, twice

as many witnesses as interviewed by Petitioner's trial team.

The other similarity involves the mental health of the defendant. Mr. Ferrell's

attorneys were found ineffective in part because, "despite Ferrell's obvious mental

disabilities," defense counsel never asked "any of Ferrell's family -- the ones who were

called to testify anyway -- about any topics related to Ferrell's mental health." *Ferrell v. Hall*,

640 F.3d at 1228. The performance of counsel for Mr. Ferrell, even under the deferential

standard of review of the AEDPA, was found to be deficient.

> In the face of these obvious indicators that Ferrell had substantial mental
> health issues, we cannot say it was reasonable for the Georgia Supreme Court
> to conclude that trial counsel performed adequately and effectively in limiting
> their mental health mitigation investigation in the way that they did, or in
> failing to follow up on Ferrell's mental health as their representation
> proceeded.

*Ferrell v. Hall*, 640 F.3d at 1228.

 The trial team, in addition, failed to perform competent interviews of the persons they

did interview.  Those interviews, for the most part, ignored family mental health history, and

apparently operated on the flawed assumption expressed by Mr. Skaggs that family members

should be willing to talk about mental illness and domestic violence. The more commonly accepted and understood wisdom, based on research in capital defense cases, is such issues are typically closely guarded family secrets. Mr. Skaggs, however, testified, "My experience has been that they're not. I know that I've heard that before, but my experience has been not." [Doc. 261, p. 212 lines 11-14]. His "experience," however, is not consistent with the experience of persons dealing with mental health issues in capital cases.

> Keep in mind that most people consider mental handicaps shameful and may be reluctant to reveal any signs of mental trouble. Like the client, they may think they are being helpful by minimizing, normalizing or rationalizing signs of mental illness in the defendant and his family. . . . Recognize that the tendency of a client's family and friends to minimize, normalize or deny mental illness is a barrier to achieving a reliable. social history. The necessity of overcoming this hurdle is the main reason you must carefully select a social history investigator who has the ability to probe these matters with sensitivity and respectful perseverance. It also makes it critical to interview people such as neighbors, ministers and  teachers who are outside the client's intimate circle of family and friends, so you get a picture of the client's life that is both broad and richly detailed.

John H. Blume & Pamela Blume Leonard, *Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, Mental Health & Experts Manual, 8th Edition,  Chapter 6, pp. 6-2, 6-3 (Kentucky Department of Public Advocacy, 2005).

Mr. Stetler offered a similar insight.

Q. (BY MR. O'BRIEN) In paragraph 15 you mention barriers to disclosure of sensitive shameful information and how clients, their family members, and other witnesses often don't give you complete or even candid information the first time you talk to them. How common is it to encounter such barriers in the investigation of a capital case?

A. Well, I think barriers are always there. Just as human beings we have psychological defenses that make it difficult to share sensitive information with total strangers. And then on top of that all of these kind of badges of social identity which define who we are also establish differences between members of the defense team and the, and the client or family members. You know, we have differences in terms of our backgrounds, our education, our jobs, our training, religion, politics, you name it. All of these things that help define who we are may become further barriers between ourselves and, and clients. And so those are things that we -- you know, you can't just wish them to go away. You have to acknowledge that they're going to be there, differences in education, differences in social values, politics, of course, race and culture in many cases. And by culture I don't just mean foreign nationals and, you know, the obvious cultural differences, but everybody comes from some sort of subcultural group within our society, and you need to, you know, recognize that that's gonna make it difficult for them to share some information. They're gonna view you as a stranger. They'll view you, Professor O'Brien, as the college professor, you know, that gives you a certain identity, as well as the lawyer. And so all of those are things that we potentially have to be aware of and find ways to bridge.

Q. Does the fact that these barriers exist in virtually every case affect the staffing and performance of capital defense teams?

A. Yeah, absolutely.

[Doc. 264, p. 44 lines 13-25; p. 45 lines 1-21].

Mr. Skaggs' failure to recognize the fact he and the trial team were probing very sensitive, emotionally charged subjects significantly impeded the mitigation investigation, preparation and presentation. Mr. Skaggs and the trial team failed to appreciate the fact natural barriers to discussing family issues might explain Petitioner's reticence in discussing his family life. Ms. Moree testified how Petitioner, during her first meeting with him, stopped cooperating with her, which she readily admitted was her fault.

> The -- your first meeting with Mr. Eaton didn't go very well, did it?
>
> A. No, it didn't, and that was my fault.
>
> Q. Why do you say that?
>
> A. Uh, because I went in rather cold. And as we talked before, my other cases with Brian Collins and Justin Sincock, they were, they were young, willing guys. And I really walked in with Mr. Eaton not knowing who I was dealing with, and I started off on absolutely the wrong foot. And, um, I've since kicked myself over that. I mentioned his sister Judy, and not knowing that he detested his sister Judy. And once I mentioned her name, it was as though a curtain came down. And I, I felt so, so bad after that because I, I really screwed that one up.
>
> Q. All right. There was a point at which Mr. Skaggs left the room and you were left alone with Mr. Eaton. Do you -- was that during this visit?
>
> A. Yes, and I had asked him to leave because I wanted to talk to Mr. Eaton. And I was using the same approach I had with these other two young guys who were very willing to tell me anything I wanted to know, and then I run up against someone like Mr. Eaton, and, uh, he was not receptive to me at all because of the way that I approached the meeting.
>
> Q. Did you ask Mr. Skaggs to leave?
>
> A. Yes, I did.

Q. Why did you do that?

.        .        .

A. Because I wanted to talk one on one with Mr. Eaton and to get a sense. And I went into this like I would like for you to tell me something about your background and, and if you could take some time, uh, and write down family members, where I might locate them, and employment history and the things that I usually said to these, these other clients in order to do the mitigation. And once I mentioned his sister Judy, it was really all over, and I take the blame.

Q. So there's some heavy emotional loading around that particular family member; is that true?

A. Yes.

[Doc. 262, p. 244 lines 10-25; p. 245 lines 1-23]. Mr. Neubauer attempted to engage Petitioner in discussion of his family, however, his efforts were as well not successful. "He just… never wanted to talk to about it. It just, it seemed like something unpleasant to him that he just didn't want to talk about." [Doc. 262, p. 164 lines 9-12].

Mr. Skaggs and the trial team also ignored the fact they were actually encountering those barriers with specific potential mitigation witnesses. Ms. Moree advised Mr. Skaggs in a memo Petitioner's sister, Sharon, "is a police dispatcher and although she told me she would like to be helpful, she is concerned that her neighbors and friends not know about her relationship to Dale because of her standing in the community." [Exhibit 253-59, p. 1 ¶ 2]. Ms. Moree, in another memo describing her interview with Petitioner's Aunt Marilu

O'Malley, cautioned Mr. Skaggs "Marilu would like to testify before the other witnesses are allowed in the courtroom, because of the family dynamics. She would feel better about her testimony if it were not in front of the other family members." [Exhibit 213-47, p. 2].

The mitigation presentation by Mr. Skaggs and the trial team, as related by both Mr. Neubauer and Mr. Skaggs, did not turn out as expected. Mr. Neubauer testified to say the case "tanked" was "an understatement." It "completely tanked." [Doc. 262, p. 168 lines 24-25; p. 169 lines 1-4]. Mr. Skaggs stated "the abuse thing was a complete dud." The testimony of two family mitigation witnesses "was different from what they had told you before." [Doc, 262, p. 100 lines 16-20]. And as confirmed by Mr. Neubauer "we didn't plan on that, and no, I don't think there was a backup plan." [Doc. 262, p. 169 lines 5-8]. The shallow mitigation investigation was clearly a factor contributing to the implosion of the mitigation presentation which left Mr. Skaggs and the trial team without an alternative and reliable means to establish a pattern of childhood maltreatment as a mitigation theme.

The telephone contact by Ms. Moree of Richard Eaton, followed by a letter from Mr. Skaggs is a further example of the substandard approach used by the trial team to contact mitigation witnesses, and its resultant effect.

> Do you know who Priscilla Moree is?
> A. Yes, I, I remember a phone call from her. And, uh, I don't remember exactly where I was when I got that call, but I wasn't very happy with the phone call, with the insensitivity of the matter and not showing enough, you know, respect

or anything to come person to person and talk about something like this, not over the phone. That's not a way to do that.

Q. You talked about the insensitivity of it. What was -- tell me more about the call. What was she asking you about?

A. She was asking things about our family that, you know, I'm not gonna talk to anybody over the phone about.

Q. All right. Personal things?

. . . .

Q. Embarrassing things?

A. Yeah. Asking about my mom, you know, and different parts of our life.

Q. Embarrassing things about your mother?

A. Yes.

Q. Had you ever met this woman before?

A. No. I have no clue what -- who she is or if it was even her that called, you know, because I had no, no clue who it was.

Q. How do you feel about being approached like that?

A. Well, I had a few calls from reporters, and I wasn't happy with that either, you know. You know, and somebody just calling me up out of the blue and, uh, start asking me stuff about our family, they have no business to know it.

Q. Did you have any way of knowing who she actually was other than what she said on the phone?

A. No.

Q. So in terms of your willingness to cooperate with her, were you gonna cooperate with somebody who --

A. No.

Q. -- approached you like that? Did you later receive a letter from a lawyer named Wyatt Skaggs?

A. Yes.   . . . .

Q. (BY MR. O'BRIEN) I'm showing you what has been marked as Exhibit 173-4, a letter to you dated October 10th, 2003 from Wyatt Skaggs. Do you remember receiving this letter from Mr. Skaggs?

A. Yes, I do.

Q. And do you remember how you reacted to this letter?

A. I felt like he was putting the blame on me for not being a part of it.

.   .   .   .

A. You know, that he was just pointing out and saying that I, I was putting Dale to death. And I've never met that man either, you know.

Q. How did that make you feel?

A. Made me mad.

Q. All right. Did it help at all toward your willingness to cooperate?

A. No. That even pushed me further away.

Q. Did anybody representing your brother at trial ever come and talk to you about the legal process?

A. I never seen anybody.

Q. Did they talk to you about, um -- well, I guess I don't have to ask that next question 'cause nobody talked to you is what I hear you say. Was there a time in which -- well, when -- let me back up and ask a question How did you feel about the fact that nobody involved in the case came to talk to you about the legal process?

A. I felt like they really didn't care.

[Doc. 266, p. 208 lines12-25;p. 209 lines 1-25; p. 210 lines 1-25;p. 211 lines 1-3; *See also*, Doc. 68-10, p. 1].

Any attempt to interview a family member over the telephone about the subjects which must be broached in the investigation of a capital case invites failure.

The experience of Petitioner's former wife, Melody Cline, in her five-minute interview in Mr. Skaggs' office is also revealing.

> Q.    [BY MR. O'BRIEN] Did you ever meet with Mr. Skaggs?
>
> A.    [MRS. CLINE] I did.
>
> Q.    Where did you meet him?
>
> A.    Priscilla drove me to Laramie to Mr. Skaggs' office.
>
> Q.    And how long did that meeting last?
>
> A.    Maybe five minutes or so.
>
> Q.    All right. How were you treated by Mr. Skaggs?
>
> A.    Rudely.
>
> Q.    What makes you say that?
>
> A.    Apparently I didn't have anything to say that he wanted to hear.
>
> Q.    How did you feel after your meeting with Mr. Skaggs?
>
> A.    Dirty.
>
> Q.    Do you recall either Priscilla Moree or Mr. Skaggs asking you about your confrontation with Dale in March of 1988?
>
> A.    No. I . . .
>
> Q.    Looking back, when do you think that was in relation to the homicide of Miss Kimmell?
>
> A.    Looking back, I think it was same day.

[Doc. 266, p. 134 lines 23-25; p. 135 lines 1-16]. Mrs. Cline, when interviewed more thoroughly, and in a less hurried manner, was able to provide helpful and insightful information on many different mitigation subjects. She helped establish Petitioner's emotional state and stressors near the time of the homicide, and provided important

information and investigative leads regarding Petitioner's family mental health history covering several generations, including their children. [Doc. 266, pp. 112 - 122].

Ed Eaton, Petitioner's son, was also contacted by the trial team, and had an experience similar to Richard Eaton's.

> The Natrona County investigators contacted me before my dad's trial. They wanted me to testify against him and I left for California so I wouldn't have to testify against him. I was contacted once by telephone by an investigator on my dad's defense team before his trial. The conversation was brief and much like the Natrona County investigators, she wanted to know whether my father was abusive to me and the rest of our family. I was angry and confused over what my father was accused of and the brief telephone conversation did not make me feel comfortable being forthcoming with a total stranger about myself, my father, or our troubled family history. Had she spent time with me and gained my trust, I might have talked with her and told her what I have told his current attorneys. I would have testified on my father's behalf.

[Exhibit 237, p. 4].

The performance of Mr. Skaggs and the trial team was, as observed by Mr. Stetler, based on the number of witnesses who were in fact interview either by phone or in person [Exhibit 322], narrow and limited.

> Q. (BY MR. O'BRIEN) In this slide, based on Ms. Moree's time records and her testimony, we've identified the number of witnesses -- or not the number of witnesses, rather we've identified by names the mitigation witnesses that she interviewed, on the right-hand column by telephone, on the left-hand column

in person. Did you find any indication that any other members of the defense team interviewed any witnesses who aren't on this list?

A. I didn't see anything supporting that, no.

Q. Does this raise concerns about Mr. Skaggs' performance with respect to the mitigation investigation in this case?

A. Yes. It's a narrow set of sources, and particularly when you consider that against the, you know, the potential universe of witnesses out there, including people who were identified in records.

[Doc. 264, p. 75 lines 13-25; p. 76 lines 1-3].

The mitigation investigation by Mr. Skaggs and the trial team resulted in only a "rudimentary knowledge . . . from a narrow set of sources," and as a result was "fell short of the standards for capital defense work," and was therefore deficient as measured against the ABA Guidelines.

Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf.

*id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing .... Investigation is essential to fulfillment of these functions").

*Wiggins v. Smith*, 539 U.S. at 524.

The trial team clearly did not adequately perform a thorough mitigation investigation.

**Counsel must conduct a "thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial."** *Wilson,* 536 F.3d at 1083. "We recently had occasion to expound on this principle, drawing on a trilogy of Supreme Court cases— *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)—involving ineffective assistance at capital-sentencing proceedings." *Victor Hooks,* 689 F.3d at 1201 (referring to the discussion in *Wilson,* 536 F.3d at 1084–85). We set forth "three important principles" that are derived from these cases:

> First, the question is not whether counsel did *something;* **counsel must conduct a full investigation and pursue reasonable leads when they become evident.** Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a

capital case. **Finally, because of the crucial mitigating role that evidence of a poor upbringing or *mental health problems* can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence.**

*Wilson*, 536 F.3d at 1084–85 (emphasis added) (internal quotation marks omitted) (citations omitted); *see id.* at 1085 (noting that "[o]ur own Circuit has emphasized this [due-diligence] guiding principle").

*Littlejohn v. Trammell*, 704 F.3d at 859, 860(emphasis added).

Mr. Stetler and Mr. Burr offered similar opinions.

Q. You were brought into this case by Mr. Eaton's appellate counsel; correct?
A. Correct.
Q. Did they give you materials to review?
A. Yes.
Q. Based on those materials, were you able to form an opinion to a reasonable degree of certainty as to whether trial counsel's mitigation investigation was deficient?
A. Yes. That was my conclusion.
Q. All right. You anticipated my next question. You did reach that conclusion that it was, in fact, deficient?
A. Yes, by the standards of 2003, 2004.
Q. Did the appellate lawyers provide you with any new data pertaining to the mitigation case? A. I don't think they did.

[Doc. 264, p. 154 lines 2-16 (Russell Stetler)].

Q. (BY MR. HARRIS) Okay. Do you have an opinion today, Mr. Burr, based on the standards of performance that applied to the mitigation function of capital defense teams during 2003 and 2004, whether the trial team here performed competently with respect to the investigation of Mr. Eaton's background and character?

A. Yes, I do.

Q. And what is that opinion?

A. And that is that their performance was far below a reasonable performance. It was deficient under *Strickland*.

[Doc. 266, p. 77 lines 14-23 (Richard Burr)].

*ABA Guideline 10.11*

An additional ABA Guideline to consider when analyzing the performance of Petitioner's trial team mandates discussions by counsel with the defendant concerning the substance and purpose of the mitigation evidence to be presented during the trial penalty phase, and how to strengthen such presentation. The Guideline indicates counsel should consider witnesses familiar with defendant's entire life, from conception to sentencing, and use expert witnesses and supporting documentation to present medical, psychological, sociological, cultural, and other insights with regard to a defendant's mental and emotional state and life history which would help to explain or lessen defendant's culpability for the underlying offense. [ABA Guideline, 10.11, p. 104].

The Commentary to Guideline 10.11 indicates "areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death." [ABA Guideline, 10.11, p. 107]. Counsel should thus construct a persuasive narrative outlining a defendant's extended, multigenerational history by presentation of evidence of defendant's complete social history from before conception to the present. [ABA Guideline, 10.11, pp. 107, 108].

Petitioner's trial team failed to fulfill their responsibility under this Guideline, primarily based on a chronology approved by Mr. Skaggs and presented by Dr. Gummow which was deficient and incorrect; their failure to provide Dr. Ash with an adequate and reliable life history; and their failure to offer evidence of Petitioner's remorse.

### *Incorrect and Deficient Chronology*

Dr. Linda Gummow is a neuropsychologist who administered a number of neuropsychological tests on Petitioner. [Doc. 85-11, pp. 6, 11]. Her testimony at Petitioner's state court trial enumerated a number of stressors in his life at the time of the homicide, which included the suicide of his brother, Daryl. She utilized a chronology of stressors on a PowerPoint slide, which erroneously placed Daryl Eaton's suicide prior to the homicide of Ms. Kimmell. Mr. Skaggs had reviewed and approved the PowerPoint slide, and acknowledged it was incorrect.

Q. Did you prepare Dr. Gummow for her testimony?'

A. I certainly did.

Q. Did you discuss that issue with her?

A. You know, she prepared that chronology and gave it to me. And in all fairness to Dr. Gummow, she said, Review it for accuracy. I think I may have talked to her about some other issues in the chronology. We changed some things. But I just flat didn't catch that. I knew -- I knew that he died after the homicide, and I just didn't catch it, frankly.

[Doc. 85, p. 9 lines 14-25].

Q. Okay. So you may have had the death certificate?

A. Not may have. I did have the death certificate.

Q. You did have it. So you knew that chronology was wrong
when you put it up, didn't you?

A. No, I did not know it was wrong. I just didn't catch it,
as I've testified before.

[Doc. 262, p. 50 lines 9-16].

This was no small mistake by Mr. Skaggs, particularly in light of the fact he represented to the trial court jury the chronology had been well-researched.

Q.     [BY MR. SKAGGS] Okay. What do you rely on for putting together the chronology for court?

A.     [BY DR. GUMMOW] Usually written documents.

Q.     Okay. And, also, statements and that sort of thing that have been written down?

A.     Yes.

Q.      Okay. And you also review background family records and also do that sort of thing to verify the information?

A.      Yes. In this case, I reviewed the psychiatric records of Mr. Eaton's mother.

Q.      Okay. And were you able to prepare a chronology -- I think I already asked you this. I apologize. Were you able to prepare a chronology for him?

A.      Yes, again.

Q.      Okay. Okay. Without showing this to the jury quite yet, was this basically what you did?

A.      Yes.

Q.      Okay. And is that the chronology you prepared?

A.      Yes.

[Doc. 85-11, p. 13 lines 19-25; p. 14 lines 1-15]. Mr. Skaggs then asked Dr. Gummow to tell the jury "what this chronology entails," and she described it as "marker events in Mr. Eaton's life." [Doc. 85-11, p. 16 lines 5, 6]. Dr. Gummow reviewed in summary form various dates and events, until she got to 1987, the year prior to the homicide.

This was another very significant date. That's why I put it on here. Dale's brother asphyxiated himself with carbon monoxide sometime in 1987. I don't know the exact date. Dale blamed himself for this, because he believed that if he had loaned his brother some money that he had asked for, that his brother wouldn't have committed suicide. Whether or not that's an accurate understanding, I don't know. And then, of course, significant date here for our purposes is April 2, 1988, was when the body of Lisa Marie Kimmell was found in the North Platte River.

[Doc. 85-11, p. 25 lines 4-16].

The prosecuting attorney took advantage of the inaccurate chronology.

Q.      [BY MR. BLONIGEN] Actually, from what he reported to you, the suicide of his brother wasn't having much impact on him at the time that he committed this crime, was it?

A.      [BY DR. GUMMOW] I never specifically discussed that with him. I don't know whether it was still bothering him or not.

MR. SKAGGS: Well, Your Honor -- excuse me -- actually, suicide of his brother I don't think happened until after --

Q.      [BY MR. BLONIGEN] That's not what her chart says.

A.      It was '87, is my understanding.

MR. SKAGGS: When was Torrington?

MR. BLONIGEN: '86.

THE WITNESS: '86.

MR. SKAGGS: Okay. So it happened afterward.

MR. BLONIGEN: After Torrington, yes, but before the homicide.

MR. SKAGGS: Oh, okay. I missed where you were at.

Q.      [BY MR. BLONIGEN] Did you consider the suicide of his brother a significant event in his life?

A.      I have no way to evaluate that.

Q.      Did you do anything to confirm whether that information was accurate?

A.      Just -- it was mentioned in reports. That's where I got the date from. I didn't get it from Mr. Eaton. Mr. Eaton didn't recall the date.

Q.      Now, then we go back to 1988. And almost everything about what you saw happening in 1988 came from Mr. Eaton,' didn't it, specifically what was happening in 1988?

A.      In terms of his self report of the situation, I did take that. And then like I said, I had the 1986 hospital report. That's all I had.

[Doc. 85-12, p. 32 lines 2-25; p. 33 lines 1-14].

Q.      And one of the -- you said, when you were standing up here with this time chart, that one of the most significant events in Dale's life before the homicide was the suicide of his brother Darrel; is that correct?

A.      That was my statement, yes.

Q.      And that was listed as occurring on January 1, 1987; is that correct?

A.      That's an approximate date. I only had the year. So when I have something like 1/1/87, it means that I don't know the exact date; and I put the year.

Q.      Well, both you and Dr. Ash talked about this being an event that was affecting him at the time of the homicide, as part of his depression; isn't that true?

A.      No, I didn't testify to that.

Q.      [BY MR. BLONIGEN] Well, Doctor, did you ever bother to get a death certificate?

A.      No.

Q.      I would like to show you 1003, a simple thing to check on, a very simple thing to check on.

A.      Not for me. I'm not an investigator. I wouldn't even be able to get the authorization to do this.

Q.      Doctor, what day did Mr. Eaton's brother commit suicide, from that document?

A.      October 10, 1988.

Q.      So well after the Kimmell homicide; isn't that true?

A.      That's true.

[Doc. 85-12, p. 46 lines 3- 25; p. 47 lines 1-8]. The prosecuting attorney addressed this issue and the credibility of Dr. Gummow in his closing argument.

> And perhaps the best indication of how Dr. Gummow testifies is the suicide of Mr. Eaton's brother. She made a big point with that board in front of this jury saying, Now, look at this; this is a really important thing. Then when she finds out there's a problem with it, Oh, that's not such an important thing; that doesn't really count.

[Doc. 85-13, p. 26 lines 9-15].

Mr. Skaggs has previously admitted "Dr. Gummow prepared that chronology and gave it to me,... But I just flat didn't catch that. I knew – I knew that he died after the homicide, and I just didn't catch it, frankly." [Doc. 86-5, p. 9 lines 18- 25]. He then, however, speculated maybe his client was the source of the error. "I think that came from Mr. Eaton himself, from what he had told Dr. Gummow."[Doc. 86-5, p. 9 line 25; p. line 1]. His speculation is clearly inaccurate. Dr. Gummow testified she did not get the date from Petitioner. [Doc. 85-12, p. 32 lines 24-25; p. 33, lines 1-7].

Mr. Stetler explained a chronology is an important mitigation tool, however, the one compiled by the trial team was deficient, in part because it was incomplete, but also because events were not connected with a source. He examined the pretrial chronology, Exhibit 259, and observed "there are no sources. It's missing that crucial third column," which can create problems. [Doc. 264, p. 103 lines 17-25; p. 104 lines 1-5]. The chronology developed by the

trial team was "short and incomplete and totally unsourced." [Doc. 264, p. 105 lines 14-18].

Mr. Stetler stated, in his experience, the mistake with regard to the date of the suicide of

Petitioner's brother "makes the expert look incompetent. Very damaging. It looks sloppy. It

makes you look like the facts that you're relying on are just not accurate." [Doc. 264, p. 105

lines 8-14].

The lack of a detailed and thorough investigation in Petitioner's mental health also

made Dr. Gummow's diagnoses of depression and brain damage easily susceptible to cross-

examination challenging both diagnoses.

> Q.    [BY MR. BLONIGEN] And you were saying that the depression is a common disability, isn't it?
> A.    [BY DR. GUMMOW] Yes, it is.
> Q.    Now, many people suffer from depression?
> A.    That's right.
> Q.    And they don't kill people, do they?
> A.    That's right.
> Q.    Now, many people suffer from minimal or minor organic brain damage. They don't kill people, do they?
> A.    That's right.

[Doc. 85-12, p. 37 lines 21-25; p. 38 lines 1-6].

A competent, thorough investigation and preparation of a psychosocial history would

arguably have negated the challenges to the testimony by Dr. Gummow. Mr. Burr offered his

insight into the problem.

Q. Again, do we have a similar problem with Dr. Gummow being exposed based on the fact that she's obtaining her psychosocial history from Mr. Eaton?

A. Well, and it's not just that, but -- because the, the brain damage is based on her testing, her neuropsychological testing and that's not something Mr. Eaton can malinger, but it's -- the larger question here is the absence of the psychosocial history that is now known made, made the two diagnoses that Dr. Gummow had reached easily attackable as, look, a lot of people have depression but they don't kill anybody, a lot of people have this kind of brain damage and they don't kill anybody, and she acknowledged it. So she was putting forward those, those disorders as reasons to mitigate, and in those simple questions the prosecution took the reasons for mitigation away.

Had she known this history, at least we will know from Dr. Ash and Dr. Woods when they testify, and I have looked at what they, you know, what they've reported in the wake of the new information and the new history, the diagnosis of Mr. Eaton would have been far different and would have involved disorders that are much more associated with people losing control and committing very violent acts . . . .

[Doc. 266, p. 76 lines 11-25; p. 77 lines 1-7].

### *Failure to Provide Dr. Ash With an Adequate and Reliable History*

The inadequate investigation of Petitioner's background and life history also impacted

the testimony of Dr. Ash, a defense mitigation witness at Petitioner's trial. [Doc. 85-8, p. 8

et seq.] [20] He testified Petitioner had a life-long history of depression [Doc. 85-8, p. 25 lines 6-11]. He related the conditions in which Petitioner was living in March and April, 1988, which aggravated his depression.[Doc. 85-8, p. 26 lines 19-25; p. 27 lines 1-4].

> Q. Okay. Now, did you have occasion to talk
> to him about his -- his environmental circumstances,
> his surrounding circumstances, the way that he lived
> in March and April of 1988?
> A. Yes, I did.
> Q. Okay. And, basically, how was he living at
> that particular time?
> A. Mr. Eaton was living in the most abject of
> circumstances. He had lost his marriage, lost his
> family. He had lost his welding business. He had
> lost his job. He had lost his home, because he
> could not afford it. He had a home that would take
> 2- or $300 a month in Cheyenne. He lost that and
> was living in a -- a bus by himself. He was
> isolated, essentially, from friends; and he was
> isolated from family. He was in poverty. He was
> able to manage to feed himself, essentially, by
> scavenging cans out of dumps and selling them for
> money for groceries.

[Doc. 85-8, p. 25 lines 17-25; p. 26 lines 1-5].

--------------------

[20] Dr. Ash is a board-certified psychiatrist [Doc. 267, p. 35 line 5] who testified as an expert before this Court.

Dr. Ash described an additional "stressor" which he believed, at the time of trial, occurred on the night Petitioner encountered Ms. Kimmell. Petitioner's ex-wife, Melody Cline, told him, in a phone call, he could not have their children over the Easter holiday, and she laughed when she told him he was not their biological father. [Doc. 85-8, p. 29 lines 18-25; p. 30 lines 1-17].

Dr. Ash, on cross-examination, admitted, however, he had not talked with Melody Cline to confirm Petitioner's statement or history regarding the phone call which Dr. Ash viewed as "triggering" event for Petitioner's emotional crisis. [Doc. 85-8, p. 55 lines 1-6; Doc. 85-9, p. 21 lines 5-10]. The inadequate chronology was also an issue on cross-examination.

Q.	[BY MR. BLONIGEN] And he told you when this confinement first began, the thing that really, really had him going was that phone call?

A.	Yes.

Q.	And that it was Thursday or Friday before Easter?

A.	Yes.

Q.	I'm going to show you what's been introduced as a calendar from 1988. Can you tell me what date Easter was in 1988.

* * *

A.	That would be the 3rd of April.

Q.	So Easter was April 3. Did you know Lisa Marie Kimmell disappeared on March 25?

A.	I'm -- I'm not aware of that.

[Doc. 85-9, p. 25 lines 13-25; p. 26 lines 1-3].

The failure by the trial team to perform an in-depth mitigation investigation allowed the prosecuting attorney to challenge Dr. Ash's credibility in a manner similar to his challenge of Dr. Gummow. He argued to the jury, "[t]here is no way that that call could have been made around the time that Lisa was first taken. He was very insistent on that, though. That was the critical fact, is that phone call." [Doc. 85-13, p. 32 lines 15-18]. He stated "Dr. Ash is quite candid with you he didn't have all of the information. He has one source of information, Dale Eaton, who has given multiple stories now, who is a convicted felon, who has been through the mental health system innumerable times; and he's supposed to be our source of information." [Doc. 85-13, p. 31 lines 3-8].

The inadequate mitigation investigation by the trial team also exposed Dr. Ash to a challenge on cross-examination concerning his observation Petitioner was socially isolated and withdrawn at the time of the homicide. It is fairly clear the trial team did not provide Petitioner's experts with a number of significant mitigation documents, in particular the journal of Mrs. Buchta. This failure left Dr. Ash at a distinct disadvantage during cross-examination.

> Q.  [BY MR. BLONIGEN] Now, Mr. Eaton, when he spoke to you, describes a fairly miserable life at the time of early 1988; fair statement?
> A.  Yes.
> Q.  Okay. Were you aware that he was, on a frequent basis, visiting his neighbors?
> A.  At the time in the spring?

Q.     Yes.

A.     No.

Q.     Okay. For instance, did you know there was a little old lady across the way that kept a diary?

A.     I was aware of the people across the way. I had thought that they were getting involved with each other after this happened.

Q.     Okay. Well, let's talk about that, then; because Mr. Eaton basically told you he holed up and didn't leave unless he just had to?

A.     Yes.

Q.     That's not an overstatement, is it?

A.     That is not an overstatement.

Q.     Okay. And so things that happened in March would be relevant, wouldn't they, March of 1988?

A.     Yes.

Q.     Okay. And, for instance, he also reported that he had a very poor economic status; is that true?

A.     That's correct.

Q.     Okay. So if she has a note that Dale visited on March 8 and paid the taxes on an adjoining property, that would seem somewhat inconsistent with what he told you, wouldn't it?

A.     How much were the taxes?

Q.     Well, I mean, I guess that's inconsistent two ways. He was going out and seeing people, that would indicate, wouldn't it?

A.     He -- he had a hard time getting out seeing people, he said. That's correct.

Q.     Okay. Were you aware there's another entry on March 16 that he had visited the Buchtas? Were you aware of that?

A.     No.

Q.      Were you aware that on March 22, he visited the Buchtas for two hours? Were you aware of that?

A.      No.

Q.      On March 24, were you aware that he had gone over and helped Mr. Buchta work on a car?

A.      No.

Q.      And this persisted after March 24, did it not, the depression, this period of horrible isolation?

A.      In my opinion and from what I've been told, yes.

Q.      Were you aware that he visited the Buchtas again on April 1?

A.      No.

Q.      Were you aware on April 11 that he wanted to visit, and he went over and visited them for six hours? Does that sound like he's keeping himself in isolation?

A.      No, it does not.

Q.      Finally -- there's a lot of these, but I think this is a relevant time period. April 25, were you aware that he went over and visited the Buchtas, again, for chicken dinner?

A.      No.

Q.      So he's maybe not quite as isolated as he led you to believe?

A.      Those are more visits than I was aware of.

Q.      Did they ever give you that to look at?

A.      No.

[Doc. 85-9, p. 13 lines 5-25; p. 14 lines 1-25; p. 15 lines 1-24].

Dr. Ash expected Mr. Skaggs knew he would talk about Petitioner's isolation from other people around the time of the homicide. [Doc. 267, p. 70 lines 24-25; p. 71 line 1]. He

has since reviewed Mrs. Buchta's journal, and notes there were eight contacts between Petitioner and the Buchtas in the seven or eight months from September, 1987, when Petitioner moved the bus onto the Moneta property, and the time of the homicide at the end of March, 1988. [Doc. 267, p. 71 lines 6-12]. He indicated this limited minimal contact did not affect his opinion with regard to Petitioner's isolation. [Doc. 267, p. 71 lines 13-15].

Dr. Ash also found Petitioner's extreme poverty relevant to his mental and emotional condition at the time of the homicide. The lack of an adequate life history investigation by the trial team again left Dr. Ash vulnerable to a cross-examination.

Q.    [BY MR. BLONIGEN] Okay. He talked about employment. And you indicated that employment was a real problem for him at this time.

A.    Yes.

Q.    And I should say "at this time," I should say March of 1988, so we know which time we're talking about.

A.    Yes.

Q.    Were you aware that in job applications, he lists himself as sole proprietor of the business of Eaton and Sons during this time period?

A.    I'm not aware of that.

Q.    Okay. That's a little different than what he told you, isn't it?

A.    What he had told me was that he had a business and that he lost it.

Q.    Did he indicate he had that business until 1991?

A.    No.

Q.    Did he indicate that business was working and welding on equipment at mines and oil fields?

A.    I was aware that he had a welding truck and was working -- and working in oil fields. I also was under the impression that he had lost that truck.

Q.      Okay. That he had lost it completely; didn't own it anymore?

A.      Correct.

Q.      Would you be surprised to find that he owns several vehicles in 1988?

A.      I would be surprised.

* * * *

Q.      Were you aware that he had a welding truck that was still running?

A.      No, I was not.

Q.      Were you aware that he bought another welding truck shortly after that?

A.      Shortly after?

Q.      After March of 1988.

A.      No.

Q.      Were you aware that in May or June of 1988, he had the money to have the electricity hooked up to the trailer?

A.      No.


[Doc. 85-9, p. 15 line 25; p. 16 lines 1-25; p. 17 lines 1-24].

Dr. Ash, because of the inadequate life history investigation, was also forced to admit Petitioner was capable of making choices about what he was doing with respect to the crimes involving Ms. Kimmell.

Q.      [BY MR. BLONIGEN] Now, specifically, the State Hospital found that he did not have any mental condition that grossly and demonstrably impaired his perception or understanding of reality. Do you agree with that?

A.      [BY DR. ASH] I do.

Q.      Okay. So Mr. Eaton knew what he was doing at all times that evening, did he not?

A.      At all times the evening of?

Q.    Of the homicide -- or the – or the evening that he made contact with Ms. Kimmell and the following days.

A.    He knew what he was doing, yes.

Q.    Okay. And he was also able to make choices about his conduct -- what his conduct would be, was he not?

A.    Yes.

[Doc. 85-9, p. 5 lines 17-25; p. 6 lines 1-6].

Mr. Burr points out Dr. Ash was vulnerable based on the fact the trial team did not conduct a thorough psychosocial history. Such a history would have enabled Dr. Ash to respond effectively to the cross-examination. He could have, with adequate preparation, explained how Petitioner's choices were significantly undermined by his impairments.

Well, he's, he's vulnerable because he's providing -- he's agreeing with the prosecutor about critical issues, that is, that during the course of this crime he was able to make choices about what he was doing. And given all of the history that has been developed, the psychosocial history that has been developed since trial that your team has developed and that Dr. Woods has assessed and that, indeed, Dr. Ash has now assessed, that answer that he gave to the prosecutor was inaccurate because he did not have the information that in multiple ways says that Mr. Eaton's ability to decide what he was doing and to make choices was not impaired.

[Doc. 266, p. 69 lines 23-25; p. 70 lines 1-8]. Mr. Burr points to the following exchange as a further example of an inadequate investigation leaving Dr. Ash vulnerable to cross-examination suggesting Petitioner is a malingerer.

> Q. [BY MR. BLONIGEN] Now, in addition to that – my associate makes a good point. By 'malingering,' we obviously mean that an individual is reporting symptomatology that may not be genuine?
>
> A. [BY DR. ASH] That's correct.
>
> Q. And in legal situations, that's particularly a problem if the person who is in the legal problem exaggerates their symptomatology?
>
> A. That's correct.
>
> Q. Or exaggerates the report on their history?
>
> A. That's correct.
>
> Q. And wouldn't it be a fair conclusion from this evaluation that those folks didn't find Mr. Eaton to be a very accurate historian?
>
> * * *
>
> A. There are two parts to the answer. One, that they found him malingering in terms of the dementia. They did not find him malingering in terms of the depression.

[Doc. 85-9, p. 6 lines 7-25; p. 7 lines 1-8].

Mr. Burr once again offers his perspective.

> [T]he whole question of malingering arises when an expert bases his or her opinion entirely or almost entirely on the reporting of the client or the patient, of the defendant in this case, not only reporting to him but reporting to previous mental health experts. And in the previous evaluations that were being referenced here . . . of Mr. Eaton he was the primary historian. You know, he

was the primary provider of information that then the experts used to make a diagnosis or reach conclusions.

So any, any time an expert relies on that person as the primary source of information, the question of malingering naturally arises because malingering is exaggerating symptoms in order to gain something, and here in criminal proceedings we know what you're trying to gain. So there's no way for an expert to refute malingering or even know whether there is malingering unless he or she has a much larger history. * * * That's what was happening here with Dr. Ash.

[Doc. 266, p. 72 lines 10-25; p. 73 lines 1-3].

Dr. Ash, prior to his testimony before this Court, was provided Petitioner's life-long Social Security Administration record of earnings. [Exhibit 267].



Exhibit 328, Slide 24, compares Petitioner's SSA earnings and the U.S.D.A. poverty level year-by-year. Dr. Ash explained the significance of this data to his findings.

> I think it helps to, to give us a picture of his ups and downs with his moods. It I think is quite dramatic that in 1988 it's very close to zero. I believe the figure actually is like $900 and something for the year. And also in 1997 that it is at zero.

[Doc. 267, p. 107 lines 21-25]. The income low points correspond with both the homicide of Ms. Kimmell, and the rather strange assaultive encounter with Scott and Shannon Breeden. This information "would have been of great help" in explaining to the jury the depth of Petitioner's depression. [Doc. 267, p. 108 lines 1-24].

### *Evidence of Petitioner's Remorse*

Dr. Ash, at the request of Mr. Skaggs, interviewed Petitioner concerning the circumstances of the homicide of Ms. Kimmell. Dr. Ash, in his May 17, 2003, report to Mr. Skaggs, included this description of Petitioner as he described the homicide of Ms. Kimmell, and the death of the man he killed in prison.

> As he talked about this, as well as a man that he had killed in prison. He was filled with horrendous agony and remorse. He teared up on a number of occasions, his face was held in and he clenched his teeth and his hands.

[Doc. 66-6, p. 2]. Dr. Ash stated his opinion Petitioner was displaying "[g]enuine, deep, powerful remorse." [Doc. 267, p. 66 lines 16-21]. Dr. Ash, at trial, at the request of Mr. Skaggs, recounted what Petitioner had told him with regard to the homicide of Ms. Kimmell. [Doc. 85-8, p. 38 lines 12-25; p. 39-41; p. 42 lines 1-8]. Mr. Skaggs, however, failed to ask Dr. Ash anything about his observations of Petitioner's remorse when recounting the homicide. [Doc. 267, p. 67 lines 10-12].

**Deficient Performance - Conclusion**

The United States Supreme Court, in 2011, in *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770 (2011), reiterated its philosophy on deficient performance . . . first set out in *Strickland v. Washington*.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052.
>
> .            .            .
>
> The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. at 787, 788, 789, 790, 791. *See also, United States v. Rushin*, 642 F.3d 1299, 1306, 1307, 1308 (10th Cir. 2011).

The Court has also offered this explanation of the "deficient performance" . . . and its relationship to the AEDPA:

The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690, 104 S.Ct. 2052.

*Premo v. Moore*, 562 U.S. 115, 131 S.Ct 733, 739-740 (2011)(quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 788).

The Supreme Court has further concluded, the American Bar Association guidelines in effect at the time of the representation identify the appropriate "prevailing norms" which reasonably diligent attorneys would follow.

The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.,* at 688, 104 S.Ct. 2052. We long have recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ... ." *Ibid.;*

*Padilla v. Kentucky*, 559 U.S. 356, 366, 367 (2010). *See also*, *Hinton v. Alabama*, ____ U.S. ____, _____, 134 S.Ct. 1081, 1088 (2014)(quoting *Padilla v. Kentucky*, 559 U.S. at 366), and *Heard v. Addison*, 728 F.3d 1170, 1180 (10th Cir. 2013).

Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495.

*Wiggins v. Smith*, 539 U.S. 510, 524 (2003). *See also, Young v. Sirmons*, 551 F.3d 942, 957

(10th Cir. 2008)(quoting *Wiggins v. Smith*, 539 U.S. at 524); and *Littlejohn v. Trammell*, 704

F.3d 817, 859, 860 (10th Cir. 2013). *See also, Cole v. Trammell*, 755 F.3d 1142, 1160 (10th

Cir. 2014).

Petitioner's state court trial resulted in a sentence of death imposed on June 3, 2004.

*Eaton v. State*, 192 P.3d at 49. The American Bar Association Guidelines for the Appointment

and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February,

2003, thus represent the "guides to determining what is reasonable" in considering the

deficient performance aspect of the ineffective assistance of counsel allegations. *Bobby v. Van

Hook*, 558 U.S. at 6.

The representation of Petitioner by his trial team, and in particular Mr. Skaggs, fell

well below the applicable "prevailing professional norms" as outlined by the American Bar

Association Guidelines. Mr. Skaggs, as lead counsel, failed to assemble an acceptable trial

team. The team, of which he was the leader, did not include two qualified attorneys, nor did

it include a qualified mitigation specialist. It also lacked at least one member qualified to

detect the presence of mental or psychological disorders. [ABA Guideline 4.1].

Mr. Skaggs also failed to fulfill his responsibility of demanding and acquiring "on

behalf of the client all resources necessary to provide high quality legal representation," and

make an adequate record for post-conviction review if such resources are not provided. [ABA Guideline, 10.4].

Mr. Skaggs and the trial team further failed to "make every appropriate effort to establish a relationship of trust" with a defendant, including "a continuing interactive dialogue" concerning all materials which might well impact the defendant's case. [ABA Guideline 10.5].

Mr. Skaggs, and the trial team, probably most significantly, failed to pursue, in preparation for the penalty phase of his trial, an "extensive and generally unparalleled investigation into personal and family history," including medical records, family and social history, educational history, military service, employment and training history, as well as prior juvenile and adult correctional experiences. [ABA Guideline, 10.7]. This failure was particularly significant concerning Petitioner's mental health, with regard to which the team "acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. at 524.

Finally, Petitioner's trial team was expected to construct a persuasive narrative outlining Petitioner's extended, multigenerational history by presentation of evidence of defendant's's complete social history from before conception to the present. [ABA Guideline, 10.11]. It failed to fulfill their responsibility under this Guideline, primarily based on a chronology approved by Mr. Skaggs and presented by Dr. Gummow which was deficient and

incorrect; their failure to provide Dr. Ash with an adequate and reliable life history; and the failure to offer evidence of Petitioner's remorse.

It is further apparent Petitioner's trial team did not actually function as a "team," which is the accepted standard of performance in capital cases. [Doc. 264, p. 77 lines 1-4]. The time records kept by Ms. Moree for her billings reflect she, Mr. Skaggs and Mr. Neubauer met together as a group for one hour (.183%) of the 544.6 hours she billed for her work as part of Petitioner's trial team. [Exhibit 328, p. 11]. Mr. Stetler testified "this picture tells me it was not really a team. It met once with all three people for an hour, but otherwise it was three people working relatively independently . . . with one another, all reporting back to Mr. Skaggs, but not really functioning collectively." [Doc. 264, p. 79 lines 24, 25; p. 80 lines 1-3]. The trial team was so disconnected Mr. Neubauer discovered for first the time only the night before his testimony to this Court Ms. Moree had visited Petitioner only twice in the Natrona County jail. [Doc. 262, p. 198 lines 18-25; p. 199 lines 1,2].

One can surmise, from the testimony presented to this Court, two possible underlying reasons for the failure by Mr. Skaggs and the trial team to adhere to the then prevailing professional standards. The first is a concern with regard to reducing expenses. Mr. Skaggs professed to be a "frugal person" when "it comes to public money," even if it meant economizing on an indigent defense. [Doc. 261, pp. 64, 65]. He felt keeping costs down was always a consideration, [Doc. 261, p. 80], and economizing was important, [Doc. 261, p. 81],

a philosophy which impacted, in particular, the development of mitigation evidence. [Doc. 65-2, p. 2; Doc. 261, 65 lines 12-25, p. 66 lines 1-12; p. 80; p. 89 lines 11-22; p. 197 lines 9-15; Doc. 262, p. 233 lines 19-25, p. 234 lines 1-13, 19-23; pp. 240, 241; Doc. 267, p. 13 lines 17-22]. The second reason was a desire to proceed to trial as quickly as possible.

> Q. You have described your capital clients as getting ratty in the county jail?
> A. Pardon me?
> Q. **In the Calene proceeding you described your capital clients as tending to get ratty in the county jail.**
> A. **Oh, they do tend to get ratty in jail.**
> Q. **Tell me what you mean by ratty.**
> A. **You know, they start doing -- the longer they're in there, and that's why you can't let these cases sit around for a long period of time, but the longer they're in there the more, the more dumb stuff they do.** They talk to other inmates in jail about their case. They forget what you ask them. They get, you know, their mind set on certain things in the case that aren't going well, uh, and they, um, they just get ratty. I don't know how to describe it, but they do the longer they sit in county jail.

[Doc. 261, p. 124 lines 22-25; p. 125 lines 1-12][emphasis added].

> But overall, the client doesn't do well when he's sitting around the jail cell waiting for a trial. They get ratty. They get hard to handle. And they don't do well sitting around in a jail cell, waiting months on end for a trial, because they don't think you're doing anything, for one thing; and they don't have anything to do themselves. And it is hard to deal with clients. **And so for that, particular reason, I like to have a little bit faster trial maybe than some other lawyers would.**

[Doc. 86-4, p. 12 lines 11-21][emphasis added].

**PREJUDICE**

The performance of Petitioner's trial counsel was constitutionally deficient as it fell below "an objective standard of reasonableness," even recognizing the fact such performance is entitled to the strong presumption it was within the wide range of reasonable professional assistance. Counsels' representation amounted to "incompetence under prevailing professional norms.'" *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 787-791. *See also*, *United States v. Rushin*, 642 F.3d at 1306-1308.

The question now for consideration is whether the deficient performance by Petitioner's trial counsel was prejudicial.  Is there "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different." *Strickland v. Washington*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 787-788. *See also*, *United States v. Rushin*, 642 F.3d at 1309-1310.

There are, as previously noted, no ABA Guidelines for determining whether a deficient performance by either trial counsel or appellate counsel resulted in actual prejudice. The United States Supreme Court has, however, outlined the proper prejudice inquiry for evaluating a claim of ineffective assistance of counsel in the context of a penalty phase mitigation investigation.

09-CV-261-J                                          page  221 of  375

A court, when considering the question of prejudice in the context of a capital sentence, must "reweigh the evidence of aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. at 534. *See also*, *Sears v. Upton*, 561 U.S. 945, 130 S.Ct. 3259, 3266-3267 (2010); *Porter v. McCollum*, 558 U.S. 30, 41 (2009; *Rompilla v. Beard*, 545 U.S. 374, 393; *Littlejohn v. Trammell*, 704 F.3d at 864 (quoting *Sears v. Upton*, 561 U.S. 945, 130 S.Ct. at 3266). The critical question is thus whether "there is a reasonable probability that at least one juror would have struck a different balance" in considering the evidence presented for and against a death sentence. *Wiggins v. Smith*, 539 U.S. at 537.

The penalty phase of Petitioner's trial commenced immediately after return of a jury verdict of guilty of all charges. [Doc. 85-6, pp. 11, 12]. The jury was then advised all evidence admitted during the prior guilt phase of trial was also admitted for purposes of sentencing. [Doc. 85-7, pp. 53, 54].

The prosecution, in the penalty phase, relied upon three statutory aggravating factors:

(1) The murder was especially atrocious or cruel, being unnecessarily torturous to the victim;
(2) the murder was premeditated and committed purposely while Eaton was engaged in the crimes of kidnaping, robbery, and sexual assault; and
(3) Eaton was previously convicted of a felony involving the use or threat of violence to the person.

*Eaton v. State,* 192 P.3d at 93. The prosecution argued the evidence from the guilt stage of the trial supported the first two aggravating circumstances, focusing on the physical evidence of bruising, ligature marks, stab wounds, and evidence of sexual assault. [Doc. 85-13, pp. 16-22].

The prosecution, to support the third aggravating circumstance of prior violent convictions, introduced evidence of Petitioner's aggravated assault conviction based on his September 12, 1997, encounter with Scott and Shannon Breeden. It presented, in addition to the conviction record, the testimony of Shannon Breeden, the testimony of the investigating deputy sheriff, and the testimony of the prosecuting attorney to confirm the basic facts set forth in the Information, Judgment and Sentence. [Doc. 85-7, pp. 54-60; Doc. 85-8, pp. 1-5]. The prosecution was precluded from presenting more detail of the crime. [Doc. 85-5, pp. 40-45].

Petitioner's trial counsel attempted to establish four mitigating circumstances:

(1) The murder was committed while Eaton was under the influence of an extreme mental or emotional disturbance;
(2) Eaton acted under extreme duress;
(3) the capacity of Eaton to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
(4) any other fact or circumstance of Eaton's character or prior record or matter surrounding his offense which serves to mitigate his culpability.

*Eaton v. State,* 192 P.3d at 93, 94.

Mr. Skaggs, in his opening statement of the penalty phase of Petitioner's trial, set out the mitigation themes the defense hoped to establish. He told the jury one major theme would be the abuse which Petitioner suffered as a child. "The evidence will show that Dale Eaton was abused virtually from the time he was born." [Doc. 85-7, p. 43 lines 6, 7].The next theme was mental health. "We're going to be talking about a diagnosis, basically, of depression." [Doc. 85-7, p. 47 lines 19, 20]. The final theme would include evidence from lay witnesses who "have known him for a long time, like the Schifferns, like the Widmers. And they have known him. They like Dale." [Doc. 85-7, p. 52 lines 11-5]. Mr. Skaggs, in his penalty phase closing argument, added a fourth theme, *i.e.*, Petitioner was remorseful for his crime. [Doc. 85-13, pp. 46, 47].

Dr. Ash testified during the penalty phase of Petitioner's trial, and described Petitioner's social and financial condition in March and April, 1988. He concluded Petitioner suffered from chronic, life-long depression and a related brain dysfunction. [Doc. 85-8, pp. 22, 23, 24]. He further opined Petitioner's depression was compounded by situational stressors in his life around the time of the murder, including the break-up of his family and his poverty. Dr. Ash spoke of Petitioner's recent confrontation with his ex-wife concerning visitation with his children over Easter, and her statement to him "these aren't even your kids. And she laughed. And then she let him know that she was with another man. So it was a

particularly stressful area." [Doc. 85-8, pp. 25-29]. Petitioner told Dr. Ash this conversation

with his ex-wife was the night he met Ms. Kimmell. [Doc. 85-8, pp. 29, 30].

Dr. Ash, based on Petitioner's depression, brain dysfunction and life stressors, offered

his opinion Petitioner had acted under "extreme duress" at time of crime. [Doc. 85-8, p. 52].

The cross-examination by the prosecution was aggressive. [Doc. 85-8, pp. 54-60; Doc.

85-9, pp. 1-33]. The final cross-examination question challenged Dr. Ash's opinions based

on a deficiency of the background information provided to him.

Q.    [BY MR. BLONIGEN] Doctor, a diagnosis is only as good as the
information it's based on, isn't it
A.    [BY DR. ASH] That's correct.
MR. BLONIGEN:  That's all the questions I have.

[Doc. 85-9, p. 33 lines 15-17].

The presentation of lay witness testimony by Petitioner's trial team was, as noted by

Judge Park, sparse. [Exhibit 32, p. 10 ¶ 12]. Petitioner's maternal Uncle, Loren Ferrins,

testified Petitioner's father, Merle Eaton, abused Petitioner's mother Marian, and Petitioner's

relationship with his father, Merle, was not good. Mr. Ferrins and his first wife wanted to

adopt Petitioner, however, they never pursued the idea. He also testified Petitioner's father

"picked on" Petitioner, although he admitted he didn't know what that really entailed. [Doc.

85-9, pp. 42-50].  Betty Ferrins testified she has known Petitioner since she had married

Loren. She likes Petitioner, and does not want him to die "[b]ecause I don't think he was in his right mind when he did this." [Doc. 85-9, p. 55 line 25; p. 56 line 1].

Marilu O'Malley, Petitioner's maternal aunt, testified Merle was abusive, and Petitioner was singled out for the worst of it. She admitted, however, she did not observe abuse on a lot of occasions, and although she felt sorry for Petitioner, she never looked into adopting him. [Doc. 85-9, pp. 57-60. Petitioner's mother, Marian, "didn't seem to dare show too much affection or stand up for the kids at all; but she loved them, because she expressed her concern for them all the time to my parents. And . . . I knew she expressed a lot of concern about the kids and about [Dale] Eaton specifically sometimes." [Doc. 85-10, p. 2 lines 17-25].

Virginia and Lodine Schifferns lived in Glenrock, Wyoming. Mr. Schifferns testified, "We was very good friends. Well, we are very good friends."[Doc. 85-10, p. 15 lines 16-19]. He also testified, "I still like him and everything. I just -- like my wife, I just can't believe, like, anything like that could happen to him." [Doc. 85-10, p. 16 lines 2-8].

The trial team also called Shirley and Floyd Widmer who lived in Waltman, Wyoming. Shirley had known Petitioner for "quite a few years." The Widmers came to know Petitioner because "he used to come in and eat there, eat at our place." [Doc. 85-18, p. 18 lines 10-22]. She always gotten along "real good" with Petitioner, and at one point he lived behind their place in a motor home. She "really got to know him when Menters were paving the highway over there." [Doc. 85-10, p. 19 lines 9-25; p. 20 lines 1-5].

The mitigation presentation of Petitioner's family and friends, including cross-examination by the prosecution, took less than one hour. [Doc. 85-9, p. 34; Doc. 85-10, p. 28].[21]

Linda Gummow, Ph.D. testified on behalf of Petitioner during the penalty phase of his trial. She had met with Petitioner and had administered neuropsychological test to him. [Doc. 85-11, pp. 11, 29-33, 44, 59]. She testified concerning Petitioner's history of altercations at work,[Doc. 85-11, p. 22], and his exposure to heavy metals through his work as a welder. [Doc. 85-11, p. 48]. She noted the Wyoming State Hospital in 1997 "found elevated zinc, and they found elevated arsenic." [Doc. 85-12, p. 35]. She diagnosed Petitioner as suffering from Depressive Disorder NOS (Not Otherwise Specified). [Doc. 85-11, p. 39 lines 11-14]. Dr. Gummow, in addition to depression, diagnosed Petitioner as having "[m]oderate brain damage,"[Doc. 85-12, pp. 8, 9], which "substantially impairs his ability to conform his conduct to the requirements of the law." [Doc. 85-12, p.13 lines 17-19]. Dr. Gummow also testified Petitioner was under extreme duress at the time of the crime. [Doc. 85-12, pp. 14, 15]. Dr. Gummow was aggressively cross-examined by the prosecution with regard to the chronology approved by Mr. Skaggs, which erroneously placed the suicide of Daryl Eaton before the homicide of Ms. Kimmell. [Doc. 85-12, pp. 46, 47].

---

[21] The mitigation presentation began at 2:53 p.m., and ended at 3:52 p.m. on the same day.

The final mitigation witness called to testify for Petitioner during the penalty phase of his trial was Natrona County Sheriff Deputy Lynn Cohee. She testified Petitioner's sister, Sharon Slagowski, had told her their father had broken a beer bottle over Petitioner's head. [Doc. 85-12, p. 55 lines 2-6; Exhibit 225-2, p. 5]. Mr. Skaggs, although this conversation had been tape-recorded, used a partial transcript of the conversation in an attempt to prevent disclosure of some negative things Ms. Slagowski said about Petitioner. [Doc. 262, p. 95 line 6-25; p. 96 lines 1-7]. The negative information on the tape was nevertheless elicited by the prosecution cross-examination. Ms. Slagowski had also said Petitioner once became upset and physically attacked her.[Doc. 85-12, p. 56 lines 13-24; Exhibit 225-2, p. 6].

The jury, after deliberating approximately four hours, unanimously found the aggravating circumstances presented by the prosecution, unanimously rejected each and every mitigating circumstance submitted by the defense, and assessed the death penalty. [Doc. 85-14, pp. 11, 15, 19, 20; Exhibit 1]. [22]

The trial court judge reported on August 19, 2004, "There was strong evidence of aggravating circumstances and sparse evidence of mitigating factors." [Exhibit 32, p. 10 ¶ 12]. Mr. Skaggs agreed it was fair to say his case "blew up" on him. [Doc. 261, p. 167. Mr. Neubauer agreed. To say the case "essentially tanked" is "an understatement," and there was

---

[22] Jury deliberations commenced at 11:05 a.m., and ended at 3:48 p.m. on the same day. [Doc. 85-14, pp. 11, 15].

no "backup plan or strategy for that occurrence." [Doc. 262, p. 168 lines 24, 25; p. 169 lines 1-8]. Hrg. Tr. Vol. 2, p. 398].

The depth and scope of the mitigation presentation on behalf of Petitioner would most assuredly have been much different had Mr. Skaggs and the trial team performed up to prevailing professional standards.

The mitigation evidence which the trial team should have developed and presented during the penalty phase of Petitioner's trial is best considered within the same thematic outline which Mr. Skaggs attempted to develop at trial, *i.e.*, abuse, mental impairment, remorse, and likeability. [Doc. 85-7, p. 43 lines 6, 7; Doc. 85-7, p. 47 lines 19, 20; Doc. 85-7, p. 52 lines 11-5; Doc. 85-13, pp. 46, 47]. This somewhat compartmentalized approach to examining the mitigation evidence available to the trial team does not negate the fact those themes are intricately interrelated. The violence and abuse Petitioner experienced during his childhood very likely had a profound and permanent effect on his intellectual and emotional development. His psychiatric disabilities permeate every other part of his life.

*Abuse*

Mr. Skaggs, when asked if the physical maltreatment and abuse of Petitioner by his father was a significant element of the penalty phase defense, went one step further, stating, "It was, in my belief, the key to the mitigation case." [Doc. 261, p. 166 lines 23-25; p. 167 line 1]. He explained, "that was one issue that I was focused on. It was a safe issue, and I would

have liked to have developed it, yes." [Doc. 261, p. 214 lines 3-5]. He "tried to introduce some evidence of child abuse in the mitigation phase," but "[w]e didn't have much of it." [Doc. 86-5, p. 3 lines 12-18]. What little he had "didn't come out nearly as well in the actual testimony." [Doc. 86-5, p. 8 lines 8-11]. Mr. Skaggs, because he had relied on a narrow set of witnesses, had no additional evidence to present. "So consequently, I decided just to live with – with their testimony. But it – it wasn't nearly as good as what I had been led to believe it would be by my personal conversations with them." [Doc. 86-8, p. 42 lines 8-12].

The trial team, notwithstanding the fact its mitigation investigation was basically narrow and shallow, did identify witnesses who knew Petitioner had suffered physical maltreatment and abuse by his father. Mr. Skaggs unfortunately, however, deemed the interviews with Loren Ferrins and Marilu O'Malley sufficient to establish the abuse theme during the trial penalty phase. Mr. Ferrins and Ms. O'Malley were not emotionally able to provide in a public courtroom their mitigation evidence with an intensity equal to their prior discussions with the trial team. Mr. Skaggs blamed their lack of intensity in the courtroom on the fact Petitioners sister, Judy Mason, who had been, according to Mr. Skaggs, disrupting the mitigation investigation, was present in the courtroom when both Mr. Ferrins and Ms. O'Malley testified.

Q. And so -- but why do you think they went in the tank on you?
A. Uh, Judy Mason had been -- and Judy Mason is the sister of Dale Eaton --
she had been since the beginning of this case very disruptive to the defense. She

contacted available witnesses. Uh, she talked to available witnesses. She knew that we were focusing on Merle because Sharon Slagowski had told the deputies that. And, uh, and, in fact, in our -- Priscilla's discussions with her, Priscilla I think told her that. And so she was extremely disruptive. Come trial time she developed a relationship or had developed a relationship with Sheila Kimmell. Not that that's bad. Sheila's here in the courtroom. But she had developed a relationship with Sheila Kimmell. She was, she was continuing to be entirely uncooperative with us. And during the time that she testified -- or during the time that the Farrens testified she was kind of on the edge of the bench, and it was in a direct line of view with Mr. Farrens. And so when he testified, this merely had to do -- all he had to do was look down at Judy Mason. And I'm not saying she is a bad person. I am just saying she was disruptive, very disruptive to the defense. And she would look down, and, uh, I think that that's where he lost his nerve, so to speak, to testify about how abusive Merle was.

[Doc. 261, p. 168 lines 11-25; p. 169 lines 1-9].

Ms. Mason herself, however, described her father's violence against her brother,

Petitioner, which Ms. Moree related in a memo to Mr. Skaggs.

Judy described their childhood as being chaotic and dysfunctional. She tells a story about Dale when he was 4 years old being woken early in the mornings by his father and made to go by himself out to milk cows while the dad returned to bed. She says Dale was the child who was beaten from an early age by his father, and the beatings were severe and often included beatings to Dale's head.

.            .            .

Judy describes her father as being a liar who fabricates stories and will deny any abusive treatment given to the children, especially Dale. She says that when

Dale was being beaten, if the mother tried to stop him or interfere in the beatings, she would be beaten by the father.

[Exhibit 253-59, p. 1]. Ms. Mason's comments corroborate Petitioner's statement in the Sweetwater County presentence investigation.

The Defendant described his childhood as one full of abuse. He stated, 'If something didn't hit dad right he'd take it out on me. I would get beat with whatever he could reach. He never seemed to touch the other kids, in fact the other kids found out that if they did something they could blame me and I'd get beat. My mom would try and pull dad off of me and then she'd get beat.

[Doc. 267, p. 75 lines 11-17; Exhibit 171-52, p. 4]. Dr. Ash found it "very poignant that, as vulnerable and fragile as she was with her mental illness, that she tried to step in and protect him. It also says a lot about Dale, too, because he has always held himself responsible for his mother developing psychosis." [Doc. 267, p. 76 lines 6-10].

The memo by Ms. Moree, or even her testimony relating Ms. Mason's disclosures, would arguably have been admissible under Wyoming law,[23] and Dr. Ash could have testified

---

[23] The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided

about having the same information from Petitioner and documented by other sources. Mr. Skaggs nonetheless chose not to use the statements by Ms. Mason as independent proof Petitioner had suffered abuse by his father.

Ms. O'Malley and Mr. Ferrins have died since testifying at Petitioner's trial. [24] Ms. O'Malley, however, provided a declaration behalf of Petitioner, her nephew, before her death in January, 2013.

> Dale Wayne got the brunt of everything from his father. Merle was always on him for something. Nothing was ever good enough. There was nothing Dale Wayne could do to make his father happy. Merle had a wide, thick belt that he would whip off and beat Dale. This continued even until Dale Wayne was in his 20s. All the kids would be rough housing and Merle would go after Dale Wayne. He got the worst of it by far.
>
> .                    .                    .
>
> Dale was a quiet child. He was beat down. I never thought he had a very high IQ because of the way he talked and the way he acted. I don't know how to describe it, but I just felt he probably wasn't very smart, but kids need attention and encouragement to grow and Dale Wayne certainly never received that. I kept him for a week or so when he was around twelve years old. I asked if he could come and stay with me because I felt so sorry for him. While he was staying with us my husband, Bill, took Dale Wayne fishing. Dale Wayne

---

further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible. Wyo. Stat. § 6-2-102(c).

[24] Loren Ferrins and his wife, Betty, died in an automobile accident on December 7, 2007. [Doc. 268, p. 66 lines 13-22].

idolized Bill because of that one incident. I'm sure it was the only time anyone took him fishing. Merle never did anything with those kids. I never saw Merle show any affection or say a kind word to anyone, especially Dale Wayne. Years later, Dale Wayne still commented on Bill taking him fishing when he was a boy. It was only one time and it had such an impact on Dale Wayne. Bill and I divorced and Dale Wayne still talked about it. He bought Bill a fishing rod years later to thank him for taking him fishing. Dale Wayne had an appreciative heart and he could recognize when someone showed him kindness. After he had been with me for a week, I called Marian and asked if Dale Wayne could stay longer. She told me, "No," because Merle had work for him. He left and that was the only time he stayed with me for an extended time. I wanted to keep Dale Wayne. Usually, the eldest son has a special closeness with their father. That certainly wasn't the case between Merle and Dale Wayne. There was no relationship, no closeness and certainly no love. There wasn't anything Dale Wayne could have done to change the way his father thought about him. It was really sad.

[Exhibit 39, pp. 1-3]. Ms. O'Malley's testimony would have been strong mitigation evidence to confirm the abuse suffered by Petitioner.

Mr. Skaggs admitted eyewitnesses to the abuse Petitioner suffered as a child would be very significant to him, yet no one from the trial team apparently ever interviewed Loren Ferrins' daughters, Sandra Andrae or Lorena Altman, who played with their cousin, Petitioner, when they were children. [Doc. 261, p. 214]. Lorena indicated, "We were like shadows,…there was the one following the other somewhere."

Q. Do you remember Dale Wayne as a child?

A. Yes.

Q. When you lived in Riverton, did you play together?

A. We were all like shadows, you know.

Q. Like shadows?

A. Mm-hmm. There was the one following the other somewhere.

.                    .                    .

Q. All right. And what did you think of, of Merle Eaton?

A. Didn't like him.

Q. Why not? What did you not like about him?

A. Well, it was like with Dale Wayne he would whop him side of the head, you know, make him do things. He was just always batting at him.

Q. When you said he'd bop him on the side of the head, can you describe that?

A. (Indicating.) I don't know how you do it, but --

Q. You're doing a motion.

A. Yeah. You can't follow a motion. Just come up and backhand him or whatever on the side of the head. He was always slapping him.

Q. Did those blows ever knock Dale to the ground?

A. Yeah.

[Doc. 268, p. 70 lines 27-, 11-24].

Lorena's twin sister, Sandra Andrae, also recalls:

From the time he was born, Dale Wayne seemed to be the one that he wanted to pick on. No matter what Dale Wayne did, whether he was being good or not, all my Uncle Merle had to do was look at him and he would hit him or yell at him, just always on his case, you know, for no reason at all. He would slap him for him crying. And even when he was a baby and older, he cried all the time, and I think it was because he was colicky. We didn't know at that time exactly

what it was, but I think that's what it was. And he was around four years old or older before he even learned how to walk.

[Doc. 286, p. 107 lines 8-17].

Ms. Andrae could have given vivid mitigation testimony of two instances of the extreme violence by Merle, his father, toward Petitioner. The first involved an incident with a child's bow and arrow set their grandfather, Elmer Ferrins, bought Petitioner as a young child. Ms. Andrae was hit in the back by an arrow shot by Petitioner, which prompted a severe beating by Merle.

Q.     [BY MS. RUNNELS] And did Dale get in some trouble over this?

A.     Uncle Merle grabbed a hold of him and beat him to a pulp. I mean, he hit him, kicked him, beat him, slapped him, threw him up against the wall. And then he told all of us to stay away from him when he came out, and we didn't hear anything from Dale Wayne.

Q.     Did you think that Merle had killed Dale?

A.     Yes, because Dale Wayne would scream out, "Someone help me, please help me," and nobody did. Everybody just stood there and watched because Uncle Merle said no one come in there.

Q.     How did Merle look when he got finished beating Dale?

A.     He was sweating really bad, red in the face, and he was still mad, and he come walking out, and he says, "Nobody goes in there and leave him alone," and he got in his -- I guess he got in his pickup and took off, or he went behind the trees anyway, because we never saw him after that.

[Doc. 268, p. 106 lines 15-25; p. 107 lines 1-6].

Ms. Andrae was asked whether Merle drank.

> Q. Okay. Did Merle drink?
> A. All the time.
> Q. What was he like when he was drinking?
> A. I, since I never saw him probably sober that much, he was
> just belligerent, uh, hateful, uh, always yelling at somebody,
> uh, just unfriendly.

[Doc. 268, p. 108 lines 7-12]. She recalled another violent episode at a family picnic when Richard (Petitioner's brother) was just a baby, so Petitioner would have been a little over ten years old. Merle told Petitioner to get him another beer, and Petitioner was slow to comply.

> A. -- and Mary Louise on that side. Dale Wayne was on the end. And then next
> to Granddad was my dad, my stepmother Betty, Lorena, Judy, me, and Sharon.
> And we were eating, and -- but Uncle Merle had been drinking all this time, and
> he had about five or six bottles of beer around his table or his plate, and he was
> getting kind of mouthy and kind of swearing once in a while, and I remember
> my dad telling him to shut up, and he -- and so he just kept drinking instead of
> eating. And he looks down at Dale Wayne, and he says, "You go and get me a
> beer." And Dale Wayne wasn't paying any attention to him because he was
> eating. And he could have picked one of the girls, you know, because they were
> closer to that side and stuff, but he went right to Dale Wayne and said, "Go get
> me a beer," and Dale didn't even look up at him. And Uncle Merle said, "Get
> up Dale, and get me a beer now." And Dale Wayne says, "I don't want to. I
> want to eat." And Uncle Merle yelled at him and swore at him. So Dale Wayne
> gets up. Instead of, you know, hurrying off there, he just kind of scuffled off
> towards the house to go to get the beer. And he wasn't going fast enough for
> Uncle Merle, so Uncle Merle took a beer bottle and he threw it, and it landed

right next to the door just as Dale Wayne got to the door, and it shattered, and it split his head open. Q. And then what happened to Merle? Did he -- A. Uh, well, he lost his balance when he threw the bottle, and he fell back, and he hit his head up against the swing set that the kids had back there with them heavy iron posts, and it knocked him out. And they just left him there. Q. And what about Dale Wayne? What happened? A. Uh, my mom and my dad and Aunt Marian wrapped a towel around his head, and they took him in to town to the hospital. And then my dad went to the police, had them come out and get Uncle Merle.

[Doc. 268, p. 109 lines 4-25; p. 110 lines 1-11].

This most likely is not the same incident described by Petitioner's sister, Sharon Slagowski, to Deputy Cohee, in her tape-recorded phone call. She told the police, "I remember when [Merle] used to hit [Dale] with a belt and hit him with his fist and I remember one time when I don't remember how old I was he broke a beer bottle over his head." [Exhibit 225-2, p. 4]. Ms. Slagowski stated "we had to be real young" when this happened, "I'm thinking early grade school." [[Exhibit 225-2, p. 4]. Whether there were one or two assaults with a beer bottle is not the relevant issue, as explained by Dr. George Woods, a psychiatrist.

Frankly, the part that I considered to be the most relevant, whether he was hit over the head or whether -- with a beer bottle or whether someone threw a beer bottle at him and it shattered next to him and cut him on, on the forehead, certainly getting hit directly over the head at four could cause some neurological damage, but the internal consistency is a beer bottle. Right? It's not, it's not like one time he threw a cup. Each story, no matter what the

specific circumstances of the story are, the stories that we've heard have all included somehow Mr. Eaton having a beer bottle available and using it in an inappropriate way. And this reinforces what is said about him being an alcoholic and that impairing his ability to effectively take care of his family.

[Doc. 269, p. 89 lines 1-13].

The documentary record which the trial team had, or could have easily obtained, contains numerous other indications of the violence Petitioner suffered as a child. The nightmares which troubled him, according to Mr. Stetler, are consistent with a trauma history, and could be corroborative of maltreatment. [Doc. 264, p. 138 lines 3-19; p. 143 lines 7-12]. The record of Petitioner's hospitalization for psychiatric examination in 1961 contained additional indications of his maltreatment in the home. A physician wrote, "He expressed considerable unhappiness with his home situation and said 'I hope I get sentenced to a reform school so I won't have to go home.'" [Doc. 264, p. 143 line 22-25; p. 144 lines 1-4; Exhibit 169-4, p. 11]. Mr. Stetler pointed out hoping to go the reform school rather than home - "that's a pretty extreme statement." [Doc. 264, p. 134 lines 1-6].

Dr. Woods also found passages in Mrs. Eaton's psychiatric hospital records, which the trial team could easily have obtained, which contain corroborative evidence of the violence in the Eaton home. Dr. Woods testified these documentary clues are "very relevant" to the issue of trauma in Petitioner's life and family. They indicate "this is a family that lived with

significant trauma…Merle Eaton was described as a heavy alcoholic, a man that was prone to physical abuse, and it seems as though Dale Eaton was one of his prime targets." [Doc. 269, p. 66 lines 6-10].

The issues of abuse and mental health are not separate and distinct. They are intricately related. Violence against a child, as Dr. Woods explained, "can have a direct impact" on the child's growth and development, including neurologically.

Q. (BY MR. O'BRIEN) And before we move on to this, Doctor, what kind of damaging effects can the type of abuse described by Ms. Andrae, by Lorena Altman, by Sharon Slagowski, and by others, what kind of impact can that have on a human being's
growth and development?
A. It can have a direct impact. Um, you know, we, um -- there's a wonderful book out, if any of you choose to take the time. The name of the book is Formative Experiences,
and it's a book on developmental psychology. And what it talks about is how much of the baby's brain is developed compared to other species. A baby's brain is only about 40 percent developed when it's born. A cat's brain is about 65 percent developed. An ant's brain is about 90 percent developed. And the reason it's thought that a human's brain is only developed about 40 percent is because environment has so much to do with who that human becomes. Language, education, so many other things shape that brain and shape it directly. So the idea that the brain is just there and environment is just air and global warming, it's not really true. That brain is shaped -- the brain of that child is shaped by the experiences that they undergo. And if those experiences are traumatic, it's not just a psychiatric issue. If you have a child that is being constantly traumatized, their autonomic system is being overamped all the time.

Their autonomic nervous system is being heightened. They have anticipatory anxiety. It changes their brain, and we know that now, particularly in the right parietal lobe. So it's very important to take into consideration the environment when you look at these issues, not just the brain itself.

[Doc. 269, p. 91 lines 5-25; p. 92 lines 1-9].

Dr. Ash also found the evidence of abuse presented to this Court, but not at Petitioner's trial, to be probative of many issues, including Petitioner's strained relationship with Mr. Skaggs.

Q. You had dealings with Mr. Skaggs.
A. Yes.
Q. How would you describe his tone and approach?
A. Wyatt is brusque.
Q. Is that approach, without some substantial modification effort on Mr. Skaggs' part, conducive to building the kind of trust and rapport with a client like Mr. Eaton?
A. With Mr. Eaton especially, he was so nervous and so paranoid around men and especially aggressive men that it would -- again, it would be like the gasoline and fire sort of
thing, that the more brusque that Wyatt might become the more angry and agitated and defensive Mr. Eaton would become, I would suspect.
Q. We're going to talk more about this later, but generally where do you think that comes from with Mr. Eaton?
A. That's an important question. I think it's a complicated question. He was paranoid by genetics. There is paranoia that comes with bipolar condition. There's tremendous paranoia that can come when there's been a great deal of

physical abuse. And I believe in Mr. Eaton all of those things came together. Especially, you know, Mr. Eaton was bullied substantially in the home and outside of the home growing up, and his nervousness, his tension, his wish to avoid that, his attempts to avoid that all are, are factors in terms of this.

[Doc. 267, p. 60 lines 16-25; p. 61 lines 1-13].

Another significant chapter in Petitioner's life, and another dimension to his childhood trauma, is the treatment he received from the bullies in Meeker, Colorado, in his early teens. Brian Conrado, who could have been identified as a potential mitigation witness if the trial team had contacted his friend, Phyllis Lake, explained why Petitioner was singled out for abuse and ridicule by his peers. Meeker was a very homogenous community, whose long-time inhabitants could trace their roots to the English settlers, so that "if you weren't of the right pedigree, so to speak, it was rough." [Doc. 268, p. 39 lines 13, 14]. It was even worse for Petitioner, who stood out because he was overweight, poor and not very smart. The other children nicknamed him "Always Eating" because he was overweight and was often seen eating candy bars. [Doc. 268, p. 42 lines 19-25; p. 43 line 1]. The other children belittled Dale because he wasn't very smart. [Doc. 268, p. 43 lines 8-15]. Mr. Conrado remembers Petitioner working very hard mowing lawns and helping the janitor after school to earn money. [Doc. 268, p. 44, 45]. Sometimes the older kids would wait for Petitioner and take his money.

Dale, when he mowed lawns, wow, he -- you know, you could see him, it might be 6:00, 7 o'clock at night when he was pushing his mower down the street

heading home. And I can remember -- I wasn't involved 'cause, I mean, I was just -- I wasn't as big as these guys by any means, and -- but I was in the car when it happened several times. And they'd pull over, and they would, pardon my language, threaten to beat the shit out of Dale if he didn't give them his money or his candy bars.

[Doc. 268, p. 45 lines 22-25; p. 46 lines 1-8]. Mr. Conrado remembered Petitioner did not fight back as "he was outnumbered. These guys were high school kids." [Doc. 268, p. 46 lines 11-13]. Petitioner simply withdrew in the face of constant bullying. "[H]e didn't socialize…I can only imagine what went through his mind, but he didn't retaliate. I think about what could he do?" There were no adults who stood up for him, either. [Doc. 268, p. 46 lines 21-25; p. 47 lines 1-3].

Mr. Conrado remembers the only extracurricular activity in which Petitioner participated in Meeker was the 4-H Club electrical program. The children would car pool to the meetings at a ranch outside of town, and while they were waiting for their rides Petitioner would be "harassed and belittled" by the other children. The other kids, on one occasion, forcibly removed Petitioner's pants, and rubbed Canadian thistles over his genitals. [Doc. 268, p. 41 lines 15-25; p. 42 line 1].

Dr. Ash found the declaration by Mr. Conrado [Exhibit 68-5] provided some very significant history. The constant, severe bullying, and the one episode of "taking his clothes off and rubbing thistles on his genitals must have been really humiliating and frightening."

[Doc. 267, p. 136 lines 5-9]. Dr. Ash testified this information "would have been helpful for mitigation. It would have been helpful in terms of, again, the overall understanding. There's so much posttraumatic stress disorder kind of symptoms in Dale's presentation, along with everything else." [Doc. 267, p. 136 lines 12-15]. Dr. Ash also found very probative and significant the testimony given by Sandra Andrae "that Merle was punching him to the head and body. This was when he was just a boy. That Dale fell to the ground, and his father drug him into the house and continued to beat him, and Dale cried for help, but nobody came." [Doc. 267, p. 137 lines 18-21]. Mr. Skaggs, prior to Petitioner's trial, had not provided Dr. Ash with any evidence of physical maltreatment which came anywhere close to the nature and quality of the abuse of which he had been subsequently informed. [Doc. 267, p. 137 lines 22-25]. This new evidence of the trauma endured by Petitioner is significant to Dr. Ash's psychiatric evaluation.

> With… the history that's been, been given, the picture of posttraumatic stress disorder has got to be considered as a compounding condition. The essence of it is that when you're exposed to …what is considered a life-threatening situation or you feel your life is being threatened, that whenever you are reexposed to that that it fills you with intense psychological distress. So that's the picture that you see with Dale Eaton whenever he goes off to work with other men and when he feels threatened. It helps explain, I believe, his difficulties that he had with his attorney Wyatt Skaggs. So that, that extreme anxiety, tension that starts coming up, and you try to avoid it, you try to stay away from it, that's another part of PTSD, but if you can't avoid it then … another symptom of PTSD is explosive anger that comes… Dale exhibited a lot

of symptoms of PTSD, and they talk about it can reach psychotic proportions when severe enough, when the stress is severe enough.

[Doc. 267, p. 138 lines 1-22].

Dr. Ash also found another symptom of PTSD, "hypervigilance," which is apparent throughout Petitioner's life history.

> That's another one of the symptoms. And the hypervigilance I think is so well described by his employers talking about Dale painted all his windows black. He didn't want anyone to be able to look into them. When he, again, when he hid parts and didn't want people to look at them. When he booby-trapped his, his place where he lived where -- when he told the kids be on the lookout for anybody coming to rob our place and get the gun. Hypervigilance is very strong.
> And he also had another symptom of PTSD, increased startle. Somebody walk up behind him and touch him, and he would swing.
> So he has all those symptoms, and they would be very connected with the kind of physical trauma, whether it's from his father or from the bullying that he received or both.

[Doc. 267, p. 138 line 25; p. 139 lines 1-14].

Dr. Ash recognized, prior to trial, he needed more data for his assessment of Petitioner, yet when he asked Mr. Skaggs, none was provided. Mr. Skaggs actually discouraged him from talking to other family members. [Doc. 267, p. 62 lines 12-25; p. 63 lines 1-14].

A social history, in Dr. Ash's field of expertise, is investigated and prepared by forensic social workers, or in the case of capital defendants, mitigation specialists. Psychiatrists spend most of their time talking with the patient and reviewing reports, while the forensic social worker or mitigation specialist "would be gathering…the collateral information from the family, from friends, from legal circumstances and so on." Dr. Ash, in Petitioner's case, had nothing available to him which was equivalent to the psychosocial history he was used to getting from a forensic social worker. [Doc. 267, p. 64 lines 20-25; p. 65 lines 1-15].

The impact of the deficient mitigation investigation into Petitioner's social history on the reliability of the findings by Dr. Ash was addressed by Mr. Burr, a capitol defense expert.

> Q. Who bears, in capital litigation, who bears responsibility for an accurate and complete psychosocial history being obtained?
> A. The lawyer.
> Q. Why is that?
> A. Well, you know, as much as I tried after *Ake* to say it's the expert, you know, got to have competent mental health experts, the courts quickly disposed of that and said it's the lawyers who are responsible for this. The investigation that goes into it and the working with experts is a lawyer's task. And there's not ineffective assistance of expert. There's ineffective assistance and a guarantee of effective assistance in the Constitution by counsel. And so it's the lawyer's duty to assure that…an adequate mental health history is presented to the mental health expert.

[Doc. 265, p. 138 line 25; p. 139 lines 1-14].

*Mental impairment*

There is a "critical interrelation between expert psychiatric assistance and minimally effective assistance of counsel." *Blake v. Kemp,* 758 F.2d 523, 531 (11th Cir. 1985) (quoting *United States v. Edwards*, 488 F.2d 1154, 1163 (5th Cir. 1974)). Dr. Ash, as previously discussed, explained psychiatrists are not investigators. They routinely depend on forensic social workers or mitigation specialists working for capital defense attorneys to provide a thorough and reliable bio-psychosocial history, which is critical to an accurate assessment. Dr. Ash did not received such an assessment from Petitioner's trial team prior to trial. [Doc. 267, p. 64 lines 20-25; p. 65 lines 1-15].

Richard Burr explained the danger of failing to provide a complete psychosocial history to a forensic mental health expert. It's "pretty simple -- you know, the less complete your history is going in, the less accurate, reliable, and persuasive and meaningful the opinion is coming out. It's very, a very direct relationship." [Doc. 265, p. 139 lines 18-21]. He explained the reasons a thorough investigation conducted by a capital defense team with mental health knowledge and related interview skills is critical to a capital case.

> Q. So what efforts does competent capital counsel make to obtain an accurate and complete psychosocial history, um, in a case?
> A. We need to have at least a full-time mitigation specialist working with us who is trained and experienced. The work of the mitigation specialist is expert work. Most lawyers are not capable of doing that kind of investigation because … much of the information we seek or look for is information that people don't

easily disclose because it's about hard things. It's about, it's about abuse and malevolence and dysfunction. And, you know, all of us like to be perceived as competent and fully functioning, and the evidence that we suspect is there and almost always is there is the opposite, and people don't willingly talk about that. So it requires some real skill at getting to that information with people.

And the other thing is that most of us as laypeople don't know what you mean. I mean, Mr. Hoopes didn't know what a declaration was, but he knew he'd signed a statement. Most laypeople will … know if a relative has a mental health problem or has been sent to a doctor or has been hospitalized involuntarily, and they can describe their behavior, but if you simply go in and say, um, do any of your relatives have schizophrenia, they'll say no, and yet there are. And so you have to learn how to ask these questions in a way that will help people connect to the information they know and have and are willing to talk about. So part of it is overcoming a reluctance to disclose information. Part of it is helping people understand what kind of information you're looking for if it's there. And that requires some real skill. It is … very different from so-called fact investigation, which is looking more at, you know, what happened and who did it, and that kind of evidence. This is a very different form of investigation. It requires patience and gaining the trust of people that you are talking with.

[Doc. 265, p. 139 lines 22-25; p. 140 lines 1-25; p. 141 lines 1-7]. The process described by Mr. Burr is clearly not the process utilized by Petitioner's trial team.

A complete psychosocial history, once it is prepared and provided to the expert, allows them to develop a thorough and reliable assessment. Mr. Burr explained the psychosocial life history report is used by the expert

[a]t least in a couple of ways. [Y]ou will often provide it to the mental health expert… George Woods' declaration is a good example. Most of that declaration I would venture to say was not originally written by Dr. Woods, and that's okay. I suspect that the mitigation specialist and the team had a lot to do with crafting the life history that he has in his report. I may be wrong…I don't have inside information, but I know how I work, and oftentimes the … psychosocial history we put together finds its way into the expert's report. It should. It's … a critical piece of the report. It's information the expert is relying on. And whether the expert actually writes those words or not, the expert is embracing that … report and relying on it and using it as the platform upon which to, to … develop impressions, to interview and do a clinical interview of the client. It will inform the medical and neurological exam. It will inform what other diagnostic studies are done. So it's … the critical piece of evaluation that we provide for the expert.

[Doc. 265, p. 180 lines 3-21].

The foregoing discussion with regard to the relationship between a lawyer's performance and an expert's findings clearly identifies the causal link between the trial team's deficient performance, and the incomplete mental health assessments and opinions presented to the trial court jury, through no fault of the conscientious experts who testified on behalf of Petitioner.

The expert assessments of Petitioner's mental condition were undermined by the trial team's substandard performance in two ways. First, as a result of the lack of a complete family history, the mental health experts who testified for Petitioner were logically and

ethically unable to consider conditions known to have a genetic component, such as bipolar disorder. Second, because no one on the trial team had any real knowledge of Petitioner's mental health conditions and issues, they were unable to provide the mental health experts with a thorough personal history of Petitioner which should have included evidence of his delayed development and prominent symptoms of his mental and emotional impairments which were reasonably necessary to a reliable assessment. A discussion of the prejudice caused by the failure to conduct a thorough and competent mental health investigation of Petitioner's own symptoms of impairments and disabilities is thus appropriate.

*Family History*

The investigation of Petitioner's family history by his trial team discovered basically only two relevant pieces of information. One was the eleven-page admission and discharge summary from the Colorado State Hospital for Petitioner's mother, Marion Eaton. The second was the fact Petitioner's brother had committed suicide, although the date provided was incorrect. These two bits of family history information were the only evidence provided to Petitioner's mental health experts. The mental health experts did not know there was additional reliable and probative information available.

Petitioner, through his genetics, is heavily loaded for mental illness from both sides of the family. Dr. Woods, a neuropsychiatrist, indicated "family history is most important because we've come to understand that many, many not only medical diseases but psychiatric

diseases are familial if not genetic." [Doc. 269, p. 29 lines 13-16]. He further explained how and why a family history is reasonably necessary to a thorough and reliable assessment. Symptoms are hereditary, and the symptoms Petitioner displays can be seen throughout his extended family.

> [W]hat you inherit are symptoms. You don't inherit a constellation. You inherit symptoms, and so in the same way that you inherit diabetes. And in this family you see a lot of diabetes . . .. The same is true with psychiatric disorders. In psychiatric disorders you may inherit pressured speech and flight of ideas, but that doesn't necessarily mean that you will be psychotic. You may inherit impaired judgment involved with your frontal lobe. So it doesn't mean that you inherit all of the symptoms.
>
> What we see in the Eaton family, however, is that this is an affectively laden family. This is a family that from generation to generation you see multiple symptoms being inherited, passed down from generation to generation.

[Doc. 269, p. 44 lines 10-25; p. 45 lines 1-4].

The pattern of symptoms throughout the Eaton and Ferrins families are set out in Exhibits 336, 337, 339.[25] The following discussion will concentrate on the family members who share specific symptoms which have been observed and documented in Petitioner.

_____

[25] Exhibit 336 and Exhibit 337 are color-coded (Exhibit 339) genograms of the Eaton and Ferrins families according to confirmed symptoms observed in various family members. The social history section of the report by Dr. Woods of his neuropsychiatric examination of Petitioner, Exhibit 168, provides sources for each individual's symptoms represented in the genograms.

The symptoms and mental condition of Zelma Eaton Smith, the sister of Petitioner's father, Merle Eaton, and thus Petitioner's aunt, are well documented in her hospitalization records, [Exhibit 178], and most closely resemble Petitioner's symptoms. Dr. Woods described the similarities.

> She is described as having a chronic mental illness. And as we look back, what we see is that about every decade, about 10 or every 15 years, she has a significant psychotic what we describe as an exacerbation. The symptoms just become out of control and require hospitalization. And what are the symptoms that we see with her? Well, if you look at the genogram, you see that she becomes psychotic. You see that she has depression or elation. You see that she here at 71 has developed what they described as dementia. And yet, you know, over her life this is someone that wrote children's books, wrote an opera for children, [26] had extremely high functioning, and yet in the midst of that was assaultive, was noncompliant with medication, was grossly psychotic.

> So you see numbers of symptoms. She's treated … both with antipsychotic medication as well as with medication to try to help control her mood.

> You also see that she had compulsive behavior. And she illustrates the compulsive behavior that was really even more rampant in the Eaton … Eaton side of the family than in the Farrens side of the family. She hoarded. She -- in the hospital records they talk about her … repeatedly stacking things in her room. Her clothes, wearing layers of clothes. And so you really see these core

---

[26]
www.amazon.co.uk/Gallant-childrens-operetta-arranged-Rothrock/dp/B0000D3FLC
The Gallant Tailor or, Seven at one Blow. A children's operetta in three acts. Music adapted and arranged by Z. Smith. Book and lyrics by Edith Rothrock.

symptoms of the Eaton family: aggressiveness, assaultiveness, mood lability, compulsive behavior, reactivity, and a single area often of relatively good functioning.

[Doc. 269, p. 45 lines 17-25; p. 46 lines 1-18]. These are some of the same symptoms, as described *infra*, which have been observed in Petitioner.

Another characteristic Petitioner shares with his Aunt Zelma is "this deterioration over time. You know, when they're younger, they seem to be able to bounce back from these symptoms much more effectively, but as time goes by these symptoms tend to, to bring them down and to impact them cognitively as well as behaviorally as well as psychiatrically." [Doc. 269, p. 47 lines 3-8].

Another symptom they shared is one "that appears to be a core symptom when we're talking about this family, and that is altered sexual behavior or unusual hypersexuality. She was in the times that she was hospitalized, there's no other way to put it but a flirt. She was described as seductive. So that's another symptom that one sees." [Doc. 269, p. 47 lines 13-18]. Aunt Zelma's diagnosis was "bipolar disorder, manic episode." [Doc. 269, p. 48 lines 3-5; Exhibit 178, p. 21].

Dr. Ash agreed with Dr. Woods, and explained why the information concerning Zelma Eaton Smith would have made a significant difference in his findings and testimony at Petitioner's trial.

> [I]t was extremely important that there's the genetic history of bipolar disorder in, in a very close relative, but also the, the form of the bipolar disorder. There were two things that were very powerful. One, here is a 70-year-old woman barricading herself and fighting off the people working in the hospital. And then also in the record is this 70-year-old woman trying to seduce her doctor.

[Doc.267, p. 78 line 25; p. 79 lines 1-7]. Her aggressiveness and hypersexuality are behaviors "which you come to expect with bipolar disorder." Indeed, hypersexuality is "one of the diagnostic criteria." [Doc. 267, p. 79 lines 8-13]. Dr. Ash saw parallels between Zelma Eaton Smith and Petitioner's conditions.

> Dale, when he would get into a tense situation, and again a tense situation was primarily when he was around other men that he saw potentially combative, he would get nervous, tense, paranoid, and then he would have very limited abilities to respond. It was either to take off, to avoid, to flee, or to fight. And he often would explode and fight with his coworkers. Where at the same time, as one fellow, Mr. Hoopes, described, 90 percent of the time he was calm. As Mr. DuBry described, he was good if he went out and worked … by himself, but you could expect trouble if he was out there with other men.

[Doc. 267, p. 79 line 25; p. 80 lines 1-11]. Dr. Ash, before Petitioner's trial, received no information with regard to Zelma Eaton Smith. He, in fact, did not even know she existed. [Doc. 267, p. 119 lines 19-24].

An equally important element of Petitioner's family history concerns his brother, Daryl Eaton. Daryl's ex-wife, Elizabeth Pryor, in a declaration, described behaviors and mood swings which, according to Dr. Woods, "one sees in bipolar disorder." [Doc. 269, p. 78 lines 6, 7; Exhibit 210]. Ms. Pryor, in her declaration, stated,

> (w)e divorced because Daryl fell apart and I could not take anymore. Daryl was a good man but he could not cope. His anxiety and depression would overtake him and he could not function when he really fell apart. The heavy debts that he incurred were a major part of it.

[Doc. 269, p. 77 lines 5-9; Exhibit 210, p. 1]. Dr. Woods, in reviewing Ms. Pryor's description of her ex-husband's symptoms, observed, "(y)ou could in many cases substitute Mr. Eaton's name there." [Doc. 269, p. 77 lines 11, 12]. Dr. Woods pointed out in Petitioner's life, as early as age 16,

> we see this reactivity, we see this kind of inability to weigh and deliberate, this kind of inability to structure, effectively structure, and his anxiety and depression would overwhelm him. We see in multiple cases, in the Torrington records for example, where he fell apart and went in because he was suicidal. We see him in jail situations where he is treated with medication because he's falling apart.

[Doc. 269, p. 77 lines 14-21].

Daryl Eaton also shared Petitioner's symptoms of hypersomnia, multiple episodes of suicidal ideation, mood swings between depression and irritability, and out-of-control

behavior which can often accompany bipolar disorder. Daryl, like Petitioner, was paranoid, concerned his wife was cheating on him. His spending got out of control. He started a construction business and started hiring people even though "there was no way he could ever pay those men." Daryl's grandiosity and excessive spending are also symptoms commonly seen with bipolar disorder. Daryl, once again as did Petitioner, would lose control, behave aggressively, and then immediately express remorse, which is unusual, although "it's not unusual within this family." [Doc. 269, p. 78 lines 1-25; p. 79 lines 1-25; p. 80 lines 1-18].

Daryl Eaton also started a construction business with his second wife, Terry Lerseth, and followed hail storms to repair and replace roofs and do painting, [Doc. 265, p. 10 lines 14-20]. Ms. Lerseth described one time when business was so slow she had to go to a food bank to get food. [Doc. 265, p. 10 lines 21-25; p. 11 lines 1-6].

Daryl's energy level was high. "His mind wouldn't stop." He didn't sleep much; maybe a few hours a night. [Doc. 265, p. 11 lines 20-25; p. 12 lines 1-3].

Daryl did not save money. "He spent it on tools, and he just -- as soon as he got it, he spent it." [Doc. 265, p. 15 lines 21-25]. Ms. Lerseth realized in January, 1988, they were having serious money trouble when their phone was shut off. [Doc. 265, p. 12 lines 22-25; p. 13 lines 1, 2]. She took a job as a waitress to help cope with the financial stress, however, Daryl disapproved and in March, 1988, they argued. Daryl got real angry and went outside and "kind of exploded…he took one of his pickups and rammed another one and then got his

gun out and shot the windshield out." He owned three trucks at the time, and ended up wrecking all of them that night. Ms. Lerseth doesn't know how many shots Daryl fired into his truck, however, it was "(a) lot." She "thought he was crazy." She was "kind of scared. I was hoping he wouldn't come in the house after me." Daryl, afterward, "was very apologetic, sorry he did it. It's like he couldn't control himself." [Doc. 265, p. 13 lines 3-25; p. 14 lines 1-14]. Ms. Pryor described both manic and depressive episodes for Daryl. Ms. Lerseth, however, "described mainly the high energy." Dr. Ash found significant the fact "she described a very sweet, caring fellow, but she also described an episode where this, again, generally very gentle, caring man suddenly lost it and was overwhelmed with rage and was shooting cars in the back and ramming them into each other and, … unexplicable." [Doc. 267, p. 83 lines 23-25; p. 84 lines 1-3]. Dr. Ash indicated the experiences Ms. Lerseth described with Daryl Eaton would be significant with regard to diagnosis of Petitioner.

> Q. What is the significance of these experiences that Terry Lerseth had with Daryl Eaton in your diagnostic picture of Dale Eaton?
> A. Well, they're just very significant because it would be -- there's so much evidence that his brother had bipolar disorder, and in the bipolar disorder part of the manifestation was in terms of rage that became out of control.

[Doc. 267, p. 84 lines 7-13].

Dr. Ash concurred with the conclusion by Dr. Woods that Daryl Eaton was an undiagnosed case of bipolar disorder. His symptoms were classic.

And the information that Elizabeth Pryor described … classic descriptions where Daryl would become depressed and lay around, have a hard time getting out of bed, do nothing for periods of time. And then there would be other times when he had extremely high energy, would need very little sleep, and during that time he would have what really sounded like grandiose ideas of hiring and developing a construction company to the point that he got himself into very significant financial problems, which is what you often see with someone with bipolar disorder. In the high-energy grandiose period they start overreaching and get themselves into significant problems. So she described these classic mood swings that you see with bipolar disorder.

[Doc. 267, p. 81 lines 22-25; p. 82 lines 1-9]. The information provided by Ms. Pryor was extremely important information to Dr. Ash. "Whenever there is a first-degree relative, that is, a mother, father, brother, sister, daughter, son, first-degree relative with bipolar disorder, one immediately has to be concerned about bipolar disorder being there when depression is also present." [Doc. 267, p. 81 lines 16-22].

Dr. Ash pointed to other significant family history which had not been provided to him prior to Petitioner's trial. Petitioner's son, Ed, was diagnosed with bipolar disorder at the Wyoming State Hospital, and medicated with Mellaril, an antipsychotic, and Desipramine, a tricyclic antidepressant. [Doc. 267, p. 85 lines 14-25; p. 86 lines 1-3]. This information would have had a "profound" effect on Dr. Ash's assessment of Petitioner. "A first-degree relative diagnosed with bipolar disorder in a man who shows symptoms of bipolar disorder." [Doc. 267, p. 86 lines 4-8]. Dr. Ash stated identifying two first-degree relatives with bipolar

disorder, plus a maternal aunt, "tremendously" alters his view of Petitioner's genetic vulnerability to bipolar disorder from the view he held at the time of trial. [Doc. 267, p. 86 lines 9-20].

Other family history added to the likelihood of Petitioner suffered from a major psychosis. His niece's daughter was apparently diagnosed with bipolar disorder, and a nephew committed suicide, which is often associated with the disorder. [Doc. 267, p. 87, 88]. The failure by the trial team to provide Dr. Ash with any information indicating Petitioner had multiple relatives diagnosed with bipolar disease significantly altered the mitigation evidentiary landscape of Petitioner's trial. Dr. Ash testified without a family history of genetic vulnerability to bipolar disorder, "it's extremely tenuous" to make such a diagnosis, and the trial team fail to provide Dr. Ash with any information about this family history. Dr. Ash, without this history, could not reach the conclusion Petitioner suffered from bipolar disorder. Dr. Ash, when asked what trial counsel had failed to provide him, simply replied, "What was missing was the genetic history and evidence of hypomanic reactions." [Doc. 267, p. 74 lines 4-15].

The trial team also failed to provide Dr. Ash with Exhibit 176, the Weld County General Hospital records of Marian Eaton's psychiatric treatment in the 1960's. [Doc. 267, p. 76 lines 18-24]. Dr. Ash testified the information contained in these records shed

considerable light on Mrs. Eaton's lack of ability to be an effective buffer between her children and her husband's violence.

> Dr. Mark Farrell in Greeley diagnosed Marian Eaton as having paranoid schizophrenia, and when she was hospitalized by Dr. Farrell and then she was treated … at the state hospital in Pueblo she described very severe delusional materials, one of them being that her family had been essentially replaced by somebody else so that her children were really not her own children, they were other people… -- the profound effect that that would have before going in the hospital, during the hospital, and after returning from the hospital on … her ability to be able to be with her children would be very powerful.

[Doc. 267, p. 72 lines 6-17]. Dr. Woods testified this particular delusion is called Capgras syndrome, a disorder of the right temporal lobe. This delusion first appeared in 1961, around the time of Petitioner's first major criminal episode, when he stabbed a woman in an argument over melons as he was trying to get money to run away from home. [Doc. 269, p. 74 lines 12-25; p. 75 lines 1-9]. Dr. Ash, in light of these delusions, believed "it would be virtually impossible" for Mrs. Eaton to nurture, love and care for her children, [Doc. 267, p. 77 lines 18-20], and Dr. Woods agreed.

> Q. And in the -- you've explained the diagnostic significance
> and the significance with respect to Mrs. Eaton, but what
> would be the effect of such a delusion on her children?
> A. Well, you're living with a mother who doesn't believe that you are her child.
> You're living with a mother that is acting in a very psychotic way who is unable
> to do the basics in terms of taking care of you. And what happens in these

situations is that roles get reversed and you find the children in many way taking the responsibility of the parent because the parent's no longer able to do that. In many cases there is another parent that provides that type of support. In this case Mr. Eaton, himself an alcoholic, was probably less able to do that than in many families.

[Doc. 269, p. 75 lines 10-22].

Dr. Woods testified life is very difficult for the children of mothers with psychotic illnesses. "They often do not have the level of support. They don't have the level of resources. She was in the hospital … for years at a time. I believe from 1961 through perhaps 1964 she was hospitalized. These were pivotal years in Mr. Eaton's life. 1961 was when he had his first difficult, real difficulty with the law." [Doc. 269, p. 60 lines 8-13; p. 75 lines 4-9]. The hospitalization records for Petitioner's mother thus have both genetic and environmental significance in assessing his condition. [Doc. 269, p. 75 lines 23-25].

The existence of major disorders on both sides of Petitioner's family tree, and bipolar disorder in a sibling and a child, indicate Petitioner's chance of inheriting psychotic symptoms to be "very high." [Doc. 269, p. 43 lines 21-25; p. 44 lines 1-12]. Dr. Woods testified although Mrs. Eaton's diagnosis was "a bit different than Zelma's in that she was diagnosed with schizophrenia over the years," Mrs. Eaton had "these consistent core symptoms. She was much more consistently psychotic than Miss Smith and over time was treated fairly regularly with antipsychotic medication." Mrs. Eaton "obviously had a mood problem as well. She had

tremendous problems with hygiene. She had tremendous problems with being able to organize her environment." [Doc. 269, p. 59 lines 2-19]. The nursing notes from her hospitalizations also specifically describe her auditory and visual hallucinations, including "voices of people I've known but I can't identify them," [Doc. 269, p. 63 lines 10-25, quoting Mrs. Eaton, Exhibit 176, p. 28]; the paranoid sense (dementia) people were removing her undergarments while she slept, [Doc. 269, p. 64 lines 6-16; Exhibit 176, p. 29]; and she talked about seeing transparent people. [Doc. 269, p. 58 line 3; Exhibit 176, p. 61]. The hospital records also reflect Mrs. Eaton "continues to have flight of ideas," [Exhibit 176, p. 62[, which "really sounds manic" rather than schizophrenic. Doc. 269, p. 68 lines 5-25; p. 69 lines 1-20]. Other places in the records describe her as aggressive, "hostile and … threatening to shoot family and neighborhood children." She had broken most of the windows of her home, exhibiting "anger and threatening behavior that can be part of a mental illness." Dr. Woods described Mrs. Eaton as "underwater." She was not able to function as "a mother that can actually provide the resources to raise her child." [Doc. 269, p. 72 lines 2-25; p. 73 lines 1-22]. Dr. Woods summarized the disadvantage of growing up in the Eaton home.

> What you really see here is the genetics are the foundation. The environment is the next level. And when we have -- if the genetics are bad, if the genetics are, in fact, impaired, then you have a foundation that is very, very difficult to build a good environmental home on, and that's what happened here.

[Doc. 269, p. 76 lines 10-15].

Other symptoms and disorders appear throughout the Eaton family history. Impulsive behavior is common. One story related by Petitioner's brother, Richard, involved their grandfather, Elmer Ferrins, who fought with his neighbor and killed his sheep.

> [T]his neighbor … kept letting his sheep run on my grandfather's property, and my grandfather kept telling him to keep his sheep off his property, and the guy just kept ignoring, ignoring him. And finally my grandfather … put a table outside and a chair, put his rifles out there, and just started shooting sheep. And that neighbor came over and was gonna whip my grandfather, and my grandfather -- I think the neighbor was 40, my grandfather was in his 60s, and he whooped him.

[Doc. 266, p. 223 lines 6-15]. Dr. Woods viewed this piece of family lore as a good example of the impulsivity which runs through this family. [Doc. 269, p. 38 lines 9-23]. Dr. Ash observed Elmer also ate nails, adding to the "strangeness, weirdness in the family history." [Doc. 267, p. 115 lines 19-22]. Dr. Woods testified Elmer's eating disorder, called feromania or pica, is "a subset of obsessive-compulsive disorders." [Doc. 269, p. 37 lines 12-25; p. 38 lines 1-8].

Other members of the Eaton-Ferrins family exhibited similar behavior. Petitioner's paternal grandfather, Harvey Eaton, "was a real ornery old pup. He was a little man, but boy did he get himself into trouble. He had a temper too." Mrs. Lange recalled "Harvey hit the gas

deliveryman over the head with a hammer. He went and turned himself in straight away, but he was known for doing things like that. He got into fights pretty regular and he was always causing trouble. He could not get along with any of his neighbors and he had an awful stubborn streak." [Doc. 68-7, p. 2]. Harvey's granddaughter and Petitioner's first cousin, Darlene Pursel, stated when she and her mother, Zelma Eaton Smith, would try to visit Harvey, he would sometimes literally shoot them off his property. [Doc. 68-8, p. 1]. Dr. Woods noted Uncle Loren Ferrins was a particularly colorful character.

> The declarations of his daughters, twin daughters, Sandra and Lorena, describe him as both impulsive, compulsive, and quite a ladies' man. If I recall one of the declarations, his daughter described him as chasing high school girls when she was in high school while her mother or stepmother was home crying. So he was a pretty hypersexual person, married several times. Married Wynona, and married Betty. Divorced Betty. Broke his back. Betty was the… emergency room nurse. They got back together. And after reading through his history, I'll never look at a skunk the same way again.

[Doc. 269, p. 39 lines 5-15].

The Ferrins and Eaton families both have a history of late onset dementia. Zelma Eaton Smith, Merle Eaton, and virtually all of the men in the Ferrins family apparently suffered from Alzheimer's disease, or some other form of late onset dementia. Loren Ferrins' daughter, Lorena Ferrins Altman testified her grandfather, Elmer Ferrins, and all of her paternal uncles (Petitioner's maternal uncles) "all died from Alzheimer's…Gus, Ross, Dale, and then wound

up Elmer, my granddad. And my dad was paranoid of everybody, didn't trust nobody for nothing." [Doc. 268, p. 83 lines 17-25]. Dr. Woods explained the probative value of this pattern.

> And so what we're really seeing here is another type of dementia form process that not only goes through his paternal family, but we see it going through the maternal family as well. And this often occurs with people that have chronic psychiatric disorder. We now know that … psychiatric disorder is a brain disorder, and people that have these kinds of disorders often become increasingly impaired cognitively, not only psychiatrically, as time goes by.

[Doc. 269, p. 40 lines 10-18]. The men in the Ferrins family were affected by Alzheimer's. Diabetes seems to plague the women in the Ferrins family. Confirmed cases of diabetes in the family include Marian Ferrins Eaton, Marilu Ferrins O'Malley, Mirabel Ferrins Thomison, and Sharon Eaton Slagowski. [Doc. 268, p. 85 lines 6-25]. Diabetes is another disease which "can have psychiatric manifestations." [Doc. 269, p. 12 lines 22-24].

Dr. Woods explained why obsessive-compulsive behaviors are another important symptom to track through the family tree.

> [C]ompulsive behavior reflects a lack of mental flexibility. Compulsive behavior reflects an inability to effectively weigh and deliberate. You get stuck.
> Now, when compulsive behavior occurs along with another psychiatric disorder, it decreases the potential of that person's ability to function. … [A] person that has bipolar disorder and obsessive-compulsive disorder or schizophrenia and obsessive-compulsive disorder has a worst potential in terms

of functioning than a person that does not have the compulsive disorder. …
[W]e call those comorbid disorders. And we see comorbid disorders, we see
that in truth psychiatric disorders occur in clumps. They don't occur singularly.
They occur in clumps. And if one of your clumps is a compulsive behavior, it
really undermines your ability to function.

[Doc. 269, p. 31 lines 24, 25; p. 32 lines 1-16].

Dr. Woods identified a variety of obsessive-compulsive behaviors such as eating

disorders and hoarding in the Eaton and Ferrins families.

Compulsive behavior. Compulsive behavior is very, very important. And
compulsive behavior is, um, what we see with Mr. Eaton and the
trichotillomania. We see hoarding behavior again with Mr. Eaton. We see
hoarding behavior with aunts, with uncles, um, with his mother. Um, we see
compulsive eating behavior with other family members, his
sisters, for example.

[Doc. 269, p. 31 lines 18-24].

Marian Eaton was known to eat an entire five-gallon tub of ice-cream in the middle of

the night. Petitioner's sisters were all obese as a result of eating disorders, and all have had

intestinal bypass surgery to control their weight. [Doc. 268, p. 74 lines 21-25; p. 25 lines 1-

23]. Denise Heinz describes an example of the obsessive-compulsive eating-disordered

behavior of her mother, Judy Mason.

I have little contact with my mother, Judy. She is very controlling and she likes the spotlight. I am certain that she is mentally ill because she has the same kinds of mood swings and she is very weird about food. At restaurants she will interrogate the waiter about the recipe and method of preparing the food, and when the food comes exactly as she ordered, she will make a huge scene. She did that once in my favorite Chinese restaurant in Greeley, and I was so humiliated that I won't go back….

[Exhibit 194, p. 2].

Hoarding is another form of obsessive-compulsive behavior seen on both sides of the

Eaton family, usually accompanied by obvious paranoia. The hospital records for Aunt Zelma

Eaton Smith document she hoarded items in her room such as shoes, books, and multiple

layers of clothing, and she repetitively sorted them. [Doc. 269, p. 56 lines 24, 25; p. 57 lines

1-21]. Sandra Andrae described the paranoid hoarding-like storage of personal belongings by

her father, Loren Ferrins.

[H]e had an imagination, but he would take all of his vehicles, his lawnmowers, anything that had a motor on it, and he would make switches or backups of some kind that he would fix them so if someone tried to start them, it might start, but then it would die, and they'd never get it started again, and they wouldn't be able to know it that it was a fake starter that he would put on it for them to start. And on his guns, because if they stole the gun, you know, they could sell it and stuff, so he would take … the bolts off of the rifles, and he would go and put them all over, out in the garage, all over, in his toolbox. He'd put them in sacks. He'd put them in corners, in his chains, under the

furniture, in the back of the furniture, he would tape it to the furniture, so people couldn't find it.

[Doc. 268, p. 113 lines 13-25; p. 114 lines 1-4]. He had equally bizarre rituals for storing his important papers.

He would take and he'd either stuff it into a box or a piece of paper or in a sack, a plastic bag, and he'd hide them in between books. He would go and stick them up in the closets and his drawers. He would never put the same thing together. He would go -- everything had to be somewhere else so that you had to look for it. Even when he died I had to go through every piece of paper because we didn't know if it was junk or not.

[Doc. 268, p. 114 lines 1-14].

Dr. Woods described Petitioner's family as "an affectively laden family. This is a family that from generation to generation you see multiple symptoms being inherited, passed down from generation to generation." [Doc. 269, p. 45 lines 1-4].

*Petitioner's Life History*

The trial team, in addition to failing to investigate the mental health history of Petitioner's extended family, also failed to conduct an adequate investigation of Petitioner's own developmental and mental health history. They, as well, failed to make competent observations of their client's symptoms of mental impairment which they observed in their

dealings with him. Mr. Stetler explained what a psychosocial history of the client entails, and why it is important.

Q. First is the psychosocial history. What is a psychosocial history?

A. Well, that's, that's the ultimate kind of finished product. That's the narrative account of who this client is in the context of the family, community, and historical period in which he grew up. So that's a kind of comprehensive summary of all the information that you've distilled out of your records and client interviews.

Q. Are they often divided into aspects of the client's life, like employment --

A. Yes.

Q. -- education --

A. Of course, yeah.

Q. -- family history?

A. Yeah, and they're called biopsychosocial histories sometimes because, you know, what's in the DNA, what's running in this family, what's the story of his developmental period, what's his educational experience, did he have problems in school, what's his work life been like, what relationships did he have, what romantic relationships, marriages, children, so forth.

Q. Why is this important?

A. Well, again, it's gonna be a part of the story that humanizes the client. You want to convey to the trier of fact, the jurors who are making decisions about the reasoned moral decision about whether this person should live and die, you want to convey his humanity. And so that's a big part of what you're trying to discover in producing this psychosocial history. But it's also going to be the, you know, the building block of a reliable mental health assessment. It's the information that you want to give your mental health experts when they're doing their evaluations.

[Doc. 264, p. 96 lines 18-25; p. 97 lines 1-25; p. 98 lines 1, 2].

The mental health assessment by the forensic mental health experts who testified at trial on behalf of Petitioner, in particular Dr. Ash,[27] was adversely impacted by the paucity of documentation and instructions provided to them prior to Petitioner's trial; the failure of the trial team to apprise Dr. Ash of their observations and interactions with Petitioner prior to, and during trial; and their failure to investigate and provide to Dr. Ash important aspects of Petitioner's developmental, psychiatric, and life history.

<u>Documentation and Instructions Provided</u>

The trial team, in May, 2003, retained Dr. Ash, a forensic psychiatrist, to assess Petitioner for competency to proceed, and responsibility at the time of the homicide of Ms. Kimmell. Dr. Ash, when he visited Petitioner for the first time on May 17, 2003, had not been provided any life history information for him. [Doc. 267, p. 41 lines 11-25; p. 43 lines 12-19]. Garri Gemelli, who was listed by the Public Defender's Office on its letterhead as a "Mitigation Specialist," sent Dr. Ash, on November 13, 2003, a packet of materials accompanied by a cover letter which read in its entirety:

---

[27] Dr. Linda J. Gummow testified on behalf of Petitioner at trial. She was, however, not available to be interviewed by Petitioner's counsel in this proceeding due to an incapacitating illness. Dr. Gummow did testify at the *Calene* Remand Hearing. [Doc. 86-13, pp. 25-55; Doc. 86-14, pp. 1-55].

Enclosed please find:

1.     Natrona County Sheriffs Office Chronology of the case;

2.     FBI Analysis;

3.     Our chronology updated as of 9/18/03;

4.     Pre-sentence Investigation Report and Addendum dated 10/7/03;

5.     Weld County, Colorado court records 1961commitment;

6.     Mental Health records from Torrington, WY 1986;

7.     Wyoming State Hospital mental evaluation 9/17/97 & 11/24/97;

8.     Wyoming State Penitentiary Incident Report 1998;

9.     Lo-Fu Tan, MD mental health notes 1998;

10.    Forensic Report for periods June 17 to August 5, 1999 and addendum; and

11.    Medical records from Federal Bureau of Prisons June, 1999-March, 2003.

If you have any questions, please do not hesitate to give me a call.

[Doc. 267, p. 43 lines 21-25; p. 44 lines 1-25; p. 45 lines 1-17; Doc. 66-3]. Item number 5, the Weld County juvenile court reports, consisted solely of the two-page report of Dr. Donald Langsley to the Weld County District Court. [Doc. 267, p. 44 lines 4-17].

The next communication to Dr. Ash was a December 10, 2003, fax from Mr. Skaggs telling Dr. Ash, "Focus on the three underlined mitigators and see if any fit. Talk to you Thursday." [Doc. 267, p. 45 lines 19-25; p. 46 lines 1-6; Doc. 66-4; Exhibit 15 (highlighted W.S. § 6-2-102 statutory mitigators, attached to December 10, 2003 fax)].

Dr. Ash, when asked if he received any further guidance from the trial team, testified, "This essentially was the extent of it." [Doc. 267, p. 46 lines 7-9]. He did find, based on what he was given, "deep depression is throughout all of the records that were sent to me." [Doc. 267, p. 61 lines 20-25]. He could not, however, go further, and diagnose a bipolar disorder.

Q. (BY MR. O'BRIEN) Were there some things missing from Mr. Eaton's history that excluded at this particular time bipolar disorder as a diagnosis?
A. Yes, there were.
Q. What was missing?
A. There were two major things missing. Bipolar is a genetic brain condition fundamentally. It has a lot of things that are added to that, but fundamentally it's a genetic bipolar condition -- or organic condition. When there is nothing in the genetic tree that I could find that was bipolar disorder, I was left, uh, nervous about making that diagnosis. It can be done if there's a classical clinical picture, but that then led to the second area. With bipolar disorder you have to have the profound depressions, and he unquestionably in my mind had those, but you also have to have hypomanic or manic episodes, and I could not gather that from the information that I had either directly from Mr. Eaton, which is not unusual -- a person with bipolar disorder often has very little insight into that themselves -- but I also did not have it from any of the other information that was in front of me.

[Doc. 267, p. 62 lines 12-25; p. 63 lines 1-7].

<u>Observations and Interactions</u>

Mr. Skaggs and the other members of the trial team failed to relate to Dr. Ash any of their observations and interactions with regard to Petitioner's mental health or his ability to

assist with his own defense. They did not tell Dr. Ash, for example, Petitioner was refusing to cooperate in his defense, or that Ms. Moree could not get Petitioner to provide a chronology of schools or jobs. Mr. Skaggs did not tell Dr. Ash Petitioner was getting "ratty" in the county jail, or that he was irritable, unkempt, agitated or uncooperative. Dr. Ash did have some records from the Natrona County Jail describing Petitioner's feelings of persecution by other inmates, however, he had no idea these issues might have been spilling over into the attorney-client relationship. [Doc. 267, p. 50 lines 5-25; p. 51 lines 1-15]. Dr. Ash was able to form a trusting relationship with Petitioner in which information flowed freely. He thus anticipated, in the absence of information to the contrary, Petitioner was doing the same with his attorney. [Doc. 267, p. 51 lines 16-25; p. 52 lines 1-5].

Petitioner's inability to provide a chronology of schools and work was important to the assessment by Dr. Ash as it might indicate he "is becoming increasingly paranoid" under stress which, coupled with his limited intelligence, could make it "very difficult for him to remember and give accurate data." [Doc. 267, p. 53 lines 18-25; p. 54 lines 1-9]. Petitioner's deteriorating physical appearance and hygiene would be of concern, and is consistent with his mother's poor physical hygiene which accompanied her chronic undifferentiated schizophrenia, "and that's something you see often with people with chronic mental illness." [Doc. 267, p. 54 lines 10-25; p. 55 lines 1-3]. Dr. Ash indicated Petitioner's irritability and

agitation "has progressed into a direction of paranoia and at times delusional." [Doc. 257, p. 55 lines 4-13].

Dr. Ash was also apparently not aware of Petitioner's outbursts during the guilt or innocence stage of the trial, which was important for similar reasons: "under duress, when he gets tense and the agitation and the anger builds, that he can become psychotic." [Doc. 267, p. 58 lines 11-19].

<u>Developmental, Psychiatric, and Life History</u>

The failure by the trial team to develop a thorough and comprehensive developmental, psychiatric, and life history for Petitioner had perhaps the most significant effect on the forensic mental health assessment presented on behalf of Petitioner at trial.

Petitioner, in the proceedings before this Court, has presented voluminous records which the trial team could have obtained through a reasonable investigation. He has also provided information derived from interviews by his present counsel of witnesses whose identity and relevance were known to the trial team, but whom they did not interview. These documents and witness interviews provide information concerning Petitioner's personal growth, development, and symptomology which was reasonably necessary for a reliable mental health assessment as part of the development of mental health defense for Petitioner.

*Early childhood development*

The mitigation investigation by the trial team produced virtually no information concerning Petitioner's early years, and only very sketchy information with regard to his adolescence and young adulthood. Mr. Skaggs agreed the first sentence of the October 31, 1961, report by Dr. Donald Langsley raised the possibility of patient records being available in 2003, since they were available in 2013, documenting Petitioner's ten-day hospitalization at the Colorado University Hospital from October 16 through 26, 1961. [Doc.261, p. 217 lines 9-23; Exhibit 223-14]. An investigation into the possible existence of such records would have produced the day-to-day records of Petitioner's hospitalization and related psychiatric assessment. [Exhibit 169-4]. Those records contained the only known data concerning Petitioner's developmental milestones in the first five years of life.[28] Both of Petitioner's parents are now deceased, thus no information exists with regard to Petitioner's early childhood except the hospitalization records.

Petitioner's parents, in 1961, told the physicians examining Petitioner he experienced significant developmental delays.

---

[28] Merle Eaton, Petitioner's father, was living at the time of trial, yet he was never asked him any questions about Petitioner's early development. As Mr. Stetler pointed out, "Merle may not have been forthcoming about the physical violence in the home but could still have been a reliable informant about the developmental milestones,…[e]specially if he is shown records like that that would refresh his recollection." [Doc. 264, p. 136 lines 13-25; p. 137 lines 1, 2].

> The mother recalls that the patient had difficulty learning to talk and had some
> trouble with pronunciation. She said that he walked at age fourteen months. She
> said in general he has always been a little slower than the other children. She
> related that the patient went to a special speech class in his second year of
> school. However, the patient denied this. She said that he was a little slow in
> learning toilet training and that he did not achieve bowel control until he was
> beyond the age of three. Also the patient was enuretic until after starting school.

[Doc. 264, p. 137 lines 12-25; Exhibit 169-4, p. 17]. Mr. and Mrs. Eaton also told Dr.

Langsley Petitioner spent two years in the first grade. [Exhibit 169-4, p. 17]. The trial team

never obtained these records, thus Dr. Ash did not see them before trial. He indicated he

would have found these records "very helpful because it talks in terms of Dale Eaton was

having trouble right from the beginning. . . . He was, he was slow to walk, slow to talk, slow

to potty train, and had difficulty with school right from the beginning, couldn't even complete

the first grade, had to have speech help, had major problems throughout." [Doc. 267, p. 126

lines 7-12]. Dr. Woods noted additional evidence of Petitioner's delayed development and

cognitive impairment in this same file. Examiners noted Petitioner's speech was described as

"slowed," and his "[i]ntelligence was estimated as dull normal, and he had a poor grasp of

general information. Judgment and insight were felt to be poor." [Doc. 269, p. 97 lines 14-25].

The records indicate Petitioner is "lagging behind" and, in addition to the factors in his life

which are holding him back, "there are other…cognitive things that are going on." [Doc. 269,

p. 98 lines 3-8].

Petitioner's Aunt, Marilu O'Malley, was also available to the trial team to provide relevant information about Petitioner's home life and intellectual functioning. He had one extended stay with Ms. O'Malley and her husband, Bill, a visit about which no one from the trial team made any inquiry. She indicated, in her experience, in a declaration admitted as an exhibit in this matter, "Dale was a quiet child. He was beat down. I never thought he had a very high IQ because of the way he talked and the way he acted." She felt Petitioner "probably wasn't very smart, but kids need attention and encouragement to grow and Dale Wayne certainly never received that." When Petitioner was around twelve years old, Ms. O'Malley asked if he could stay with her "because I felt so sorry for him." Petitioner was so needy. Her husband, Bill, took Petitioner fishing, and he talked about it for years afterward. Petitioner bought Bill a fishing rod years later to thank him for taking him fishing. Ms. O'Malley said between Petitioner and his father, Merle, there was "no relationship, no closeness and certainly no love. There wasn't anything Dale Wayne could have done to change the way his father thought about him. It was really sad."[Doc. 68-9, p. 2].

*Meeker, Colorado*

Other probative evidence of Petitioner's delayed development can be found in the records of the Meeker, Colorado school district, [Exhibit 169-82] and Petitioner's age-peers from Meeker. These materials, which provide relevant data including standardized testing, were also not available to Dr. Ash. [Doc. 267, p. 129 lines 24, 24; p. 130 lines 1-4; p. 131

lines 22-25]. The enrollment forms completed by Petitioner are even important. Dr. Ash stated the form is "very significant" as it shows "a 13-year-old boy who can't spell his father's name," which "reflects such…a low development in terms of academics." [Doc. 267, p. 130 lines 5-15]. He did no better with the enrollment form at age 15. "He's again trying to spell his dad's name and can't do it." [Doc. 267, p. 130 lines 18-23]. The school records reveal Petitioner failed the first grade, and failed the seventh grade twice. He was, nonetheless, socially promoted to the eighth grade. Dr. Ash noted Petitioner's younger sister, Sharon, was also held back so she would not surpass her older brother in school. [Doc. 267, p. 131 lines 2-19].[29] Dr. Woods noted Petitioner's obsessive-compulsive hair-pulling (trichotillomania) is captured in his seventh grade picture which shows an odd bald patch on the right side of Petitioner's head. [Doc. 269, p. 94 lines 10-24; Exhibit 169-82, p. 1].

The Meeker school records also contain standardized test results which reveal significant impairments in Petitioner's verbal and reasoning abilities. Dr. Woods found it fascinating there was such a spread in Petitioner's test scores. He is in the bottom one and two percent of the population in arithmetic reasoning (story problems) and language comprehension, however, he was in the 88th percentile in applied science and mechanics.

---

[29] Sharon Slagowski told Natrona County Deputy Lynn Cohee, "my folks held me back a year because they thought it would help Dale want to finish school. So, it had to be 7th or 8th grade." [Doc. 199-8, p. 8].

"[T]his is the basis of what we look at 20 years later when he may be working as a welder but he can't keep track of his checkbook, or he lets his ex-wife handle his money even though he knows that she's taking -- he assumes that she's taking money from him. He is still able to do this welding to a degree. It's not inconsistent with the kinds of strengths and weaknesses that we see in him." [Doc. 269, p. 92 lines 19-25; p .93 lines 1-24]. Dr. Ash found it remarkable "his scores are just so low, such low percentiles. It was -- I had written these down that he's in the 1st, 2nd, 4th, 7th, 7th, 12th, and 16th percentiles except for one thing and that was mechanics, and he was up to 88th percentile with that. Everything else was extremely low." [Doc. 267, p. 132 lines 5-9]. Dr. Ash, when asked what this says about Petitioner's general intellectual capacity, simply replied, "so limited." [Doc. 267, p. 132 lines 10-12].

Interviews with Petitioner's peers conducted in support of his petition herein also provide information important to a reliable mental health assessment. Phyllis Lake, the daughter of John and Syble Barney, who knew Petitioner in junior high school and when he worked for her parents, is quite articulate in describing Petitioner's limitations. Dr. Ash found her description of Petitioner "was really sad. … [H]er statement he was overweight, socially awkward, poor self-esteem, tries to draw attention to himself, even negative attention. He's poor. He's troubled. Odd, a misfit. Other kids picked on him." [Doc. 267, p. 132 lines 23-25; p. 133 lines 1-4]. Margie Jackson recalled Petitioner was perceived as "different in the head," and "Dale never really fit in at Meeker; he was an outsider." [Exhibit 195]. Jacque Duzik

remembers "Dale had very bad hygiene and wore dirty clothes to school…He was invisible." [Exhibit 191]. The person Brian Conrado knew as Petitioner "was the brunt of all kinds of harassment and belittling." [Doc. 268, p. 40 lines 18-20]. "He was belittled. He, . . . from what I remember, . . . he wasn't real smart. Of course, . . . you know, if you took a test in school, then a lot of times you passed your test and your classmate graded it, so your classmates knew how you were doing, whether you liked it or not, 'cause they were grading your paper, you were grading theirs, you know, or getting the answers. And, . . . Dale just wasn't -- he didn't have it." [Doc. 268, p. 43 lines -15].

Petitioner was so needy Phyllis Lake's brother, Lyn, stirred a fly into a bowl of beans and fed it to Petitioner, then laughed at him, and "he was okay with that." [Doc. 267, p. 133 lines 5-11; Doc. 268, p. 12 lines 23-25; p. 13 lines 1-8]. Dr. Ash found her observations to be important.

> Q. What other aspects of Mr. Eaton are significant from Mrs. Lake's declaration in terms of his socialization with his peers?
> A. You know, the one thing that I felt was really important and said a lot about Dale was that, that she wanted to avoid him because she was afraid if she let him get close to her that he was so needy that he would stick to her like glue. So he [sic] tried to, to stay back.

[Doc. 267, p. 133 lines 12-19].

Ms. Lake observed Petitioner's "ability to learn was limited." [Doc. 268, p. 13 lines 18-24]. He had a "very difficult time in taking directions," and "you weren't quite sure where he was coming from with his lack of social skills." [Doc. 268, p. 13 lines 18-24; p. 14 lines 1-4]. He ate meals with the Barney family on occasion, and Ms. Lake saw Petitioner "[d]idn't know how to hold a fork. Did not have good manners. He was just hungry." [Doc. 268, p. 16 lines 10-19]. Even simple farm tasks were very difficult. "He couldn't learn simple things like how to -- if a gate was twisted, a wire gate was twisted, he couldn't understand how to retwist it to make it stand up or to work." Petitioner was not allowed to drive any vehicles or tractors. [Doc. 268, p. 14 lines 22-25; p. 15 lines 1-6]. Ms. Lake, when asked if her father accepted Petitioner's work, related:

> My dad would just fix it, because he knew -- I don't know how to term this because when I was growing up we didn't have ODC and all the other words that were -- bipolar, whatever you would want to say, so we would think of Dale as possibly retarded or mentally -- we knew he was mentally challenged. Um, what we weren't sure if it was because of his father's abuse or whether it was retardation in the family. We didn't ever try to analyze him. We just accepted him. But … he couldn't do step 1-2-3. You'd have to tell him 3-2-1 again and again and 2-1-3 and -- to try to get it -- so someone worked with him most of the time.

[Doc. 268, p. 15 lines 7-22]. Dr. Woods found it significant the instructions have to be repeated for Petitioner.

Q. (BY MR. O'BRIEN) Let's scroll down a little further and see if that provides you more detail. And what did she observe that caused her to conclude he was mentally slow?

A. That instructions had to be repeated. When you do a neurological examination or a neuropsychiatric examination, you try to do one-step, two-step, and three-step instructions.

And you do one-step, two-step, you do multistep instructions, you're testing for a couple of things. You're testing for working memory, can a person really hold it into their mind.

Okay, George, get up, go to the door, you know, turn left, um, go to the -- where your cell phone is, put in your key, get your cell phone out, multisteps. It takes working memory for

you to remember that and to go do it. It also takes processing speed. You have to be able to listen, as time goes by, to be able to hold all that in your basket. So you have to have both working memory and processing speed. When you cannot do multistep instructions, often one or the other is not working, either your memory, you can't hold it all in, or you're not catching … it quickly enough to really be able to make sense of it. And here she's talking about really having to go over instructions over and over. Now, that doesn't mean that he couldn't do the task. Right? Because if he stuck long enough, he might be able to do the task. It's just that he needed this prompting in order to get it up and running.

[Doc. 269, p. 96 lines 2-25; p. 97 line 1].

Ms. Lake did not believe Petitioner would ever be able to keep a job. "He didn't have the ability to work with people. His social skills, unless he really matured or found someone to guide him his whole life, we didn't know that he could sit, that he could listen, that he

could communicate, that he could respond even with love." [Doc. 268, p. 17 lines 8-16]. Dr. Ash acknowledged the observations by Ms. Lake offered insight into Petitioner's development and social skills.

> Q. (BY MR. O'BRIEN) Does that paragraph or that information provided by Mrs. Lake provide you some additional insight into Mr. Eaton's developmental stage or adaptive skills?
> A. Well, she was a very good observer, and she talked about the very same thing actually that a number of his coworkers and employers talked about and his family, that he had a
> temper, that he was easily frustrated, and he was mentally slow. And if he had a chore to do, he couldn't do it very well, but he had a hard time understanding it. Instructions had to be repeated. And he at times like that gets very angry, very frustrated, and has a tendency to lose his temper.

[Doc. 267, p. 135 lines 6-16].

The comments by Ms. Lake also confirmed the testimony of Brian Conrado indicating Petitioner was tormented and ridiculed by his peers, and her observations corroborates the abuse Petitioner suffered in his home. These traumatic experiences add posttraumatic stress disorder "as a compounding condition" in Petitioner's compromised mental and emotional impairments. [Doc. 267, p. 138 lines 1-7].

A significant crossroads in Petitioner's life occurred when his father, Merle, moved the family to Greeley, Colorado. Petitioner, notwithstanding the fact he was badly tormented and belittled by his peers, still wanted to stay in Meeker, particularly on the Barney farm,

arguably to avoid further violence by his father. [Doc. 267, p. 134 lines 10-17; Doc. 267, p. 127 lines 3-17].

*Greeley, Colorado*

The Colorado University Hospital records contain information helpful to establishing a meaningful chronology of Petitioner's first significant contact with the law enforcement as part of a very disorganized, poorly planned attempt to run away from home in Greeley, Colorado, a few months after the family moved there from Meeker. Petitioner, at age 16, stabbed a woman in an argument over melons he was trying to sell her, and stole a truck in his attempt to run away. He told the police "he thought he would become a hermit and was going to go to the mountains." [Exhibit 169-119, p. 14]. He broke into a business in Greeley, stole a rifle, ammunition, and a truck, and drove off looking for the mountains, but he could not find them, and was arrested in Morgan County. [Exhibit 169-119, p. 14]. Dr. Woods found this episode provided significant insight into Petitioner's frontal lobe neurological deficits.

> [T]here's no real effective organization. He jumps in, and then he has to figure out how to swim. And you see this happen over and over. And, more importantly, you see it happen in situations that some of them have criminal underpinnings, others don't. You see this happen on his job where someone touches him and he hits the person or someone says something to him and he, um, you know, he goes after them.
>
> So you see this reactivity, which is frontal lobe, this kind of inability to weigh and deliberate, and I don't want to put it all in neurological terms, but

then the parietal lobe, which allows you to see the big picture, doesn't seem to click in. And that's certainly what the neuropsychological testing reinforces.

[Doc. 269, p. 101 lines 2-15].

Dr. Ash also found the Colorado University Hospital records important as they provide insight into Petitioner's life in Greeley. Those records describing Petitioner's 1961 arrest and subsequent evaluation reveal a time line in relation to his mother's mental health issues which is significant. "During the *latter part of August and early September* of this year [1961], Mrs. Eaton had been a patient at the Greeley Hospital because of a mental breakdown and had been seen in consultation at that time by Dr. Mark Farrell of Greeley and is still under Dr. Farrell's care." [Doc. 267, p. 127 line 25; p. 128 lines 1-4 (emphasis added)]. Dr. Farrell confirmed Mrs. Eaton was suffering from a paranoid delusional disorder involving a belief her in-laws "were trying to harm her in some way." [Doc. 267, p. 128 lines 4-9]. Petitioner's frantic attempt to runaway in October, 1961, thus came immediately after his mother's psychotic episode and first hospitalization. Mr. Stetler pointed out this information, in context, was important.

Q. And so would that cause you -- and so that robbery and an assault of a woman with a, with a knife --
A. Yes.
Q. -- and a runaway attempt and getting a truck and running to try to find the mountains, and you've read those documents as well.

A. Yes, I have.

Q. And that occurred on September 29th, 1961?

A. Yes.

Q. And so follows very closely Mrs. Eaton's psychiatric hospitalization?

A. Yeah, that context is very important. You want to know more about what was happening in the family at that time. Where was the father? Was he the only caretaker in the home? Were there other relatives who were attempting to fill in during the mother's hospitalization? What were the children told about the mother's illness? Did they know whether she was coming back? Lots of things to discuss.

Q. All right. And if you also had information, evidence, witness testimony that the father was particularly abusive toward Dale, you know, beat him rather severely, does this have additional implications even beyond that?

A. Of course. It means that the mother with all her problems was, nonetheless, a potential protector from the father's violence.

[Doc. 264, p. 130 lines 18-25; p. 131 lines 1-17]. Dr. Ash did not have this document, which places Mrs. Eaton's psychiatric hospitalization in meaningful proximity to Petitioner's first significant criminal episode, prior to his trial. [Doc. 264, p. 128 lines 10-12]. He felt it would have helped the mitigation presentation.

I think it would have been very helpful for the jury to understand that the very first difficulty with the law -- up till then he had always gone to school, up till then he had worked, up until then he had not had encounters with the law, and it was after his mother went to the hospital that he had a violent episode and was trying to get away. Being able to see the connection between that and his first legal offense would have been helpful, I think.

[Doc. 267, p. 128 lines 17-25; p. 129 lines 1, 2]. Petitioner's statements to Dr. Dean, "I hope I get sentenced to reform school so I won't have to go home," [Exhibit 169-4, p. 117] shows home "was a dangerous place for him." [Doc. 267, p. 129 lines 10-21]. Dr. Woods agrees, "It's a very sad statement. It really says something about the quality of his home life." [Doc. 269, p. 98 lines 9-16].

*Young Adulthood*

The next ten years of Petitioner's life, following his juvenile court adjudication, were spent struggling to earn a living while being in and out of jail. He was arrested July 9, 1964, for taking $81 from the cash register of the gas station where he worked. A mental evaluation conducted in connection with this charge, although finding no indication the theft was motivated by psychosis, noted "[t]his boy is demonstrating some symptoms of rather severe traits of angriness, depression and a masochistic self-destructive attitude. He speaks in an extremely angry way about his father and mother and vows that he is going to be a bigger disgrace to them…He is a severely emotionally disturbed boy who would profit from long term psychiatric treatment in an institutional setting." The examiner reported Petitioner was competent to proceed, but noted he "considers himself to be the object of a great deal of anger and abuse at the hands of his parents, particularly his father." [Exhibit 168, p. 26, Report of Dr. George Woods].

The records of the Buena Vista (Colorado) Correctional Center reflect Petitioner's first months in prison, based on the July, 1964, theft were difficult. Staff followed up with him about his concerns for his mother and his distress over his girlfriend ending their relationship. He was written up in November for fighting in Cell Block B, and thus moved to Cell Block C. He became angry in the dining room on December 12, 1964, and threw a glass of milk in the face of the server, which caused a fight. He was moved to Cell Block D on January 16, 1965. His medical file reflects on January 8, 1965, he was "extremely nervous from fight with inmates," and 2ccs of Nembutal were administered. He was brought into the Hospital on February 16, 1965, "for a shot to quiet him down. He was to the point of becoming hysterical." He was again sedated with Nembutal. [Exhibit 169-41, p. 42; Doc. 168, p. 27]. Dr. Woods explained Nembutal is a phenobarbital, a short-acting barbiturate, which was "the only thing available at that time" to calm him down. [Doc. 269, p. 105 lines 19-25; p. 106 lines 1-2]. Dr. Woods commented on this event in his declaration.

> Dale's inability to function in new, novel, and stressful circumstances has been lifelong. This life long trait is, again, consistent the brain dysfunction, particularly in the frontal and temporal lobes.(Godefroy 2003, Anderson, Barrash et al. 2006) Similar to children with structural brain damage, Dale's cognitive impairments undermined his desires to function normally. He easily became overwhelmed and unable to develop adequate coping mechanisms, even as a child.

[Exhibit 168, p. 27].

Petitioner was released on parole in early 1966. He subsequently he wrote approximately $100 in insufficient funds check in August, 1966, mostly for cigarettes, gas, soda pop and candy. He made restitution for some of the checks, however, authorities did not believe his assertion he thought he had sufficient funds in his account, and he was returned to prison. [Exhibit 168, p. 28; Exhibit 169-41, p. 30]. Dr. Woods found an "internal consistency" in this incident.

> A. My understanding is that the checks totaled to about $81, that the checks -- there were several checks. Um, there were checks of $10, $5, um, that added up to less than a hundred dollars. Mr. Eaton stated that he thought that he had the funds to cover the checks at the time that he wrote them. It's not clear whether that's accurate or not, but he obviously did not have the funds to cover them.
>
> Q. So is this an example of his ability to manage a checkbook?
>
> A. It's this kind of internal consistency, Mr. O'Brien. You know we go back and we look at his Iowa basic test, and they say, you know, this guy's gonna have problems with these kinds of numerical situations. We go to this, and he has problems writing checks. And, you know, well, let's say that they didn't really have to do with his ability, that maybe he just wrote the checks fraudulently, um, but then we've got his wife saying, oh, he couldn't write checks, he couldn't handle his money….Mr. Hoopes said one of the great problems with this kind of work is that you made money at one time, but then you didn't make money at other times, and you had to manage your money in order to be able to be successful. This is not something that Mr. Eaton was able to do. Miss Cline talks about him going to … swap meets and coming back with more junk and

less money …and so … you don't see him as being able to handle money very effectively.

[Doc. 269, p. 102 lines 20-25; p. 103 lines 1-25; p. 104 lines 1-9]. Petitioner was returned to Buena Vista, where he was trained to be welder. [Exhibit 169-41, pp. 20, 23].

Petitioner, after he was released from Buena Vista, returned to Riverton and became friends with David Brewbaker, who was then a young boy with a background very similar to Petitioner's. Dave's father "beat the hell out of [him]" and was sexually abusive as well. Petitioner took Dave fishing and hunting to get him away from his abusive father. [Exhibit 239, p. 1].

Dave Brewbaker also had valuable insight into Petitioner's frame of mind since Dave himself had some years earlier been diagnosed with bipolar disorder for which he now takes medication. He has some insight into his own symptoms, and by comparison, he has insight into Petitioner's as well. Dave is very uneasy around people, so, like Petitioner, he keeps to himself "except for a handful of people who know me very well." He and Petitioner discussed the fact they shared a "sixth sense" which enables them to know just by looking people are out to get them. "I can see them judging me, and they don't even know me. I know Dale had the same feeling." [Exhibit 239, p. 1]. Dave also witnessed Petitioner's temper.

It was like he had a split personality. At times he would spontaneously get mad, and his ears would turn white, and his eyes would get red, and he would just have a fit. When he was uncertain about something, he would stand with his

arms extended by his side, palms forward, and just open and close his fists. At other times, he would sit and frown, and look off in the distance for a long time like he wasn't seeing anything, and if I would ask him what he was doing he would eventually snap out of it and say, "I'm just thinking."

[Exhibit 239, p. 2]. Petitioner's brother, Richard Eaton, also described this very behavior. Petitioner, when frustrated, would open and close his fist rapidly, "[a]nd the more agitated he got, the faster … he'd do it." [Doc. 266, p. 213 lines 2-6].

*Adulthood/Symptomology*

There were many potential mitigation witnesses who knew Petitioner, and could have testified and presented additional information with regard to his behaviors, impairments and symptoms which Dr. Ash and Dr. Woods both deemed essential to a reliable assessment.[30] Dr. Ash, as previously discussed, testified one of the reasons he could not find Petitioner suffered from a psychosis, such as bipolar disorder, was the absence of any evidence of key symptoms, such as hypomania and grandiosity. The evidence presented to this Court clearly establishes such a history existed, however, the inadequate mitigation investigation by Mr. Skaggs and the trial team simply failed to uncover it.

---

[30] The declaration by Dr. Woods also sets out, with citation to evidentiary material which was not presented at trial, Petitioner's life history in some detail, until his arrest for the homicide of Ms. Kimmell. [Exhibit 168, pp. 7-53].

Dr. Ash explained hypomania exists "when there's a great deal of increased energy, a decreased need for sleep, impulsive, hypersexual, angry, frustrated behavior, grandiose thinking, and there are some others." [Doc. 267, p. 88 lines 10-13]. Richard, Petitioner's brother, indicated at times when Petitioner stayed with him and his wife, Bobbie, he "often wondered if he (Petitioner) got more than three or four hours of sleep." Petitioner would, at times, "just work around the clock on trucks," or read the Bible or watch movies through the night. Richard related one incident when he was watching a comet with his binoculars in the middle of the night, and went to find Petitioner to show it to him. He found Petitioner in his shop under a truck. "I was standing there, and here he was all black and greasy, and the only thing he had on was his underwear." [Doc. 266, p. 226 lines 21-25; p. 227 lines 1-25; p. 228 lines 1-9].

Sandy Hoopes also noted Petitioner did not sleep much, "cause he would work way into the night. He'd be out there with a light, and then … when we would get up in the morning, he'd be already out there working." [Doc. 265, p. 30 lines 1-9]. Petitioner, at the other end of the cycle, would lay in bed, "[h]e couldn't move. He could not get out of bed." [Doc. 267, p. 83 lines 6-9].

Another characteristic of bipolar disease is grandiosity, and there are ample examples with Petitioner. Melody Cline testified Petitioner "liked to imagine himself a lot better than he was." He exaggerated his achievements and had unrealistic goals. [Doc. 264, p. 139 lines

19-25; p. 140 lines 1-7].  Dr. Woods noted several examples, including his unrealistic view

of his relationship with Alice Kardonowy and "the idea that he was going to be able to build

a truck stop in Moneta, Wyoming." [Doc. 269, pl 129 lines 12-25; p. 130 lines 1-20].

Petitioner talked about his dream of a truck stop with a number of people, including his son

Billy, his brother Richard, his cousin Lorena Altman[31] and his neighbor, Doris Buchta, who

mentioned it in her journal in an entry on June 9, 1988. [Doc. 267, pp. 83, 91; Exhibit 235,

p. 1] Many truck stops do, in fact, get built, however, Dr. Ash testified clinically, it was

grandiose for Petitioner to think he could because "Mr. Eaton just simply was unable to follow

through in a consistent way. And in my opinion it's so much connected with his bipolar

disorder." [Doc. 267, p. 83 lines 10-15]. Petitioner's image of himself as a ladies' man was,

as well,  unrealistic and grandiose, considering "what's been described to me by woman after

woman in all the declarations that you gave me was that, you know, he was physically so

repugnant because of his personal hygiene." [Doc. 267, p. 92 lines 5-8].

Deteriorating hygiene is another classic sign of mental illness.

---

[31] "Dale Wayne was a dreamer, and he thought he could fix the property up to be a trailer park where labor and construction crews could stay when they were working away from home. . . He showed me a trailer that he moved onto the property and was planning to fix up. He had big plans to move more trailers onto the property to rent to people. The one I looked at needed a lot of work before anyone would want to stay there. It had been in a fire so he had a lot to clean up." [Exhibit 315, p. 2].

Q. If he is becoming -- Mr. Eaton is becoming physically unkempt in his appearance as he progresses toward the trial, is that something that's potentially relevant to your assessment both as to competency and mental health generally?

A. Yes, it is.

Q. And how is that relevant?

A. Well, first of all, Dale Eaton's hygiene overall was really poor, and it's commented over and over by friends, by relatives, by employers that he had very little interest, very little concern, very little awareness of his awful physical hygiene. If that was progressing even more so and becoming worse, that would be of concern.

Dale Eaton's mother, who was diagnosed with paranoid schizophrenia and chronic undifferentiated schizophrenia, depending on the doctor, had those very same issues of a very poor physical hygiene, very poor awareness of her physical presentation. And that is something that I feel Dale carried forward with him. And that's also something you see often with people with chronic mental illness.

[Doc. 267, p. 54 lines 10-25; p. 55 lines 1-3].

Richard Eaton, Petitioner's brother, and his wife, Bobbie, are among the many witnesses who could attest to Petitioner's failure to bathe and intense body odor. Petitioner, when he was arrested in Yellowstone Park, told the park ranger he was hoping to get mauled to death by a bear. The ranger told Bobbie and Richard "Dale smelled so bad the bear actually ran away from him." [Doc. 266, p. 182 lines 6-21]. Petitioner, at times, smelled so bad Bobbie would make him take a shower. He would not, however, come in the house and use the shower. He told Bobbie he did not "want to leave a ring in my tub." [Doc. 266, p. 179 lines

22-25].  Richard testified "sometimes he went to the car wash with a bottle of Dawn soap, and

he'd spray himself down, soap himself up, and spray himself off [with the car wash wand]…

and do the same with his work clothes. And another incident that when he was staying with

us, walked outside, and he was doing it in our front yard in his underwear." [Doc. 266, p. 229

lines 10-24].

Dr. Woods commented on a similar incident related by Steve DuBry about finding

Petitioner in a car wash. "Mr. Eaton had hooked up one of the drive-in automobile … car

washes, he had driven in there, taken the washer, somehow gerrymandered it to the back of

his truck so that the water was shooting straight up, and was buck naked in his truck, in the

back of his truck, taking a shower. Now, he's out in the middle of town. …it's just a totally

bizarre story." [Doc. 269, p. 122 lines 10-25]. This incident, and another in which Petitioner

served spaghetti to Steve DuBry and his son by pulling it out of the pot with his bare, dirty,

unwashed hands, are evidence of his impaired mental condition. "These are, these are

recognitions, descriptions of impairment of social context. These are noncriminal situations

where most of us would know a better way to do this. And we see these situations over and

over again in Mr. Eaton's life." [Doc. 269, lines 16-20].

Petitioner's lack of hygiene extended to his personal surroundings. Bobbie Eaton

recalled Petitioner's trailer in Moneta was "dirty, nasty. There was old food still all over the

counters. It was -- had stuff growing on it. It was just messy, and you couldn't stand to be in

there for a second. I had to hurry up and turn around and go out before I threw up. It was pretty nasty, pretty bad." [Doc. 266, p. 182 lines 12-16].

The condition of Petitioner's vehicles and trailer was only made worse by the fact he was a "hoarder." Sandy Hoopes testified Petitioner "hoarded everything," and was definitely a hoarder "cause … he doesn't away throw anything. And he has … old grocery sacks and stuff that were just there." [Doc. 265, p. 31 lines 19-25; p. 32 lines 1-6; p. 36 lines 14-18]. Other people who knew Petitioner recognized the same behavior, including Sandy's husband Jim Hoopes, [Doc. 215, p. 84 lines 7-19], and Bobbie Eaton, [Doc. 266, p. 182 lines 17-20]. Steve DuBry, according to Dr. Woods, also described hoarding behavior. [Doc. 269, p. 123 lines 1-2]. Dr. Woods found this behavior to be significant.

> Compulsive behavior. Compulsive behavior is very, very important. And compulsive behavior is, um, what we see with Mr. Eaton and the trichotillomania. We see hoarding behavior again with Mr. Eaton. We see hoarding behavior with aunts, with uncles, um, with his mother. Um, we see compulsive eating behavior with other family members, his sisters, for example. And the reason why compulsive behavior is important is because compulsive behavior reflects a lack of mental flexibility. Compulsive behavior reflects an inability to effectively weigh and deliberate. You get stuck.
>
> Now, when compulsive behavior occurs along with another psychiatric disorder, it decreases the potential of that person's ability to function. So when you have obsessive-compulsive disorder and bipolar disorder together, there's a greater -- I should say, a person that has bipolar disorder and obsessive-compulsive disorder or schizophrenia and obsessive-compulsive disorder has a worst potential in terms of functioning than a person that does not have the

compulsive disorder. If you only have -- we call those comorbid disorders. And we see comorbid disorders, we see that in truth psychiatric disorders occur in clumps. They don't occur singularly. They occur in clumps. And if one of your clumps is a compulsive behavior, it really undermines your ability to function.

[Doc. 269, p. 31 lines 18-25; p. 32 lines 1-16].

Work was an important aspect of Petitioner's life, one which the trial team and Mr. Skaggs completely ignored, and thus failed to contact or interview Mark Dotson, a potential mitigation witness who had employed Petitioner.

Mark Dotson suffers from significant health problems, and thus could not attend the hearing before this Court. He did, however, provide a written declaration which outlines significant mitigating facts which could have been presented at trial with regard to Petitioner's severe mental impairments. [Exhibit 69-7].

Mr. Dotson is the former President and CEO of Copper King Mining Corporation, and in 1996, owned West Hills Excavating in Milford, Utah, where Petitioner worked for him, and lived in his trailer behind Mr. Dotson's shop. [Doc. 69-7, p. 1]. Mr. Dotson recalls Petitioner was afraid of people, and didn't trust them. Mr. Dotson has serious mental illness within his own family, thus he had credible insight into Petitioner's mental health.

He was visibly paranoid, and did weird things. He was constantly looking over his shoulder. He blacked out every single window in his trailer; not a drop of daylight could get through. I mean he was *really* weird. My brother has

> schizophrenia, Dale absolutely, no question in my mind, is a schizophrenic of
> the highest order. I have no doubt about it. Dale would hold parts in his hand
> like they were hidden treasures. He would hide them and cover up his work so
> no one could see. He wouldn't let anyone see what was in his hands or what he
> was doing with the parts. It was almost comical. He behaved very strangely.

[Doc. 69-7, p. 1].

Petitioner, in spite of his obvious mental illness, was "ninety percent of the time, . . .

pleasant to be around. He's a likeable guy. He was a weird guy, but I liked Dale." [Doc. 69-7,

p. 2]. Petitioner, however, was easy to anger, and would act out, "but then his remorse was

a lot more than the incident warranted. He would get angry too easily, and then he'd feel too

bad about it. It wasn't that big of a deal usually and he would mope around for a couple of

days over it." [ Doc. 69-7, p. 2].[32]

The testimony of Mark Dotson provided Dr. Ash with a useful example of Petitioner's

paranoia, which is significant to the psychiatric assessment.

> His employers, his coworkers described his always looking over his shoulder,
> always scared, always paranoid. One example was where he … had a part that
> he was working on that he would hide and shield from letting anybody else see
> it. People described about his windows being blackened so that nobody could
> look in. There's just example after example after example of paranoia.

---

[32] Daniel Dotson, Mark's son, has very similar observations with regard to
Petitioner. [Exhibit 46].

[Doc. 267, p. 93 lines 2-8]. The paranoia reported by Mr. Dotson is consistent with what others have observed.

> Q. All right. I also want to talk to you about paranoia. What is paranoia in a psychiatric setting?
> A. Paranoia is a stance that the world out there is dangerous and is out to get you.
> Q. Did you find examples of paranoia in Mr. Eaton's personal and family history?
> A. Yes.
> Q. First of all, beginning with his mother Marian Eaton, did you see examples there in her files?
> A. Yes.
> Q. And what about Mr. Eaton himself?
> A. With, with Mr. Eaton the one story that, that Richard gave was that his dad told all of the kids to always be ready to protect their place from being attacked and people coming in and stealing things. That they all knew where to get the gun and to get it. That he put hidden barricades with nails in them to prevent people from coming in. The, the -- that was family members describing his paranoia.

[Doc. 267, p. 92 lines 9-25; p. 93 lines 1].

Dr. Woods also found Mr. Dotson's insight with regard to Petitioner remarkable, perhaps stemming from the fact Mr. Dotson had a brother with schizophrenia. [Doc. 269, p. 118 lines 14-25]. Mr. Dotson, in spite of Petitioner's mental impairments, "saw him as an effective worker … Mr. Dotson felt comfortable with him being around his son particularly,

yet he had real problems on the job. It wasn't doing the job. It was the socialization, being

able to work around other people, being able to focus." [Doc. 269, p. 117 lines 20-25; p. 118

lines 1-4]. Mr. Dotson took extraordinary steps to accommodate, on the job, Petitioner's

illness, even allowing him to work a midnight shift when there were no other employees

around. "But the other part was he was just not able to make it in the day-to-day work world

in spite of his skills." [Doc. 269, p. 118 lines 5-25; p. 119 lines 1-2].

Dr. Woods also benefitted from the observations of Jim and Sandy Hoopes. Jim

Hoopes provided useful information concerning Petitioner's reactivity on the job, such as

when a man would "come up and tap him on the shoulder and he would hit the guy, just this

hyper reactive response." Mr. Hoopes identified both positive qualities and significant

symptoms. "He was a friend to their family, friend to their children, but a very, very paranoid,

withdrawn, socially isolated, reactive man." [Doc. 269, p. 120 lines 20-25; p. 121 lines 1-4].

Petitioner's former wife, Melody Cline, was also a potential source of mitigation

evidence with regard to Petitioner's impaired functioning. There were many episodes in their

marriage when Petitioner abused her. Petitioner would hit her with his fist, and then collapse

into tears. He was "very sorry, very contrite… he cried, and I just tried to comfort him and tell

him, you know, we're both stressed, it's okay." It was always the same. Petitioner, after hitting

Melody, cried and begged forgiveness. Melody, even though she was angry and hurt, "always

felt sorry for him…[because] I think he just couldn't control it." [Doc. 266, p. 108 lines 1-25; p. 109 lines 1-22].

Melody also describes Petitioner's impaired functioning. There were a number of things Petitioner could not do for himself. "[H]ygiene would be on the top of the list." He could not manage the checkbook. [Doc. 266, p. 121 lines 7-16]. He could not keep a job because "he didn't play well with others." [Doc. 266, p. 122 lines 1-4]. Petitioner, when he was unemployed, tried to make money at swap meets, however "that was never a living…Can't believe anybody would call it that." Petitioner was a big talker sometimes, however, he "never understood that he didn't make money doing this." Melody indicated Petitioner would spend money to buy things to sell, and pay, for example, $200 for an item which some guy with "a gift of gab" would talk him out of for $150. "You know, that's not how you make money. If he wasn't giving the product away, he was putting money back into bringing more product to sell… that's not how you make money." It would be fair to say that Petitioner would go to a swap meet with a pile of junk and some money, and come back with less money and more junk. Petitioner did not make money at swap meets. "There'd be no money for food or housing." [Doc. 266, p. 122 lines 8-25; p. 123 lines 1-13].

There has been some suggestion, albeit, incorrect, Petitioner and his family were not living in poverty during these times. Melody testified when Petitioner was trying to support the family with his swap meet activities, the family lived

in like a…dealership-type place, you know, where you've got the nice front room and the back is where you do the mechanics and that kind of thing. There was never a kitchen in that place…my stove was a microwave. I didn't have running water to wash dishes as in a kitchen sink. I used the bathroom that was for -- in the back area of the mechanical part of the shop. Yeah, it was pretty gross. For walls, we hung up sheets… The boys were in bunk beds, and Valetha was in the sheeted room next door. And then we had a bathtub, I had a bed wetter at the time, for which you filled with a garden hose and emptied the same way. But when you filled it with the cold water, you put a tank heater, a engine tank heater into the tub to heat the water so that my bed wetter could have a bath before, before going to school the next morning.

[Doc. 266, p. 123 lines 14-25; p. 124 lines 1-10]. There were no laundry facilities or stove.

This was how the family lived when Petitioner was trying to make money at swap meets.

[Doc. 266, p. 124 lines 11-14].

The physicians at the Wyoming State Hospital who evaluated Petitioner in 1997, after his encounter with the Breeden family, related their observations with regard to the state of Petitioner's mental health.

His mental state at the time of admission was apparently abnormal. He appeared perplexed by many questions, appeared genuinely unable to remember details for recent and remote events...and appeared genuinely apologetic that he could not remember these details. His mood alternated between profuse frequent crying, and irritable verbal lashing out. He admitted suicidal ideation at the time of admission and stated he wants someone to shoot him. He...appeared to show little understanding of the reasons for his current mental state.

[Doc. 269, p. 108 lines 4-19; Exhibit 223-33, p. 3].

The remainder of the Wyoming State Hospital examination, as discussed by Dr. Woods, was distorted by Petitioner's score on the Test of Memory Malingering (TOMM), which suggested he was malingering, effectively truncating the exploration of other possible mental health issues. The author of the TOMM, Thomas Tombaugh, cautions it should not be administered to patients with dementia. [Doc. 269, p. 108 lines 20-25; p. 109 lines 1-16]. Petitioner's performance on the TOMM, which should either have never been given or the results disregarded, seemed to temper the diagnosis which included "pseudodementia." [33]

The lab tests conducted by the Wyoming State Hospital showed high levels of zinc and arsenic in Petitioner's system, which is "not really associated with dementia, it's associated with brain problems." [Doc. 269, p. 110 lines 29]. Dr. Woods, based on Petitioner's welding and exposure to manganese fumes, observed:

> There are some central nervous system effects. There are autonomic nervous system effects as well that one sees with inhaling manganese as well as the fact, uh -- it's not exactly the same as black lung, but manganese is a metal, and so

---

[33] Dr. Woods explained, "Pseudodementia is the cognitive impairment that one sees in depression. It's a slowing of brain function. It's not a dementia, … it's not malingering. It's a slowing of brain function. True vegetative depression, depression of the body, slows the brain down. A person's thinking may be slower. Their reactivity can be slower. And so when that is of such a severe degree, that's the term that's used, pseudodementia." [Doc. 269, p. 110 lines 15-25; p. 111 lines 1-2].

it does tend to impair your lung function as well. So there are, there are some central nervous effects, really more autonomic nervous effects and pulmonary effects.

[Doc. 269, p. 113 lines 9-17]. Dr. Woods observed Petitioner had been a welder "for a significant period of time." [Doc. 269, p. 114 lines 21-25; p. 115 line 1].What Dr. Woods found even more probative of Petitioner's employment history was "his reactivity, his isolation, his bizarre behavior forced not only him to move from job to job but forced his employers to create work for him, create special circumstances for him in order to keep him employed, and even then they often were not able to do so." [Doc. 269, p. 115 lines 1-5].

Mr. Skaggs and the trial team avoided any investigation, and thus full knowledge of, Petitioner's work and family life, apparently based on a concern such an investigation would "open doors" to certain issues, primarily violence and sexuality. Such an investigation would arguably have been protected under the umbrella of attorney-client and work-product privileges, and could have yielded relevant mitigation evidence. Dr. Ash explained hypersexuality, such as seen in Petitioner's Aunt Zelma and in Petitioner's own conduct toward his wife, is not just a characteristic of bipolar disorder, "it's one of the diagnostic criteria." Clinically, hypersexuality describes when "a person is filled with intense sexual feelings to the point that a person who normally would have good control over their behavior ends up, a loyal wife, going out and having a number of affairs, doing things impulsively

sexually, with painful, harmful consequences, which is exactly the way it's written in the DSM-IV. [Doc. 267, p. 79 lines 10-21]. "Hypersexuality is something you come to expect with bipolar disorder." [Doc. 267, p. 80 lines 19-22]. Dr. Woods agrees.

> [T]rue bipolar disorder is a difficult disease. It is reflected by irritability, it is reflected by hostility, it is reflected by reactivity, it's reflected by hypersexuality, and it's reflected by a lack of social understanding and impaired understanding of context. So mood lability, mood swings, are just a small part of what bipolar disorder really is.

[Doc. 269, p. 50 lines 15-21].

Dr. Ash explained testimony with regard to Petitioner's workplace and family, including his occasional altercations with co-workers and violence toward his wife and children, significantly contributes to an accurate, mitigating psychiatric assessment.

> It's important from the standpoint that he clearly would get very anxious and nervous. Each person that he worked with described he would get scared, he would get nervous, he would become afraid, he would be looking over his shoulder, and then when he was forced to go out and work with some of these people in that stance, if something happened he would be reading attack and would respond as such.

[Doc. 267, p. 94 lines 18-24]. This behavior "can certainly be a part of bipolar disorder. Again, in the DSM-IV the diagnostic criteria is, you know, periods of increased irritability, anger, frustration is part of the, the description of hypomanic or manic episodes." [Doc. 267, p. 95 lines 2-5]. Dr. Ash, with a complete psychosocial history, could very well have

considered and explored a much broader range of mitigating mental health conditions than he could with the narrow and limited information he was provided prior to trial. [Doc. 267, p. 138 lines 1-22]. He described the contrast between the information with regard to Petitioner's life history he was provided prior to trial, and the material he received in preparation for his testimony before this Court.

> It's … a really dramatic difference. The …the original trial I really felt essentially it was myself, the hospital records, the criminal records investigations, and Dale Eaton, and that left us with a very, very limited picture. With your current team it has felt from the very beginning that I was being provided all the information that I could possibly ask for, more than I thought I could possibly read, and a lot of help interpreting that so that I feel like I can much more confidently either make a diagnosis or know areas that should have been explored to further clarify diagnoses. So it's a, it's been a very enlightening and a very good experience.

[Doc. 267, p. 141 lines 14-25; p. 142 lines 1-5].

The impact of the newly obtained psychosocial history data is very clear throughout Dr. Ash's testimony. Dr. Woods agreed with Dr. Ash the clinical picture of Petitioner involves multiple, compounded impairments.

> Yes. What I would suggest to you, however, is that we would not see Aunt Zelma's down cycle go as far down as his. What takes Mr. Eaton's down cycle so far down is his brain impairments. If it were just his bipolar disorder, then he might have gone down, but he may have figured out another way to make some money. He may have figured out how to stay on the job longer. He may

have -- when I talk about perseveration, getting stuck, this is a man, if you recall, Your Honor, this is a man who we looked at having multiple jobs, welding jobs. That's what the other PowerPoint really reflected. He had multiple jobs. What was it that kept him from saying I need to keep this job, I can't hit this guy again, or I need to keep this job, maybe I will work the day shift, I think I can get along with this person, you know, maybe I can learn how to, you know, be more social, but he was never able to do that. And that's the combination of the brain impairment and the mood disorder that, in my opinion, took him so low.

[Doc. 269, p. 150 lines 8-25].

There was a direct relationship between Petitioner's disease processes, such as paranoia, and his social withdrawal.

Q. And did he suffer from bipolar disorder in 1988?

A. Yes.

Q. Doctor, I notice that you also made note in your report of Mr. Eaton's paranoid ideation and isolation and withdrawal. What role do those characteristics play in the clinical picture of Mr. Eaton?

A. These are compensatory mechanisms that Mr. Eaton himself attempted in order to control his, um, behavior. He recognized his behavior as inappropriate. He told people he wanted help for his anger. When you look at his prison records, he talks to the jails and the prisons about I want help for my anger, I need to be able to control this. When Dr. Ash, for example, thought it might be useful to have him off his medication to see if he would look the way he did in 1988, Mr. Eaton was frightened because he saw the medication as being able to control his anger in the prison where he was and refused to come off of it.

So he consistently has asked for help around these anger issues when help has been available. When it hasn't been available, he's become increasingly isolated, withdrawn, and tries to stay out of people's way because he knew that he had these vulnerabilities.

[Doc. 269, p. 152 lines 9-25; p. 153 lines 1-5]. Petitioner's retreat to his life of isolation, and his pattern of abruptly leaving jobs and friends after staying for a period of a few months, reflects his anxiety about his potential for losing control.

Petitioner's psychological disorder and brain disorder cause both impulsivity and disinhibition, which are "actions without thinking." [Doc. 269, p. 153 lines 9-12].

What does that mean in the real world? That means reacting and saying I'm sorry, reacting and realizing I shouldn't have acted, reacting or not reacting and realizing that you should have. So that's a neurological condition. And I'm not saying that in each and every instance that's true, but we know that that's a part of his neurological condition.

[Doc. 269, p. 153 line 25; p. 154 lines 1-6].

This dynamic becomes even more disabling in persons with obsessive-compulsive disorders (OCD), such as Petitioner's trichotillomania and hoarding. OCD which drives ritualistic or repetitive behavior will "start to impair your ability to function, to actually weigh and deliberate….that's when they start to impair your ability to effectively be mentally flexible. . . So if you have a disorder like bipolar disorder which impairs mental flexibility, and then you have perseveration on top of that, an obsessive-compulsive disorder on top of

that, you really are locked in." [Doc. 269, p. 154 lines 7-24]. Petitioner could not, under stress, generate any of alternative courses of action. His deficits in processing speed, working memory, obsessive-compulsive disorder, disinhibition, impulsivity, all affect the act, and the quality of the act. Each of these factors affected Petitioner's ability to function properly, and were compounded by his paranoia. "Paranoia is you don't understand exactly what's going on, … because you don't have your working memory working effectively. And that's where problems with … being able to effectively weigh and deliberate. You don't have all the data because your brain isn't working properly." [Doc. 269, p. 155 lines 2-25; p. 156 lines 1-18]. Dr. Woods, based on his examination and a thorough psychosocial history, concluded Petitioner has bipolar disorder.

> Mr. Eaton, in my professional opinion, Your Honor, has bipolar disorder. He's had it all of his life. He got it honestly, as they say. He has a family history that's consistent with bipolar disorder. Mr. Eaton also has a brain that doesn't work well, and we see that this has been a brain that hasn't worked well most of his life if not all of his life. The 1961 [interview] that his mother gave to … Dr. Langsley noted difficulties in early developmental stages, in talking, in walking, in language. We see that he failed the first grade … once. ….Seventh grade twice. And eventually dropped out in the ninth grade. So we see academic and problems early in life. That speaks to cognitive problems. …

> And so I see bipolar disorder. We haven't talked about posttraumatic stress disorder, but obviously he's had significant trauma as well. I see a brain that doesn't work effectively. And I see, tragically, all of those acting synergistically particularly in new, novel, and stressful circumstances.

[Doc. 269, p. 159 lines 7-25; p. 160 lines 1-12].

Dr. Woods explained all of Petitioner's diseases, trauma, and limitations were very much a part of his actions in March, 1988, when Ms. Kimmell was killed.

> The brain factors were always there. It may be that they were to a greater or lesser degree, but they are always there because it's like having your arm or your leg.
>
> The mood factors were heightened during this time in March [1988]. By all indications, he had just left his … ex-wife who at a minimum did not agree to let him have his children for this time. [T]here's … some indication that she may have said these aren't your children. It's also clear that she also introduced her new boyfriend and now husband, Mike Cline, to him at the same time. And he describes himself as coming back and being profoundly depressed and being stressed. When we look at the other information from that time, … [Ms. Buchta is] journaling how poorly he's living. He has a stove. He has no running water. He has no electricity. His place is like a pigsty. His children are running around without a toilet and facilities. And we've looked at his income which that year was less than a thousand dollars. I believe it was about $900. This was clearly the low point of Mr. Eaton's life. That does not in any way excuse the terrible thing that occurred, but it does give me some understanding of what his mental functioning was at that time.

[Doc. 269, p. 160 lines 13-25; p. 161 lines 1-16]. Dr. Woods stated his opinion, to a reasonable degree of neuropsychiatric certainty, Petitioner was acting under extreme mental and emotional disturbance and his ability to conform his conduct to the requirements of the

law was substantially impaired at the time of Ms. Kimmel's death. [Doc. 269, p. 161 lines 17-24].

The well-qualified, well-supported, and well-reasoned opinions of Dr. Ash and Dr. Woods as mental health experts, corroborated by the life histories of Petitioner and his family, set forth a complex, mitigating, and humanizing picture of Petitioner which, if those opinions had been presented at Petitioner's trial, very probably would have persuaded at least one juror to decline to impose a death penalty.

*Remorse*

The evidence Mr. Skaggs used to argue remorse was minimal at best. He argued remorse was established by the Stringfellow Hawke letter, which Petitioner repudiated in the presence of the jury, and by the fact Petitioner drove Ms. Kimmell's body eighty miles and dropped it in a river where it was sure to be found. Mr. Skaggs, when asked if this was the best evidence he could present, replied, "it's the evidence I used." [Doc. 262, p. 32 lines 5-25; p. 33 lines 1-25; p. 34 lines 1-5].

There was, however, additional evidence which the trial team could have discovered through a reasonable investigation which would have enabled Mr. Skaggs to clearly characterize Petitioner as a sincerely remorseful person who was tormented by the fact he does not have the wherewithal or ability to control his conduct. Dr. Ash saw first-hand Petitioner's "genuine, deep, powerful remorse."

Q. (By Mr. O'Brien) In your May 17th, 2003 interview did you inquire of Mr. Eaton of the circumstances of the crime?

A. Yes, I did. And this was at the direct request of Mr. Skaggs.

Q. All right. And as you're looking at Exhibit 16 and recalling your trial testimony, is this substantially what you told the jury that you learned from Mr. Eaton about the crime?

A. Yes.

Q. And that was at Mr. Skaggs' request that you did so?

A. Yes.

Q. All right. Could you read for the Court the following paragraph about Mr. Eaton's condition as he was relating this to you?

A. "As he talked about this, as well as a man that he had killed in prison. He was filled with horrendous agony and remorse. He teared up on a number of occasions, his face was held in and he clenched his teeth and his hands."

Q. How did you interpret his response?

A. Genuine, deep, powerful remorse.

[Doc. 267, p. 66 lines 3-21; Doc. 66-6, p. 2].

Mr. Pepin, Petitioner's attorney in the Colorado manslaughter case, "thought that he had a genuine deep sense of remorse about what had happened to Mr. Palmer. And all of that led to just a basic, a positive feel I had being around Dale." [Doc. 263, p. 119 lines 10-24]. Mr. Pepin described the honest emotion which the manslaughter jury saw from Petitioner.

> Dale was expressing deep remorse over having a part in the death of
> Clay Palmer… he had expressed that openly during the actual trial. When I was

giving my opening statement, I made reference to Mr. Palmer being dead, and from behind me came a noise that I don't know that I have ever heard from any source. It sounded like a wounded big animal, and it was in essence a sob, an involuntary minor sort of muffled explosion from Dale. He was so distraught …about having been part of Mr. Palmer's death. … And I had hoped that to some degree Dale would perhaps have his pain about having been involved in Mr. Palmer's death lessened by having more neutral people say this is bad and we understand … how you feel, but … the law is not finding you accountable. He was not consoled at all. When I went back to see him, it was not the celebratory mood that one often finds with a not guilty verdict.

[Doc. 263, p. 126 lines 8-25; p. 127 lines 1-5]. Mr. Skaggs, without ever speaking to Mr. Pepin or reviewing the file, decided to keep the Clay Palmer incident and all related evidence out of Petitioner's trial. Mr. Pepin told Ms. Moree "that I would be willing to testify, if necessary, that I thought that his remorse was palpable as it applied to Clay Palmer, that I thought those were human qualities that I could help communicate." [Doc. 263, p. 135 lines 16-19].

The issue of remorse in Petitioner's case goes much deeper than simply his reaction of "horrendous agony and remorse" to his own conduct in this crime. [Doc. 267, p. 66 lines 16-19]. It reveals a deeper level of agony and suffering which has been a part of Petitioner's life. It arguably softens the impact of his conduct on previous instances when he abruptly lost control. Dr. Ash found similar feelings documented in the records of the 1961 Colorado University Hospital examination. The examiners noted, "Subjectively, he said he felt hopeless

and sad. He expressed concern over what happened to the woman whom he had apparently stabbed." [Doc. 267, p. 124 lines 18-22; Exhibit 169-4, p. 11]. Dr. Ash found this an important insight into Petitioner's impairments and character because "[i]t expresses both depression, which I think was there probably before, but also since, and it expresses, you know, the sadness, the remorse." [Doc. 267, p. 124 lines 22-25; p. 125 line 1]. Evidence of sincere remorse, in addition to being a humanizing aspect of Petitioner's character, and illustrative of his positive character which lies beneath his ability to control his frustration, can be diagnostically important as well. Dr. Ash, when cross-examined during the hearing before this Court with regard to narcissistic personality disorder, quickly discounted it based on Petitioner's remorse. "[Narcissistic Personality Disorder] boils down to a person uses other people, doesn't have much in the way of feelings about other people. If they do something to another person, there's very little in the way of remorse." [Doc. 267, p. 148 lines 12-22]. This was not the case with Petitioner.

> Mark Dotson described the way Petitioner's remorse would overwhelm him.

> But then there were times that he would get angry over something so small, and then he'd sulk around for a couple of days. He was always sorry for acting like that, but then his remorse was a lot more than the incident warranted. He would get angry too easily, and then he'd feel too bad about it. It wasn't that big of a deal usually and he would mope around for a couple of days over it.

[Doc. 69-7, p. 2].

Another relevant episode indicating Petitioner's remorse were his statements to a fellow prisoner, Brett Hudson, in the fall of 2002. Inmate Hudson told Natrona County Deputy Lynn Cohee that Petitioner had told him in 2001, "I did something so bad I don't know if Jesus will forgive me for it." Petitioner, later the same day told Hudson, "It happened a long time ago. I killed somebody young about 16 years ago." Hudson related Petitioner then began crying and said, "I can only hope Jesus forgives me for it." [Doc. 35-1, p. 3]. The jury never heard this information provided by Inmate Hudson.

Petitioner's sister-in-law, Bobbie Eaton, had an experience similar to one by Inmate Hudson. She was trying to persuade Petitioner to go to church with her, but he resisted, saying "he would like to go but … he had done something that he didn't think he'd ever be forgiven for." [Doc. 266, p. 186 lines 15-19].

The mental health experts who examined him found Petitioner's sincere remorse to be powerful evidence of how little control he had over his neurological and emotional impairments. Dr. Ash indicated Petitioner had "stated emphatically that he wished he never would get angry with anybody." [Doc. 267, p. 70 lines 2-3]. This evidence is "extremely important," according to Dr. Ash, because "it shows how he struggled with this part of him. He tried to avoid this in a number of ways. He would try to avoid situations that would bring up his anger. And when he would get angry, he would have a great deal of difficulty controlling it and would do things that he would regret." [Doc. 267, p. 70 lines 7-11].

Mr. Burr pointed out Petitioner's sincere regret for his outbursts temper the potential negative impact of such evidence in a meaningful way, therefore, in spite of his getting fired from jobs, Petitioner's work history is a rich environment for evidence which fosters an understanding of both his impairments and his good qualities.

> [T]he workplace is a very rich environment for understanding Dale Eaton. It's not the only environment, but it's an extremely rich environment with the observations of … some people who were kind of like Dale, some people who were probably smarter and have more ability but who cared about Dale and saw a lot of good qualities in him, saw him struggling, saw him trying to, trying to avoid situations where he'd lose control, when he did lose control, … saw him being very apologetic and sorrowful for what he had done, more so than he needed to be most of the time. And so … it's far from being an environment in which you would only see bad stuff about Dale Eaton. You'd see a lot of information that helped you understand him fully as a human being, as one of us and not the other …, as Mr. Skaggs was afraid it would be.

[Doc. 266, p. 31 lines 6-20].

A portion of the evidence of Petitioner's deep and sincere remorse which was available to the trial team, and should have been presented, was directly connected to his crimes against Ms. Kimmell, such as Dr. Ash's eyewitness account of Petitioner's "horrendous agony and remorse." [Doc. 267, p. 66 lines 16-19]. Other evidence of remorse arises from Petitioner's reaction to his prior violent outbursts which invariably reduced him to tears of regret. [Doc. 266, p. 108 lines 1-25]. Mr. Skaggs and the trial team steered away from the evidence of

remorse in the latter category, apparently out of a concern over Petitioner's history of violence associated with his various employments. Mr. Skaggs and the trial team, however, without investigating those prior instances, could not make a reasonable strategic decision not to use those prior incidents to help humanize Petitioner. Mr. Burr explained. "This is a man who is on trial for an unspeakable act of violence, and for most people who are on trial for similar occurrences this is not the first time in their lives that they have been violent." [Doc. 265, p. 199 lines 8-11]. A competent defense attorney would perceive there was nothing to fear in Petitioner's work history, rather only opportunities for a deeper level of understanding of his actions. Mr. Burr explained.

> [I]f we don't come to understand that and why those incidents happen, then we can't begin to explain credibly why this murder happened. And so we have to, we have to embrace and not hide from and try to understand as fully as we can every incident like this that happens throughout a client's life.

[Doc. 265, p. 199 lines 22-25; p. 200 lines 1-2].

Remorse, if perceived as sincere and genuine, moves jurors away from the death penalty. John H. Blume, Sheri Lynn Johnson, & Scott E. Sundby, *Competent Capital Representation: Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, 1037, 1038, 1049, 1050. (2008) (noting that remorse is a factor which can lead jurors to choose life over death). There can be little doubt one or more jurors might well have been

persuaded Petitioner was truly remorseful for his crime. The failure of Mr. Skaggs and the trial team to investigate the depth of Petitioner's feelings of remorse, and, therefore, offer a fuller and more complete presentation to the jury with regards thereto, was prejudicial to Petitioner.

*Likeability - Humanizing Qualities*

The previous discussion of Petitioner's life and social history relates to what Professor Gary Goodpaster emphasized in 1983, twenty years before Mr. Skaggs and the trial team represented Petitioner, concerning the standard of defense performance in capital cases, and the necessity of presenting mitigating evidence which indicates the crimes by the defendant are "humanly understandable in light of his past history and the unique circumstances affecting his formative development, that he is not solely responsible for what he is." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 335 (1983).

This mitigating evidence, in and of itself, is often, however, not sufficient to counter the prosecution's characterization of a defendant.

> First, counsel must portray the defendant as a human being with positive qualities. The prosecution will have selectively presented the judge or jury with evidence of defendant's criminal side, portraying him as evil and inhuman, perhaps monstrous. Defense counsel must make use of the fact that few people are thoroughly and one-sidedly evil. Every individual possesses some good qualities and has performed some kind deeds. Defense counsel must, therefore,

by presenting positive evidence of the defendant's character and acts, attempt to convince the sentencer that the defendant has redeeming qualities. A true advocate cannot permit a capital case to go to the sentencer on the prosecution's one-sided portrayal alone and claim to be rendering effective assistance.

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 335 (1983)(footnotes omitted).

Mr. Skaggs apparently did not agree with Professor Goodpaster with regard to the need to "portray the defendant as a human being with positive qualities." He, in fact, prepared a memo for each of the witnesses telling them what not to say on behalf of Petitioner.

Things you **<u>CANNOT</u>** say while testifying:
1.      "Mr. Eaton is a good guy" ("good man", "good father", "hard worker").
2.      Mr. Eaton tried to commit suicide.
3.      Mr. Eaton doesn't have a big criminal record - **<u>NOTHING</u>** about his criminal record.
4.      Mr. Eaton would do well in prison if given a life sentence.

[Exhibit 220-9 (bold and double underlining in original)]. The jury thus did not hear any evidence of Petitioner's positive qualities, nothing about his suicide attempts, and nothing about his institutional history. Mr. Skaggs and the trial team failed to discover and present any substantial humanizing evidence of Petitioner's strong work ethic, his acts of kindness and acts of generosity.

Petitioner's work ethic is an integral part of his identity, beginning from a very early age. Natrona County Deputy Lynn Cohee uncovered his work ethic in one of her earliest pieces of investigation, a tape-recorded interview of Petitioner's sister, Sharon Slagowski.

SS     [Sharon Slagowski] He, he's very good at his welding. He's very good at work, but just a minute.

LC     [Lynn Cohee] Ok. Take your time.

SS     He's very, he'd give his, give me his last dollar. He was always so good.

LC     Uhhuh.

SS     He just had a rough life.

LC     How did he do in school, do you know?

SS     Well, he never had a chance to be in school. We moved around a lot and that really affected him. And he never got to be a little boy, cuz he had to work so hard. And he was always up so early, uh, you know milking cows

LC     Uhhuh.

SS     and doing the (inaudible) farm work and everything. He never got a chance to be a kid.

[Doc. 199-8, p. 7].

Petitioner's parents expressed the same sentiment in their interview with Dr. Robert Dean and Dr. Donald Langsley, indicating Petitioner "has always been interested in working and has liked to work since early childhood." [Exhibit 169-4, p. 19]. Petitioner, at the age of sixteen [Doc. 169-4, p. 17] had already compiled quite a work history.

For example, doing farm work, milking cows, etc. In the past few years the patient has done varies of odd jobs; for example, lawn work, cleaning up debris on construction jobs. This past summer the patient had started working on a

ranch near Meeker where he had worked before. However, this was terminated on the move to Greeley. After moving to Greeley, the patient worked for his father in the gravel pits. The father reports that he was to pay the patient a dollar an hour; however, the patient says that he never really was paid anything. Also, this past summer the patient had worked doing general cleanup for construction companies. A year ago the patient had worked the summer months on a ranch near Meeker and when the family moved from Meeker to Greeley, the patient had expressed that he wanted to stay with the family on the ranch and live there and work there. It is the patient's hope that he will be placed on probation in the custody of these people."

[Exhibit 169-4, p. 19].

Petitioner's work ethic was one of the first qualities his childhood friend, Brian Conrado, noted about him.

Dale was always a hard worker. He worked for the Barneys on their ranch, but when he was still just a kid he was constantly mowing people's yards for money. He would use the money to buy candy bars. I believe that the candy bars he bought were the only meals he was getting. I remember seeing Dale walk all over town pushing a Toro lawn mower, that Dale financed himself from Gamble's Store, and carrying a can of gas as he went around mowing grass.

[Doc. 68-5, p. 1].

Mr. Conrado and Petitioner were both about junior high school age, and earned money by mowing lawns. Mr. Conrado indicated many times his grandfather would haul his lawnmower to the job, "but Dale had no one, so he would push this lawnmower up miles

probably during the week to lawns wherever they were." [Doc. 268, p. 43 lines 23-25; p. 44 line 1]. They would meet on the streets and talk as each of them was pushing his lawnmower to the next job. [Doc. 268, p. 44 line 1-6]. Mr. Odin Harris owned a hardware store in Meeker. He sold Petitioner a red Toro lawnmower and trusted him enough to finance it. [Doc. 268, p. 44 lines 9-19; p. 56 lines 19-125; p. 57 lines 1-22].

Mr. Conrado also remembers Petitioner's younger brother, Alan Eaton, who was born with cerebral palsy. Alan had a wheelchair, but "Dale would pull him around in a wagon," usually headed toward school. [Doc. 268, p. 47 lines 13-24]. Margie Jackson also remembers Petitioner pulling Alan around in a little wagon. [Exhibit 195, p. 1]. Alan was also mentioned in Dr. Dean's interview with Petitioner and his parents in 1961. Alan was the "nine year old boy, in the fourth grade, who was born after a six months' pregnancy and has suffered from cerebral palsy since birth." Alan was born when Petitioner first started school. Dr. Dean wrote, "Dale reports that he has always tried to help and take care of this brother. The parents confirm this." [Exhibit 169-4, p. 21]. David Brewbaker, a friend of Petitioner and Alan, stated "I know Alan loved Dale very much. Dale watched out for Alan better than any of Alan's other brothers and sisters. Alan said that Dale argued with his brothers and sisters so that Alan could have money." [Exhibit 239, p. 2].

Terry Schmuck, who knew Petitioner and his family in Riverton, recalls when Alan got old enough to drive, "Dale fixed Alan's vehicles so that he could operate the breaks (*sic*) and

the accelerator with hand levers. Dale modified the vehicles so that Alan could get around and go places like everyone else. Like I said, Dale was a good mechanic." [Exhibit 192, p. 2]. Alan died in 2008. [Exhibit 292].

Petitioner, when he was a young man in Riverton, became friends with David Brewbaker. Mr. Brewbaker is medicated for bipolar disorder, and comes from a family in which he was badly beaten and sexually abused by his father. He "didn't have much of a dad, and Dale tried to fill that role for me." Petitioner took him hunting and fishing, but "(p)erhaps the most valuable thing I learned about Dale was the importance of hard work. He was a hard man to follow on the job because he would work so hard it made everyone else seem lazy." Petitioner got Dave a job cutting hay with him one summer. "He stressed the importance of moving quickly to get the job done. The work was available only for brief times when the season was right. . . Dale was a good person and a good friend to me. He was tender and loving and generous. I loved him like a father or a big brother, and he was always good to me." [Exhibit 239, pp. 1,2].

Jim and Sandy Hoopes have perhaps known Petitioner longer than anyone, ever since the early 1970s. Jim knows Petitioner through work, and his wife, Sandy, considers Petitioner a friend. [Doc. 265, p. 22 lines 13-25; p. 23 lines 1-4]. Petitioner had significant, positive interaction with their children and grandchildren. He took old bicycles and tricycles and welded them together and painted them up so they were like new, and their children rode

them. One Christmas he played Santa Claus for their grandchildren and great-grandchildren, and brought them oranges and candy. One great-granddaughter, Belinda, made Santa a gift of feminine napkins, "and Dale was embarrassed, and he pushed it down inside the couch." Petitioner was a very good, jolly Santa. He was also kind and thoughtful. He bought Mrs. Hoopes gifts, such as flower vases, he found at swap meets. [Doc. 265, pp. 22, 23, 29, 81].

Mrs. Hoopes described Petitioner as "intelligent with his hands." [Doc. 265, p. 29]. [34] He performed mechanical work for Mr. and Mrs. Hoopes, such as putting new brakes on Mr. Hoopes' truck. [Doc. 265, p. 29 lines 8-25; p. 59 lines 7-15]. He welded a gooseneck hitch and metal frame onto their sheep shearing plant so they could tow it behind their truck. [Doc. 265, p. 24 lines 12-22; p. 60 lines 6-17; Exhibit 269]. Petitioner did the work from November through January when it was cold outside, however, he pitched a tent around the trailer and worked on it around the clock. It is still in use thirty years later. Petitioner was such a good welder "he could even weld with bailing wire." [Doc. 265, p. 25 lines 24-25; p. 26 lines 1-15]. Mrs. Hoopes stated "(h)e worked. I mean, he worked hard. Anybody who could work out there in the cold and just keep working, he was doing a -- well, you know, and he worked with Jimmy a lot…" [Doc. 265, p. 27 lines 2-6].

---

[34] She also described him as "slow" in other areas. He had no social skills, had difficulty communicating with people, and he had very few friends, and he could not keep himself or his surroundings clean. [Doc. 265, p. 30 lines 2-25; p. 31 lines 1-25; p. 32 lines 1-25].

Jim Hoopes, who is over eighty-four years old, had worked with Petitioner at various jobs beginning in 1972. [Doc. 265, p. 55 lines 1-3]. He reviewed his work history with Petitioner as best he could, given his age and circumstances. [Doc. 265, pp. 60-80]. He "always thought he (Petitioner) was a real good worker, but I had to keep an eye on him cause he had such a wicked temper." [Doc. 265, p. 55 lines 4-8].[35] Petitioner was, nevertheless, such a good worker, Mr. Hoopes requested him for his crew whenever he had the opportunity. [Doc. 265, p. 54 lines 10-24].

Mark Dotson, owner-operator of West Hills Excavation, valued Petitioner's job skills and work ethic. Mr. Dotson, although his health prevented him from attending the hearing before this Court, executed a declaration attesting to Petitioner's valuable job skills and work ethic.

> Dale never disappointed me on the job. He's an exceptional mechanic. One of the best I've ever seen, and I've seen a lot. There's no question that he's a master mechanic, and one of the best. I'm a master mechanic and he's better than me. There wasn't anything he couldn't fix or do on the job. I had zero doubt about his abilities. He got mad a few times and told me he was leaving. I convinced him to stay because he was such a good worker and mechanic. But then one day he just disappeared. He was mad at another employee the day before, or a couple days before, I don't remember about what exactly and I'm

---

[35] Dr. Ash found Petitioner's temper to be a significant symptom of his overall clinical picture. *Supra.*

sure that's why he left. I hated to see him go. He was the best mechanic I've ever worked with.

[Doc. 69-7, p. 2].

Other employers and co-workers had similar opinions with regard to Petitioner's work ethic. Steve DuBry, of Casper, described Petitioner as "a hard worker, a good mechanic, and a great welder." He also witnessed Petitioner's difficulty with other people. "Dale could not work with other people, he just couldn't handle it. If a contractor needed one mechanic, or one welder, Dale was your man. If the job called for several mechanics then I would not send Dale unless I absolutely had to because I knew there would be problems." He admits "Dale was a skilled worker and I could depend on him to do a job right, but his inability to get along with others often worked against Dale and he lost jobs over it." [Doc. 69-4, p. 1].

Johnny Miller, a construction worker, valued Dale as a good friend and good employee.

Dale was a good employee, he was better than good. He was a heavy equipment operator on most of the jobs we worked together. He was also a pretty good mechanic and sometimes he would do repair work on jobs too, but mostly he operated equipment like cranes, dozers, and the like. I can't remember Dale ever getting fired. I don't know why he would have; he was a good worker and a good employee. He did his job and he was good at it.

[Doc. 69-5, p. 1]. He indicated Petitioner "would do anything for you. If you needed something and he could help, he was your man. He never thought twice about helping me with my work. He was a good friend to me, I still consider him my friend." [Doc. 69-5, p. 2].

People who knew Petitioner outside the workplace valued him for his kindness and generosity. Petitioner, while working for Mark Dotson in Utah, was dating Kerry Lynn Rose. Ms. Rose is now deceased, although she was alive at the time of Petitioner's trial, and actually offered her assistance. [Exhibit 171-36]. Her parents, Ron and Sally Rose, remember Petitioner as someone who was good to their daughter and granddaughter. He also poured a new driveway and sidewalk for Mr. and Mrs. Rose. He helped Kerry Lynn financially, even when they were no longer dating. He often had surprises for Kerry Lynn's daughter, Angela, such as candy, toys or games. [Exhibit 200, p. 1; Exhibit 201, p. 1].

Shirley Widmer remembered Petitioner was always helping her husband, Floyd, fix cars, played with their children, and regularly took them out to dinner. [Exhibit 204, p. 1]. Their daughter, Thea Smith, recalls Petitioner picking her up when her motorcycle broke down and driving her home. Petitioner "was very protective of my brother and me and I know he would have done anything for us." [Exhibit 205, p. 1].

Floyd Widmer, though now deceased, testified as a mitigation witness. Shirley stated Floyd "couldn't hear the attorney's questions," and they "didn't practice or go over our

testimony with Dale's attorney that I remember." Floyd Widmer, after the trial, was very

upset. [Exhibit 204, p. 2]. Thea Smith has the same recollection.

> After my father testified and Dale had received a death sentence, he said to me,
> "Thea I know I must have said the wrong thing. I couldn't hear the lawyer's
> questions so I just nodded yes. I couldn't understand him and I know I said
> something wrong." My dad was really tom up about all of it.

[Exhibit 205, p. 1].

Bobbie and Richard Eaton were also beneficiaries of Petitioner's kindness and

generosity. "He was a good man to my point. He was generous. If you ever needed anything,

he would try to get it for you or help you." [Doc. 266, p. 180 line 25; p. 181 lines 1-4]. Bobbie

and Richard were having financial problems, and Petitioner would "give us money for food

and for gas and just to try to help out." [Doc. 266, p. 181 lines 15-20].[36] Petitioner, when he

went to flea markets, always brought home a gift for Bobbie and Richard. He knew Richard

collected marbles, and liked oil lamps, so he would bring them an oil lamp and fill it with

marbles. He would bring Bobbie Coca-Cola items and little knickknack horses. [Doc. 266,

p. 181 lines 23-23; p. 182 lines 1-6]. Petitioner was especially kind to Bobbie's son by a prior

marriage, Bennie, whom they called JR, and would take him hunting and fishing. The Eaton

---

[36] Financial generosity by Petitioner apparently was apparent at an early age. "The
patient's main interest, according to the parents, is working and earning money. . . .
They say that he is quite unselfish with the money that he earns ... . [Exhibit 169-4, pp.
19, 21].

sisters did not accept JR as part of the family, so it was important to Bobbie that Petitioner "welcomed him like he was just part -- one of his other nephews and nieces, treated him really well." [Doc. 266, p. 175 lines 20-25; p. 176 lines 1-19]. Sadly, JR was shot to death at age 16, and Petitioner "was very, very emotional about it." He was very supportive of Bobbie, and bought her little gifts to make her feel better. [Doc. 266, p. 177 lines 2-22]. Richard stated if he liked you, "Dale would give you the shirt off of his back, and … I've seen him give stuff to people … when he was doing without." [Doc. 266, p. 232 lines 1-10].

Richard also stated Petitioner went to stay with his niece, Denise Heinz, in July and August, 1997, to protect her from an abusive ex-husband who had been threatening and stalking her. [Doc. 266, p. 232 lines 11-24; Exhibit 194, p. 1].

One characteristic exhibited by Petitioner which would possibly have been significant mitigation evidence for the jury to consider was the fact he would never pass up a person in need of help. What Donna Schmuck "remember[s] most about Dale is that he was always willing to help. Whenever he came by, if Terry was working on something, Dale would stop and pitch in. Dale was good at welding, and he fixed equipment around the farm for us on a number of occasions. He never took any money for it." [Exhibit 203, p. 1]. Donna's husband, Terry Schmuck, has the same memories of Petitioner. "Dale was generous with his time. Whenever I was outside working on something when Dale drove by, he would always stop and help." [Exhibit 192, p. 1]. Priscilla Moree was provided the same type of evidence when

she interviewed Keith Lange by telephone. He, too, talked of Petitioner's helpfulness, and told her of a time when his hogs got loose and Petitioner stopped to help him round them up. [Exhibit 171-22, p.1].

Mr. Burr explain why the evidence which would have shown the jury Petitioner's positive qualities is just as important in the penalty phase of a capital trial as the evidence of his substantial mental and emotional impairments.

> The constant duality about Dale Eaton is very, very important and should have become a centerpiece of both investigation and presentation, but this fellow who's got great difficulties in relating to other people and being around other people and can, can just un -- you know, without much provocation go off, and coupled with this very same man is very kind to people and very generous, you know, described as having a good heart, those -- that duality, which, you know, seems contradictory but, you know, is -- it's much like all of us who have contradictory qualities, and it, it not only suggests investigation for mental health but suggests a very powerful set of themes for humanizing Mr. Eaton and helping the jury understand him as a fellow human being.

[Doc. 266, p. 12 lines 17-25; p. 13 lines 1-4]. Mr. Skaggs and the trial team failed to produce mitigation evidence and testimony which would have offered the jury insight into Petitioner's innate humanity.

Defense counsel, when the only genuine question is whether the jury will impose the death penalty, cannot afford to overlook any opportunity draw out admissible evidence of the client's intrinsic human dignity. These opportunities will often arise on the cross-examination

of prosecution witnesses who know the client. The practice among capital defense lawyers of taking proper steps to humanize the client during the guilt or innocence stage of the trial is called "frontloading mitigation." Mr. Burr explained why it is so crucial in a death penalty case.

> Front-loading, the concept of front-loading has come about because of the bifurcated nature of a capital trial. In the first, first half of the trial is all about guilt or innocence and not about mitigation or even aggravation and not about the sentence. It's about whether the person is guilty of what he's been charged with. And over time and certainly by the, by the late '90s, early 2000s we had realized that if we, as the defense, waited to begin mitigating our client, that is, beginning to put some human flesh on the bones of the skeleton that was apparent in the guilt phase, we might be too late, that we needed to start helping the jury to understand our client as fully human as early as possible and find ways of doing that in the guilt/innocence phase.

> And so the notion of front-loading mitigation has developed, that's just the term of art for it, but what it simply means is looking for opportunities in the guilt phase witness testimony and their relationships to your client, the relationships of those witnesses to your client, to be able, within the proper scope of cross-examination, to be able to ask questions about the person who is the defendant.

[Doc. 266, p. 32 lines 10-25; p. 33 lines 1-5]. The ABA Guidelines as well provide "(c)ounsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." [ABA Guideline 10.11.L].

There is no indication in the trial record Mr. Skaggs or the trial team gave any thought to "front-loading" mitigation evidence. This apparent failure to consider "front-loading" is particularly perplexing in light of the fact the law review article by Professor Garvey, which Mr. Skaggs testified he read before trial, and even brought to the hearing before this Court, [Doc. 261, p. 36 lines 1-8], cautions capital defense lawyers that "a number of jurors make up their minds about the defendant's punishment even before they hear any evidence in the penalty phase." Stephen Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538, 1543 (October 1998). Jurors tend to make up their minds early, thus "(i)ntroducing mitigating evidence early adds an additional humanizing dimension to the image of the defendant as a two-dimensional, cold-hearted killer - an image the jurors are otherwise likely to form prior to the penalty phase." Scott Sundby, *The Intersection of Trial Strategy, Remorse, and the Death Penalty,* 83 CORNELL L. REV. 1557, 1595 (September, 1998). Professor Craig Haney, a lawyer and psychologist who specializes in capital punishment issues, explains the necessity to frontload mitigating evidence in the guilt or innocence stage of trial.

> The poor timing of the defense case in mitigation, the fact that it would require most jurors to perform the difficult work of essentially changing their minds about the defendant, and the heavy crime-focus of the penalty instructions that follow may help to explain why the Capital Jury Project found that the penalty trial was the least well-remembered stage of the entire process for capital jurors. Half of the jurors studied had actually made up their minds about the

appropriate penalty once they had convicted the defendant of the guilt phase crime.

Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 STAN. L. REV. 1447, 1457, 1458 (1997). In other words, if the jury knows nothing about the defendant other than the facts of the crime when it renders its verdict finding him guilty, the defense bears a very heavy burden to win them over to life in the second stage of trial.

There were a number of witnesses who testified for the prosecution at the guilt or innocence stage of Petitioner's trial who presented opportunities, through informed and proper cross-examination, to begin to paint a humanizing picture of Petitioner. Doris Buchta is one example of a missed opportunity to "frontload" mitigation—to humanize the defendant as early as possible in the proceedings by drawing out evidence of his relationships with witnesses, whether they testify for the State or for the defense. Mr. Burr explained the missed opportunities with respect to Mrs. Buchta.

> Q. Was front-loading available to Mr. Skaggs in Dale Eaton's trial?
> A. I believe it was, yes.
> Q. I want to talk to you about four of the witnesses who testified or actually three -- yeah, four of the witnesses who testified. One was a woman named Doris Buchta who was a neighbor of Dale Eaton's out at Moneta, Wyoming, out in the middle of the country. She kept a journal, but she also testified at the, at the guilt phase of the trial as a prosecution witness. You've had an opportunity to review her journal?

A. I have.

Q. Was there information in that journal that indicated that -- to a reasonably competent capital attorney that front-loading was available through Miss Buchta?

A. Yes. Ms. Buchta had a number of entries about contacts with Dale Eaton. She was a very good journal keeper, and … there were a number of entries that whenever he came by to say hello or to have some interaction with her or her husband, she made a note about it. And there were a number of times where Dale brought her simple gifts, candy or, you know, other confections that she was appreciative of, and there were things that she noted that Dale had helped her husband, Buck, do with respect to a vehicle or some chore that needed to be done that he needed help with, and just notes about him visiting. And … those are the kinds of things … you could very easily within the scope of cross ask some simple questions of Ms. Buchta that would evoke information about that.

And generally when a witness who's been talking about sort of hard facts, … that is, … did you see him here, there, or wherever at certain times, that's what I mean by hard facts, when a witness who's been talking about that is asked some more sort of human emotional facts, they'll brighten up and … they'll express some emotion and talk about Dale … as a person who's a friend. And that's the kind of testimony that is gold in terms of front-loading, because you're not just talking about a stick figure at that point … who is seen here or there at certain times, but you're talking about a person who acts like other human beings and … is kind and generous and, and so that would have been a golden opportunity.

[Doc. 266, p. 33 lines 6-25; p. 34 lines 1-24; *See also* Exhibit 235, a verbatim compilation of Doris Buchta's journal entries which mention Petitioner].

Mr. Skaggs and the trial team missed similar opportunities with other prosecution witnesses. Mary Follette could have testified Petitioner "bought gifts for me and my son as tokens of his affection. Sometimes I would come home to find a huge bouquet of flowers waiting for me. Another time he gave my son, Brian, a pick-up truck. He was generous and I'm sure he would have done anything for me." She also had some sympathy for Petitioner. "When I think of Dale and his situation I am saddened. I always knew there was something wrong with Dale and I don't believe he deserves to be put to death." [Exhibit 313, pp. 1, 2]. Mr. Burr explained this was a wasted opportunity.

> These two paragraphs again sort of capture the contradictory human being that Dale Eaton was. In the first paragraph she's talking about his, his sweetness to her, his kindness, his gifts, his tokens of affection. He was obviously, you know, interested in her as a female friend. And, you know, he didn't overstep any boundaries. He was just -- you know, he was being very sweet to her. And she appreciated that, but she wasn't interested. She didn't reciprocate in any sort of romantic sense.
>
> And she explains in part why in the next paragraph. He was weird, and he smelled terrible. And his hygiene was disgusting. And he was strange and physically repulsive because of his poor hygiene. And his vehicles were a mess. And, you know, there's the Dale Eaton that is very dysfunctional in that sphere of his life. And, again, it's sort of if a theme of mental retardation emerged, it could begin to introduce that theme of social ineptitudes, the limitations in his social adaptive behavior. You know, that's, that third paragraph is quite an extraordinary capsulation of those problems.

[Doc. 266, p. 36 lines 24-25; p. 37 lines 1-18]. Mr. Burr pointed out the seventh paragraph of Mary Follette's declaration reflects the availability of even more front-loading. "Yeah, I mean, you could begin to introduce the theme of his being -- his good work ethic and his considerable skills as a welder." [Doc. 266, p. 47 lines 23-25; p. 38 lines 1-2].

Mr. Skaggs and the trial team had the opportunity as well to front-load mitigation evidence through prosecution witness Paul Follette. Mr. Burr points out the declaration by Mr. Follette [Exhibit 314] reflects the "contradictions about people that tend to humanize them and us" and allow the jury to "begin to start resonating with him as a fellow human being." [Doc. 266, p. 38 lines 22-25; p. 39 lines 1-10]. Mr. Follette testified for the prosecution, and could have been cross-examined about his knowledge of Petitioner. His declaration states: "I know Dale cared a lot for his children and even when he had very little he thought of them first. Whatever he had, he made sure they were fed and taken care of. It was obvious to me that he loved his children and tried to care for them the best he knew how." [Exhibit 314, p. 1].

Mr. Burr observed Mr. Follette could also have begun laying the foundation for the mental health case, in addition to elucidating Petitioner's positive human qualities and frailties.

(T)his is an interesting observation about Dale because he talks about him, again, in praiseworthy ways about his skill as a welder and his ability to make a lot of money at times, but then sort of goes to the flip side of his limitations

in managing the money, not having knowledge or education to plan for hard times. Then he goes on to say he sees that pretty often in people in what he calls "among a certain group of workers in Wyoming." So that limitation on Dale's part didn't set him apart in this -- in Mr. Follette's mind. But, again, it could begin to open up a window into the complexity of Dale as a human being. He's both skilled and able to be a good provider at some level and a disaster at other levels within his life.

And, again, it's the contradictions about people that tend to humanize them and us. I mean, it's -- when we tell stories about each other, you know, we -- at funerals I guess we tend to tell only good stories about people, but every other time we talk about people in an honest way we talk about them and each other as contradictory characters. I mean, we are all people who are a mix of strengths and weaknesses and heroic acts and dastardly cowardly acts and everything in between, and all of us know that intuitively. And so when you begin to introduce a person in that fashion to a jury, they begin to start resonating with him as a fellow human being. And that ultimately is the mission of, of capital defense mitigation work is to, is to connect people together as human beings, the jurors and the client.

[Doc. 266, p. 38 lines 9-25; p. 39 lines 1-10].

James Raney presented yet another opportunity to begin laying the foundation for Petitioner's penalty stage defense. Mr. Burr noted Mr. Raney's declaration, [Exhibit 285], beginning with paragraph four, reflects

observations about Dale's behavior that suggested some mental health problems and, you know, not, not -- the first paragraph we looked at having the memory problems, that he loses train of thought, stare into space, sort of his face would

go blank . . . I mean, it's important for an investigative sense for mitigation, but also knowing that, knowing that your themes when you get to full-blown presentation of mitigation are going to have a lot to do with presenting the mental health difficulties and disorders that inflict -- that afflicted Dale, you can begin to get the jury thinking about that by bringing out, uh, the problems noted in the memory paragraph and in the next paragraph about his fearfulness about being around other people.

[Doc. 266, p. 35 lines 13-25; p. 36 lines 1-2]. A competent capital defense attorney, through James Raney, would be able to begin presenting the mitigation case-in-chief during the prosecution's case in chief. Mr. Burr explained further.

That's exactly right. The themes -- there are important themes here in these two paragraphs [of Raney's declaration] that are gonna be -- become full-blown themes in the penalty phase, and you can do a lot to introduce the jury to those themes through a witness like this who's testifying in the guilt phase.

[Doc. 266, p. 36 lines 3-10].

The failure by Mr. Skaggs and the trial team to conduct a reasonable mitigation investigation caused them to miss these front-loading opportunities. "I don't know which it was, ignoring or failing to see, but he missed these opportunities, you know, in part because they had not done the kind of interviewing with these witnesses that, that would have evoked this information." [Doc. 266, p. 39 lines 11-17]. It is even apparent from the declaration by James Raney he appears to know the Steve DuBry story about Dale reaching into the pot of spaghetti with the greasy hand. "Yeah, that's right. So there are a lot of connections that were

there and were unknown to the defense because of the superficiality of their work." Mr. Burr opines competent capital counsel would not have performed this way. [Doc. 266, p. 39 lines 21-25].

The mitigation investigation and presentation on behalf of Petitioner by Mr. Skaggs and the trial team was fundamentally flawed, and failed to show the jury Petitioner, in spite of his severe impairments, was a unique, complex human being with positive qualities. This failure inevitably prejudiced the outcome of Petitioner's capital trial.

**Prejudice - Conclusion**

A § 2254 petitioner, in order to establish an ineffective assistance of counsel claim, "must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 1419 (2009).

"To establish a claim for ineffective assistance of counsel, a defendant must show that . . . . (2) counsel's deficient performance was prejudicial." *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. at 787-792. Prejudice entails "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. *See also*, *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009)(quoting *Strickland v. Washington*, 466 U.S. at 688, 694).

The United States Supreme Court, in 2011, in *Harrington v. Richter*, 562 U.S. 86, 131

S.Ct. 770 (2011), reiterated its philosophy on deficient performance and prejudice first set out

in *Strickland v. Washington*. The Supreme Court, with regard to prejudice, stated:

> With respect to prejudice, a challenger must demonstrate "a reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different. A reasonable probability is a probability
> sufficient to undermine confidence in the outcome." *Id.,* at 694, 104 S.Ct. 2052.
> It is not enough "to show that the errors had some conceivable effect on the
> outcome of the proceeding." *Id.,* at 693, 104 S.Ct. 2052. Counsel's errors must
> be "so serious as to deprive the defendant of a fair trial, a trial whose result is
> reliable." *Id.,* at 687, 104 S.Ct. 2052.

.                    .                    .

> In assessing prejudice under *Strickland,* the question is not whether a court can
> be certain counsel's performance had no effect on the outcome or whether it is
> possible a reasonable doubt might have been established if counsel acted
> differently. See *Wong v. Belmontes,* 558 U.S. ——, ——, 130 S.Ct. 383, 390,
> 175 L.Ed.2d 328 (2009) *(per curiam)* (slip op., at 13); *Strickland,* 466 U.S., at
> 693, 104 S.Ct. 2052. Instead, *Strickland* asks whether it is "reasonably likely"
> the result would have been different. *Id.,* at 696, 104 S.Ct. 2052. This does not
> require a showing that counsel's actions "more likely than not altered the
> outcome," but the difference between *Strickland*'s prejudice standard and a
> more-probable-than-not standard is slight and matters "only in the rarest case."
> *Id.,* at 693, 697, 104 S.Ct. 2052. The likelihood of a different result must be
> substantial, not just conceivable. *Id.,* at 693, 104 S.Ct. 2052.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. at 787-788, 791-792. *See also, United States v. Rushin*, 642 F.3d at 1309-1310.

The United States Supreme Court has outlined the proper prejudice inquiry for evaluating a claim of ineffective assistance of counsel in the context of a penalty phase mitigation investigation.

We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below. [footnote omitted] In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U.S., at 397–398, 120 S.Ct. 1495. And, in *Porter,* we recently explained:

"To assess [the] probability [of a different outcome under *Strickland* ], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig [h] it against the evidence in aggravation." 558 U.S., at ——[, 130 S.Ct., at 453–54] (internal quotation marks omitted; third alteration in original).

That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase.

*Sears v. Upton*, 561 U.S. 945, 130 S.Ct. 3259, 3266-3267 (2010). *See also*, *Littlejohn v. Trammell*, 704 F.3d at 864 (quoting *Sears v. Upton Sears v. Upton*, 561 U.S. 945, 130 S.Ct. at 3266).

The significant mitigation evidence presented to this Court, through lay and expert testimony, was not discovered, and if discovered, not utilized by Mr, Skaggs and the trial team. This lack of discovery and/or lack of use was apparently based on a concern an in-depth investigation might "open the door" to presentation of adverse information, arguably through the *possible* cross-examination of the potential mitigation witnesses.[37] This type of mitigation investigation is inevitably ineffective as a judgement as to whether potential mitigation evidence will be helpful or harmful is not possible when there is absolutely no knowledge or understanding, based on a reasonable investigation, of the nature and character of the potential evidence. This is why a "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a

---

[37] "A. Well, you can talk about helpfulness, but it's pretty mild in comparison to **the cross-examination you might get** about how helpful he's been to other people." [Doc. 261, p. 186 lines 15-17]. "A. No, but he's certainly going to be cross-examined."[Doc. 261, p. 186 line 21]. "A. It could **if you don't have to deal with cross**." [Doc. 261, p. 187 line 13]. "A. No, it isn't, **but I can imagine cross**."[Doc. 261, p. 188 line 8]. (Emphasis added).

thorough investigation of the defendant's background.'" *Wiggins v. Smith,* 539 U.S. at 522,

quoting *Williams v. Taylor,* 529 U.S. 362, 396 (2000). In other words, a "failure to investigate

thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins v. Smith,* 539

U.S. at 526. It has long been recognized "strategy resulting from lack of diligence in

preparation and investigation is not protected by the presumption in favor of counsel." *Kenley*

*v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991). Any claims by the trial team of "strategy"

carry little weight since "counsel can hardly be said to have made a strategic choice against

pursuing a certain line of investigation when s/he has not yet obtained the facts on which such

a decision could be made."*Kenley v. Armontrout*, 937 F.2d at 1308. A strategic decision is an

informed choice between alternative courses of action, which does not describe the choices

by Mr. Skaggs and the trial team with respect to the mitigation case. Trial counsel's claim of

uninvestigated trial strategy, in similar circumstances, have been rejected.

      The other potentially damaging information consists principally of
Kenley's antisocial behavior, violence and arrests (not convictions) when he
was a minor. His sole conviction was already in evidence. Had all the reports
been introduced into evidence and had all affiants and doctors testified, we do
not deny the jury would have heard aggravating information. After conducting
a reasonable investigation, counsel may conclude that the introduction of the
mitigating evidence "would barely have altered the sentencing profile
presented", *Strickland*, 466 U.S. at 700, or that harmful information is greater
than potential helpful information, and choose not to present certain evidence.
*Burger v. Kemp*, 483 U.S. 776, 789-91 (1987); Guinan, 909 F.2d at 1231. In
this case we have concluded counsel did not conduct a reasonable investigation.

But even if he had, in the context of what the jury had already heard at trial about Kenley's crazed and violent actions on the night of the crimes, *we are doubtful that much of the additional aggravating information would have had any significant incremental aggravating effect on the jury*. Furthermore, the aggravating information was mostly cumulative.

*Kenley v. Armontrout*, 937 F.2d at 1309 (emphasis added).

The Court has concluded, for a number of reasons, including for failing to investigate reasonably available and potentially mitigating evidence, the performance of Petitioner's trial counsel was constitutionally defective. The remaining question is whether the deficient performance by trial counsel prejudiced Petitioner.

The standard by which a court must judge prejudice is whether there is a reasonable probability the outcome of the sentencing phase of Petitioner's trial would have been different "but for" trial counsel's deficient representation. A reasonable probability is one sufficient to undermine a court's confidence in the outcome of the trial proceeding. An assessment of the probability of a different outcome must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." *Sears v. Upton*, 561 U.S. 945, 130 S.Ct. at 3266-3267.

It is the conclusion of this Court there is, at a minimum, a reasonable probability Petitioner would not have received a sentence of death if the mitigating evidence presented

this Court had been presented to the trial court jury. Petitioner has suffered prejudice as the result of the constitutionally deficient performance of his trial counsel.

**CLAIM FOUR**

> The Wyoming State Public Defender appellate counsel representing Petitioner were burdened by a conflict of interest based on their professional affiliation with trial counsel, Wyatt Skaggs, and State Public Defender Ken Koski, whose personal and professional interests were adverse to Petitioner's interests, and who actively undermined the ability of appellate counsel to investigate and pursue legitimate claims of ineffective assistance of trial counsel.

The "conflict of interest" which Petitioner alleges in this, his fourth claim, is not one in the traditional sense in which an attorney has "abandoned his 'duty of loyalty' to his client" through a conflict. *Osborne v. Shillinger*, 861 F.2d 612, 625 (10th Cir. 1988); *Wood v. Georgia*, 450 U.S. 261, 267 (1981); *Fisher v. Gibson*, 282 F.3d 1283, 1291 (10th Cir. 2002). His claim rather asserts his Wyoming State Public Defender appellate counsel was constitutionally deficient based, once again, on a failure to adequately investigate his background, character, and mental health, which failure was caused by an internal conflict within the Wyoming State Public Defender Office between his appellate counsel and his trial counsel which undermined the investigative efforts of appellate counsel. The Court will address Petitioner's claim from this perspective.

Petitioner was represented on appeal by an evolving team of attorneys from the Wyoming State Public Defender Office. The initial team included Tina Kerin (now "Olson"), Donna Domonkos, Ryan Roden, and Diane Lozano. [Doc. 263, p. 165 line 25; p. 166 lines 1-8]. Ms. Olson, Ms. Domonkos, and Mr. Roden were, at that time, the entire Wyoming State Public Defender Office Appellate Division. [Doc. 263, p. 148 lines 18-22]. Petitioner's appellate team eventually included Marion Yoder, following the departure of both Ms. Domonkos and Ms. Lozano. [Doc. 263, p. 166 lines 9-25; p. 167 lines 1-21]. Mr. Kenneth Koski was the State Public Defender at the time of Petitioner's trial and appeal, and Mr. Skaggs was the capital trial "unit." [Doc. 86-3, p. 18 lines 13-18].

Appellate counsel obtained the files of Mr. Skaggs and Ms. Moree. Ms. Olson testified as part of her record review in Petitioner's case, she reviewed the combined fact investigation/mitigation investigation billings of Ms. Moree, and determined "it was like $21,000, and I think most of that or a good chunk of that was sitting through the trial." This caused the appellate team concern – it both was significantly lower than, for example, what had been spent in the *Harlow* case, and "the scope of the work that needed to be done could not have been done in that amount of time certainly." [Doc. 263, p. 198 lines 20-25; p. 199 lines 1-17]. Ms. Olson, based upon her file review and the state court record, along with the files of Petitioner's trial attorneys which had been gathered in connection with the appellate

team's efforts, offered her impression the scope or breadth of the mitigation case or

investigation which had been done

> was extremely limited, and it appeared to me to be inadequate. . . . And then
> when, you know -- a lot of things were going on, you know. Certainly reading
> the penalty phase and seeing what was produced at the penalty phase and then
> seeing this box of materials and then seeing the sorts of communications that
> were made to the family members, for example, it all seemed not to be what we
> had been told it needed to be.
> Q. In your training and experience?
> A. In our training and our reading and our consultations.
> Q. And the ABA Guidelines?
> A. Correct.

[Doc. 263, p. 199 lines 18-25; p. 200 lines 1-21].

Ms. Moree's engagement letter to Mr. Skaggs, [Exhibit 4], along with the failure by

Mr. Skaggs to make any funding requests for "sending Priscilla to places where Dale Eaton

had lived," caused concerns. [Doc. 263, p. 201 lines 7-24]. The appellate team also recognized

interviews by Ms Moree were "largely by phone," and "did not seem to be productive. * * *

[F]or example, if you compared police interviews with Miss Moree's interviews, the police

interviews were more replete with information than the mitigation person's, Miss Moree's,

interviews." The police interviews largely were in-person. Ms. Moree's witness interviews,

by contrast, "were brief." Ms. Moree did not follow-up with personal visits. Ms. Olson

indicated "Priscilla did not proceed in a manner that was commensurate with the guidelines

or the [mitigation] training that I had received." [Doc. 263, p. 201 line 25; p. 202 lines 1-20].

The appellate team was further concerned the necessary mitigation investigation had not been done, and Ms. Moree simply "was not going out. Priscilla was not traveling. Priscilla was not on the scene, so to speak. That's what you do. You have to go to the towns. You have to do all those things." [Doc. 264, p. 201 lines 1-5].

Petitioner's appellate counsel, in fact, knew competent representation of him would require additional investigation.

> We were, however, extremely concerned about what we've been talking about here, the preparation for the sentencing phase, the mitigation phase of the case. And with regard to that, we were not at all comfortable with what all we had done, what we had now learned we needed to do, the types of people we needed to be speaking with, and so that was not in a good posture at that point.

[Doc. 264, p. 169 lines 20-25; p. 170 lines 1-7]. The required investigation was never conducted.

> We have this limited amount of time, and then we're preparing for the *Calene* hearing which is granted. And the second prong of *Strickland* and the one that our court frequently analyzes first, of course, is the prejudice component, and in order to show that there was prejudice from this deficient investigation you have to show what the evidence would have been had it been done. So you have to do it, and we didn't do it.
>
> We tried to do it. Um, you know, again, Dale, if you sat down and listened to him, he'd tell you where he went to school. I got school records for Dale that showed he was in school here, for two months I was in school here,

you know, odds between the grade level and how old Dale is. I got two or three sets of those things. Um, I got a form showing that mental health records in Kemmerer had been destroyed. Those would have been very significant information. But, you know, we could not, dealing with preparation for the hearing, dealing with the briefing of the many legal issues, not being trained mitigation specialists ourselves at that point in time, you know, this was our first capital case, we could not redo the mitigation in terms of time, in terms of resources. We needed a mitigation specialist to get those interviews, to get those kinds of declarations, to establish the prejudice that we needed to show.

Q. And at that time did the team have a qualified mitigation specialist on board?

A. The appellate team?

Q. Yes.

A. No.

[Doc. 264, p. 204 lines 7-25; p. 205 lines 1-11].

The appellate team consulted Russell Stetler, the National Mitigation Coordinator for the Federal Public Defender System, and Richard Burr, Federal Death Penalty Resource Counsel and an experienced death penalty trial attorney. Both confirmed significant avenues of mitigation and mental health evidence remained unexplored in Petitioner's case. [Doc. 264, p. 206 lines 13-25; p. 207 lines 1-12; Doc. 87-6, pp. 35-48; Doc. 87-7, pp. 1-18]. The appellate team learned from Mr. Stetler it

had layer upon layer of problem. We didn't have this kind of social history investigation. The experts who testified at trial didn't have this kind of social history investigation. And so I'm getting ready to ask for a hearing at which I

don't even have all those things that I need because I've already had multiple extensions of time.

[Doc. 264, p. 207 lines 23-25; p. 208 lines 1-10]. The appellate team similarly learned from Mr. Burr

without the information, without the social history, without knowing the levels of abuse and trauma and all those things that we reasonably, as it turns out, suspected would be there, we couldn't, we couldn't get an expert who would be able to thoroughly and completely assist us, that we needed those things so we'd know if he'd even been competent to stand trial, because I had serious concerns about the competence at the time of the trial.

* * *

That we need to get the new information so that it can be provided to the mental health experts so that Mr. Eaton can then be accurately, accurately and with a good history, evaluated by those people. Because, for example, you know, Dr. Ash and Dr. Gummow did not have everything. Um, I don't even know everything you have now, but what you have shown me that you have now, they didn't have those things.

[Doc. 264, p. 209 lines 2-25]. The appellate team obtained the affidavit by Mr. Burr, [Doc. 71-1], just three days prior to the start of the *Calene* remand evidentiary hearing. [Doc. 264, p. 208 lines 22-25; p. 209 line 1]. The appellate team then fully realized it needed a thorough, accurate, and complete psychosocial history. [Doc. 264, p. 209 lines 17-25; p. 210 lines 1-4]. Mr. Stetler and Mr. Burr both confirmed Ms. Olson's earlier concerns the appellate team was not doing the mitigation investigation which needed to be done. Both "were assuring me that

my concerns were extremely well-founded and that we were in some hot water. They were educating me about the scope of what still needed to be done. Um, and, uh, and it wasn't just at this moment in time. I had many, many, many conversations with Russ Stetler." [Doc. 264, p. 210 lines 9018]. The appellate team was ultimately not able to perform the life history or mitigation investigation which needed to be done on behalf of Petitioner. [Doc. 264, p. 222 lines 20-24; p. 229 lines 23-25; p. 230 lines 1-6]. The appellate team was never able to provide their mental health expert, Dr. William Logan, a proper psychosocial history concerning Petitioner.[Doc. 264, p. 230 lines 7-9].

The Wyoming Supreme Court observed, based upon its application of the *Strickland v. Washington* ineffective assistance of counsel doctrine, "opportunity to the defendant for a favorable conclusion has been noticeably confined." *Calene v. State*, 846 P.2d 679, 693 (Wyo. 1993).

> Ineffectiveness of counsel issues have not provided a major ingredient in the Wyoming Supreme Court appellate activities. Among opinions published since January 1, 1986, only thirty-six decisions rendered by written opinion of this court have included clearly stated ineffectiveness of counsel, trial court and appeal, appellate contentions. Most significant within that number have been procedural access rehearing of some kind and not substantive review of issues of ineffectiveness themselves. Within approximately 330 criminal opinion appeals, and those thirty-six which in some way alleged ineffectiveness, only three have been reversed by this court as substantively meritorious.

*Calene v. State*, 846 P.2d at 693, n.5. The three cases in which the Supreme Court found the trial counsel to be ineffective all have one thing in common. "It is quickly apparent that the only successful avenue has related to investigation and obtaining witnesses, e.g. *Frias* [*v. State,* 722 P.2d 135 (Wyo. 1986)], *Gist* [*v. State,* 737 P.2d 336 (Wyo. 1987)]*,* and *King* [*v. State,* 810 P.2d 119 (Wyo. 1991)].*"* *Calene v. State,* 846 P.2d 679, 693, n.5 (Wyo. 1993). Petitioner's appellate team, when they began work on Petitioner's appeal, recognized any *Calene* remand required investigation outside of the state court record. [Doc. 263, p. 162 lines 8-25; p. 163 lines 1-16].

There was, however, in the view of Petitioner's appellate team, a hostility within the Wyoming Public Defender Office with regard to ineffective assistance of counsel claims.

> The Wyoming Public Defender System has a culture of hostility toward ineffective assistance of counsel claims, regardless of how meritorious it is. Such claims are discouraged, no doubt about it. Mr. Koski would have to be consulted before any ineffective assistance of counsel claim could be made, and while he would not say "no" to what appeared to be a well-founded claim, he consistently would respond rather derisively that "we eat our own."

[Doc. 70-3, p. 3]. Mr. Koski was the person responsible for staffing and funding Petitioner's appeal, and thus had the ultimate authority over resources, both time and money, to be allocated thereto. Mr. Koski, on at least one occasion, made his feelings clear as to the

expenses which can be associated with capital defense within the Wyoming Public Defender System – they drain the system's resources.[Doc. 263, p. 216 lines 2-20; Doc. 70-3, p. 4].

The appellate team, given its lack of capital experience or training, met with expert state and federal capital defenders in Colorado on October 26, 2004. [Doc. 263, pp. 188-190; Exhibit 247-3]. David Wymore, during the meeting, "was very emphatic and vocal about the fact that implicit in our system that we have here in Wyoming is an inherent conflict of interest in raising ineffective assistance of counsel claims on our fellow employee attorneys. * * * [T]hey thought that it was a very big issue. I said huge in my contemporaneous note." [Doc. 263, p. 190 lines 10-19]. The Colorado meeting included a discussion as to whether there would be documentation in support of any conflict claim, and Ms. Olson knew coming away from the meeting the appellate team had a challenging task ahead of it. It needed more assistance, needed more resources, and "[t]hat we would need to continue to confer with people more experienced in capital case litigation and appellate work." [Doc. 263, p. 194 lines 10-25]. Ms. Olson was concerned "we not accommodate the machinery of death [by not raising conflict issue], as Mr. Wymore phrased it." [Doc. 263, p. 195 lines 20-24]. Donna Domonkos, following the appellate team Colorado meeting, first approached Mr. Koski with regard to the conflict issue. The meeting "did not go well. * * * Mr. Koski was not receptive to the idea of the conflict motion initially." [Doc. 263, p. 196 lines 4-22]. He "took the suggestion of a conflict that we would be, you know, wanting to get out of the case, not

having to do the representation in the case, was his initial reaction to Donna approaching him." [Doc. 263, p. 197 lines 16-22].

The appellate team, following the adverse reaction by Mr. Koski to the suggestion a conflict existed, continued to make efforts to meet with him and keep him informed regarding their work on the conflict motion to withdraw. [Doc. 263, p. 203 lines 5-25; p. 204 lines 1-21]. Petitioner's appellate defense team meet with Mr. Koski in December, 2004.

> In a meeting with Mr. Koski on December 29, 2004, he made it clear to us that he strongly disapproved of our allegation that Wyatt Skaggs was ineffective. He said that our motion that we were filing on Mr. Eaton's behalf was a "cheap shot" at Mr. Skaggs, and he angrily scolded us for having filed it. He personally and professionally insulted me, accusing me of "half truths" in an affidavit I had executed in another post-conviction case involving a Mr. McKinney. Things got real ugly with Mr. Koski at this point in Mr. Eaton's representation.

[Doc. 70-3, p. 4].

The day after the appellate team met with Mr. Koski, December 30, 2004, Andy Fraser, the investigator the appellate team had chosen to assist them in Petitioner's appeal, telephoned Diane Lozano, and declined to work further on Petitioner's appeal. The reason he gave was the fact "Mr. Skaggs is not happy with the fact that I have been working on the Eaton appeal." [Doc. 67-5, pp. 12, 13; Doc. 67-6, pp. 3, 4]. The loss of Mr. Fraser as their investigator put the appeal team "in a serious bind. We lost valuable time as we scrambled to find another

investigator who would have to review a large volume of transcripts and other documents to get up to speed on the case. As all of this was going on, the clock was ticking on our time to pursue the appeal, and we were having to request extensions of time from the Wyoming Supreme Court." [Doc. 66-7, p. 6].

Ms. Olson also recalls a personal confrontation she had with Mr. Koski after the December 29th meeting and just prior to the appellate team filing the motion to withdraw with the Wyoming Supreme Court based on a conflict of interest.

> [W]e had been keeping Ken in the loop that we were filing the motion and so forth, and we expected that he would be upset by that. And he approached me in the copy room in our office. At that point in time all of us were together on the third floor of the U.S. Bank building here. The administration, the appellate division, and the Laramie County trial division, we were all together. And he approached me in the copy room of that office and said, uh, you know, "Are you filing that affidavit?" And he was talking about Donna's affidavit about her interactions with Wyatt Skaggs. And he told me it was horse manure and half-truths. And I said, "Tell me what is a half-truth in there? I asked you that before." And he backed off, but he was very, uh, unhappy with the situation of the conflict motion.

[Doc. 263, p. 207 lines 19-25; p. 208 lines 1-8].

The Wyoming Supreme Court denied, without conducting a hearing or further inquiry, the motion to withdraw by Petitioner's appellate team. [Doc. 67-8].

Ms. Olson, when asked by Deputy Attorney General David Delicath whether Ken Koski actively undermined appellate team's case, candidly replied:

> Did he actively undermine my case? Actively, but not knowingly. Not purposefully. Actively, but not purposefully. * * * I'm sorry. I'm not trying to be evasive. I feel that my case was undermined.

[Doc. 264, p. 252 lines 20-25].

Petitioner's trial record was one of the largest Ms. Olson had encountered, and even prior to reviewing the complete record the appellate team had a concern as to what mitigation had been done in preparation for, and presentation at trial.

> This meeting was before we had reviewed the entire record, and we did not yet have access to or had not reviewed everything or have access to all the things that we needed. I think at that point in time we were concerned . . . about what little we knew about the mitigation, the sentencing phase of the case. And Priscilla had operated as the mitigation investigator in the case, and . . . we needed to start looking at – talking to Priscilla and looking at whether that was going to be a component of what we needed to do.

[Doc. 263, p. 159 lines 3-12].

The composition of the appellate team, as previously noted, changed over time, however, the most problematic result for the appellate team was the loss of their two chosen investigators, which directly impacted the team's ability to perform the necessary mitigation investigation.

This was in the fall and early winter of 2004, 2005. And then most problematic in terms of the composition of our team, well, most problematic up to that point, Andy, uh, Fraser and Roy Holiday could not assist us in the investigation anymore. Andy had been working on the investigation; Roy not so much. I believe Roy left the team because of the Grady case. I'm not positive. I'd have to check the dates on that, too, but it seems to me that the Floyd Grady case, which was also a capital trial-level case and ended up getting tried twice, I think Roy got attached to that because he's a very, a very good investigator. So Andy and Roy left the team, and we did not have an investigator.

[Doc.263, p. 167 lines 21-25; p. 168 lines 1-7]. The appellate team attorneys, as of February or March, 2005, were Ryan Roden, Marion Yoder, and Tina Olson. [Doc. 263, p. 168 lines 21-25]. Richard Webb was hired as an investigator sometime in February or March, 2005. [Doc. 263, p. 181 lines 2-13]. Ms. Olson described the adverse impact replacing Andy Fraser and Roy Holiday with Richard Webb had on the representation of Petitioner.

[Andy Fraser] is a very good investigator. * * * Very quick, very much a people person, very likable, very smart. I had worked with him on one or two other matters, very impressed with him. * * * He's a very, very good person to have on your case. * * * Likewise, I would say nothing but good things about Roy [Holiday], very smart, . . . people person, likes being an investigator, and does a really good job at it. * * * Would have been a real asset to the team, either or both of them.

[Doc. 263, p. 179 lines 13-25; p. 180 lines 1-4]. Richard Webb, in contrast, was not what the appellate team needed to adequately prepare and ultimately present an effective mitigation case for Petitioner.

> (B)y that point in time we were well immersed in the fact that our, our biggest investigatory problems lay in the sentencing phase of the trial, and he was not, uh, as it turned out, the person I would have chosen for that job.

[Doc. 263, p. 181 lines 18-25; p. 182 lines 1-2]. Andy Fraser and Roy Holiday being replaced by Mr. Webb

> was very problematic. And it's not just a matter of timing, although the timing was very bad because now all this time had elapsed. We'd had apparently three extensions of time at that point -- one, two, three -- and it was problematic from the standpoint we then had to find a different investigator. And then when we found the outside investigator as Ken instructed us we had to do, he did not . . . turn out to be an investigator who was as helpful as we would have liked for that part of the case.

[Doc. 264, p. 170 lines 12-23]. Mr. Neubauer is more blunt, describing Mr. Webb as "very demanding . . . very rude." [Doc. 262, p. 206 lines 18-25]. Mr. Neubauer describes Mr. Webb as having approached him like a

> bull in a china closet. He, you know, he was so rude to me. I had some kind of meeting, and he was telling me, well, that's just gonna have to get moved 'cause I'm gonna be here at this place and time. And so I called up Wyatt and said, Hey, who's this guy, Wyatt? And I told him, you know, He's gonna be here. You want to be here? And so Wyatt was there. * * * Um, the very first thing this guy, the very first thing out of his mouth is that we could've gotten

Wyatt [sic] acquitted on the murder count. Do tell. And, boy, I mean, he was just rude and insulting every step of the way. He was a total bull in a china closet. * * * And I realize my responsibilities to this case to cooperate with the people involved, but I mean, this guy was over the top. I am a very tolerant person. I've had defendants accuse me of everything under the – I don't -- that stuff usually doesn't bother me. This guy was over the top, I mean, big time. I essentially kicked him out of my office, and I don't do that, you know.

[Doc. 262, p. 207 lines 7-25; p. 208 line 1].

The appellate team, as previously discussed, consulted Russell Stetler, who confirmed significant avenues of mitigation and mental health evidence remain unexplored in Petitioner's case. [Doc. 87-6, pp. 35-48; Doc. 87-7, pp. 1-18]. The appellate team also learned from Mr. Stetler the performance by Mr. Skaggs and the trial team was definitely deficient, however, the appellate team had done little or nothing to establish Petitioner was prejudiced thereby. Mr. Stetler testified "some of the stuff was just so basic. I mean, there were all these family members who had never been interviewed. There were lots of places to start." [Doc. 264, p. 154 lines 22-25; p. 155 line 1]. The team similarly learned from Mr. Burr

without the information, without the social history, without knowing the levels of abuse and trauma and all those things that we reasonably, as it turns out, suspected would be there, we couldn't, we couldn't get an expert who would be able to thoroughly and completely assist us, that we needed those things so we'd know if he'd even been competent to stand trial, because I had serious concerns about the competence at the time of the trial.

* * *

That we need to get the new information so that it can be provided to the mental health experts so that Mr. Eaton can then be accurately, accurately and with a good history, evaluated by those people. Because, for example, you know, Dr. Ash and Dr. Gummow did not have everything. Um, I don't even know everything you have now, but what you have shown me that you have now, they didn't have those things.

[Doc. 264, p. 209 lines 2-25].

The appellate team specifically sought approval by Mr. Ken Koski to employ a mitigation specialist to perform the mitigation investigation which had never been done in preparation for Petitioner's trial. [Doc. 264, p. 204 line 25; p. 205 lines 1-4]. Ms. Olson understood the critical role and function of a mitigation specialist.

(A) mitigation specialist should be . . . a person who's able to . . . compile a good social history, a good familial history . . . . Really it's everything. It's the medical history of the person, the educational history of the person, the family history of the person. And it has to be multigenerational, and it has to be in depth. And the person who has the skill set has to . . . be able to do those things, to do the records collection, to do the interviews, to recognize the signs and symptoms of mental illness both in the client, in the family, in the extended family, patterns of substance abuse, uh, all of those types of things.

[Doc. 264, p. 202 lines 15-25; p. 203 lines 1-6]. Mr. Koski denied the team's request.

I mean, we got to the place where I just, you know, said to him very straight out we need a mitigation specialist to redo this mitigation, and Ken said no. And Ken said we have been spending money on this case, you've gotten this person and that person and the other person. And I had had people, you know,

at that point, um, who were assisting us, some of whom were assisting us and we were having to pay them, and some of whom were assisting us out of the goodness of their hearts who we were not paying. Um, and in terms of experts. * * * I call it redo, but it was to do the mitigation. The mitigation was not done.

[Doc. 264, p. 198 lines 1-17]. The appellate team discussions with Mr. Koski included informing him, with respect to the ABA Guidelines, of the required composition of a capital defense team, and what a mitigation specialist should have by way of qualifications, experience, and abilities. It did no good. Mr. Koski was "familiar with Mary [Goody] and the kind of work she had done, and he knew how much it costs and what that person would do. So he had that knowledge, and that's what he was telling me I couldn't do from his perspective, I can't do that." [Doc. 264, p. 198 lines 18-25; p. 199 lines 1-8].

Those appellate team discussions with Mr. Koski also included discussing with him the deficient trial team mitigation investigation and representation at Petitioner's sentencing. Ms. Olson made an effort to explain by example the need for a mitigation investigation, an investigation which had not been done prior to trial.

[I remember] providing him with some specific examples of things from the *Guidelines* and comparing it with what was done. Like . . . family members, for example. Um, the *Guidelines*, the commentary, various things that we read and talk about, lots of times family members don't immediately say, hey, I want to talk about my horrible family history. Because Ken was very much like, well, Wyatt wrote a letter to this sister, Wyatt tried to call this sister, Priscilla tried to call that sister. And I said no, you have to go to see these people, and you have

to sometimes not even talk about the case with them at all at first, just say I'm so-and-so and I just want to know you or whatever. And I tried to explain specifically those kinds of things, and he said no, that, you know, having sent the letter, they tried to contact them, that was that, and so what would the point be of hiring somebody to compile this social history when we already knew the family wasn't gonna cooperate.

* * *

So and, again, I feel bad talking for Ken when Ken is not here to talk because he cared very much about our clients, but, uh -- so those kinds of things when I would provide that example that, you know, the mitigation specialist needs to be somebody who goes to -- and we knew about the significant amount of time in Meeker, and we knew from what we had that, you know, that Marian Eaton had had significant problems there, and so I said, you know, for example, this person would go there and this person -- but it was so long ago, he would say. And I would say it doesn't matter that it's so long ago, there are still going to be people that remember. And so those are some specific examples of how, um, I was trying to educate him.

[Doc. 264, p. 199 lines 15-25; p. 200 lines 1-22]. Those discussions by the appellate team with Mr. Koski concerning the critical need for a mitigation specialist included the most current United States Supreme Court cases with respect to the mitigation investigation which should be done by competent counsel, such as *Wiggins v. Smith*, and *Williams v. Taylor*. [Doc. 264, p. 202 lines 2-14]. Mr. Koski nevertheless seemed to be of the "opinion that having sent the letters to certain family members and so forth * * * was the adequate effort, and if the family member said I'm not talking to you, that's that." [Doc. 264, p. 203 lines 13-20]. Mr. Koski did

not seem to understand what Ms. Olson or her team were discussing with him with respect to the need for a mitigation specialist. His reason given for denying the mitigation specialist request - "[t]he money." [Doc. 264, p. 203 lines 7-12].

Ms. Olson stated the appellate team did not "obtain the resources [the] team felt were necessary to represent Dale Eaton on his appeal and his associated *Calene* remand proceeding. * * * Ken Koski's refusal to consider and approve [the] team's request for a . . . mitigation specialist[] impact[ed the team's] representation of Dale Eaton." [Doc. 264, p.203 lines 21-25; p. 204 lines 1-4].

The Wyoming Supreme Court, in its *Calene* decision, suggested any successful ineffective assistance of counsel claim must be based on new facts and evidence not discovered by trial counsel. Mr. Burr, in his affidavit submitted to Petitioner's appellate team and filed with the *Calene* court, explained in detail the work required to enable appellate counsel to develop the facts supporting Petitioner's claim the representation at trial by Mr. Skaggs and the trial team was constitutionally deficient.

> For current counsel for Mr. Eaton to show prejudice, they must be have the time and resources necessary to:
> (a)    conduct in-depth interviews with all of Mr. Eaton's siblings and children, his former wife, and his father concerning Mr. Eaton's expression of anger, abusive behavior, and redeeming qualities, in keeping with the goals discussed herein;

(b)     conduct in-depth interviews with Mr. Eaton's father concerning his abusive treatment of Mr. Eaton during childhood;

(c)     identify, locate, and interview in-depth as many former co-workers of Mr. Eaton as can now be found;

(d)     obtain all medical records pertaining to the pregnancy of Marion Eaton with Dale Eaton, and to the birth of Dale Eaton;

(e)     interview Merle Eaton and all of Marion Eaton's and Merle Eaton's siblings concerning Marion Eaton's health during her pregnancy with Dale Eaton, including any maternal ingestion of alcohol, drugs, and prescription medications, and exposure to environmental toxins and trauma, and concerning the conditions of Dale Eaton's birth;

(f)     work intensively with Mr. Eaton to help him disclose all that he can now remember about his actions, thoughts, and feelings during the entire course of the crime against Ms. Kimmell;

(g)     provide all new information that is discovered in connection with the foregoing tasks to mental health experts, ask those experts to interview Mr. Eaton extensively concerning the crime against Ms. Kimmell, ask those experts to redetermine the nature of Mr. Eaton's mental illness and brain dysfunction, and ask those experts to examine how Mr. Eaton's mental disorders, together with his experience of childhood abuse and trauma, impacted him during the entire course of the crime against Ms. Kimmell; and

(h)     in light of all the new information about and evaluation of Mr. Eaton, ask the mental health experts to examine to the extent possible retrospectively whether Mr. Eaton was competent to stand trial.

[Doc. 71-1, pp. 14, 15]. The required work described by Mr. Burr is well-supported by United States Supreme Court death penalty jurisprudence. *Williams v. Taylor,* 529 U.S. 362 (2000), *Wiggins v. Smith,* 539 U.S. 510 (2003); *Rompilla v. Beard,* 545 U.S. 374 (2006); and the *ABA*

*Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (Summer, 2003). Mr. Burr advised Petitioner's appellate team of their duty to investigate Petitioner's life history, prepare an accurate, and thorough psychosocial history, and then in turn present it to the mental health expert. [Doc. 265, p. 186 lines 23-25; p. 187 lines 1-2]. Mr. Burr alerted the appellate team to a number of

> red flags . . . for investigation . . . that showed that somebody who might have been thought to be an adverse witness or somebody that had nothing helpful . . . might, in fact, have information that was very helpful. So there were a number of red flags I pointed out. And then towards the end I think I did kind of a laundry list of tasks that they needed to accomplish. And really those tasks are for the second half of an ineffective assistance claim, which is the prejudice showing. You have to show what, had a reasonably effective investigation been done, what would have been produced * * * and whether that could have had a reasonable likelihood of affecting the outcome of the proceeding.
>
> And so all of that was more of a . . . suggestion for what they needed to do to develop evidence that might satisfy the prejudice prong of *Strickland versus Washington*.

[Doc. 265, p. 187 lines 7-25]. Mr. Burr advised the appellate team, in essence, to develop the psychosocial history and then present it to the experts.

> To go back -- I thought particularly to go back to these two experts, because their testimony seemed to me to be from experts who were trying, you know, who were -- I've read a lot of expert testimony over the years, and these experts seemed to care about Mr. Eaton. They seemed to, to be trying to use every shred of information they could discern to help understand him, and they fell short.

> In my view, they fell very short. You know, having a diagnosis of severe
> depression has very little weight with juries, almost none, and, and you knew
> based on the red flags that there was a lot more there than they knew about.
> And so I recommended that they, they do this and then go back to the experts.

[Doc. 265, p. 188 lines 5-16]. Mr. Burr does not believe the appellate team was able to

conduct the investigation he recommended, basically because of a lack "of time and lack of

resources." [Doc. 265, p. 188 lines 17-20]. It is also likely a reasonable investigation and

effective performance by the appellate team would have produced the same workplace

mitigation declarations presented to this Court.

> Oh, yeah. If any team of lawyers and mitigation specialists had had
> enough time and enough resources, they could have done exactly what you've
> done. I mean, that's -- you know, you've got to have a mitigation specialist and
> lawyers who know how important this is, you know, as the standards of care
> guide us to know they are, and the skills to do it, but after that it's a matter of
> time and, and resources.

[Doc. 266, p. 31 lines 24, 24; p. 32 lines 1-9]. Mr. Burr stated his opinion, based on the

standards of performance which applied to the mitigation function of capital defense teams

during 2003 and 2004, the performance by Petitioner's appellate team with respect to the

investigation of Petitioner's background and character "was well below reasonable and was

deficient under *Strickland*, for different reasons, but it was." [Doc. 266, p. 78 lines 24, 25; p.

79 lines 1-8]. Mr. Burr also offered his opinion, based upon his training, experience, and

research in the field of capital litigation, there is a reasonable likelihood at least one juror would have voted for a life sentence based upon the information now available as a result of the mitigation investigation which had been done by Petitioner's capital habeas team. "Yes, there is at least a reasonable likelihood, in my opinion probably a greater likelihood of that." [Doc. 266, p. 78 lines 9-25].

Petitioner's appellate team was deprived of arguably the most critical tool for developing Petitioner's claim of ineffective assistance of counsel, *i.e.*, a mitigation specialist with the specialized skills necessary to handle a case like Petitioner's.

> I explained the deficiencies of the original investigation to Mr. Koski. He had approved various funding requests as I and others on the team consulted with capital case experts. Because the trial team's investigation into Mr. Eaton's life history was deficient (no inquiries into the circumstances of his birth, incomplete educational records, incomplete mental health records, failure to interview numerous people, etc.), we knew that our representation of him would require the assistance of a mitigation specialist. We knew that the mitigation phase of the investigation needed to be entirely redone, so that we could establish prejudice to Mr. Eaton at the remand hearing and on argument of the appeal. I told Mr. Koski that we would need a mitigation specialist because the trial team's investigation was completely inadequate. I had discussed the issue with a couple different people, and knew it would be expensive, but it needed to be done. Mr. Koski firmly refused to consider that, and advised that no such funds would be forthcoming. This was my first death penalty case, and the same was true of Mr. Roden. Although Ms. Yoder had worked on the *Harlow* case, and had received capital training, she had no real experience in capital defense. We were all learning, but knew that all the

lawyers and mitigation specialists we had consulted advised us that such assistance was critical, and prior to Mr. Eaton's trial, the ABA Guidelines had been amended to explicitly provide that the defense team consist of no fewer than two attorneys, an investigator and a mitigation specialist. Nevertheless, Mr. Koski refused to provide funds to enable us to conduct a mitigation investigation in this case. As a result, our ability to conduct such an investigation, and to meet the deadlines imposed by the district court upon remand and the Wyoming Supreme Court, was significantly impaired by Mr. Koski's decision.

[Doc. 66-7, pp. 6, 7 ¶ 23].

The Wyoming Supreme Court, in its April 5, 2005, order remanding Petitioner's appeal to the trial court for a *Calene* hearing to allow appellate counsel to develop and prove Petitioner's claim of ineffective assistance of trial counsel, required the *Calene* hearing be completed, and findings of fact and conclusions of law be issued within ninety (90) days. [Doc. 264, p. 210 lines 19-25; p. 211 lines 1-11]. The trial court, following entry of the remand order, held a scheduling conference on April 12, 2005, during which the court allowed the appellate team ten days within which to designate, with reports, their expert witnesses who would testify at the *Calene* hearing. The court also set an evidentiary hearing date which allowed the appellate team was less than two months to prepare. [Doc. 264, p. 218 lines 15-25; p. 219 lines 1-21].

Appellate counsel advised the trial court and the Wyoming Supreme Court on multiple occasions additional time was necessary to investigate Petitioner's claims for relief. Appellate counsel objected to the "speedy schedule," and moved for a continuance in order to investigate Mr. Eaton's claims for relief. Appellate counsel advised the trial court their investigation was "incomplete" because of the Wyoming Supreme Court deadline, and Petitioner's due process rights were violated by "being forced to maintain that schedule." [Doc. 86-2, pp. 21, 22]. Appellate counsel further stated Petitioner was occasionally unable to assist them in their investigation. [Doc. 86-2, p. 23]. The trial court denied the motion to continue the *Calene* hearing, and thereafter denied Petitioner's claims of ineffective assistance of counsel.

Ms. Olson concedes Petitioner's appellate team was not adequately prepared to present their claims of ineffective assistance of counsel at the *Calene* remand hearing. [Doc. 264, p. 229 lines 23-25; p. 230 lines 1-25; p. 231 lines 1-4]. The appellate team was basically not able to adequately fulfill the recommendations received from both Mr. Stetler and Mr. Burr:

> We attempted to ourselves, but we did not have the time . . . to do it . . . . And, again, you're supposed to be trained to do it. You're supposed to travel to do it. You're supposed to do it in person. So we tried to initiate some contacts. We tried to locate some people, uh, which was very frustrating that Wyatt hadn't done it. I remember contacting one of the schoolteachers that Dale named for me, and I got his wife, and he had died a couple weeks before, seriously, a couple weeks before. I forget whether it was before my hearing or

before I called him or whatever it was, but he was alive during the time frame.
* * * So we attempted to do some of those things, but we did not have the
qualifications at that time or the time, you know.

[Doc. 264, p. 232 lines 8-25].

**Claim Four - Conclusion**

A § 2254 petitioner, as previously noted, in order to establish an ineffective assistance
of counsel claim, "must show both deficient performance by counsel and prejudice." *Knowles
v. Mirzayance*, 556 U.S. at 122, 129 S.Ct. at 1419.

An inquiry into an allegation of deficient performance by appellate counsel and
resulting prejudice is guided, the same as it is with such an assertion with regard to trial
counsel, by the ABA Guidelines for the Appointment and Performance of Counsel in Capital
Penalty Cases, which outline the "prevailing professional norms" by which the performance
by death penalty counsel is to be measured. *Padilla v. Kentucky*, 559 U.S. at 366, 367; *Heard
v. Addison*, 728 F. 3d at 1180; *Wiggins v. Smith*, 539 U.S. at 524; *Littlejohn v. Trammell*, 704
F.3d at 859, 860; *Bobby v. VanHook*, 558 U.S. at 6; ABA Guidelines 1.1, pp. 1, 10, 11.

Petitioner's appellate team, as is clearly apparent from the foregoing discussion in
which members of his team basically admitted as much, failed to perform to the "prevailing
professional norms," primarily for one of the same reasons Petitioner's trial counsel was
deficient, *i.e.*, the failure to perform and present to the court a through and detailed mitigation

investigation. [ABA Guideline 10.7]. The fact the failure by the appellate team to conduct the required investigation was obviously impeded by the culture of the Wyoming Public Defender Office with regard to ineffective assistance claims, as well as the concrete fact Mr. Koski, as the head of the Wyoming Public Defender Office, refused to allow the appellate team to hire a mitigation specialist, cannot excuse the fact the performance by the appellate team was constitutionally deficient. The appellate team, as evidenced by the testimony of Ms. Olson and Ms. Domonkos, was well aware of what was required to provide effective representation of Petitioner at the *Calene* hearing and on appeal. The fact said team, despite its clearly diligent effort, could not provide the required constitutional appellate representation of Petitioner also prejudices him for the same reasons he was prejudiced by the failure of the trial team to conduct the required in-depth mitigation investigation. A full and complete psychosocial history for Petitioner was not presented to either the *Calene* court, nor to the Wyoming Supreme Court.

## CONCLUSION

Respondent has not challenged the ability of this Court to consider Petitioner's allegations of ineffective assistance of counsel based on the fact such claims were considered and rejected in the state court proceedings, particularly Petitioner's appeal to the Wyoming Supreme Court. Petitioner's allegations of a conflict of interest provide an opportunity for the

Court, perhaps out of an abundance of caution, to address the propriety of its consideration of Petitioner's ineffective assistance claims.

The law of the Tenth Circuit, based upon the United State Supreme Court decision in *Kimmelman v. Morrison*, 477 U.S. 365 (1986), indicates a state procedure requiring ineffective assistance of counsel claims to be raised on direct appeal will not bar *de novo* federal review of a claim of ineffective assistance of trial counsel unless it satisfies two conditions. The state procedure must "(1) allow[ ] petitioner an opportunity to consult with **separate counsel on appeal** in order to obtain an objective assessment of trial counsel's performance and (2) provid[e] a procedural mechanism [on direct appeal] whereby petitioner can **adequately develop the factual basis of his claims** of ineffectiveness." *English v. Cody,* 146 F.3d 1257, 1263 (10th Cir. 1998)(Emphasis added).

The Tenth Circuit Court of Appeals has also provided guidance as to what would constitute "separate counsel on appeal."

> In our view, whether trial and appellate attorneys from the same "office" should be deemed "separate" counsel will turn on the specific circumstances. A statewide public defender's office with independent local offices, and perhaps even a distinct appellate office, would not raise the same concerns as when trial and appellate counsel work in adjacent rooms. *Cf.* Restatement § 123 & cmt. e (for conflict-of-interest purposes, lawyers who share office space may be considered conflicted). The culture of an office can also make a substantial difference.

*Cannon v. Mullen,* 383 F.3d 1152, 1173, 1174 (10th Cir. 2004).

The previous discussion of the financial and logistical difficulties faced by Petitioner's appellate team in asserting an ineffective assistance claim on direct appeal to the Wyoming Supreme Court, including the fact trial counsel and appellate counsel shared the same office space, clearly reveal a "culture" in the Wyoming Public Defender Office during the time frame of Petitioner's appeal which, at best, discouraged, and, at worst, substantially impeded, the ability of his appellate counsel to make an "objective assessment of trial counsel's performance."

The second requirement set out by the Tenth Circuit in *English v. Cody* was also not fulfilled. The *Calene* remand procedure established by the Wyoming Supreme Court, which allowed appellate counsel, in actual effect, less than ninety (90) days in which to "adequately develop the factual basis of his claims of ineffectiveness" was, as well, in light of the expert testimony of Mr. Stetler and Mr. Burr, obviously an unrealistic time frame. [38]

---

[38] The Wyoming Supreme Court codified the *Calene* remand procedure in Rule 21, Wyoming Rules of Appellate Procedure, effective September 1, 2007. Rule 21 establishes ninety (90) days from entry by the Wyoming Supreme Court of an order of remand as the time frame for completion of any hearing and the filing of findings of fact and conclusions of law "absent a finding by the trial court of good cause for a delay of reasonable length."

The requirements set out by the Tenth Circuit in *English v. Cody* were, as pertains to Petitioner's ineffective assistance claims, not fulfilled, thus this Court has the ability to consider such claims *de novo*.

The representation of Petitioner by Mr. Skaggs and the trial team, as outlined in detail by the evidence presented to this Court, failed to fulfill the then applicable "prevailing professional norms," as outlined by United States Supreme Court precedent and the applicable ABA Guidelines for the Appointment and Performance of Counsel in Capital Penalty Cases, and was thus constitutionally deficient to the prejudice of Petitioner. The same conclusion is mandated by the evidence presented to this Court with regard to the representation of Petitioner by his appellate team from the Wyoming Public Defender Office. The writ of *habeas corpus* sought by Petitioner pursuant to 28 U.S.C. § 2254 will be conditionally granted.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 by Dale W. Eaton, Petitioner, is **GRANTED**, and the sentence of death of the Petitioner, Dale W. Eaton is **VACATED**, provided, however, the State of Wyoming may within one-hundred twenty (120) days from the date hereof grant Petitioner a new sentencing proceeding in the Seventh Judicial District Court, Natrona County, Wyoming.

**IT IS FURTHER HEREBY ORDERED** the Seventh Judicial District Court, Natrona County, Wyoming, shall promptly appointed experienced death penalty counsel not associated with the Office of the Wyoming Public Defender to represent Petitioner in any further proceedings before the Seventh Judicial District Court.

**IT IS FURTHER HEREBY ORDERED** in the event the State of Wyoming concludes not to grant Petitioner a new sentencing proceeding, he shall remain incarcerated by the State of Wyoming under a sentence of life without parole pursuant to Wyo. Stat. § 6-2-101(b), and Wyo. Stat. § 6-10-301.

**IT IS FINALLY HEREBY ORDERED** Respondent shall have a continuing duty to notify this Court concerning proceedings in the Seventh Judicial District Court with respect to Petitioner.

Dated this 20th day of November, 2014.

_____
ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE